## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:                                    :
                                          :    **Chapter 11**
**ONCO INVESTMENT COMPANY,**              :
**a Delaware corporation, et al.,**       :    **Jointly Administered**
                                          :    **Case No. 04-_____ (___)**
                            **Debtors.**  :

### AFFIDAVIT OF ROCHELLE F. WALK IN SUPPORT OF
### CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

STATE OF DELAWARE          )
                           )    SS:
COUNTY OF NEW CASTLE       )

Rochelle F. Walk, being duly sworn, deposes and states:

1      I am the Vice President and Secretary of ONCO Investment Company ("ONCO"), a corporation organized under the laws of the state of Delaware, and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") I also hold officer positions with each of the other Debtors  Debtor Oglebay Norton Company, an Ohio corporation ("Oglebay"), is the direct parent of ONCO and the direct or indirect parent of each of the other Debtors  As described below, the Debtors are one of the largest producers of limestone, lime, industrial sands and muscovite mica in the United States  I am familiar with the Debtors' day-to-day operations, business affairs and books and records

2      On February 23, 2004 (the "Petition Date"), each of the Debtors commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U S C §§ 101-1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware

3     To enable the Debtors to minimize any adverse effects of the commencement of their chapter 11 cases on their businesses, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Pleadings").[1] The First Day Pleadings seek relief, among other things, to: (a) obtain new financing to fund the operation of the Debtors' businesses; (b) preserve customer, vendor and supplier relationships; (c) maintain employee confidence and morale; (d) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; and (e) establish certain other administrative procedures to promote a smooth transition to chapter 11  Building and maintaining the support of the Debtors' customers, employees, vendors, service providers and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be crucial to the Debtors' reorganization efforts

4.     I submit this Affidavit in support of the Debtors' chapter 11 filings and certain First Day Pleadings[2] Any capitalized terms not expressly defined herein have the meanings given to them in the applicable First Day Pleading  Except as otherwise indicated, all statements in this Affidavit are based on my personal knowledge, my discussions with responsible management and other employees, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations

---

[1]    Although the Debtors intend to file each of the First Day Pleadings upon commencing their cases, the Debtors anticipate that the Court will not consider certain First Day Pleadings until the expiration of an appropriate notice period.

[2]    A separate affidavit has been submitted in support of the Debtors' motion for interim and final approval of their proposed debtor in possession financing facility and related relief (the "DIP Financing Motion")

and financial condition  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion  I am authorized to submit this Affidavit on behalf of the Debtors  Part I of this Affidavit describes the Debtors' businesses, capital structure and the circumstances giving rise to the commencement of these chapter 11 cases  Part II of this Affidavit sets forth relevant facts in support of certain First Day Pleadings

## I.    **BACKGROUND**

### A.    **The Debtors' Businesses**

5        Created as an iron ore agency business in 1854, the Debtors' predecessors undertook the management and operation of certain iron ore properties on the Mesabi Range in Minnesota in 1890  The Debtors subsequently entered into (a) Great Lakes shipping, coal mining and manufacturing industries in the 1920's; (b) the ownership of docks and terminals in the 1930's; (c) rail-to-barge coal transfer in the 1950's, and (d) industrial minerals mining in the 1960's

6        Today, the Debtors mine, process, transport and market industrial minerals and aggregates that are used in building, energy, environmental and industrial applications  In addition, the Debtors own (a) strategically located, proven long-life reserves of high-quality limestone, industrial sand and mica and (b) related mineral extraction equipment, processing plants and transportation equipment, including trucks, railway lines and equipment, marine vessels and docks  The Debtors maintain operations in 13 states and are (a) one of the five largest producers of lime, (b) one of the ten largest producers of limestone, (c) the fourth largest producer of industrial sands and (d) the largest producer of muscovite mica in the United States

7        For their fiscal year ended December 31, 2003, the Debtors generated consolidated sales of approximately $404 million  As of December 31, 2003, the Debtors had

approximately $650 million in assets and approximately $561 million in liabilities on a

consolidated basis  The Debtors' workforce currently consists of approximately 1,770 full-time

and part-time employees, approximately one-third of which are covered by collective bargaining

agreements

**B.**     **Corporate Reorganizations**

8     On March 5, 1999, Oglebay Norton Company n/k/a Debtor ON Marine

Services Company ("ON Marine" or "Old Oglebay") was reorganized as a second-tier wholly-

owned subsidiary of Oglebay Norton Holding Company n/k/a Oglebay, pursuant to Section

251(g) of the Delaware General Corporation Law (the "Reorganization")  The Reorganization

was effected pursuant to the Agreement and Plan of Merger, dated March 3, 1999, by and among

Old Oglebay, Oglebay Norton Holding Company n/k/a Oglebay, ONCO and Oglebay Norton

Merger Company (the "Merger Agreement"), as follows:

- To initiate the Reorganization, three new Delaware corporations were created.  (i) Oglebay Norton Holding Company n/k/a Oglebay, with Old Oglebay as its sole shareholder; (ii) ONCO, with Oglebay Norton Holding Company n/k/a Oglebay as its sole shareholder; and (iii) Oglebay Norton Merger Company, with ONCO Investment Company, an Ohio corporation ("ONCO Ohio"), as its sole shareholder

- On March 3, 1999, Oglebay Norton Holding Company, an Ohio corporation , and ONCO Ohio merged into ONCO, with ONCO being the surviving corporation and the parent of Oglebay Norton Merger Company (as well as the other subsidiaries previously owned by ONCO Ohio)

- On March 5, 1999, (i) Oglebay Norton Merger Company merged into Old Oglebay (the "Merger") and the survivor, Old Oglebay, was renamed ON Marine Services Company, (ii) ONCO exchanged its Oglebay Norton Merger Company stock for stock in ON Marine, thereby making ON Marine a subsidiary of ONCO; (iii) the publicly held stock in Old Oglebay was exchanged for stock in Oglebay Norton Holding Company, thereby making Oglebay Norton Holding Company the publicly owned parent company; (iv) all of ON Marine's stock in Oglebay Norton Holding Company was cancelled, and (v) the name of Oglebay Norton Holding Company, a Delaware corporation, was changed to Oglebay Norton Company

9       As noted above, as a result of the Merger, stockholders of ON Marine became stockholders of Oglebay, receiving one share of common stock of Oglebay in exchange for each share of common stock of ON Marine held at the effective time of the Merger  The directors and officers of ON Marine became the directors and officers of Oglebay at the effective time of the Merger  In 2001, Oglebay, by way of merger with ON Minerals Company, Inc , an Ohio corporation, reincorporated as an Ohio corporation

C.    **Operating Segments**

10      To maximize their production, distribution and marketing capabilities, the Debtors have aligned their businesses into the following three segments (collectively, the "Operating Segments") that share business strategies and are related by geography and product mix.  (a) Great Lakes Minerals, (b) Global Stone and (c) Performance Minerals  The Operating Segments are described further below

*Great Lakes Minerals Segment*

11.     Great Lakes Minerals is the largest and only fully integrated producer and bulk transporter of limestone on the Great Lakes  Great Lakes Minerals (a) mines limestone at three quarries located in northern Michigan, which collectively comprise one of the largest reserves of metallurgical and chemical quality high-calcium carbonate and dolomitic limestone in the world; (b) processes mined limestone into crushed limestone; (c) dredges and markets construction sands; and (d) markets and distributes crushed limestone to customers throughout the Great Lakes region for use primarily (i) as construction aggregates and building materials, (ii) in chemical and metallurgical processes, (iii) in cement and lime manufacturing, and (iv) for agricultural purposes

12      Great Lakes Minerals also (a) operates one of the largest fleets of self-unloading vessels on the Great Lakes, comprised of 11 owned vessels and one leased vessel

(collectively, the "Fleet"), providing transportation services primarily for limestone, coal and iron ore, and (b) owns numerous docks, including bulk material dock facilities in Cleveland, Ohio and Erie, Pennsylvania  In early 2002, Oglebay entered into a multi-year pooling agreement (the "Pooling Agreement") with American Steamship Company, which operates a fleet of 11 modern, self-unloading Great Lakes vessels comparable in size to the Fleet  The Pooling Agreement (a) combines the operations and customers of the two fleets to achieve more efficient overall operations and better customer service and (b) affords the Debtors improved trade patterns for all cargo, including limestone, which has resulted in more efficient deployment of the Fleet, reduced delays across the combined fleet and better service to customers of both companies

13     Great Lakes Minerals' primary customers include (a) purchasers and producers of construction aggregates and chemical limestone, (b) integrated steel manufacturers and (c) electric utility companies

### Global Stone

14     Global Stone (a) mines and processes high-purity limestone at seven locations in the United States and (b) supplies crushed and ground limestone, construction aggregates, chemical limestone and lime to a broad customer base located primarily in the Mid-Atlantic and Southeastern United States

15     Ground limestone is used in flue gas desulfurization and a wide variety of manufacturing processes, including vinyl flooring, carpet backing, adhesives, sealants and jointing compounds for wallboard  Ground limestone is an extremely fine form of chemical limestone that is used in the manufacturing of products as diverse as poultry feed mixtures, fiberglass and roofing shingles   Lime is derived by heating chemical limestone to extreme temperatures in kilns and is widely used in a variety of industries, including iron and steel, pulp

and paper, chemical, air purification, sewage, water and waste treatment, agriculture and construction

### *Performance Minerals*

16    Performance Minerals mines and processes high-purity silica sands and muscovite mica at seven facilities in the Southwestern United States, two facilities in Ohio and one facility in North Carolina

17.    The Performance Minerals segment produces (a) fracturing sands, which are used by natural gas and oil-well service and exploration companies in the natural gas and oil-well fracturing process to hold rock structures open; (b) whole grain sands which are used in glass-making; (c) filtration sands, which are used in liquid filtration systems, (d) recreational sands, which are used in the construction of golf courses and other recreation fields as well as in general landscaping applications, (e) specialty construction/industrial sands, which are used in the construction industry, (f) coated sand, which is used as an industrial abrasive; (g) silica flour, which is used in glass-making and the manufacture of building materials such as roofing shingles, stucco, mortar and grout and in fiberglass and ceramics, and (h) mica products, which are used as a functional filler in building materials, automotive sound deadening materials, joint compounds, thermoplastics and cosmetics

### D.    Events Preceding the Debtors' Chapter 11 Filings

### *Acquisitions*

18    Beginning in the late 1990's, the Debtors engaged in the following transactions to capitalize on the Debtors' core competencies in the industrial minerals industry and expand the Debtors' scope of operations to include the mining and processing of limestone and the production of lime

### *1998*

19      In the first quarter of 1998, the Debtors acquired all of the outstanding common shares of Colorado Silica Sands, Inc , a producer of industrial sands, for $6,127,000 in cash and a $1,067,000 note, payable over three years

20      In the second quarter of 1998, the Debtors acquired (a) the assets of a limestone operation in Port Inland, Michigan, which included inventory, land, mineral reserves, equipment and other property used in mining, processing, marketing and distributing limestone, chemical limestone and construction aggregates, for $35,200,000 in cash; and (b) all of the outstanding common stock of Global Stone Corporation, a publicly traded Canadian company engaged in the mining, production and marketing of lime, chemical limestone and construction aggregates, for $173,600,000 in cash and $54,000,000 in assumed debt (the "Global Stone Acquisition")  In the third quarter of 1999, the Debtors sold all of the stock of two companies acquired in the Global Stone Acquisition, Global Stone Detroit Lime Company and Global Stone Ingersoll Ltd , to affiliates of Carfin, S A , a Belgian corporation and a member of the Carmeuse Group, for $60,950,00 in cash   The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Revolving Credit Facility, as such term is defined below

21      In the third quarter of 1998, the Debtors acquired the assets of Filler Products, Inc , a privately owned producer of chemical limestone, located in Chatsworth, Georgia, for $24,000,000 in cash

### *1999*

22      In the first quarter of 1999, the Debtors acquired a high purity limestone quarry, lime production facility and related assets from the W S  Frey Company for  (a) $12,008,000 in cash, (b) shares of Oglebay's common stock, issued from treasury and having a guaranteed value of $1,500,000, and (c) non-competition and royalty payments of $3,500,000

23      In the fourth quarter of 1999, the Debtors acquired mica mining reserves, production facilities, equipment and other assets, located in North Carolina and New Mexico, from Franklin Industries for $32,000,000 in cash

### 2000

24      In the second quarter of 2000, the Debtors acquired all of the partnership interests in Michigan Limestone Operations Limited Partnership, a producer of high calcium and dolomitic limestone, for (a) $53,000,000 in cash; (b) $8,247,000 in assumed debt, and (c) certain contingent payments payable over ten years

25      In the third quarter of 2000, the Debtors acquired a limestone processing facility and related assets from J M Huber Corporation for $12,512,000 in cash

### 2003

26      In January of 2003, the Debtors acquired all of the outstanding common shares and other ownership interests in the Erie Sand and Gravel Company, Inc and certain affiliates and distributors of construction sand and aggregates in Northwestern Pennsylvania/Western New York, for approximately $6,800,000 in cash and approximately $4,000,000 in assumed debt

**Recent Material Divestitures**

### Sale of Lawn and Garden Unit

27      On October 27, 2003, as part of their ongoing business restructuring, the Debtors sold the Lawn and Garden ("Lawn and Garden") unit of Global Stone to Oldcastle Retail, Inc ("Oldcastle") for $10,000,000 (the "Purchase Price"), subject to a final net working capital adjustment within 90 days of the closing date  $6,871,000 of the Purchase Price was paid in cash at closing  $500,000, constituting the remaining amount of the Purchase Price after the final net working capital adjustment, remains in escrow pending the payment of certain

receivables of Lawn and Garden. In conjunction with the sale of Lawn and Garden, the Debtors entered into (a) a long-term supply agreement with Oldcastle for the provision of certain raw materials, and (b) a lease and operation of equipment agreement with Oldcastle, under which certain areas of the Debtors' York, Pennsylvania plant previously used by Lawn and Garden are being leased to Oldcastle through December 31, 2005  The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Revolving Credit Facility

### Sale of Ready-Mix Concrete Business

28     On January 21, 2004, as part of their ongoing business restructuring, Oglebay sold its equity interests in S&J Trucking, Inc. and Serv-All Concrete, Inc , which owned the Debtors' ready-mix concrete business (the "Redi-Mix Business"), to EE Austin and Son, Inc ("EE Austin") for $1,250,000  In conjunction with the sale of the Redi-Mix business, the Debtors entered into (a) a fifteen-year supply agreement (the "Supply Agreement") with EE Austin for the provision of certain raw materials and (b) a sublease agreement with EE Austin, under which certain areas of the Debtors' Erie, Pennsylvania facility are subleased to EE Austin for the term of the Supply Agreement. The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Revolving Credit Facility.

### Sale of Marine Vessel Richard Reiss

29.     On January 30, 2004, as part of their ongoing business restructuring, the Debtors sold the marine vessel Richard Reiss to Grand River Navigation Company, Inc  for $1,800,000  The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Revolving Credit Facility

### Current Capital Structure

30     The Debtors incurred significant debt in connection with the acquisitions described above, which resulted in a highly leveraged balance sheet  The facilities and

instruments evidencing this debt and the other primary elements of the Debtors' capital structure are described below.

31.    ***Prepetition Term Loan Facility.***  Pursuant to the Loan Agreement, dated as of April 3, 2000 (as otherwise amended from time to time and collectively with related agreements, the "Prepetition Term Loan Agreement"), by and among Oglebay, as borrower, the guarantors named therein, and a group of lenders (collectively, the "Bank Group") formerly led by KeyBank National Association ("KeyBank"), as administrative agent, Oglebay obtained a senior secured term loan in the principal amount of $118 million (the "Prepetition Term Loan Facility")  The Prepetition Term Loan Facility matures on October 31, 2004

32.    The Prepetition Term Loan Facility is guaranteed by each of the Debtors other than Oglebay and is secured by a first priority lien on substantially all of the Debtors' assets  As of February 16, 2004 approximately $113 2 million of indebtedness was outstanding under the Prepetition Term Loan Facility because the Prepetition Term Loan Facility has been subsequently reduced by $4 8 million on account of asset sales

33.    ***Prepetition Revolving Credit Facility.***  Pursuant to a Credit Agreement, dated as of May 15, 1998, as amended and restated as of April 3, 2000 (as otherwise amended from time to time and collectively with related agreements, the "Prepetition Revolving Credit Agreement"), by and among Oglebay, as borrower, the guarantors named therein, the Bank Group formerly led by KeyBank, as administrative agent, Oglebay obtained a senior secured revolving credit facility (the "Prepetition Revolving Credit Facility" and, collectively with the Prepetition Term Loan Facility, the "Prepetition Credit Facility")[3]  The Prepetition Revolving

---

[3]    On January 29, 2004, KeyBank resigned as agent for the Prepetition Credit Facility, effective March 1, 2004, or earlier if a new agent bank has been selected  General Electric Capital Corporation ("GECC") will be the new agent bank for the Prepetition Credit Facility, and KeyBank is transitioning its duties as agent to GECC

Credit Facility is comprised of a $147 million senior secured revolving credit facility (with a

$15 million sub-limit for letters of credit)  The Prepetition Revolving Credit Facility matures on

October 31, 2004

34      The Prepetition Revolving Credit Facility is guaranteed by each of the

Debtors other than Oglebay and is secured by a first priority lien on substantially all of the

Debtors' assets equal in priority to the liens securing the Prepetition Term Loan Facility  As of

February 16, 2004 approximately $119 6 million of indebtedness was outstanding under the

Prepetition Revolving Credit Facility (excluding outstanding letters of credit in the amount of

$9 3 million)  As of February 16, 2004, Oglebay had $18 1 million in remaining borrowing

availability under the Prepetition Revolving Credit Facility, of which $1 6 million was accessible

by the Debtors

35      *Senior Secured Notes.* Pursuant to the Senior Secured Note Purchase

Agreement, dated as of October 25, 2002 (as otherwise amended from time to time and

collectively with related agreements, the "Senior Secured Notes Agreement"), by and among

Oglebay, as borrower, a group of purchasers led by the 1818 Mezzanine Fund II, LP

(collectively, the "Senior Secured Noteholders"), Oglebay sold $75 million principal amount of

18% senior secured notes due on October 25, 2008 (collectively, the "Senior Secured Notes") [4]

The Senior Secured Notes are guaranteed by each of the Debtors other than Oglebay and are

secured by a first priority lien on substantially all of the Debtors' assets junior only to the liens

---

[4]     The current interest rate on the Senior Secured Notes is 19% per year, comprised of
        (a) 13% interest payable in cash on a quarterly basis and (b) 6% interest (the "PIK
        Interest") (i) payable, at Oglebay's option, in cash on a quarterly basis or (ii) added
        quarterly to the unpaid principal amount of the Senior Secured Notes  50% of the unpaid
        principal amount of the Senior Secured Notes is due on October 25, 2007, and the
        remaining 50% is due on October 25, 2008  Prior to the Amendments, as defined below,
        the PIK Interest on the Senior Secured Notes had been 5%

securing the Prepetition Credit Facility  As of the Petition Date, $75 million, plus accrued interest and fees (estimated to be $5 million as of December 31, 2003), was outstanding under the Senior Secured Notes

36    *Vessel Term Loan Agreement.* Pursuant to the Credit Agreement, dated as of July 14, 1997 (as otherwise amended from time to time, the "Vessel Term Loan Agreement"), by and among ON Marine, Debtor Oglebay Norton Marine Services, L L C and National City Bank, the Debtors obtained a $17 million term loan (the "Vessel Term Loan"), which was used to purchase the following marine vessels (collectively, the "Vessels")  (a) the Wolverine and (b) the David Z  Norton  The Vessel Term Loan is secured by a purchase money security interest in the Vessels and matures on July 15, 2007  As of the Petition Date, $13 4 million, plus accrued interest and fees, was outstanding under the Vessel Term Loan Agreement

37    *IRB Agreement.* Pursuant to the New Mexico Floating Rate Demand Industrial Revenue Bond (Franklin Industries, Inc  Project), Series 1990 issued pursuant to the Trust Indenture, dated as of September 1, 1990 (the "IRB Bonds"), between a predecessor of Debtor Oglebay Norton Specialty Minerals, Inc  ("Oglebay Minerals") and the County of Rio Arriba, New Mexico (the "IRB Agreement"), Oglebay Minerals issued IRB Bonds in the principal amount of $5 million  As of the Petition Date, approximately $1 3 million remains outstanding under the IRB Agreement  The IRB Bonds are secured by the equipment located at the plant owned by Oglebay Minerals in Velarde, New Mexico

38    *Senior Subordinated Notes.* Pursuant to an Indenture, dated as of February 1, 1999 (as otherwise amended from time to time, the "Senior Subordinated Notes Indenture"), between Oglebay, as issuer, and Norwest Bank Minnesota, National Association, n/k/a Wells Fargo Bank MN, National Association, as indenture trustee, Oglebay issued

$100 million principal amount of 10% senior subordinated unsecured notes due on February 1, 2009 (collectively, the "Senior Subordinated Notes")  As of the Petition Date, $100 million, plus accrued interest and fees, was outstanding under the Senior Subordinated Notes

39.    The Senior Subordinated Notes are unsecured debt obligations of Oglebay, subordinate in right of payment to the indebtedness under the Prepetition Credit Facility, the Senior Secured Notes and the Vessel Term Loan Agreement  Oglebay's obligations under the Senior Subordinated Notes are guaranteed by certain of the other Debtors

40.    *Other Unsecured Debt.*  In addition to the debt obligations described above, the Debtors are also obligated to certain other unsecured creditors, including employees and retirees, vendors, contract parties and the like (collectively, the "Unsecured Claims")  Certain of the Debtors are also defendants in product liability litigation, including asbestos and silica related litigation (the "Product Claims")  Finally, the Debtors are obligated to the holders of certain claims arising from the Debtors' prepetition purchases of certain businesses (among others, the "MLO Claims")  As indicated below, the Debtors currently contemplate that the terms of their plan of reorganization, when filed, will not impair the Unsecured Claims and the Product Claims

### Factors Leading to Chapter 11 Filings

41    *Substantial Indebtedness*  As of the Petition Date, the Debtors had approximately $430 million in outstanding funded debt, as described above  The Senior Subordinated Notes and the Senior Secured Notes, which have interest rates of 10 0% and 19 0% respectively, are subordinate in right of payment to the indebtedness under the Prepetition Credit Facility, the majority of which, at December 31, 2003, was at a 7% variable interest rate  The significant debt load has been aggravated by continuing net losses, which have caused the

Debtors to be net borrowers during 2001-2003, when they utilized available funds under the Prepetition Revolving Credit Facility to fund working capital.

42.     ***Economy and Market Conditions.***  Although there is limited competition in the markets in which the Debtors do business, primarily due to the transportation costs associated with the Debtors' products, the Debtors have been significantly affected by various economic factors over the last three years  In particular, the general economic slowdown in the United States, and specifically in the integrated steel industry, over the past few years resulted in net operating losses of $18 8 million in 2001, $6 6 million in 2002 and $32 1 million in 2003 Notwithstanding the foregoing, the Debtors' net sales and operating revenues in 2003 were approximately $3 7 million higher than in 2002  This gain was offset, however, by charges relating to restructuring, asset impairments and early retirements

### *Restructuring Efforts*

43     In an effort to remedy their heavily burdened balance sheet and return to profitability, the Debtors began implementing a restructuring initiative in 2001 that focused on the transition of their businesses from a decentralized organization into an integrated business model that capitalizes on core strengths in the industrial mineral business  In particular, since 2001, the Debtors have, among other things, (a) closed two subsidiary office headquarters; (b) closed three underperforming mineral processing operations, (c) reduced salaried level employees by 8%, resulting in a flattened and more responsive management structure, (d) reduced administrative overhead by consolidating certain administrative functions of each of the Operating Segments under centralized control, and (e) divested their businesses of certain underperforming assets

44     In connection with the Debtors' restructuring efforts discussed above, the Debtors also experienced a number of changes in senior management in the approximately two

years preceding the Petition Date  In particular, (a) Michael D  Lundin was appointed (i) as Oglebay's President and Chief Operating Officer on November 2, 2001, (ii) to Oglebay's Board of Directors on December 13, 2001 and (iii) as Oglebay's Chief Executive Officer on December 4, 2002; (b) Julie A  Boland was appointed as Oglebay's Vice President, Chief Financial Officer and Treasurer, effective January 1, 2002, (c) Sylvie A  Bon was appointed as Oglebay's Vice President and Chief Information Officer, effective May 1, 2002; and (d) Michael J  Minkel was appointed as Oglebay's Vice President-Sales and Marketing on November 4, 2002

### Prepetition Restructuring Negotiations

45  ***Initiation of Restructuring Negotiations.***  At times during the second and third quarters of 2003, the Debtors were not in compliance with various financial-based covenants under the Prepetition Credit Facility, Senior Secured Notes Agreement and Vessel Term Loan Agreement  In June 2003, the Debtors obtained waivers (collectively, the "Waivers") of these covenants from the Bank Group and the Senior Subordinated Noteholders until August 15, 2003, while the Debtors continued to negotiate long term amendments to the Prepetition Credit Facility and the Senior Secured Notes Agreement (collectively, the "Prepetition Secured Credit Agreements") that would, among other things, modify certain financial covenants in the Prepetition Secured Credit Agreements to levels that would be achievable by the Debtors in the current economic environment

46  ***Senior Subordinated Notes' August 2003 Interest Payment.***  On August 1, 2003, the Debtors announced that, although they had sufficient liquidity, they would not make the August 1, 2003 interest payment (the "August Interest Payment") due on account of the Senior Subordinated Notes until such time, if any, that satisfactory amendments could be obtained to the Prepetition Secured Credit Agreements  As a result of the deferral of the August Interest Payment, the Debtors' ability to draw on the Prepetition Revolving Credit Facility was at

the discretion of the Bank Group  On August 15, 2003, no amendments to the Prepetition

Secured Credit Agreements had been completed, and the Waivers expired  On August 31, 2003,

the 30-day grace period to make the August Interest Payment expired, and the Debtors were in

default under the Senior Subordinated Notes Indenture

47    ***Amendments to Prepetition Secured Credit Agreements.***  On

September 11, 2003, the Debtors entered into agreements (collectively, the "Amendments") with

the Bank Group and the Senior Secured Noteholders to amend the Prepetition Secured Credit

Agreements and, thereby, provide the Debtors with relief on certain restrictive covenants  The

Amendments also restored the Debtors' ability to draw on the Prepetition Revolving Credit

Facility to fund operations and make the August Interest Payment (which was paid on September

29, 2003)  Among other things, the Amendments (a) required the Debtors to pay down the

Prepetition Credit Facility by $100 million (the "$100 Million Payment") from permitted asset

sales, on or before February 25, 2004, (b) increased certain interest rates on the Prepetition

Secured Credit Agreements, and (c) established a dominion of funds arrangement for the

reduction of the Prepetition Revolving Credit Facility

48    ***Potential Asset Sales.***  Both prior to and subsequent to the Amendments,

the Debtors, with the assistance of Harris Williams & Company ("Harris Williams"), with

respect to the Debtors' lime business (the "Lime Business"), and Cobblestone Advisors, a

division of Harris Williams, with respect to the Debtors' mica mining and processing business

(the "Mica Business"), diligently marketed the Lime Business and the Mica Business to permit

the Debtors to make the $100 Million Payment  Although the Debtors received several offers to

purchase the Lime Business, the Debtors chose, in February 2004, to abandon their efforts to sell

the Lime Business at this time because the majority of proposals from potential equity investors

and lenders contemplated the retention of the Lime Business  The Debtors also received several

offers to purchase the Mica Business during the marketing period and, on December 29, 2003, signed a letter of intent to sell the Mica Business to Zemex Corporation ("Zemex"), for $11,000,000 in cash, subject to a net working capital adjustment  The Debtors were not, however, able to close this sale prior to the Petition Date and, accordingly, anticipate filing a motion with the Court in the near term seeking approval of the sale of the Mica Business to Zemex

49.    ***Retention of Lazard Frères & Co. LLC.***  Subsequent to the execution of the Amendments, the Debtors retained Lazard Frères & Co  LLC ("Lazard") as financial advisors and investment bankers  Since Lazard's engagement, the Debtors and Lazard have conducted a comprehensive review and analysis of various financial restructuring alternatives available to the Debtors, which included the sale of the Lime Business, refinancing the Prepetition Credit Facility, raising new equity, the conversion of other existing funded debt to equity and combinations of all of the foregoing

50.    ***Restructuring Discussions.***  In an effort to restructure the Debtors' funded debt, the Debtors, with the assistance of Lazard, (a) solicited interest from (i) 12 potential equity investors (collectively, the "Potential Equity Investors") with experience in investing in financially troubled companies, four of which submitted proposals to the Debtors, and (ii) 41 alternative financing sources (collectively, the "Potential Lenders") regarding the refinancing of all, or a portion of, the Prepetition Credit Facility, of which 22 expressed interest in a transaction with the Debtors and six submitted proposals; and (b) entered into lengthy discussions with an *ad hoc* committee of the majority of holders of the Senior Subordinated Notes (the "*Ad Hoc* Committee") and with certain holders of the Senior Secured Notes regarding the restructuring of such debt obligations

51      In spite of these efforts, by February 2004, the Debtors determined that due to, among other things, declining liquidity and impending defaults under the Senior Subordinated Notes Indenture (due to the Debtors' inability to pay the February interest payment owing under the Senior Subordinated Notes Indenture) and the Prepetition Secured Credit Agreements (due to the Debtors' inability to make the $100 million payment), it was necessary to complete their restructuring efforts under the protection of the Bankruptcy Code. Accordingly, the Debtors commenced these chapter 11 cases to (a) permit the final development and implementation of a restructuring plan and (b) preserve the value of their businesses for the benefit of all stakeholders

52      Prior to commencing their chapter 11 cases, the Debtors reached an agreement in principle with the Ad Hoc Committee that contemplates an exchange of the Senior Subordinated Notes for equity in the reorganized Debtors and includes an investment by certain holders of the Senior Subordinated Notes and new equity investors  Further, the Debtors have made substantial progress toward obtaining a new credit facility that would retire the Prepetition Credit Facility  As a result, the Debtors believe that they will be able to pursue an expedited process for filing a plan of reorganization and emerging rapidly from chapter 11

53      An important element of the Debtors' contemplated "prearranged" plan of reorganization is that they expected to leave unimpaired the holders of all claims other than the claims of the holders of the Senior Subordinated Notes  The Senior Secured Notes will be paid at par  At this time, decisions regarding the treatment of the MLO Claims are pending  Specifically, based on their agreement in principle with the Ad Hoc Committee and their progress toward obtaining a new credit facility, the Debtors currently contemplate that all secured obligations of the Debtors will be satisfied, that the Senior Subordinated Notes will be

exchanged for equity in the reorganized Debtors and that the Unsecured Claims and the Product Claims will "pass through" these chapter 11 cases unimpaired

## II.    FIRST DAY PLEADINGS

54      Concurrently with the filing of their chapter 11 cases, the Debtors filed a number of First Day Pleadings  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing"), at which the Court will hear certain First Day Pleadings  The Debtors also anticipate that the Court will consider the remainder of the First Day Pleadings at a later time  Those First Day Pleadings that the Debtors anticipate will be heard at the First Day Hearing (other than the DIP Financing Motion) are described below

55      Generally, the First Day Pleadings have been designed to meet the goals of (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and support of customers, employees, critical vendors and service providers and certain other key constituencies, (c) obtaining necessary postpetition financing, and (d) establishing procedures for the smooth and efficient administration of these chapter 11 cases  I have reviewed each of the First Day Pleadings, including the exhibits thereto and supporting memoranda, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization

### A.    The Case Administration Motions

#### Joint Administration

56      The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their chapter 11 cases  Such an order is a necessary administrative convenience for the Court, the Office of the

Clerk of the Court (the "Clerk's Office") and all parties in interest. I believe that the joint administration of the Debtors' respective estates is warranted, will ease the administrative burden for the Court and the parties and will protect creditors of the different estates against potential conflicts of interest.

### *Extension of Time to File Schedules and Statements*

57. Because of (a) the substantial size and scope of the Debtors' businesses, (b) the complexity of their financial affairs, (c) the limited staffing available to perform the required internal review of their accounts and affairs and (d) the press of business incident to the commencement of these chapter 11 cases, the Debtors were unable to assemble, prior to the Petition Date, all of the information necessary to complete and file the required schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases and a statement of financial affairs (collectively, the "Schedules and Statements"). Accordingly, the Debtors will seek the entry of an order extending by an additional 30 days, for a total of 60 days, until April 23, 2004, the date by which the Schedules and Statements must be filed pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure and Rule 1007-1(d) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules")

### *Filing Consolidated Lists of Creditors, Equity Holders & Top 50 Unsecured Creditors*

58. Given the size of the Debtors' chapter 11 cases, the Debtors also will move for entry of an order authorizing them to file the lists identifying their respective creditors on a consolidated basis and their respective equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' businesses. After consultation with The Trumbull Group, L L C , the Debtors' proposed claims and noticing agent in these chapter 11 cases, the Debtors believe that filing these lists in the format or formats currently maintained in

-21-

the ordinary course of business will be sufficient to permit The Trumbull Group, L L C  to notice promptly all applicable parties as required by Local Rule 1007-1(a)

59      By the same motion, the Debtors will request authority to file a single consolidated list of the Debtors' 50 largest unsecured creditors in these chapter 11 cases in lieu of filing separate lists of the largest 20 unsecured creditors for each of the Debtors  The Debtors believe that such authority will (a) facilitate the United States trustee's review of creditors' claims and its appointment of a creditors' committee, and (b) promote the efficient and orderly administration of these chapter 11 cases

### *Adequate Assurance of Payment of Utilities*

60      The Debtors currently utilize gas, water, electric, telephone, coal, fuel oil and other utility services provided by approximately 150 utility companies (collectively, the "Utility Companies")  Because the Utility Companies provide essential services to the Debtors' mining, processing, distribution and other facilities, any interruption in utility services could prove devastating  In fact, the temporary or permanent discontinuation of utility services at any of the Debtors' facilities could irreparably disrupt the Debtors' business operations and, as a result, fundamentally undermine the Debtors' reorganization efforts  Accordingly, the Debtors will seek the entry of an order (a) determining that the Debtors' history of prompt and full payment to the Utility Companies, their demonstrable ability to pay future utility bills, the administrative priority status afforded the Utility Companies' postpetition claims and any existing cash security deposits (and other forms of security) held by certain Utility Companies together constitute adequate assurance of payment for future utility services pursuant to section 366(b) of the Bankruptcy Code; and (b) establishing procedures by which the Utility Companies may seek additional adequate assurance of payment for future utility services

### *Confirmation of Administrative Expense Priority*

61    In the ordinary course of the Debtors' businesses, suppliers and service providers (collectively, the "Suppliers") provide the Debtors with goods and services that are integral to the Debtors' ongoing business operations  In addition, as of the Petition Date, the Debtors had outstanding prepetition purchase orders that span a pre- and postpetition time period (collectively, the "Outstanding Orders") with numerous Suppliers, including Outstanding Orders for a variety of supplies and services that the Debtors require to produce goods for their customers and maintain current production schedules  Due to the filing of the Debtors' chapter 11 cases, the Debtors believe that certain relief is needed to give comfort to the Suppliers and thereby permit the Debtors to (a) obtain timely delivery of goods, and (b) assure the uninterrupted provision of services from the Suppliers, including goods and services represented by Outstanding Orders, on a postpetition basis  Accordingly, the Debtors will seek the entry of an order confirming that the Debtors' undisputed obligations to Suppliers arising from the postpetition (a) shipment of goods delivered to and accepted by the Debtors and (b) provision of services to the Debtors at their request, including any goods and services provided to the Debtors pursuant to the Outstanding Orders, are entitled to administrative expense priority, pursuant to section 503(b)(1)(A) of the Bankruptcy Code

### *Appointment of Claims and Noticing Agent*

62    The Debtors recognize that the large number of creditors and other parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens upon the Court and the Clerk's Office  To relieve the Court and the Clerk's Office of these burdens, the Debtors will seek the entry of an order appointing The Trumbull Group, L L C  ("Trumbull") as the Debtors' claims and noticing agent in these chapter 11 cases to, among other things, (a) prepare and serve all notices required in the Debtors' chapter 11 cases,

including notice of the commencement of these chapter 11 cases and the initial meeting of creditors under section 341 of the Bankruptcy Code; (b) maintain the official claims register, (c) assist the Debtors with the reconciliation and resolution of claims, and (d) mail and tabulate ballots in connection with any vote to accept or reject a plan or plans of reorganization proposed in these chapter 11 cases   The Debtors selected Trumbull based on (a) its experience as a claims and noticing agent in this Court; and (b) its reputation as a provider of quality services

## B.    The Employee Motions

### Employee Wages and Benefits

63    The Debtors' workforce includes approximately 1,770 full-time and part-time hourly and salaried employees, including approximately 865 union employees, in the United States (collectively, the "Employees")   In addition to their regular workforce, the Debtors employ approximately 88 independent contractors to perform essential employee functions on a cost-effective basis (collectively, the "Independent Contractors")   Any delay or disruption in the provision of employee benefits or the payment of compensation (including the payment of prepetition compensation, prepetition business expenses, prepetition benefits and withholdings and payment of amounts on account of employee payroll deductions (collectively, the "Prepetition Employment Payments")) will destroy the Debtors' relationships with the Employees and the Independent Contractors and irreparably impair workforce morale at the very time when the dedication, confidence and cooperation of the Employees and the Independent Contractors are most critical   At this critical early stage, the Debtors simply cannot risk the substantial disruption of business operations that would inevitably result from any decline in workforce morale attributable to the Debtors' failure to make Prepetition Employment Payments in the ordinary course of their businesses

64.    Accordingly, the Debtors will seek the entry of an order authorizing the Debtors, in accordance with their stated policies (as such policies may be modified from time to time) and in the Debtors' sole discretion, to, among other things, pay (a) Prepetition Employment Payments that accrued but remained unpaid as of the Petition Date to or for the benefit of their Employees and Independent Contractors and (b) costs and expenses incident to the Prepetition Employment Payments

### Workers' Compensation Programs

65.    The Debtors have Employees in 13 states. In accordance with applicable state law, the Debtors maintain workers' compensation insurance in each of the states in which they have either current or former Employees   The failure of the Debtors to maintain their current workers' compensation coverage (a) would require the Debtors to make alternative arrangements for workers' compensation coverage, almost certainly at a much higher cost, (b) might expose the Debtors' officers to civil and, perhaps, criminal liability, (c) could endanger the Debtors' ability to continue to operate in certain states, and (d) might expose the Debtors to employee lawsuits for potentially unlimited damages   The Debtors also maintain insurance ("Jones Act Insurance"), similar to workers' compensation insurance, for claims made under the Jones Act, 46 U S C  § 688 (2003) by employees of the Fleet, who are not covered by state workers' compensation statutes   In the absence of Jones Act Insurance, the Debtors could not continue to operate the Fleet due to the potentially enormous liability associated with such operations  Accordingly, the Debtors will seek an order of the Court authorizing them to continue their workers' compensation insurance programs in all applicable states and Jones Act Insurance  In connection therewith, the Debtors also will request that the order authorize them to pay, in their sole discretion, prepetition premiums, claims and certain other processing costs

arising under, or related to, their workers' compensation insurance programs, including Jones Act

Insurance

### C.    **The Other Prepetition Claim Motions**

#### *Customer Obligations*

66    To support their sales efforts, the Debtors, in the ordinary course of their

businesses, engage in marketing and sales practices to develop and sustain positive reputations

for their products in the marketplace  The Debtors utilize various practices and procedures that

are designed to attract new customers for the Debtors' products and to enhance product loyalty

among the Debtors' existing customer base, including rebates, comprehensive pricing that

includes the cost of shipping goods to the customers, discounts, product returns or exchanges,

refunds, adjustments (including adjustments to billing), and other credits, allowances or outlays

relating to sales (collectively, the "Credits")  From time to time, the Debtors receive deposits or

prepayments from certain customers for goods not yet delivered or provided to such customers in

full or in part (collectively, the "Deposits")

67    The success and viability of the Debtors' businesses are dependent upon

the loyalty and confidence of their customers  The continued support of this constituency is

absolutely essential to the survival of the Debtors' businesses, the preservation of the value of

their estates and the Debtors' ability to reorganize successfully  Any delay in honoring the

Credits or Deposits (collectively, the "Customer Obligations") will severely and irreparably

impair the Debtors' customer relations at a time when the loyalty and support of their customers

are extremely critical  Accordingly, the Debtors will seek the entry of an order authorizing the

Debtors, in their sole discretion, to treat all Customer Obligations, and the goods and services

they represent, in the ordinary course of the Debtors' businesses in the same manner and on the

same terms and conditions as such obligations were treated prior to the Petition Date, including by honoring or paying all Customer Obligations

### Critical Vendors, Service Providers and Lienholders

68    Many of the Debtors' mines and other operations are located in geographically remote locations, and, as a result, certain essential raw materials, machinery parts and other goods and services required to operate the Debtors' mines and other operations and to bring their products to market (collectively, the "Single Source Goods") are available only from a single supplier (collectively, the "Single Source Vendors")  Because the Debtors do not have any viable alternatives to obtain substitute goods or services from other suppliers, the Debtors have determined that they must be able to satisfy the prepetition claims of the Single Source Vendors (collectively, the "Single Source Vendor Claims") to ensure that these essential Single Source Goods will continue to be available to them without interruption.

69.    In many cases, no other manufacturer or supplier can supply the required Single Source Goods in any form  In other cases, substitute goods from other potential suppliers technically are available, but these alternate suppliers cannot provide Single Source Goods that meet the Debtors' requirements for quality, quantity or reliability, or cannot ensure availability on a cost-efficient and timely basis in the appropriate geographic areas, particularly when such goods or services are required in remote locations  As a result, the Debtors cannot rely on these alternate sources to supply Single Source Goods  Under these circumstances, the Debtors believe that it is essential that they be authorized to pay the Single Source Vendor Claims to ensure that the Single Source Goods continue to be supplied without interruption on a postpetition basis

70    Any loss of access to the critical goods and services — even on a temporary basis — provided by the Single Source Vendors would immediately undermine the

Debtors' ability to fill their customer orders on a timely basis, resulting in potentially irreparable damage to customer confidence in the Debtors during this critical early stage of the Debtors' reorganization efforts. If faced with disruptions, many customers simply will seek to fill their orders elsewhere, thereby seriously impairing the Debtors' ability to complete a successful reorganization and preserve values for the benefit of their estates

71      For the foregoing reasons, the Debtors believe that the payment of the prepetition claims of the Single Source Vendor Claims is essential to ensure that the Debtors continue to receive essential goods and services that are unavailable from other sources  By contrast, failure to pay the Single Source Vendor Claims would severely impede the Debtors' ability to (a) obtain such essential goods and services, (b) operate their businesses and (c) effectuate a successful reorganization  Accordingly, the Debtors will seek the entry of an order authorizing the Debtors, in the Debtors' sole discretion, to pay the Critical Vendor Claims

72      In the ordinary course of their businesses, the Debtors. (a) retain general contractors who may then retain subcontractors to undertake certain construction, repair or maintenance projects (collectively, the "Contractors"); and (b) rely on numerous freight carriers and warehousemen (collectively, the "Freight Carriers and Warehousemen") and together with the Contractors and the Single Source Vendors, the "Critical Vendors") to transport or store necessary raw materials and finished products  The Debtors believe that certain of the Contractors and Freight Carriers and Warehousemen may be entitled to possessory, materialmen's or similar liens against the Debtors' products, equipment or property and that such parties may refuse to deliver or release the Debtors' products, equipment or property in their possession before their claims (collectively, the "Lien Claims" and together with the Single Source Vendor Claims, the "Critical Vendor Claims") have been satisfied and their liens redeemed  Since the amount of any of the Lien Claims likely is less than the value of any property securing those

claims, these parties arguably are fully secured creditors and payment of their prepetition claims will give them no more than that to which they would be entitled under any plan or plans of reorganization for the Debtors. In addition, the payment of Lien Claims is necessary to ensure the uninterrupted flow of materials and finished products through the Debtors' integrated manufacturing and distribution systems and, ultimately, to the Debtors' customers. Any delay would substantially disrupt the Debtors' business operations and jeopardize the Debtors' reorganization efforts.

73. As a result of the foregoing, the Debtors will seek entry of an order authorizing them to pay, in the Debtors' sole discretion, the undisputed amounts owed by the Debtors on account of outstanding Lien Claims.

74. In addition, the Debtors propose to require that each recipient of a payment (a "Critical Vendor Payment") on account of a Critical Vendor Claim provide the Debtors with the economic benefit of agreeing to continue to extend normalized trade credit, including the pricing of goods and services, on terms at least as favorable as those extended prepetition, or as are otherwise acceptable to the Debtors (the "Trade Credit"), until the Debtors emerge from chapter 11. If any Critical Vendor accepts a Critical Vendor Payment and fails to provide the Debtors with the requisite Trade Credit, (a) any Critical Vendor Payment received by the Critical Vendor will be deemed an unauthorized postpetition transfer under section 549 of the Bankruptcy Code so that the Debtors may (i) recover from the Critical Vendor in cash or goods or (ii) at the Debtors' option, apply the payment against any outstanding administrative claim held by such Critical Vendor, and (b) upon recovery of any Critical Vendor Payment, the corresponding prepetition claim of the Critical Vendor will be reinstated in the amount recovered by the Debtors.

*Certain Prepetition Taxes*

75      In the ordinary course of their businesses, the Debtors collect or remit certain trust fund taxes and other taxes for which nonpayment may give rise to individual liability (collectively, the "Trust Fund Taxes"), and may hold certain of such Trust Fund Taxes for a period of time before remitting them to the appropriate taxing authorities (collectively, the "Taxing Authorities")   As such, I understand that the Trust Fund Taxes are not property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code   In addition, I understand that many Taxing Authorities impose personal liability on the officers and directors of entities responsible for collecting Trust Fund Taxes to the extent that any such taxes are collected but not remitted   Thus, if any prepetition Trust Fund Taxes remain unpaid, the Debtors' officers and directors may be subject to lawsuits, or even criminal prosecution, on account of any such nonpayment during the pendency of these chapter 11 cases   Such lawsuits or proceedings would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' efforts to (a) stabilize their postpetition business operations, and (b) develop and implement a successful reorganization strategy [5]   Accordingly, the Debtors will seek the entry of an order which, among other things, authorizes the Debtors, in their sole discretion, to pay prepetition Trust Fund Taxes in the ordinary course of their businesses

---

[5]      The Debtors also are seeking authority to pay Trust Fund Taxes that have been withheld from employees' paychecks in the Motion of Debtors and Debtors in Possession for an Order Authorizing Them to Pay:  (A) Prepetition Employee and Independent Contractor Wages, Salaries and Related Items, (B) Prepetition Employee and Independent Contractor Business Expenses, (C) Prepetition Contributions to and Benefits Under Employee Benefit Plans, (D) Prepetition Employee Payroll Deductions and Withholdings, and (E) All Costs and Expenses Incident to the Foregoing Payments and Contributions

### D.     The Cash Management Motion

76    As affiliated entities, the Debtors utilize a cash management system (the "Cash Management System") in the day-to-day operation of their businesses  In light of the substantial size and complexity of the Debtors' operations, a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of the Debtors' respective values as going concerns, simply cannot be achieved if the Debtors' cash management procedures are substantially disrupted  Therefore, it is essential that the Debtors be permitted to continue to consolidate the management of their cash and transfer monies from entity to entity, as needed, in the amounts necessary to continue the operation of their businesses and in accordance with their existing cash management procedures

77    The Cash Management System, or similar cash management procedures, has been utilized by the Debtors for many years and constitutes a customary and essential business practice  The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity  The widespread use of such systems, moreover, is attributable to the numerous benefits they provide, including the ability to (a) control and monitor corporate funds, (b) invest idle cash, (c) ensure cash availability, and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information  These controls are especially important for the Debtors, given the significant volume of cash transactions — aggregating approximately $400 million annually — managed through the Cash Management System

78    In addition, given the Debtors' corporate and financial structure and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome, if not impossible, for the Debtors to establish an entirely new system of

accounts and a new cash management and disbursement system for each separate legal entity

Thus, under the circumstances, the maintenance of the Cash Management System not only is

essential, but also is in the best interests of the Debtors' respective estates and creditors [6] In

addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions

that inevitably would be associated with any substantial disruption of the Cash Management

System will (a) facilitate the Debtors' stabilization of their postpetition business operations, and

(b) assist the Debtors in their reorganization efforts

79     Prior to the Petition Date, the Debtors engaged in intercompany financial

transactions and asset transfers (collectively, the "Intercompany Transactions") in the ordinary

course of their respective businesses   Transfers of cash to and from appropriate bank accounts

are made on account of these Intercompany Transactions, which typically are in the nature of the

payment of costs related to goods and services procured by Oglebay for the benefit of all of the

Debtors, as well as payments for (a) the funding, if necessary, of the Debtors' working capital

requirements, (b) goods purchased by or services provided to one or more of the Debtors by one

or more of the other Debtors, and (c) ordinary course asset transfers from one Debtor to another

80     The Debtors anticipate that, following the Petition Date, they will continue

to enter into Intercompany Transactions in the ordinary course of their businesses  Accordingly,

the Debtors will seek authority to continue the Intercompany Transactions [7] The Intercompany

---

[6]     As a matter of course, the Debtors will continue to maintain strict records with respect to
all transfers of cash, so that all transactions can be readily ascertained, traced and recorded
properly on applicable intercompany accounts

[7]     Because the Debtors engaged in the Intercompany Transactions on a regular basis prior to
the Petition Date and such transactions are common among similar enterprises, the Debtors
believe that the Intercompany Transactions are ordinary course transactions within the
meaning of section 363(c)(1) of the Bankruptcy Code and thus do not require the Court's
approval  Nonetheless, out of an abundance of caution, the Debtors will seek express
authority to continue such transactions

Transactions reduce the administrative costs incurred by the Debtors and result in numerous efficiencies and economies of scale. By contrast, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors.

81    At any given time, there may be balances due and owing from one Debtor to another Debtor. These balances represent extensions of intercompany credit. The Debtors maintain current records of all transfers of cash and can readily ascertain, trace and account for all Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

82.    To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors will request that, pursuant to section 503(b)(1) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of Intercompany Transactions through the Cash Management System (collectively, "Intercompany Claims") be accorded administrative expense status. If Intercompany Claims are accorded administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear the ultimate repayment responsibility for such borrowings.

83    In connection with the Cash Management System, prior to the Petition Date, the Debtors maintained approximately 35 bank accounts in the ordinary course of their businesses, including an operating account, disbursement accounts, petty cash and collection accounts and other special purpose accounts (collectively, the "Prepetition Bank Accounts"), out of which they manage cash receipts and disbursements.

84.    To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual" atmosphere, the Debtors also will seek authority to continue

to use their Prepetition Bank Accounts. Allowing these accounts to be maintained with the same account numbers will assist the Debtors in accomplishing a smooth transition to operating under chapter 11. To protect against the possible inadvertent payment of prepetition claims, all banks with which the Debtors hold Prepetition Bank Accounts will be advised immediately not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors. The Debtors, moreover, have the capacity to draw the necessary distinction between pre– and postpetition obligations and payments without closing the Prepetition Bank Accounts and opening new ones.

85.    In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change. To avoid disruption of the Cash Management System and unnecessary expense, moreover, the Debtors will, as permitted by Local Rule 1007-2(a), request that they not be required to include the legend "Debtor-In-Possession" or a "debtor in possession number" on any existing checks or other business forms. To the extent that the Debtors use blank check stock, the Debtors will request that they not be required to include the legend "Debtor-In-Possession" and the jointly administered bankruptcy case number, as required by Local Rule 1007-2(a), for a period of 30 days (the "Transition Period") after the Petition Date, to permit the Debtors sufficient time to update their various computer systems to include such information on their blank check stock. After the Transition Period, any blank check stock used by the Debtors will bear the legend "Debtor-In-Possession" and the Debtors' jointly administered bankruptcy case number.

86      Any and all excess funds generated by the Debtors are either
(a) maintained in domestic bank accounts insured by the United States (through FDIC or
FSLIC); or (b) invested in low risk overnight investments, based upon the Eurodollar
(collectively, the "Investment Guidelines")   Although the Investment Guidelines may not strictly
comply with the approved investment guidelines identified in section 345 of the Bankruptcy
Code in all cases, the Debtors' deposits and investments nevertheless are safe, prudent and
designed to yield the maximum reasonable net return on the funds invested, taking into account
the safety of such deposits and investments   Accordingly, the Debtors will seek an order
(a) authorizing them to invest and deposit funds in accordance with the Investment Guidelines,
notwithstanding that such guidelines may not strictly comply in all respects with the approved
investment guidelines set forth in section 345 of the Bankruptcy Code, and (b) authorizing and
directing applicable institutions to accept and hold or invest such funds, at the Debtors' direction,
in accordance with the Investment Guidelines

87      Moreover, the Debtors will request that the banks participating in the Cash
Management System be permitted to charge back returned items, such as prepetition checks
returned as unpaid, against amounts from time to time on deposit in the Prepetition Bank
Accounts, regardless of whether such amounts were deposited before or after the Petition Date
and regardless of whether the returned items relate to prepetition or postpetition items   The
Debtors will also request authority to pay both prepetition and postpetition service and other
fees, costs, charges and expenses to which such banks may be entitled under the terms of and in
accordance with their contractual arrangements with the Debtors

**E.**    **Motions and Applications Relating to Professionals**

*Professional Retention Applications*

88.    The retention of certain chapter 11 professionals is essential to the Debtors' reorganization efforts. Accordingly, concurrently with, or shortly after, the filing of these chapter 11 cases, the Debtors will seek to retain various professionals to represent and assist them. These professionals include: (a) Jones Day, as counsel, (b) Richards, Layton & Finger, P A , as co-counsel, (c) Lazard as investment bankers and financial advisors, (d) Covington & Burling, as special insurance counsel, (e) Thompson Hine LLP, as special corporate counsel, (f) Edward Howard & Co , L P A , as corporate communication consultants, (g) Ernst & Young, L L P , as independent auditors; (h) Cobblestone Advisors as investment bankers, and (i) Mercer Human Resource Consulting, Inc , as compensation consultants. The Debtors believe that (a) the foregoing professionals are well qualified to provide the services contemplated by their various retention applications, (b) the services to be provided by the foregoing professionals are necessary for the Debtors' successful reorganization, and (c) the foregoing professionals will coordinate their services to avoid any duplication of effort. The Debtors may find it necessary to seek to retain additional professionals to assist them as their chapter 11 cases progress.

*Ordinary Course Professionals*

89.    The Debtors' employees, in the day-to-day performance of their duties, regularly call upon certain attorneys, accountants and actuaries (collectively, the "Ordinary Course Professionals") to provide professional services to assist them in carrying out their assigned responsibilities. In addition, in the ordinary course of their businesses, the Debtors employ a variety of professional service providers, including engineers, information technology consultants, consulting geologists and environmental consultants (collectively, the "Service

Providers") Because of the magnitude and breadth of the Debtors' businesses and the geographic diversity of the professional parties regularly retained by the Debtors, it would be costly, time-consuming and administratively cumbersome — as well as unnecessary under prevailing law — for the Debtors and this Court to require each Ordinary Course Professional and Service Provider to apply separately for approval of its employment and compensation Moreover, the uninterrupted service of the Ordinary Course Professionals and the Service Providers is vital to the Debtors' continuing operations and their ability to reorganize Accordingly, the Debtors will seek the entry of an order authorizing them to retain, employ and pay the Ordinary Course Professionals and the Service Providers without further order of the Court Nonetheless, to the extent that the average monthly fees and expenses of any Ordinary Course Professional exceed $25,000 during any Reporting Period (as such term is defined in the Motion of Debtors and Debtors in Possession for an Order Authorizing Them to Retain, Employ and Pay Certain Professionals in the Ordinary Course of Their Businesses (the "Ordinary Course Professionals Motion")), such Ordinary Course Professional will be required to request such fees in accordance with the procedures set forth in the Ordinary Course Professionals Motion Moreover, the Debtors will seek to retain, under section 327 of the Bankruptcy Code, any Ordinary Course Professional or Service Provider that becomes materially involved in the administration of these chapter 11 cases

### *Interim Compensation*

90. Given the size and complexity of the Debtors' chapter 11 cases and the amounts of fees and expenses that will be incurred by the Debtors' professionals, the Debtors will seek the entry of an administrative order establishing certain procedures for the interim compensation of the Debtors' professionals that are consistent with the procedures adopted by

courts in this District for the interim compensation of professionals in other large chapter 11

cases

III.   **CONCLUSION**

      91     To preserve the value of their businesses to the fullest extent possible, the

Debtors' immediate objective is to maintain "business as usual" following the commencement of

these chapter 11 cases by minimizing any adverse impact of the chapter 11 filings on the

Debtors' operations   For the reasons described herein and in the First Day Pleadings, I believe

that the prospect for achieving these objectives for the benefit of creditors and other stakeholders

will be substantially enhanced if this Court grants the relief requested in each of the First Day

Pleadings

Dated: February 23, 2004

_____

Rochelle F  Walk

Sworn to and subscribed before
me this 23rd day of February, 2004

Notary Public _Barbara J Witters_

My Commission Expires: _____

BARBARA J. WITTERS
Notary Public - State of Delaware
My Comm. Expires Mar. 13, 2005