UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| ONCO INVESTMENT COMPANY, | : | Jointly Administered |
| a Delaware corporation, et al., | : | |
| | : | Case No. 04-10558 (JBR) |
| Debtors. | : | |

FINAL ORDER (I) AUTHORIZING DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1); AND (B) UTILIZE
CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; AND
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363

Oglebay Norton Company ("Oglebay"), and its affiliated debtors and debtors in possession (collectively, the "Debtors"), having moved on February 23, 2004 (the "Motion") for an order authorizing them to incur post-petition secured indebtedness, to grant security interests and superpriority claims pursuant to sections 105(a), 361, 362, 363 and 364(c) and (d) of the Bankruptcy Code (the "Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having sought the following relief:

(a)     the Court's authorization, pursuant to sections 105(a), 361, 363 and 364(c) and (d) of the Code and Bankruptcy Rules 2002, 4001 and 9014, for Oglebay, as Borrower (the "Borrower"), and each of the other Debtors as Guarantors for the Borrower, to obtain from Silver Point Finance, LLC (by itself or, together with one or more of it affiliates "Silver Point"), as collateral and syndication agent, and General Electric Capital Corporation, as administrative agent ("GECC," and together with Silver Point, each an "Agent" and, collectively, the "Agents") acting for themselves, as lenders, and as Agents for other lenders that may from time to time become lenders (Silver Point and GECC in their capacities as lenders, together with such other lenders and the Agents, collectively, the "DIP Lenders"), cash advances, and other extensions of

9602954.9

credit, on a revolving credit basis, in an aggregate principal amount of up to $70,000,000, including a sublimit of $20,000,000 for letters of credit (the loans and letters of credit under such facilities, the "DIP Loans"), pursuant to a Financing Agreement substantially in the form annexed hereto as Exhibit "A" (as amended, modified or supplemented from time to time, the "DIP Loan Agreement"),[1] by and among the Debtors, the DIP Lenders and the Agents, to fund ongoing working capital and general corporate needs of the Debtors during their chapter 11 cases (the "Chapter 11 Cases") to pay the fees, costs, expenses, and disbursements of professionals retained by the Debtors or the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Code (the "Committee"), to pay the costs and expenses of members of the Committee as approved by the Court, to make adequate protection payments to the Existing Lenders, to pay other bankruptcy related charges all as allowed by the Court, including UST/Clerk Fees (defined herein), and to pay any fees, deposits and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lenders or the Agents, or otherwise required, under the DIP Loan Agreement and the other agreements, instruments and other documents executed in connection therewith (collectively, with the DIP Loan Agreement, the "DIP Loan Documents");

(b)    the Court's ordering, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Code, that the Obligations of the Debtors under the DIP Loan Agreement and the other DIP Loan Documents (collectively, the "DIP Obligations") are:

    i.      granted superpriority administrative claim status, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114 of the Code, subject only, during the occurrence and continuance of an Event of Default or a default hereunder, to the payment of Priority Professional Expenses

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings as defined in the DIP Loan Agreement.

(as defined in the DIP Loan Agreement) up to the Carve-Out Amount (defined below) and UST/Clerk Fees (defined below);

ii.    secured under section 364(c)(2) by a first priority, perfected lien on and security interest in all pre-petition and post-petition property of the Debtors, of whatever kind or nature, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable Liens, including, without limitation, by way of general description only, all property of the "estate" (within the meaning of the Code), and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, Vessels and other marine assets, fixtures, leases, all of the Capital Stock (whether such stock is voting or non-voting stock) in any of its Subsidiaries, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Code or otherwise (excluding all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of the foregoing (collectively, the "Unencumbered Collateral"), *pari passu*, [2] with the Senior Cash Management Lien (as defined below) and subject only to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount, and (c) the UST/Clerk Fees;

iii.    secured, under 364(d)(1) of the Code, by a first priority, perfected priming lien on and security interest in any property of the Debtors that, on or as of the Petition Date, was, or thereafter became, subject to any valid, perfected and non-avoidable liens and security interests (the "Existing Liens") of: (a) the Existing Lenders and Existing Agents (as defined as Prepetition Secured Bank Lenders in the Motion and collectively referred to herein as, the "Existing Lenders"), as set forth in the Existing Credit Agreement, Existing Loan Agreement, or any document executed in connection therewith (collectively, the "Existing Loan Documents"); and/or (b) the holders (the "2008 Note Holders") of those certain 18% Senior Secured Notes of Oglebay, due October 25, 2008 in the aggregate original principal amount of $75 million (collectively with any notes issued as paid-in-kind interest, the "2008 Notes"), issued under that certain Senior Secured Note Purchase Agreement dated as of October 25, 2002 (as amended, the "2008 Note Indenture"), as set forth in the 2008 Note Indenture or any other document executed in connection therewith (collectively with the 2008 Indenture, the "2008 Indenture Documents") (all such collateral shall be collectively referred to as, the "Pre-Petition Collateral"), *pari passu* with the Senior Cash Management Lien and subject only to: (w) any Permitted Priority Liens, (x) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount, and (y) UST/Clerk Fees;

---

[2]    For the avoidance of doubt, the term "*pari passu*" as used herein, shall mean only that any allocation to be made to a creditor subject to a *pari passu* lien shall be made in an amount equal to the amount of the debt of such creditor divided by the total debt to all creditors having the same priority.

iv.   secured under section 364(c)(3) of the Code by a perfected junior lien on and
security interest in all pre-petition and post-petition property of the Debtors (but
excluding the property described in clauses (ii) or (iii) as to which the liens and
security interests in favor of the DIP Lenders and the Agents will be as described
in such clauses), whether now existing or hereafter acquired, that is subject to
valid, perfected and non-avoidable Liens in existence immediately prior to the
Filing Date or to valid and non-avoidable Liens in existence immediately prior to
the Filing Date that are perfected subsequent to the Filing Date as permitted by
Section 546(b) of the Code (collectively, the "Junior Collateral" and, together
with the Unencumbered Collateral and the Pre-Petition Collateral, the
"Collateral"), *pari passu* with the Senior Cash Management Lien and subject only
to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of
an Event of Default or a default hereunder, the payment of Priority Professional
Expenses up to the Carve-Out Amount, and (c) UST/Clerk Fees;

(c)   the Court's grant, as adequate protection against the diminution in the value or

amount of the Pre-Petition Collateral caused by the granting of the senior security interests

described in subparagraph (b)(iii) above, and the use of the Existing Lenders' and 2008

Noteholders' cash collateral (the "Cash Collateral"), (A) to the Existing Lenders, (i) a

superpriority administrative expense claim under section 507(b) of the Code; (ii) replacement

liens, *pari passu* with the Junior Cash Management Lien, in the Collateral (including any Cash

Collateral), which liens and claims shall be subject and subordinate in all respects to the

superpriority administrative expense claim, security interests and liens granted to the DIP

Lenders and the Agents under the DIP Loan Documents and this Final Order; and (iii) cash

interest, letter of credit fee and professional fee payments; and (B) to the 2008 Note Holders, (i)

a superpriority administrative expense claim under section 507(b) of the Code, (ii) replacement

liens in the Collateral (including any Cash Collateral); which claims and liens shall be subject

and subordinate in all respects to the superpriority administrative expense claims and

replacement liens granted to the Existing Lenders hereunder, the Junior Cash Management Lien

and the superpriority administrative expense claim, security interests and liens granted to the DIP

Lenders and the Agents under the DIP Loan Documents and this Final Order, and (iii) payment

of reasonable post-petition attorneys' fees and costs of the Ad Hoc Committee of Senior Secured Noteholders (defined below);

(d)     the Court's entry of a Final Order (this "Final Order") approving on a final basis the post-petition financing pursuant to the DIP Loan Documents and authorizing the Debtors to obtain, on a final basis, DIP Loans thereunder in the amount of $70 million;

(e)     an interim hearing (the "Interim Hearing") having been held before this Court on February 24, 2004, pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of an Interim Order and an Interim Order having been entered on February 25, 2004; and

(f)     the Court's finding, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the hearing on this Final Order has been given to (i) the United States Trustee; (ii) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) counsel to the administrative agent for the Debtors' prepetition secured bank group; (iv) counsel to the unofficial committee of holders of Oglebay's senior secured notes; (v) counsel to the unofficial committee of holders of Oglebay's senior subordinated notes; and (vi) counsel to the administrative agent for the DIP Lenders (collectively, the "Notice Parties"); and based upon all of the pleadings filed with the Court, the evidence presented at the Hearing, the representations of counsel made at the hearing on the Motion and the entire record herein; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and that such relief is essential for the continued operations of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Code or other secured financing on equal

or more favorable terms than those set forth in the DIP Loan Documents; and after due deliberation and consideration, and sufficient cause appearing therefor:

## IT IS HEREBY ORDERED: [3]

1.      Disposition.  The Motion is granted as set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.

2.      Jurisdiction; Venue.  The Court has jurisdiction over these cases, the parties and the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

3.      Purpose and Necessity of Financing.  The Debtors require the financing described in the Motion to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs, for adequate protection payments to the Existing Lenders and Existing Agents, and for other purposes permitted by the DIP Loan Documents. If the Debtors do not obtain authorization to borrow under the DIP Loan Agreement and the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Code, or other financing under sections 364(c) or (d) of the Code, on terms that, taken as a whole, are as favorable as those set forth in the DIP Loan Agreement and the other DIP Loan Documents.  A loan facility in the amount provided by the DIP Loan Agreement and the other DIP Loan Documents is not available to the Debtors without granting the DIP Lenders superpriority claims, liens and security interests, pursuant to sections 364(c)(1), (2), (3) and

---

[3]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

364(d) of the Code, as provided in this Final Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best working capital financing available to them at this time.

4.      Good Cause. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Loan Documents and as a consequence of the use of Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses. Good cause has, therefore, been shown for the relief sought in the Motion.

5.      Good Faith. The DIP Loan Documents and this Final Order have been negotiated in good faith and at arm's-length between the Debtors, the Existing Lenders, the 2008 Noteholders, and the DIP Lenders. Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Lenders, the Existing Lenders and the 2008 Noteholders, pursuant to this Final Order and the DIP Loan Agreement shall be deemed to have been extended by the DIP Lenders, the Existing Lenders, and the 2008 Noteholders, in good faith, as that term is used in section 364(e) of the Code, and the DIP Lenders, the Existing Lenders, and the 2008 Noteholders, shall be entitled to all protections afforded thereunder. The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

6.      Borrowing. The Debtors are immediately authorized to obtain Loans, pursuant to the terms of the DIP Loan Documents and this Final Order, in the principal amount of up to $70

million (which includes a sublimit of $20 million for letters of credit). Available financing and advances under the DIP Loan Agreement will be used only as provided under the DIP Loan Agreement, and to fund other amounts required or allowed to be paid in accordance with this Final Order, including, without limitation, for adequate protection payments to the Existing Lenders and Existing Agents as authorized hereunder.

7.    Use of Collateral. The Debtors are hereby authorized to use the Pre-Petition Collateral (including all Cash Collateral) only in accordance with terms of the DIP Loan Documents and this Final Order. The Existing Lenders' and the Existing Agents' consent to the use of the Cash Collateral is based upon the budget and forecast entered into evidence at the hearing on this Final Order and annexed as Exhibit A hereto (the "Budget") and the Debtors' representations to the Existing Lenders and the Existing Agents that such Budget was prepared in good faith and is achievable based on good faith assumptions made at the time of its preparation. Any variance, termination or expiration of the Budget shall not be construed as a Cash Collateral Termination Event (as defined herein). Nothing in this Final Order shall be construed as or deemed to constitute the consent of the DIP Lenders, Existing Lenders or 2008 Noteholders to the use, sale or lease of the Pre-Petition Collateral, including the Cash Collateral, on any terms other than as expressly provided herein. Notwithstanding any termination of the Debtors' authority to use the Cash Collateral pursuant to the terms hereof, all liens, priorities, rights and remedies provided to the Existing Lenders, the Existing Agents, the 2008 Noteholders and the collateral agent for the 2008 Noteholders (the "2008 Noteholder Agent") in this Final Order shall survive such termination and remain in full force and effect with respect to any Existing Indebtedness and any indebtedness arising under the 2008 Indenture Documents (the "Senior

8

Note Indebtedness"), and claims and obligations arising under this Final Order, outstanding on such termination date.[4]

8.      Stipulations.    In providing for post-petition financing under the DIP Loan Agreement, the Debtors acknowledge, represent, stipulate and agree that:

(a)     all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which any Debtor is a party;

(b)     in entering into the DIP Loan Documents, and except as otherwise provided herein, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full, in cash, and the Commitments are terminated in accordance with the terms of the DIP Loan Agreement, the Debtors shall not in any way prime or seek to prime (*i.e.*, cause to be subordinated) the liens provided to the DIP Lenders and the Agents under this Final Order by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien, interest or claim pursuant to section 364(d) of the Code or otherwise. Unless and until the Existing Indebtedness (as defined below) is indefeasibly paid in full, the Debtors shall not in any way prime or seek to prime the Replacement Liens or Existing Liens, except as otherwise provided herein, without the consent of the Existing Lenders.

(c)     the Debtors are indebted to the Existing Agents and the Existing Lenders for the obligations under the Existing Loan Documents, as of February 23, 2004, in the aggregate principal amount of not less than $243,200,000 constituting loans and undrawn letters of credit

---

[4]     Nothing in this Final Order shall be construed as an admission by any party that the consent of the 2008 Noteholders or the 2008 Noteholder Agent is required for the Debtors' use of Cash Collateral.

under the Existing Loan Documents, together with interest and fees accrued and accruing thereon in respect of such loans, together with costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges now or hereafter owed by the Debtors to the Existing Agents and the Existing Lenders (collectively, the "Existing Indebtedness"), all of which are secured by the Existing Liens and are unconditionally owing by the Debtors without avoidance, offset, defense, objection, action, subordination or counterclaim of any kind, nature and description whatsoever;

(d)    except as otherwise provided herein with respect to the Post-Petition Liens, the Replacement Liens, and the Cash Management Liens (as defined herein) the Existing Liens are legal, valid, enforceable and duly perfected first priority and senior liens in all of the Pre-Petition Collateral, not subject to avoidance, defense, objection, action, counterclaim, setoff or subordination under the Code or applicable non-bankruptcy law, pursuant to the Existing Loan Documents as in effect on the Filing Date;

(e)    all of the Debtors will receive and have received reasonable consideration in exchange for the making of the DIP Loans, the use of the Cash Collateral and the other financial accommodations provided under the DIP Loan Documents and this Final Order;

(f)    as of the date of this Final Order, there are no other liens on or security interests in the Collateral except for the Permitted Liens, the Senior and Junior Cash Management Liens (each as defined herein), and the Existing Liens;

(g)    all payments made by the Debtors to the Existing Lenders prior to the Filing Date are legal, valid and non-avoidable;

(h)    the Debtors do not possess, may not assert and have waived any claim, objection, action, counterclaim, offset, right or defense of any kind or nature which could in any

way affect the validity, priority, enforceability and nonavoidability of the Existing Indebtedness or the Existing Liens or which would reduce or affect the obligation of the Debtors to pay the Existing Indebtedness;

(i)     subject to the provisions of paragraph 17 hereof, the Debtors hereby release, discharge and acquit the Existing Lenders, the Existing Agents and the Intermediary Bank and their respective agents, officers, directors, attorneys and employees, from all claims and causes of action of every type arising out of the Existing Loan Documents or any other relationship with the Debtors prior to the entry of this Final Order.

9.     Fees and Deposit. All fees paid and payable and costs and/or expenses reimbursed or reimbursable under the DIP Loan Agreement, the other DIP Loan Documents and this Final Order by the Debtors to the DIP Lenders, the Agents, the Existing Lenders or the Existing Agents, as disclosed to the Court at the hearing on February 24, 2004, are hereby approved. To the extent not previously paid, the Debtors are hereby authorized and directed to pay all such fees, in accordance with the terms of the DIP Loan Documents and this Final Order, without the necessity of the Debtors, the DIP Lenders, the Agents, the Existing Lenders or the Existing Agents filing any further application with the Court for approval or payment of such fees or expenses provided, however, that the Court requires all parties receiving reimbursement of professional fees, costs and/or expenses in whole or in part with property or proceeds of property of the estate to file a fee application that sets forth such fees, costs and expenses. Upon payment of such fees, such fees shall be deemed fully earned and non-refundable, subject to the usual fee application process required by this Court.

10.     Authority to Execute and Deliver Necessary Documents. Each of the Debtors is authorized and empowered to enter into and deliver the DIP Loan Agreement and the other DIP

Loan Documents in each case including any amendments thereto, and including UCC financing statements and mortgages or deeds of trust encumbering all of the Collateral and securing all of the Debtors' obligations under the DIP Loan Agreement, including repayment of all DIP Obligations. Each of the Debtors is hereby further authorized and directed (a) to perform all of their obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in this Final Order; (b) to perform all acts required under the DIP Loan Documents and this Final Order, including, without limitation, the payment of fees and the reimbursement of present and future reasonable costs and expenses (including without limitation, attorneys' fees and legal expenses), subject to the requirement that all professional fees and expenses require approval of the Court, paid or incurred by the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents or the ad hoc committee of 2008 Noteholders (the "Ad Hoc Committee of Senior Secured Noteholders") as and to the extent provided for in this Final Order, the DIP Loan Agreement and the other DIP Loan Documents, all of which unpaid fees, commissions, costs and expenses paid or incurred by the DIP Lenders or the Agents shall be included and constitute part of the principal amount of the DIP Obligations, and be secured by a first priority lien on and security interest in all of the Collateral, except to the extent otherwise provided for in this Final Order, the DIP Loan Agreement and the other DIP Loan Documents; and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be reasonably requested by the DIP Lenders, the Agents, the Existing Lenders or the Existing Agents. The obligations under the DIP Loan Documents and this Final Order shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Final Order.

9602954.9                                    12

11.     Amendments.   The Debtors, with the express written consent of the Required Lenders under the DIP Loan Agreement, may enter into any amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or order of this Court, provided that such modifications or amendments do not materially adversely affect the rights of any other creditor, equity holder or party in interest, and provided further, that notice of any such amendment shall be filed with the Court and served upon counsel to the Committee, the Office of the United States Trustee, counsel to the Existing Lenders, counsel to the Ad Hoc Committee of Senior Secured Noteholders, and any affected creditor, equity holder or party in interest.

12.     Superpriority Claim and Lien Priority.   To secure all of the DIP Obligations, the DIP Lenders and the Agents are hereby granted:

(a)      an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Code for all of the DIP Obligations, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114 of the Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate in priority of payment only to the Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder) and the UST/Clerk Fees; and

(b)      pari passu with the Senior Cash Management Lien and subject only to Permitted Priority Liens and, during the occurrence and continuance of an Event of Default or a default hereunder, to the payment of Priority Professional Expenses up to the Carve-Out Amount and UST/Clerk Fees, as provided in this Final Order, the DIP Lenders and the Agents are hereby

granted, effective immediately: (i) a first priority, perfected security interest in, and lien, under section 364(c)(2) of the Code, upon all of the Unencumbered Collateral; (ii) a first priority, perfected priming security interest in and lien, under section 364(d)(1) of the Code, upon all Pre-Petition Collateral, in all cases, senior to any and all present and future liens, claims or encumbrances against the Pre-Petition Collateral, including, without limitation, any and all Existing Liens, and Replacement Liens; and (iii) a junior, perfected security interest in and lien, under section 364(c)(3) of the Code, upon all Junior Collateral (collectively, the "Post-Petition Liens");

(c)     no lien or security interest granted to the DIP Lenders or the Agents under this Final Order, including the Post-Petition Liens shall (a) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Code, or (b) hereafter be subordinated to or, except as otherwise provided in this Final Order, made *pari passu* with any other lien or security interest under section 364(d) of the Code or otherwise;

(d)     the liens and security interests arising hereunder shall be and hereby are fully perfected liens and security interests, such that no additional steps need be taken by the DIP Lenders or the Agents to perfect such interests. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity, or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest, the proceeds thereof or other Collateral shall have no force or effect with respect to the transactions granting the DIP Lenders, the Agents, the

9602954.9                                        14

Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders or the 2008 Noteholder Agent a priority security interest in such fee, leasehold or other interest or other Collateral or the proceeds of any assignment, sale or other transfer thereof by any of the Debtors in favor of the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders or the 2008 Noteholder Agent in accordance with the terms of the DIP Loan Agreement or this Final Order;

(e)     the Post-Petition Liens, Superpriority Claim and other rights and remedies granted to the DIP Lenders and the Agents under this Final Order shall continue in this and in any superseding case or cases under the Code, and such liens and security interests shall maintain their first priority as provided in this Final Order until all the DIP Obligations have been indefeasibly satisfied in full in cash and the Commitment is terminated; and

(f)     nothing contained herein shall be construed to grant a priming lien on the pre-petition collateral presently subject to the First Preferred Fleet Mortgage between the Debtors and National City Bank, dated as of July 14, 1997.

13.     Adequate Protection For Existing Lenders.  Without restricting the rights of the Existing Agents or the Existing Lenders to argue that they are not adequately protected after the date of the entry of this Final Order or to seek further adequate protection, and subject to all parties' rights to reallocate any of the payments below under Code section 506(b),

(a)     as adequate protection against the diminution in the value or amount of the Pre-Petition Collateral and for use of the Pre-Petition Collateral (including Cash Collateral) by the Debtors and in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Existing Lenders are hereby granted valid, perfected, second priority post-petition security interests in and liens (such liens, the "Existing Lender Replacement Liens") on all Collateral, and

all cash and non-cash proceeds, rents, products and profits of any Collateral, which liens and security interests shall be and hereby are fully perfected liens and security interests without the need for any additional steps to be taken by the Existing Lenders or the Existing Agents to perfect such interests, to secure an amount equal to the aggregate reduction in the value or amount of the Collateral, whether by depreciation, use, sale, loss, decline in market price or otherwise (any such diminution in value, the "Existing Lender Adequate Protection Obligations"), provided, however, that, notwithstanding anything to the contrary, the Existing Lender Replacement Liens shall be pari passu with the Junior Cash Management Lien (as defined below) and remain subject to (i) the Post-Petition Liens and/or payment of any DIP Obligations on account thereof; (ii) the Permitted Priority Liens; (iii) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount; (iv) the Senior Cash Management Liens; and (v) the UST/Clerk Fees;

(b)    except for (i) the Post-Petition Liens; (ii) the Permitted Priority Liens; (iii) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount; (iv) the Cash Management Liens (as defined below); and (v) the UST/Clerk Fees, no lien or security interest in any property of the Debtors granted or arising on or after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors) shall be created or permitted to be *pari passu* with, or senior to, the Existing Lender Replacement Liens;

(c)    to the extent that the Existing Lender Replacement Liens prove insufficient to provide the Existing Lenders with adequate protection, the Existing Lenders shall

be granted a junior superpriority administrative claim (the "Existing Lender Adequate Protection Claim") under section 507(b) of the Code, in an amount equal to the Existing Lender Adequate Protection Obligations, having priority over any other claims including claims made pursuant to section 507(b) of the Bankruptcy Code, and junior in priority only to the Superpriority Claim held by the DIP Lenders and subject only to payment of DIP Obligations, the UST/Clerk Fees, and during the occurrence and continuance of an Event of Default, the payment of Priority Professional Expenses up to the Carve-Out Amount; and

                (d)     provided that no Event of Default or default hereunder has occurred and is continuing, as further adequate protection for use of the Pre-Petition Collateral (including Cash Collateral) by the Debtors, and in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Existing Agents and the Existing Lenders shall be paid (i) all interest (calculated at the contract non-default rate provided under the Existing Loan Documents and including any interest payable under or in connection with (A) that certain ISDA Master Agreement, dated as of June 30, 2000, between The Chase Manhattan Bank (n/k/a JPMorgan Chase Bank) and Oglebay Norton Company and (B) that certain ISDA Master Agreement, dated January 14, 2002, between National City Bank and ON Marine Services Company and Oglebay Norton Marine Services Company, L.L.C.) and Letter of Credit Fees (as described in the Existing Loan Documents), including any such interest and fees that are accrued and unpaid as of the Petition Date, as and when payable under the Existing Loan Documents and (ii) subject to the requirements of the usual fee application process for all professional fees and expenses that are to be paid by or out of the assets of the estate and otherwise upon receipt by the Debtors, counsel to the Debtors, counsel to the Committee, counsel to the Ad Hoc Committee of Senior Secured Noteholders, counsel to the Agents and the Office of the United States Trustee of invoices

relating thereto, all reasonable costs and expenses incurred both before and after the Filing Date in connection with the Existing Indebtedness or arising under or in connection with the Existing Loan Documents, including reasonable counsel fees and disbursements, filing fees, agency fees to which the Debtors have agreed and reasonable fees and disbursements of financial advisors in all cases, only in amounts in excess of any retainer or pre-paid fees held by such counsel or financial advisors; provided, however, that the Court may require all parties receiving reimbursement of professional fees, costs and/or expenses in whole or in part with property or proceeds of property of the estate to file a fee application that sets forth such fees, costs and expenses. To the extent any amounts arising under clauses (i) and (ii) above are outstanding as of the Filing Date, subject to the requirements of the usual fee application process for all professional fees and expenses that are to be paid by or out of the assets of the estate, the Debtors shall pay such amounts to the Existing Agents or the Existing Lenders, as applicable, within three (3) business days after entry of this Final Order.

(e) the Existing Lenders hereby acknowledge, agree, and stipulate that, as of the date of the entry of this Final Order, they are adequately protected.

14. Adequate Protection for 2008 Note Holders. As adequate protection against the diminution in the value or amount of the Pre-Petition Collateral and for use of the Pre-Petition Collateral (including Cash Collateral) by the Debtors and in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, the 2008 Note Holders are hereby granted:

(a) valid, perfected, third priority post-petition security interests in and liens (such liens, the "2008 Note Holder Replacement Liens" and, together with the Existing Lender Replacement Liens, the "Replacement Liens") on all Collateral, and all cash and non-cash proceeds, rents, products and profits of any Collateral, which liens and security interests shall be

and hereby are fully perfected liens and security interests without the need for any additional steps to be taken by the 2008 Note Holders or the 2008 Note Holder Agent to perfect such interests, to secure an amount equal to the aggregate reduction in the value or amount of the Collateral, whether by depreciation, use, sale, loss, decline in market price or otherwise (any such diminution in value, the "2008 Note Holder Adequate Protection Obligations" and, together with the Existing Lender Adequate Protection Obligations, the "Adequate Protection Obligations"), provided, however, that notwithstanding anything to the contrary, the 2008 Note Holder Replacement Liens shall be junior to the Existing Lender Replacement Liens and the Junior Cash Management Lien and remain junior and subject to (i) the Post-Petition Liens and/or payment of any DIP Obligations on account thereof; (ii) the Permitted Priority Liens; (iii) during the occurrence and continuation of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount; (iv) the Senior Cash Management Liens; and (v) the UST/Clerk Fees;

(b)      except for (i) the Existing Lender Replacement Liens; (ii) the Post-Petition Liens; (iii) the Permitted Priority Liens; (iv) during the occurrence and continuance of an Event of Default of a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount; (v) the Cash Management Liens; and (vi) the UST/Clerk Fees, no lien or security interest in any property of the Debtors granted or arising on or after the Petition Date (including, without limitation, liens and security interests, if any granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors) shall be created or permitted to be *pari passu* with, or senior to the 2008 Note Holder Replacement Liens;

(c)     to the extent that the 2008 Note Holder Replacement Liens prove insufficient to provide the 2008 Note Holders with adequate protection, the 2008 Note Holders shall be granted a junior superpriority administrative claim (the "2008 Note Holder Adequate Protection Claim" and, together with the Existing Lender Adequate Protection Claim, the "Adequate Protection Claims") under section 507(b) of the Code, in an amount equal to the 2008 Note Holder Adequate Protection Obligations, having priority over any other claims including claims made pursuant to section 507(b) of the Bankruptcy Code, and junior in priority only to (i) the Existing Lender Adequate Protection Claim, and (ii) the Superpriority Claim held by the DIP Lenders and subject only to payment of DIP Obligations, the UST/Clerk Fees, and during the occurrence and continuance of an Event of Default, the payment of Priority Professional Expenses up to the Carve-Out Amount; and

(d)     provided that no Event of Default or default hereunder has occurred and is continuing, as further protection for use of the Pre-Petition Collateral (including Cash Collateral) by the Debtors, and in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Debtors shall pay all reasonable attorneys' fees and costs incurred by the Ad Hoc Committee of Senior Secured Noteholders from and after the commencement of these chapter 11 cases, subject to the requirements of the usual fee application process for all professional fees and expenses that are to be paid by or out of the assets of the estate and otherwise upon receipt by the Debtors, counsel to the Debtors, counsel to the Committee, counsel to the Agents, counsel to the Existing Agents, and the Office of the United States Trustee of invoices relating thereto.

15.     Section 552 Rights. For the sake of clarity and specificity, nothing contained in this Final Order or the DIP Loan Documents shall in any way be construed as an order limiting or otherwise impairing the rights of the DIP Lenders, the Agents, the Existing Lenders, the

Existing Agents, the 2008 Notcholders or the 2008 Noteholder Agent as provided in Section 552 of the Code;

16.     Priority Professional Expenses & UST/Clerk Fees Carve-Out.  The payment of any amounts on account of the liens and security interests and the Superpriority Claim granted herein to the DIP Lenders and the Agents shall be subject and subordinate only to:

(a)     amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court (collectively, the "UST/Clerk Fees"); and

(b)     allowed fees and expenses of attorneys, accountants, and other professionals retained in these Chapter 11 cases pursuant to sections 327, 328, 330, 331 and 1103 of the Code by the Debtors and the Committee to the extent that such amounts do not exceed in the aggregate $5 million (inclusive of any holdbacks required by the Court) (the "Carve-Out Amount").  So long as no Event of Default or default by any of the Debtors in the performance or observance of any of their obligations under this Final Order has occurred and is continuing, the Debtors shall be permitted to pay UST/Clerks Fees and Priority Professional Expenses allowed and payable under sections 327, 328, 330 and 331 of the Code, as the same may be due and payable in accordance with any applicable order of the Court, and such payments shall not be applied against the Carve-Out Amount.  After the occurrence and during the continuation of an Event of Default or a default by any of the Debtors in the performance or observance of any of their obligations under this Final Order, any payments actually made of fees and expenses to such professionals (including payments made out of pre-Petition Date retainers) pursuant to sections 327, 328, 330, 331 and 1103 of the Code or otherwise, shall reduce the Carve-Out Amount on a dollar-for-dollar basis; and

(c)    Priority Professional Expenses shall also include any payments which are authorized to be made pursuant to any Court-approved procedure for monthly or other payment of administrative expenses; provided, that nothing contained herein shall (i) be construed to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure for interim payments of administrative expenses from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications and (ii) be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders or the 2008 Noteholder Agent to object to the reasonableness of such amounts; provided, further, that Priority Professional Expenses shall not include, and proceeds of the DIP Loans (as to the DIP Lenders) and the Cash Collateral (as to the Existing Lenders and the DIP Lenders) shall not be used for the payment or reimbursement of, any fees or disbursements of the Debtors, the Committee or any trustee appointed in these Chapter 11 Cases incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) commencing or prosecuting any action asserting claims pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Code or other cause of action (whether arising under state law, the Code or other federal law) against the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents or the Intermediary Bank with respect to the validity and extent of the DIP Obligations, the Existing Indebtedness or the validity, extent and priority of liens and security interests securing the DIP Obligations and the Existing Indebtedness of the Debtors; (B)

invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Lenders', the Agents', the Existing Lenders', the Existing Agents' or the Intermediary Bank's liens or security interests in the Collateral; (C) preventing, hindering or delaying (whether, directly or indirectly) the DIP Lenders, the Agents, the Existing Lenders or the Existing Agents in respect of their liens and security interests in the Collateral or (D) authorizing the use of the Cash Collateral on terms other than those set forth in this Final Order without the consent of the Existing Lenders and the Existing Agents. No liens, claims, interests or priority status other than Permitted Priority Liens, Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder), the Senior Cash Management Liens and UST/Clerk Fees, having a lien or administrative priority superior to or *pari passu*, with those granted by this Final Order to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents (other than the Junior Cash Management Liens), the 2008 Noteholders or the 2008 Noteholder Agent shall be granted while any portion of the DIP Obligations or the Existing Indebtedness remains outstanding or any Commitment under the DIP Loan Agreement remains in effect without the written consent of the Required Lenders under the DIP Loan Agreement or the Existing Loan Documents, as applicable. Effective upon entry of this Final Order, in exchange for priority payment of the Priority Professional Expenses, the parties entitled to be paid therefrom shall not be entitled, directly or indirectly, to charge the Collateral whether by operation of Sections 105, 506(c) or 552(b) or otherwise. The waiver set forth in the immediately preceding sentence is for the sole benefit of the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders and the 2008 Noteholder Agent and no other party shall be entitled to assert any claim or defense on account of such waiver.

17.    Committee Investigation Period. Notwithstanding anything in this Final Order or in the DIP Loan Agreement to the contrary, any party in interest (other than the Debtors, the 2008 Noteholders and 2008 Noteholder Agent who have expressly waived their rights to do so upon entry of this Final Order as provided herein), including the Committee, may commence any adversary proceeding or contested matter challenging the validity, enforceability or priority of the obligations owed to the Existing Lenders or the Existing Indebtedness or, to the extent they secure the obligations owed to the Existing Lenders or the Existing Indebtedness, the Existing Liens, or otherwise assert on behalf of the Debtors, their estates and their creditors any claim or cause of action against the Existing Lenders, no later than the date that is sixty (60) days after the filing of an application for entry of an order authorizing the retention of counsel for the Committee (the "Investigation Termination Date"). If no such adversary proceeding or contested matter is properly commenced as of such date (or such later date as extended only by written consent of the Existing Lenders or further order of this Court, upon cause shown), the obligations owed to the Existing Lenders shall constitute allowed claims, not subject to avoidance or subordination, for all purposes in the Chapter 11 Case, and the Existing Liens shall be deemed legal, valid, binding, perfected, enforceable and otherwise unavoidable, and the obligations owed to the Existing Lenders and the Existing Liens shall not be subject to any other or further challenge by any party in interest, and the stipulations in paragraphs 8(c) and 8(d) and 8(g) through 8(i) (in each case, inclusive) shall be deemed binding on all parties.

18.    Limitation On Additional Surcharges. Neither the Collateral nor the DIP Lenders, Agents, Existing Lenders, Existing Agents, the Intermediary Bank, the 2008 Noteholders or 2008 Noteholder Agent shall be subject to surcharge, pursuant to sections 506(c), 552(b) or 105(a) of the Code, or otherwise, by any of the Debtors or any other party in interest. No action, inaction,

or acquiescence by the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders or 2008 Noteholder Agent including funding the Debtors' ongoing operations under this Final Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders and 2008 Noteholder Agent to a charge against the Collateral pursuant to sections 506(c) or 105(a) of the Code. The DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders and the 2008 Noteholder Agent shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

19. Additional Perfection Measures.

(a)    The liens, security interests and priority granted to the DIP Lenders, the Agents, the Intermediary Bank (as defined below), the Existing Lenders, the Existing Agents, the 2008 Noteholders and 2008 Noteholder Agent pursuant to this Final Order with respect to property of the Debtors' estates shall be perfected by operation of law upon entry of this Final Order by the Court. Neither the Debtors nor the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Notcholders and 2008 Noteholder Agent shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United State Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interests and liens granted to the DIP

9602954.9                                                        25

Lenders, the Agents, the Intermediary Bank, the Existing Lenders, the Existing Agents, the 2008 Noteholders and 2008 Noteholder Agent pursuant to this Final Order.

(b)     If the DIP Lenders, the Agents, the Intermediary Bank, the Existing Lenders, the Existing Agents, the 2008 Noteholders or 2008 Noteholder Agent in their sole discretion, choose to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Final Order; and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(c)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lenders, the Agents, the Intermediary Bank, the Existing Lenders, the Existing Agents, the 2008 Noteholders or 2008 Noteholder Agent may, at their sole discretion, choose to file a true and complete copy of this Final Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the DIP Lenders, the Agents, the Intermediary Bank, the Existing Lenders, the Existing Agents, the 2008 Noteholders or 2008 Noteholder Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Final Order.

20.     Application of Collateral Proceeds.     Except as otherwise provided in this Final Order, including, without limitation, in the next succeeding sentence of this paragraph 18, the Debtors and the Existing Lenders are hereby authorized and directed to remit to the DIP Lenders

or the Agents, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the Collateral (subject to the satisfaction of any liens and security interests in such Collateral described particularly in the DIP Loan Agreement and herein as being senior to the liens and security interests of the DIP Lenders and the Agents), including all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors, or to which Debtors shall become entitled at any time.  The automatic stay provisions of section 362 of the Code are hereby modified to permit the DIP Lenders or the Agents to retain and apply all collections, remittances and proceeds of the Collateral in accordance with this Final Order and the DIP Loan Agreement to the DIP Obligations, first to fees, costs and expenses owed under the DIP Loan Documents, then to interest, and then to principal; provided, however, that, notwithstanding anything contained in the DIP Loan Agreement or DIP Loan Documents or to the contrary contained in this Final Order, any collection or remittance of proceeds from sales or other dispositions of Collateral outside the ordinary course of the Debtors' business, net of any associated expenses ("Sale Proceeds") shall be treated as follows: [5]

    (a)    the Debtors may use, in accordance with the terms and conditions of this Final Order and the DIP Loan Documents, up to fifty percent (50%) of the Sale Proceeds in amounts up to $12 million for any individual transaction or up to $15 million in the aggregate, and the remaining fifty percent (50%) shall be either (i) applied to the outstanding DIP Obligations as of such date (with a concomitant permanent reduction in the Commitments under the DIP Loan Agreement in like amount); (ii) used by the Debtors in accordance with the terms and conditions of this Final Order and the DIP Loan Documents (with a concomitant permanent reduction in the Commitments under the DIP Loan Agreement in like amount, provided that the Debtors reduce such Commitments only in accordance with the terms of the DIP Loan Agreement), provided, further, however, that, in such instance, if no reduction

---

[5]    Nothing in this Final Order shall be construed as the consent of any of the Agents, Lenders, Existing Agents and/or Existing Lenders to any sale of assets outside the ordinary course or the Debtors' business.

of the Commitments is permitted under the terms of the DIP Loan Agreement, then, notwithstanding anything to the contrary herein, the Debtors shall not be permitted to use any funds in accordance with subclause (ii) without the consent of the DIP Lenders and the Existing Lenders; or (iii) deposited in the Debtors' collection account to act as Cash Collateral for the outstanding DIP Obligations and the outstanding Existing Indebtedness (any such funds, the "Minor Escrowed Proceeds"), which such Minor Escrowed Proceeds shall be subject to and held according to the priorities set forth herein among the Post-Petition Liens, the Existing Liens and the Replacement Liens, with no application of any such proceeds to any of the outstanding DIP Obligations or the Existing Indebtedness; provided, however, that the Debtors may at their option subsequently elect to either (y) apply any Minor Escrowed Proceeds against outstanding DIP Obligations (or, upon Payment in Full of the DIP Obligations and the Termination of all Commitments, against outstanding Existing Indebtedness) or (z) withdraw Minor Escrowed Proceeds for use in accordance with the terms and conditions of this Final Order and the DIP Loan Documents. In either instance, there shall be a concomitant permanent reduction in the Commitments under the DIP Loan Agreement in like amount, provided, however, that if the Debtors use Minor Escrowed Funds under subclause (z) above, the Debtors must reduce such Commitments only in accordance with the terms of the DIP Loan Agreement and provided, further, however, that, in such instance, if no reduction of the Commitments is permitted under the terms of the DIP Loan Agreement, then notwithstanding anything to the contrary herein, the Debtors shall not be permitted to use any funds in accordance with subclause (z) without the consent of the DIP Lenders and the Existing Lenders. At no time shall payment be made on account of any Existing Indebtedness from Sale Proceeds until the DIP Obligations have been Paid in Full and the Commitments have been terminated; and

(b)     any Sale Proceeds in amounts equal to or greater than $12 million for any individual transaction or equal to or greater than $15 million in the aggregate, except to the extent otherwise agreed to by the DIP Lenders and Majority Banks (as defined in the Existing Credit Facility), shall be either (i) applied to the outstanding DIP Obligations as of such date (with a concomitant permanent reduction in the commitments under the DIP Loan Agreement in like amount); (ii) used by the Debtors in accordance with the terms and conditions of this Final Order and the DIP Loan Documents (with a concomitant permanent reduction in the Commitments under the DIP Loan Agreement in like amount, provided that the Debtors reduce such Commitments only in accordance with the terms of the DIP Loan Agreement), provided, further, however, that, in such instance, if no reduction of the Commitments is permitted under the terms of the DIP Loan Agreement, then, notwithstanding anything to the contrary herein, the Debtors shall not be permitted to use any funds in accordance with subclause; (ii) without the consent of the DIP Lenders and the Existing Lenders; or (iii) deposited in the Debtors' collection account to act as Cash Collateral for the outstanding DIP Obligations and the outstanding Existing Indebtedness (any such funds, the "Major Escrowed Proceeds"), which such Major Escrowed Proceeds shall be subject to and held

according to the priorities set forth herein among the Post-Petition Liens, the Existing Liens and the Replacement Liens, with no application of any such proceeds to any of the outstanding DIP Obligations or the Existing Indebtedness; provided, however, that the Debtors may at their option subsequently elect to either (y) apply any Major Escrowed Proceeds against outstanding DIP Obligations (or, upon Payment in Full of the DIP Obligations and the Termination of all Commitments, against outstanding Existing Indebtedness) or (z) withdraw Major Escrowed Proceeds for use in accordance with the terms and conditions of this Final Order and the DIP Loan Documents. In either instance, there shall be a concomitant permanent reduction in the commitments under the DIP Loan Agreement in like amount, provided, however, that if the Debtors use Major Escrowed Funds under subclause (z) above, the Debtors must reduce such Commitments only in accordance with the terms of the DIP Loan Agreement and provided, further, however, that, in such instance, if no reduction of the Commitments is permitted under the terms of the DIP Loan Agreement, then, notwithstanding anything to the contrary herein, the Debtors shall not be permitted to use any funds in accordance with subclause (z) also without the consent of the DIP Lenders and the Existing Lenders. At no time shall payment be made on account of any Existing Indebtedness from Sale Proceeds until the DIP Obligations have been Paid in Full and the Commitments have been terminated.

Notwithstanding any cash management agreements or any order entered continuing the Debtors' use of their current cash management system, the Existing Lenders shall not use the proceeds of any Collateral in any accounts maintained or controlled by them except as provided under the DIP Loan Documents and this Final Order and any funds currently held, or received by the Existing Lenders after the Petition Date, shall be held by such Existing Lenders or treated in accordance with the DIP Loan Documents and this Final Order, to be dealt with in accordance with the Debtors' cash management system as it has been modified to give effect to the DIP Loan Agreement.

21.    Access to Information. Without limiting the rights of access and information afforded the DIP Lenders or the Agents under the DIP Loan Agreement, the Debtors shall permit representatives, agents and/or employees of the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, and the Ad Hoc Committee of Senior Secured Noteholders to have

reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request. The Debtors shall timely serve upon counsel to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, and the Ad Hoc Committee of Senior Secured Noteholders all pleadings and other documents filed by the Debtors in the chapter 11 cases, including the financial reports required by the United States Trustee's office, and shall continue to supply such reports as are required under the DIP Loan Documents and/or the Existing Loan Documents or as requested by the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, and the Ad Hoc Committee of Senior Secured Noteholders. The Debtors shall provide the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents and counsel to the Ad Hoc Committee of Senior Secured Noteholders with copies of all material documents provided to the Committee, as well as copies of all non-privileged consultants' reports, appraisals, business plans, and similar documents as they become available to the Debtors (whether or not provided to the Committee), including, without limitation, any and all audits and other non-privileged reports prepared by the Debtors' accountants.

22.    Access to Collateral.

(a)    Upon the occurrence of an Event of Default or violation of this Final Order, the automatic stay of Code section 362(a) shall be terminated only after further order of the Court, in response to a motion brought in accordance with paragraph 24(c) hereof, granting relief from the automatic stay allowing the DIP Lenders or Agents to enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as

lessee or licensee under such lease or license without interference from the landlords or licensors thereunder, provided that the DIP Lenders or Agents shall request that they shall only pay base rent, or other obligations as required under the Code, of the Debtors that first arises after the DIP Lenders' or Agents' written notice referenced above and that are payable during the period of such occupancy by the DIP Lenders or the Agents, as the case may be, calculated on a per diem basis. Nothing herein shall require the Debtors, DIP Lenders or Agents to assume any lease under section 365(a) of the Code as a precondition to the rights afforded to the DIP Lenders in this paragraph. Such motion for relief from the automatic stay shall be heard in accordance with the terms of paragraph 22(c) of this Final Order.

(b)    Debtors shall give the DIP Lenders and the Agents, their representatives and consultants, reasonable access to the Debtors' facilities, offices, books and records during normal business hours to enable such parties, among other things, to inspect the Collateral.

23.    Cash Management System.    The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Documents and this Final Order.

(a)    Notwithstanding anything to the contrary contained in this Final Order or the DIP Loan Documents, KeyBank N.A., in its capacity as cash management bank with which the Debtors continue to maintain lockbox and operating accounts (in such capacity, the "Intermediary Bank"), is hereby granted for all obligations owed by Debtors to the Intermediary Bank in its capacity as Intermediary Bank, including, *inter alia*, all costs, charges, fees, expenses and other liabilities incurred in such capacity and payable under the Intermediary Bank Agreements (as defined herein) (collectively, the "Intermediary Bank Obligations"), effective immediately, (a) $1 million of cash to be held as cash collateral by the Intermediary Bank for any

Intermediary Bank Obligations,[6] (b) under Section 364 of the Code, a perfected security interest in, and lien upon, $2 million of the Collateral, which security interest and lien shall be *pari passu* with the Post-Petition Liens granted to the DIP Lenders and the Agents under this Final Order and the DIP Loan Documents in all respects (the "Senior Cash Management Liens"), and (c) under Section 364 of the Code, a perfected security interest in, and lien upon, $3 million of the Collateral, which security interest and lien shall be subordinate to the Post-Petition Liens and *pari passu* with the Existing Liens and the Existing Lender Replacement Liens in all respects (the "Junior Cash Management Liens" and, together with the Senior Cash Management Liens, the "Cash Management Liens").

   (b)   The Cash Management Liens shall be and hereby are fully perfected liens and security interests without the need for any additional steps to be taken by the Intermediary Bank to perfect such interests. No lien or security interest granted to the Intermediary Bank under this Final Order shall be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Section 551 of the Code, or hereafter be subordinated to or made *pari passu* with any other lien or security interest other than the liens granted to the DIP Lenders and the Agents under this Final Order and the DIP Loan Documents.

   (c)   Notwithstanding anything to the contrary contained in any document relating to the Debtors or any of their accounts among the Debtors and the Intermediary Bank (collectively, the "Intermediary Bank Agreements"), the Intermediary Bank is not entitled to exercise any remedies, whether pursuant to agreement or applicable nonbankruptcy law, on account of the Cash Management Liens unless and until all DIP Obligations have been indefeasibly paid in full and the Commitments have been terminated.

---

6
   For purposes of this order, the Lenders agree that they will not assert any senior interest to any portion of the $1 million cash collateral held by the Intermediary Bank in respect and to the extent of Intermediary

(d)     Notwithstanding anything to the contrary contained herein, the Debtors are authorized to pay to the Intermediary Bank any fees, expenses and charges in accordance with the Intermediary Bank Agreements governing the operation of the Debtor's cash management system and the Intermediary Bank's past practices with the Debtors.

(e)     The Intermediary Bank Agreements are hereby approved and the Debtors are authorized to enter into such Intermediary Bank Agreements.

24.     Automatic Stay Modified.  The automatic stay provisions of section 362 of the Code, to the extent applicable and subject to further order of this Court as set forth in Section (c) below, shall, with respect to subparagraph (a), and may, with respect to subparagraphs (b) and (c), be vacated and modified to the extent necessary so as to permit the DIP Lenders and the Agents:

(a)     whether or not an Event of Default or a default by any of the Debtors of any of their obligations under this Final Order has occurred, to require all cash, checks or other collections or proceeds from Collateral received by any of the Debtors to be deposited in accordance with the DIP Loan Documents and this Final Order, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lenders or the Agents, under the DIP Loan Agreement, the other DIP Loan Documents and this Final Order, as provided in the DIP Loan Agreement and this Final Order;

(b)     upon the occurrence of an Event of Default or a default by any of the Debtors of any of their obligations under this Final Order, and subject to further order of this Court as set forth in Section (c) below (except as provided in clause (d) below), to exercise all rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents,

Bank Obligations.

9602954.9                                                   33

this Final Order or under other applicable bankruptcy and nonbankruptcy law (including the right to set off funds in accounts maintained by the Debtors with any of the DIP Lenders or the Agents to repay the DIP Obligations).

(c)    Upon the occurrence of an Event of Default or a violation of this Final Order, the automatic stay of Code section 362(a), to the extent applicable, shall be terminated only after further order of the Court granting relief from the automatic stay in response to a motion filed by the DIP Lenders or the Agents seeking relief from the automatic stay. Such motion shall be heard, on the request of the DIP Lenders or the Agents, on an expedited basis, on 48 hours prior notice of such motion to counsel to the Debtors, counsel to the Existing Agents, counsel to the Committee, counsel to the Ad Hoc Committee of Senior Secured Noteholders, counsel to the Intermediary Bank, any affected landlord or licensor, the United States Trustee, and all parties entitled to notice pursuant to Fed. R. Bankr. P. 2002, which notice may be provided by e-mail and facsimile transmission. Immediately upon such notice being given by the DIP Lenders or the Agents, the Debtors shall only be authorized to pay minimum operating costs until after the entry of an order in response to a motion filed in accordance with this paragraph. The Court shall endeavor to schedule a hearing on any such request for relief from the automatic stay at the earliest practicable date and shall take all reasonable steps to resolve such motion as promptly as possible. Nothing contained herein shall be deemed a limitation of or a waiver by the DIP Lenders or the Agents of their respective rights to assert in any motion for relief from the automatic stay that no relief from the automatic stay is needed in order to exercise any remedies with respect to an Event of Default or a violation of this Final Order, however, nothing in this Final Order is intended to modify the automatic stay or to authorize or permit the DIP Lenders or Agents to exercise any rights or remedies.

(d)    Upon the occurrence and continuance of an Event of Default or a violation of this Final Order by any of the Debtors, the DIP Lenders and the Agents shall have no further obligation to provide financing under the DIP Loan Documents or this Final Order, and the DIP Lenders and the Agents are hereby authorized to, without providing any prior notice thereof, charge interest at the default rate set forth in the DIP Loan Agreement and require cash collateralization of obligations relating to letters of credit issued pursuant to the DIP Loan Agreement. The DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders or the 2008 Noteholder Agent shall provide the Debtors and Committee with prompt notice of any violation of this Final Order.

25.    No Responsible Person. In making the decision to make Loans and to extend other financial accommodations to the Borrower under the DIP Loan Agreement and this Final Order or in making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent shall not be deemed to be in control of the operations of the Debtors or to be acting as a responsible person or owner or operator with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal or state statute).

26.    Consent and Agreement to Protections for 2008 Note Holders. The Debtors have filed a Motion for: (A) An Order Authorizing Them to Pay a Commitment Fee for Postpetition Financing and Exit Financing; and (B) Upon a Further Hearing, a Final Order Authorizing Them to Obtain Postpetition Financing and Exit Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), dated March 11, 2004 (the "Second DIP Motion").

The Debtors, the Existing Lenders and the DIP Lenders (in their capacities as DIP Lenders and as potential lenders under the financing contemplated by the Second DIP Motion) hereby consent and agree that the 2008 Noteholders will receive all of the protections afforded them under this Order in any order granting the Second DIP Motion.

(a)   In addition to the foregoing, the Debtors, the Existing Lenders and the DIP Lenders (in their capacities as DIP Lenders and as potential lenders under the financing contemplated by the Second DIP Motion) hereby agree that any order approving the Second DIP Motion (the "Second DIP Order") shall provide that notwithstanding any provision of the Intercreditor Agreement, the 2008 Noteholders shall be entitled to vote claims represented by the 2008 Notes, whether secured or unsecured, to accept or reject any plan of reorganization filed in the above-captioned chapter 11 cases, without obtaining any consents or agreements that might otherwise be required in accordance with the terms of the Intercreditor Agreement and the 2008 Noteholders may object, on any grounds, whether applicable to secured claims or unsecured claims held by the 2008 Noteholders, to any plan of reorganization filed in the above-captioned chapter 11 cases.

(b)   The Ad Hoc Committee of Senior Secured Noteholders hereby agree to actively support entry of an order approving the Second DIP Motion (the "Second DIP Order") through and including such time as any such order has been entered, becomes final and non-appealable or, if an appeal has been filed, such appeal has been resolved so that such order is no longer subject to appeal. Any 2008 Noteholders receiving benefits hereunder shall be prohibited (i) from initiating, consenting to the commencing on their behalf, or joining in any action seeking to invalidate, vacate, reconsider, modify or appeal the Second DIP Order or any provision thereof; (ii) not to initiate, consent to the commencement on their behalf, or join in any action

9602954.9                                    36

seeking to avoid, challenge or disallow the DIP Obligations, Post-Petition Liens or Superpriority Claim granted in this Final Order, or any Second DIP Order, or disgorge any payments made on account of such liens or claims provided that any Second DIP Order contains the provisions described in this paragraph 26 and paragraph 14 hereof in a form substantially similar to the form in which they appear herein and that is otherwise reasonably acceptable to the Ad Hoc Committee of Senior Secured Noteholders.

(c)     Any 2008 Noteholders receiving benefits hereunder shall be prohibited from initiating, consenting on their behalf, or joining in any claim, objection, action, counterclaim, offset, right or defense of any kind or nature which could in any way affect the validity, enforceability, priority, and non-avoidability of the Existing Indebtedness, Existing Liens, Existing Lender Replacement Liens or Existing Lender Adequate Protection Claim granted in this Final Order, or to disgorge or challenge the legality, validity, or non-avoidability of any payments made on account of such liens or claims whether before or after the Filing Date provided that any Second DIP Order contains the provisions described in this paragraph 26 and paragraph 14 hereof in a form substantially similar to the form in which they appear herein and that is otherwise reasonably acceptable to the Ad Hoc Committee of Senior Secured Noteholders.

27.     Successors and Assigns.  The DIP Loan Documents and the provisions of this Final Order, as applicable, shall be binding upon the DIP Lenders, the Agents, the Debtors, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders and the 2008 Noteholder Agent and each of their respective successors and assigns, and shall inure to the benefit of the DIP Lenders, the Agents, the Debtors, the Existing Lenders, the Existing Agents, the Intermediary Bank, the 2008 Noteholders and the 2008 Noteholder Agent and each of their respective successors and assigns including, without limitation, any trustee, responsible officer,

estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.

28.    Binding Nature of Agreement.  The rights, remedies, powers, privileges, liens and priorities of the DIP Lenders, the Agents, the Existing Lenders, and the Existing Agents, including, without limitation the right to be repaid in full in cash on a date no later than the effective date of a plan of reorganization or liquidation in these cases, provided for in this Final Order, in any other DIP Loan Documents and in the Existing Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Code, which, as to the Existing Lenders and the Existing Agents, shall refer solely to the modification, alteration or impairment in any manner of the terms of payment of the Existing Indebtedness under the Final Order and the Existing Loan Documents, and the terms and provisions of this Final Order and the rights (including, without limitation the right to be repaid in full in cash on a date no later than the effective date of a plan of reorganization or liquidation in these cases), claims, liens and security interests granted to the DIP Lenders, the Agents, the Existing Lenders and the Existing Agents pursuant to this Final Order, the Existing Loan Documents and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order, and the liens, security interests and claims of the DIP Lenders, the Agents, the Existing Lenders and the Existing Agents shall maintain their priority as provided by this Final Order and the DIP Loan Documents, unless and until the DIP Obligations and the Existing Indebtedness have first been indefeasibly paid in full in cash and completely satisfied and the Commitment terminated in accordance with the DIP Loan Agreement.  The rights, remedies, powers, privileges, liens, and priorities provided to the 2008 Noteholders in this Final

Order shall not be modified, altered, or impaired in any manner by any subsequent Order (including a Confirmation Order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Code, and the rights, claims, liens and security interests granted to the 2008 Noteholders pursuant to this Final Order shall continue in full force and effect notwithstanding the entry of any such Order, and the liens, security interests and claims of the 2008 Noteholders shall maintain their priority as provided by this Final Order.

29.     Subsequent Reversal or Modification.  This Final Order is entered pursuant to sections 363 and 364 of the Code, granting the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent all protections afforded by sections 364(e) of the Code.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent prior to the date of receipt of written notice to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent of the effective date of such action; or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents or pursuant to this Final Order.  Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Lenders, the Agents, the 2008 Noteholders, the 2008 Noteholder Agent, the Existing Lenders or the Existing Agents prior to written notice to the DIP Lenders, the Agents, the Existing Agents the Existing Lenders, the 2008 Noteholders and the 2008 Noteholder Agent of the effective date of such action shall be governed in all respects by the original provisions of this Final Order, and the DIP

Lenders, the Agents, the Existing Agents and the Existing Lenders the 2008 Noteholders and the
2008 Noteholder Agent shall be entitled to all the rights, remedies, privileges and benefits
granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations
or liability.

30.     No Waiver. Except as provided herein and to the extent not modified herein, in
the Intercreditor Agreement, nothing in this Final Order shall be construed in any way as a
waiver or relinquishment of any rights that the DIP Lenders, the Existing Lenders, the
Intermediary Bank or the 2008 Noteholders, may have to bring or be heard on any matter
brought before this Court.

31.     Sale/Dismissal. None of Debtors shall file any motion seeking an order
dismissing or converting these Chapter 11 Cases under section 1112 of the Code, or appointing a
chapter 11 trustee or an examiner with expanded powers, unless and until the DIP Obligations
and the Existing Indebtedness shall have been paid indefeasibly in full, in cash, and the
Commitments terminated in accordance with the DIP Loan Agreement. No order providing for
either the sale of the ownership of the stock of any Debtor or the sale of all or substantially all of
the assets of any Debtor under section 363 of the Code shall be entered by the Court unless, in
and concurrently with any such event, the proceeds of such sale are sufficient, and applied, to
indefeasibly pay all DIP Obligations and such DIP Obligations shall be indefeasibly paid in full
in cash and the Commitment will be terminated in accordance with the DIP Loan Agreement as
part of such action, or the Required Lenders under the DIP Loan Agreement and expressly
consent in writing to any such transaction or the entry of such an order by the Court or such
transaction is expressly permitted in the DIP Loan Documents. The Debtors shall not sell either
the stock of any of the Debtors or substantially all of the assets of any of the Debtors under

section 363 of the Code unless, in any such event, the Required Lenders under the DIP Loan Agreement expressly consent in writing to any such transaction, such transaction is expressly permitted in the DIP Loan Documents or the terms of the sale expressly provide that the sale shall not be consummated unless the proceeds of the sale are sufficient, and applied, to indefeasibly pay all DIP Obligations and such DIP Obligations shall be, upon the closing of such sale, indefeasibly paid in full in cash and the Commitment terminated in accordance with the DIP Loan Agreement. If an order dismissing any of these cases under sections 305 or 1112 of the Code or otherwise is at any time entered, such order shall provide that (a) the liens, security interests and superpriority administrative expense status granted to the DIP Lenders and the Agents hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Final Order until all DIP Obligations and all Existing Indebtedness shall have been paid in full in cash and the Commitment shall have been terminated in accordance with the DIP Loan Agreement, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and superpriority administrative expense status of the DIP Lenders and the Agents, as the case may be.

32. Priority of Terms. To the extent of any conflict or inconsistency between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, this Final Order, any other order of this Court, or any other agreements, the terms and provisions of this Final Order shall govern.

33. Adequate Notice. The notice given by the Debtors of the Final Hearing, in accordance with the Interim Order, was given in accordance with Bankruptcy Rules 2002 and

4001(c)(2) and the local rules of this Court. Under the circumstances, no further notice of the request for the relief requested in the Motion is required.

34.     Entry of Order; Effect.  This Final Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Final Order on the Court's docket in these cases.

35.     Binding Effect of Order.  The terms of this Final Order shall be binding on any trustee appointed under Chapter 7 or Chapter 11 of the Code.

36.     Successor Agent.     In furtherance of the provisions of Section 9.10 of each of the Prepetition Revolving Credit Facility and the Prepetition Term Loan Facility, the Existing Lenders are authorized to appoint a successor agent (the "Successor Agent") and to take all steps necessary to effectuate such appointment. Each Debtor is authorized and directed to do and perform all acts, to make, execute and deliver all amendment to documents under the Prepetition Credit Facility (including, without limitation, the execution of security agreements, pledge agreements, mortgages, ship mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings), to cause each of its subsidiaries that is not a Debtor to execute and deliver amendments to documents under the Prepetition Credit Facility to the extent required by the Successor Agent, and to pay all filing and recording fees, in each case as may be necessary or, in the opinion of the Successor Agent, desirable to give effect to the appointment of the Successor Agent, and to ensure the perfection of any liens securing the Prepetition Credit Facility.

37.     U.S. Bancorp.  Nothing contained in this Final Order shall be construed to grant the DIP Lenders, the Existing Lenders, the Intermediary Bank or the 2008 Note Holders liens on

any equipment including all vessels and other marine assets leased or chartered by Debtors from US Bancorp Finance, Inc. and/or any of its affiliates ("US Bancorp") to the extent that such lease or charter arrangements are "true" valid binding lease or charter arrangements between the Debtors and US Bancorp. Further, notwithstanding anything to the contrary in this order or the Loan Agreement, the priming Liens to be granted to the DIP Lenders shall not attach or apply to any equipment including all vessels and other marine assets leased or chartered by Debtors from US Bancorp by the Debtors. Nothing contained in the Interim Order, this Final Order, or the DIP Loan Agreement shall be construed to prime or in any way affect any liens of US Bancorp on the Vessel and the Equipment that are valid, perfected and unavoidable liens or security interests existing as of the Petition Date. Nothing contained in the Interim Order, this Final Order, or the DIP Loan Agreement shall be construed to affect rights or remedies that US Bancorp may have under 11 U.S.C. § 1110, if any, with respect to the Charter Agreement, the Vessel Acquisition Agreement, and Trust Agreement, all dated December 30, 1998, between US Bancorp (as successor) and Oglebay Norton Company.

38.    In the event of a conflict or inconsistency between this Final Order and the DIP Loan Documents, this Final Order shall control.

39.    Reporting Requirements. During the term of this Final Order, the Debtors shall submit to the Agents, Ad Hoc Committee of Secured Noteholders, the Committee, the Existing Lenders and the Existing Agents by 12:00 p.m. of each Friday, commencing Friday, April 2, 2004, a report in a form satisfactory to the Existing Lenders, which report shall include (i) a rolling thirteen (13) week cash flow projection, (ii) a cash flow summary of receipts and disbursements during the previous week, (iii) a report on collections of any amounts received as

a result of asset sales and (iv) an update on all discussions associated with a reorganization plan,

restructuring transaction, equity investment and/or financing transaction.

40.    Cash Collateral Termination Events.   As long as any portion of the Existing
Indebtedness remains unpaid, the Debtors shall not seek, and it shall constitute a "Cash
Collateral Termination Event" if, except with the express written consent of the Existing
Lenders, which consent shall not be implied:

        (a)    any Chapter 11 Case shall be dismissed or converted to a case
under Chapter 7 of the Code; or a Chapter 11 trustee, or an examiner with
expanded powers, shall be appointed in any Chapter 11 Case; or

        (b)    an order or orders shall be entered by the Bankruptcy Court or any
other court approving any claims for recovery of amounts under section 506(c) of
the Code with respect to the Pre-Petition Collateral or the Replacement Liens; or

        (c)    the Bankruptcy Court or any other court shall enter an order to
which the Existing Lenders do not consent granting relief from the automatic stay
applicable under section 362 of the Code to the holder or holders of any security
interest (other than the security interests of the DIP Lenders and the Existing
Lenders to the extent granted in this Final Order) in any assets of the Debtors
allowing such holder or holders to foreclose or otherwise realize upon any such
security interests in respect of assets having an aggregate value in excess of
$2,000,000; or

        (d)    an order of the Bankruptcy Court or any other court shall be
entered materially amending, supplementing, staying, vacating, reversing,
revoking, rescinding or otherwise modifying this Final Order; provided that no
Termination Event shall occur under this clause (d) to the extent that any such
material amendment, supplement or other modification is not adverse to the rights
and interests of the Existing Lenders under this Final Order; or

        (e)    unless the Existing Lenders otherwise expressly agree in writing,
an order of the Bankruptcy Court or any other court shall be entered granting any
lien or security interest in any property of the Debtors in favor of any party other
than the Existing Lenders (other than (i) the Post-Petition Liens and/or payment of
any DIP Obligations on account thereof; (ii) the Permitted Priority Liens; (iii)
during the occurrence and continuance of an Event of Default or a default
hereunder, the payment of Priority Professional Expenses up to the Carve-Out
Amount; and (iv) the UST/Clerk Fees as authorized by the terms of this Final
Order; or granting a claim (other than (i) the Post-Petition Liens, Superpriority
Claim and/or payment of any DIP Obligations on account thereof; (ii) the
Permitted Priority Liens; (iii) during the occurrence and continuance of an Event

of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount; and (iv) the UST/Clerk Fees) to any party other than the Existing Lenders, that is *pari passu* with or senior to the claims granted to the Existing Lenders pursuant to this Final Order; provided, however, that it shall only constitute a "Cash Collateral Termination Event" under this subparagraph (e) to the extent that any such liens, security interests or claims have an aggregate value in excess of $2,000,000;or

(f)     any of the Debtors shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other Person's motion as to, any of the matters set forth in paragraphs (a) through (e) above, or the Court shall grant any such motion filed by any other Person; provided, however, that the Motion of Debtors and Debtors in Possession for an Order, Pursuant to Section 364(c)(2) of the Bankruptcy Code, Authorizing Entry into Insurance Premium Financing Agreement [Docket No. 97] shall not constitute a "Cash Collateral Termination Event" under this subparagraph (f); or

(g)     this Final Order shall cease to be in full force and effect or the Debtors' authority to use Cash Collateral hereunder shall have otherwise terminated; or

(h)     any of the Debtors shall make any payment (including "adequate protection" payments) on or in respect of any pre-petition indebtedness or obligations other than (i) the obligations owed to the Existing Lenders or (ii) as permitted under Section 8.02(r) of the DIP Loan Agreement; or

(i)     any of the Debtors shall fail to comply with the terms of this Final Order solely as it relates to the Existing Lenders, except for any requirement of prompt notice, prompt service of documents or any of the reporting requirements set forth in paragraph 38 hereof;

(j)     any of the Debtors violate any of the financial covenants contained in section 8.03 of the DIP Loan Agreement, an amendment thereto is annexed as Exhibit B hereto; or

(k)     this Court shall abstain from hearing the Chapter 11 Case, or any of the Debtors shall so move or support any motion brought by any third party seeking such relief; provided, however, that it shall not constitute a "Cash Collateral Termination Event" under this subparagraph (k) if the Debtors' cases continue in Chapter 11 either in this Court or in the United States District Court for the District of Delaware; or

(l)     any of the Debtors shall seek to, or shall support (by way of, inter alia, any motion or other pleading filed with this Court or any other writing to another party-in-interest executed by or on behalf of any of the Debtors) any other Person's motion to, disallow or subordinate in whole or in part the Existing Lenders' claims in respect of the Existing Indebtedness or the obligations owed to

the Existing Lenders or to challenge the validity, enforceability, perfection or priority of the Existing Liens; provided, however, that, with respect to non-written statements, it shall only constitute a "Cash Collateral Termination Event" under this subparagraph (l) if the Majority Banks (as defined in the Existing Credit Facility) reasonably determine that any of the Debtors have supported such a motion; or

(m)    except to the extent specifically provided for herein, the filing of any motion to obtain credit from any party, other than Permitted Indebtedness, unless the terms of any such facility are acceptable to the Existing Lenders in all respects, or, in connection therewith, the facility provides that all the obligations owed to the Existing Lenders shall first be paid indefeasibly in full in cash; provided, however, that the Motion of Debtors and Debtors in Possession for an Order, Pursuant to Section 364(c)(2) of the Bankruptcy Code, Authorizing Entry into Insurance Premium Financing Agreement [Docket No. 97] shall not constitute a "Cash Collateral Termination Event" under this subparagraph (m); or

(n)    any order shall be entered limiting or otherwise impairing the Existing Lenders' rights under Section 552 of the Code, or any of the Debtors shall file a pleading seeking to modify such rights, or any of the Debtors shall fail to object or shall in any way acquiesce to any pleading seeking to limit such rights

filed by any other party.

41.    Cash Collateral Remedies.    Notwithstanding anything contained in the DIP Loan Documents or to the contrary contained in this Final Order, upon the occurrence of (i) any of the foregoing Cash Collateral Termination Events and (ii) a vote of the Majority Banks (as defined in the Existing Credit Facility), and at all times thereafter, the Debtors' right to use the Cash Collateral will terminate upon further order of the Court in response to a motion filed by the Existing Lenders or Existing Agents seeking a determination that they are no longer adequately protected. (The foregoing is not intended to limit the rights of any other party to file a motion to terminate the Debtors' use of Cash Collateral.) Such motion shall be heard, on the request of the Existing Lenders or Existing Agents, on an expedited basis, on 48 hours prior notice of such motion to counsel to the Debtors, counsel to the Agents, counsel to the Committee, counsel to the Ad Hoc Committee of Senior Secured Noteholders, counsel to the Intermediary Bank, any affected landlord or licensor, the United States Trustee, and all parties entitled to notice pursuant

to Fed. R. Bankr. P. 2002, which notice may be provided by e-mail and facsimile transmission. Immediately upon such notice being given by the Existing Lenders or Existing Agents, the Debtors shall only be authorized to pay minimum operating costs until after the entry of an order in response to a motion filed in accordance with this paragraph. The Court shall endeavor to schedule a hearing on any such request for relief from the automatic stay at the earliest practicable date and shall take all reasonable steps to resolve such motion as promptly as possible. Nothing contained herein shall be deemed a limitation on or waiver by the Existing Lenders or Existing Agents of their respective rights to assert in any motion from relief from the automatic stay that no relief from the automatic stay is needed in order to exercise their rights under Code section 363. However, nothing in this Final Order is intended to modify the automatic stay or to authorize or permit the Existing Lenders or Existing Agents to exercise any rights or remedies.

(a)     Furthermore, upon the occurrence of (i) any of the foregoing Cash Collateral Termination Events and (ii) a vote of the Majority Banks (as defined in the Existing Credit Facility), but only after the repayment in full of the DIP Loans and the termination of all Commitments under the DIP Loan Agreement, the Existing Lenders may, at their absolute and sole discretion, exercise all rights and remedies and take all or any of the following actions: (x) declare the principal of and accrued interest on the Existing Indebtedness, together with all fees and other liabilities constituting the obligations owed to the Existing Lenders, to be immediately due and payable; (y) set off or realize upon and apply to the Existing Indebtedness amounts contained in any account maintained with or under the control of the Existing Lenders; and/or (z) take any other action or exercise any other right or remedy permitted to the Existing Lenders under the Existing Loan Documents, this Final Order or applicable law; provided, however, that

the Existing Lenders may exercise their rights and remedies specified in clauses (x) through (z) (inclusive) of this paragraph 41 only in accordance with the applicable provisions of paragraph 24 of this Final Order (as though the Existing Lenders and the Existing Agents were included in such paragraph 24) and subject to relief from the stay being granted.

(b)     Notwithstanding anything to the contrary herein, nothing in this Final Order shall be deemed to change the burden of proof with respect to the issue of adequate protection of the Existing Lenders and Existing Agents.

42.     Preservation of Rights. Except as otherwise specifically provided herein, or in the Intercreditor Agreement, to the extent modified herein, entry of this Final Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent may have against the Debtors or any third parties (including any rights granted under the Intercreditor Agreement), and without prejudice to the right of the DIP Lenders, the Agents, the Existing Lenders, and the Existing Agents to seek relief from the automatic stay in effect pursuant to section 362 of the Code, or any other relief under the Code or applicable non-bankruptcy law, including, without limitation, the right of the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent to (i) as to the DIP Lenders, Agents, Existing Lenders and Existing Agents, seek additional relief from the Court in respect of their respective interests in the Collateral (including, without limitation, the Cash Collateral) or relief from or modification of the automatic stay under section 362 of the Code, (ii) request conversion of any of the Chapter 11 Cases to cases under Chapter 7 of the Code and/or (iii) propose, subject to the provisions of section 1121 of the Code and the Debtors' rights to seek extensions thereunder (and the Existing Lenders' rights to object to any

such extensions), one or more Chapter 11 plans. Except as otherwise set forth herein, the Intercreditor Agreement shall remain in full force and effect in accordance with its terms.

43.     Debtors Must Maintain Insurance. The Debtors shall deliver to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, and counsel to the Ad Hoc Committee of Senior Secured Noteholders evidence satisfactory to the DIP Lenders, the Agents, the Existing Lenders and the Existing Agents that the Collateral is adequately insured under insurance policies acceptable to the DIP Lenders, the Agents, the Existing Lenders and the Existing Agents under which the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders and the 2008 Noteholder Agent are named as loss payees.

44.     No Release of Non-Debtors. Nothing contained in this Final Order shall be deemed to terminate, modify or release any obligations of any non-debtor guarantor to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents the 2008 Noteholders and the 2008 Noteholder Agent with respect to the respective obligations owed to the DIP Lenders, the Agents, the Existing Lenders, the Existing Agents, the 2008 Noteholders, the 2008 Noteholder Agent, or otherwise.

Dated: _____, _____
        April   7  , 2004

*Joel B. Rosenthal*

The Honorable Joel B. Rosenthal
United States Bankruptcy Judge