# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Jointly Administered |
| ONCO INVESTMENT COMPANY, | : | Case No. 04-10558 (JBR) |
| a Delaware corporation, et al., | : | |
| | : | |
| Debtors. | : | |
| | : | SECOND AMENDED DISCLOSURE |
| | : | STATEMENT PURSUANT TO SECTION 1125 |
| | : | OF THE BANKRUPTCY CODE FOR THE |
| | : | SECOND AMENDED JOINT PLAN OF |
| | : | REORGANIZATION OF DEBTORS AND |
| | : | DEBTORS IN POSSESSION |
| | : | |

DANIEL J. DeFRANCESCHI (DE 2732)
PAUL N. HEATH (DE 3704)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700 (Telephone)
(302) 658-6548 (Facsimile)

-and-

DAVID G. HEIMAN (OH 0038271)
HEATHER LENNOX (OH 0059649)
CARL E. BLACK (OH 0069479)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939 (Telephone)
(216) 579-0212 (Facsimile)

-and-

MICHELLE MORGAN HARNER (IL 6276282)
JONES DAY
77 W. Wacker Drive
Chicago, Illinois 60601
(312) 782-3939 (Telephone)
(312) 782-8585 (Facsimile)

July 30, 2004

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

**SECOND AMENDED DISCLOSURE STATEMENT,
DATED JULY 30, 2004 (THE "DISCLOSURE STATEMENT")**

**SOLICITATION OF VOTES
WITH RESPECT TO THE SECOND AMENDED JOINT PLAN
OF REORGANIZATION OF
DEBTORS AND DEBTORS IN POSSESSION**

**THE BOARDS OF DIRECTORS OF ONCO INVESTMENT COMPANY ("ONCO");
OGLEBAY NORTON COMPANY, ITS PARENT CORPORATION ("OGLEBAY"); AND EACH
OF ITS AFFILIATED DEBTORS LISTED ON THE ATTACHED EXHIBIT I (COLLECTIVELY
WITH ONCO AND OGLEBAY, THE "DEBTORS") BELIEVE THAT THE SECOND
AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS IN
POSSESSION DATED JULY 30, 2004 AND ATTACHED HERETO AS EXHIBIT II (THE
"PLAN"), IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. ALL PARTIES
ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR THEREOF. A
SUMMARY OF THE VOTING INSTRUCTIONS IS SET FORTH AT PAGE 137 OF THIS
DISCLOSURE STATEMENT. MORE DETAILED INSTRUCTIONS ARE CONTAINED ON
THE BALLOTS DISTRIBUTED TO PARTIES ENTITLED TO VOTE ON THE PLAN. TO BE
COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED
IN ACCORDANCE WITH THE BALLOT INSTRUCTIONS BY 5:00 P.M., EASTERN TIME, ON
[_____] [__], 2004 OR SUCH OTHER DATE IDENTIFIED ON YOUR BALLOT (THE
"VOTING DEADLINE"), UNLESS EXTENDED.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PROPOSED PLAN ARE
SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE
SATISFIED. SEE "OVERVIEW OF THE PLAN — CONDITIONS TO CONFIRMATION AND
THE EFFECTIVE DATE OF THE PLAN" AND "VOTING AND CONFIRMATION OF THE
PLAN — ACCEPTANCE OR CRAMDOWN." THERE IS NO ASSURANCE THAT THESE
CONDITIONS WILL BE SATISFIED OR WAIVED.**

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the Exhibits and schedules attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to all parties entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time subsequent to the date hereof.

**ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ
AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING
THE PLAN ATTACHED AS EXHIBIT II AND THE MATTERS DESCRIBED UNDER "RISK
FACTORS," PRIOR TO SUBMITTING BALLOTS PURSUANT TO THIS SOLICITATION.**

The summaries of the Plan and the other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the Exhibits thereto and documents described therein as being Filed prior to approval of the Disclosure Statement.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information

regarding the Debtors and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SEC OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "ASSERT," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN "RISK FACTORS" BELOW. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.**

**THE PROJECTED FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN THE SUBJECT OF AN AUDIT OR ANY REVIEW OR TESTING PROCEDURES BY THE DEBTORS' INDEPENDENT AUDITORS OR FINANCIAL ADVISORS, AND WAS NOT PREPARED IN ACCORDANCE WITH AICPA GUIDELINES FOR FINANCIAL FORECASTS.**

**All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan.**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## TABLE OF CONTENTS

SUMMARY ........................................................................................................................... 1

    The Debtors ................................................................................................................... 1

    The Chapter 11 Cases ................................................................................................... 1

    The Plan ........................................................................................................................ 1

    Voting and Confirmation of the Plan ........................................................................... 1

    Recommendation ........................................................................................................... 2

    Confirmation and Effective Date .................................................................................. 2

    Conditions to Confirmation and the Effective Date ..................................................... 2

    Treatment of Claims and Interests ................................................................................ 2

    Acceptance or Cramdown ............................................................................................. 3

    Tax Consequences of the Plan ...................................................................................... 4

    Risk Factors .................................................................................................................. 4

INTRODUCTION ................................................................................................................. 5

OVERVIEW OF THE PLAN ............................................................................................... 7

    Introduction .................................................................................................................. 7

    General Information Concerning Treatment of Claims and Interests ........................... 7

    Summary of Classes and Treatment of Claims and Interests ....................................... 8

    Information Regarding Assertion and Treatment of Administrative Claims and Priority
        Tax Claims ............................................................................................................. 13

        Administrative Claims ........................................................................................... 13

        Priority Tax Claims ............................................................................................... 15

    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims;
        Maximum Recovery .............................................................................................. 16

    Summary of Terms of Certain Securities to be Issued on the Effective Date and Other
        Post-Reorganization Indebtedness ........................................................................ 16

    New Common Stock ..................................................................................................... 16

    New Warrants ............................................................................................................... 17

    New Preferred Stock ..................................................................................................... 19

    New Term Loan ............................................................................................................ 23

    The Confirmation Facility ............................................................................................ 23

    Conditions to Confirmation and the Effective Date of the Plan ................................... 23

        Conditions to Confirmation ................................................................................... 24

        Conditions to the Effective Date ........................................................................... 24

        Effect of Nonoccurrence of Conditions to the Effective Date ............................... 24

    Modification or Revocation of the Plan ........................................................................ 25

**TABLE OF CONTENTS**
**(Cont'd)**

Page

TREATMENT OF CERTAIN CLAIMS UNDER THE PLAN .......................................... 25

    Treatment of Old Senior Secured Note Claims ............................................... 25

    Treatment of MLO Claims ............................................................................... 27

    Treatment of Tort Claims ................................................................................. 28

CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS ............... 30

    Background ....................................................................................................... 30

    Prepetition Operations and Liquidity ............................................................... 31

        Recent Corporate Acquisitions .............................................................. 31

        Recent Material Divestitures .................................................................. 32

        Overview of Prepetition Capital Structure ............................................ 32

    Factors Leading to Chapter 11 Filings ............................................................ 34

    Prepetition Restructuring Negotiations ............................................................ 35

OPERATIONS DURING THE CHAPTER 11 CASES ..................................................... 36

    Commencement of Chapter 11 Cases and First Day Relief ............................ 36

    Case Administration and Related Activities ..................................................... 37

        Retention of Professionals ..................................................................... 37

        The Creditors' Committee and Its Advisors ......................................... 37

        Certain Executory Contracts and Unexpired Leases ............................. 38

        Schedules ............................................................................................... 38

        Insurance Premium Financing Agreement ............................................ 38

        Assumption and Renewal of Insurance Contracts with Certain Affiliates of
           American International Group, Inc ........................................................ 39

        Indemnity Agreement with RLI Insurance Company ............................ 39

        Motion to Appoint Committee of Equity Security Holders ................... 39

        Motion to Appoint Committee of Toxic Tort Personal Injury Claimants ....... 40

        Motions of Tort Claimants for Relief from Automatic Stay .................. 40

        Solicitation Procedures Motion .............................................................. 40

        Exclusivity ............................................................................................. 40

        Adversary Proceeding Relating to Old Senior Secured Notes ............... 40

    Postpetition Operations and Liquidity ............................................................. 41

        First DIP Facility ................................................................................... 41

        Second DIP Facility ............................................................................... 41

    Consortium Letters of Intent ............................................................................ 42

## TABLE OF CONTENTS
### (Cont'd)

Page

Expressions of Interest in Certain of Debtors' Assets .............................................. 44

RECOVERY ACTIONS ................................................................................................. 44

Introduction .................................................................................................................. 44

Preference Claims ........................................................................................................ 44

Fraudulent Conveyance Actions .................................................................................. 45

Fiduciary Duties ........................................................................................................... 46

Other Types of Recovery Actions ............................................................................... 46

REORGANIZED OGLEBAY .......................................................................................... 46

Restructuring Transactions ........................................................................................... 46

Business and Properties of the Reorganized Debtors .................................................. 47

    Business .................................................................................................................. 47

    Legal Proceedings ................................................................................................. 57

    Additional Information .......................................................................................... 58

Selected Historical Financial Information .................................................................... 58

Projected Financial Information .................................................................................... 63

Management .................................................................................................................. 73

    Current Directors and Executive Officers of Oglebay ......................................... 73

    Executive Compensation ....................................................................................... 75

    Reorganized Oglebay Board of Directors ............................................................ 76

    Director Compensation ......................................................................................... 77

Amended and Restated Articles and Amended and Restated Code of Regulations of
Reorganized Oglebay ................................................................................................... 78

Employee Benefit Matters ............................................................................................ 80

    Self-Insured, Insured and Noninsured Plans and Programs ................................. 80

    Retirement Plans ................................................................................................... 81

    Capital Accumulation Plan ................................................................................... 83

    2002 Stock Option Plan ........................................................................................ 83

    Long-Term Incentive Plans .................................................................................. 84

    Officer Agreements .............................................................................................. 84

    Severance Agreements .......................................................................................... 85

    "Pour-Over" and Irrevocable Trusts ..................................................................... 86

    New Benefit Programs .......................................................................................... 86

Related Party Transactions ........................................................................................... 87

# TABLE OF CONTENTS
## (Cont'd)

Page

Chartered Aircraft ........................................................................................ 87

Michigan Limestone Operation ..................................................................... 87

Supplemental Retirement Benefit Plan of Mr. John N. Lauer ...................... 88

Employment Agreement with Mr. John N. Lauer ......................................... 88

Indemnity Arrangements ................................................................................. 89

Indemnification Obligations .......................................................................... 89

Treatment of Indemnification Obligations Under the Plan ........................... 90

RIGHTS OFFERING ........................................................................................... 90

Terms of the Rights Offering ......................................................................... 90

The Commitment Agreement .......................................................................... 91

SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE AND OTHER POST-
REORGANIZATION INDEBTEDNESS ............................................................ 94

Valuation ........................................................................................................ 94

New Common Stock ....................................................................................... 98

New Warrants ................................................................................................. 99

New Preferred Stock ...................................................................................... 102

Future Issuances of Stock .............................................................................. 108

New Term Loan .............................................................................................. 108

Confirmation Facility ..................................................................................... 108

RISK FACTORS ................................................................................................... 109

Risks Related to the Debtors' Reorganization ................................................ 109

Potential Disruption of Operations ................................................................. 109

Financial Condition of the Debtors; Substantial Leverage ............................ 109

Security Interests ............................................................................................ 110

Non-Confirmation of the Plan ........................................................................ 110

Projections ...................................................................................................... 111

Noncomparability of Historical Financial Information ................................. 111

Reorganized Oglebay's Long-Range Plans ................................................... 111

Risks Associated with Concentration of Share Ownership ........................... 111

Significant Influence of Principal Shareholders ........................................... 112

Certain Anti-Takeover Effects ...................................................................... 112

Implications of Resale of Shares Volume ..................................................... 112

Risks Related to the Securities ...................................................................... 112

**TABLE OF CONTENTS**
**(Cont'd)**

Page

Risks Associated with the Exercise of the New Warrants ........................... 112

Risks Associated with Purchasing the New Warrants ................................ 113

Risks Associated with Determination of Subscription Price for the New Preferred
Stock ................................................................................................ 113

Limitations on, and Effects from, Repurchase of New Preferred Stock Upon a
Change of Control ............................................................................. 113

Dividend Policies; Restrictions on Payment of Dividends and Other Payments ...... 114

Risks Associated with Receipt and Ownership of New Common Stock ............ 114

Listing of Reorganized Oglebay's Securities ......................................... 115

Risks Related to the Oglebay Companies and Their Business ........................ 115

Fluctuation in Demand for Oglebay's Products and Services ...................... 115

Impact of the Highly Competitive Mining Industry ................................. 116

Risks Associated with Mining Operations ............................................ 116

Dependence on Adequate Mineral Reserves .......................................... 117

Risks Associated with Mine Closures .................................................. 117

Environmental and Silica Exposure Regulations .................................... 118

Other Regulations Affecting Mining Activity ........................................ 118

Reliance on Third Party Transportation .............................................. 119

Dependence on Existing Vessels ....................................................... 119

Potential for Increased Competitive Pressures from Other Modes of
Transportation .................................................................................. 120

Reliance on the Steel Industry .......................................................... 120

Seasonality .................................................................................. 120

Dependence on Significant Customers ................................................. 120

Risks Associated with Labor Relations ............................................... 121

Potential for Increased Expenditures for Postretirement Benefit and Pension
Obligations ...................................................................................... 121

Risks Associated with Litigation ....................................................... 122

GENERAL INFORMATION CONCERNING THE PLAN ................................. 122

Legal Effects of the Plan ..................................................................... 122

Discharge of Claims and Termination of Interests .................................. 122

Injunctions .................................................................................. 123

Termination of Certain Subordination Rights and Settlement of Related Claims
and Controversies ............................................................................. 124

**TABLE OF CONTENTS**
**(Cont'd)**

Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions ................................................................................................ 124

Comprehensive Settlement of Claims and Controversies ...................................... 125

Releases and Related Injunction ............................................................................. 125

Special Provisions Regarding Insured Claims ........................................................ 126

Cancellation and Surrender of Instruments, Securities and Other Documentation ..... 126

Release of Liens ...................................................................................................... 126

Limitation of Liability ............................................................................................ 127

Employment, Retirement and Other Related Agreements and Management Stock Programs; Retiree Benefits; Workers' Compensation Programs ........................ 127

Executory Contracts and Unexpired Leases ........................................................... 128

Substantive Consolidation ........................................................................................... 129

DISTRIBUTIONS UNDER THE PLAN .......................................................................... 130

General .......................................................................................................................... 130

Methods of Distributions ............................................................................................. 130

Distributions to Holders of Allowed Claims and Interests .................................... 130

Compensation and Reimbursement for Services Related to Distributions ............. 130

Delivery of Distributions in General ...................................................................... 130

Special Provisions for Distributions to Holders of Old Senior Subordinated Note Claims and Interests on Account of Old Common Stock of Oglebay ................ 131

Undeliverable or Unclaimed Distributions ................................................................... 131

Timing and Calculation of Amounts to Be Distributed ................................................ 132

Distributions of New Common Stock — No Fractional Shares; Rounding ............ 132

De Minimis Distributions ....................................................................................... 132

Distribution Record Date .............................................................................................. 132

Means of Cash Payments .............................................................................................. 133

Establishment of Reserves ............................................................................................ 133

Compliance with Tax Requirements ............................................................................. 133

Tender of Old Senior Subordinated Notes .................................................................... 133

Tender of Old Common Stock of Oglebay .................................................................... 134

Setoffs ........................................................................................................................... 134

Treatment of Disputed Claims ...................................................................................... 134

Objections to Claims and Authority to Prosecute Objections ...................................... 135

Distributions on Account of Disputed Claims Once Allowed ...................................... 135

**TABLE OF CONTENTS**
(Cont'd)

Page

Dissolution of the Creditors' Committee .......... 135
VOTING AND CONFIRMATION OF THE PLAN .......... 136
    General .......... 136
    Voting Procedures and Requirements .......... 136
    Confirmation Hearing .......... 137
    Confirmation .......... 138
    Acceptance or Cramdown .......... 138
    Best Interests Test; Liquidation Analysis .......... 138
    Feasibility .......... 140
    Compliance with Applicable Provisions of the Bankruptcy Code .......... 140
    Alternatives to Confirmation and Consummation of the Plan .......... 141
CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 141
    General .......... 141
    Consequences to Debtors .......... 142
        Cancellation of Indebtedness .......... 142
        Limitations on Tax Attribute Carryforwards .......... 142
    Consequences to Holders of Claims .......... 143
        Definition of Tax Securities .......... 143
        Holders of Claims Constituting Tax Securities .......... 143
        Holders of Claims Not Constituting Tax Securities .......... 143
    Consequences to Holders of Interests in Oglebay .......... 143
    Certain Other Tax Considerations for Holders of Claims and Interests .......... 144
        Pre-Effective Date Interest .......... 144
        Reinstatement of Claims .......... 144
        Receipt of Other Consideration by Holders of Claims in Class 7 .......... 144
        Information Reporting and Backup Withholding .......... 144
        Importance of Obtaining Professional Tax Assistance .......... 145
APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS .......... 145
    General .......... 145
        Bankruptcy Code Exemptions from Registration Requirements .......... 146
        Certain Transactions by Stockbrokers .......... 148
ADDITIONAL INFORMATION .......... 148
RECOMMENDATION AND CONCLUSION .......... 148

## TABLE OF EXHIBITS

Exhibit I      Subsidiary Debtors

Exhibit II     Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession

Exhibit III    Oglebay Annual Report on Form 10-K for the year ended December 31, 2003 and
               Quarterly Report on Form 10-Q for the quarter ended March 31, 2004

Exhibit IV     Liquidation Analysis

# SUMMARY

*This summary highlights some of the information discussed in greater detail elsewhere in this Disclosure Statement. This summary may not contain all of the information that is important to you, and you should carefully read the entire Disclosure Statement, including the Exhibits and the other documents to which we refer you. For a more detailed overview of the Plan, see "Introduction" (page 5) and "General Information Concerning the Plan" (page 122). All Exhibits to the Plan will be Filed with the Bankruptcy Court and available for review, free of charge, on The Trumbull Group, L.L.C.'s ("Trumbull") website (www.trumbullgroup.com (the "Document Website")) no later than [_____], 2004 (i.e., at least 20 days before the Voting Deadline (as defined below)). Copies of all Exhibits to the Plan also may be obtained, free of charge, from Trumbull by calling either 877-878-6285 (toll-free) or 860-697-5401.*

## The Debtors

The Debtors are ONCO; Oglebay, its parent corporation; and all of Oglebay's other direct and indirect wholly-owned subsidiaries. A list of the Subsidiary Debtors is attached hereto as Exhibit I.

## The Chapter 11 Cases

The Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code on February 23, 2004 to pursue a financial restructuring that would permit the Debtors to reduce their indebtedness and provide more financial flexibility to implement their business strategy. Since the commencement of the Chapter 11 Cases, the Debtors have been operating their businesses as debtors in possession under the supervision of the Bankruptcy Court. See "Certain Events Preceding the Debtors' Chapter 11 Filings" (page 30) and "Operations During the Chapter 11 Cases" (page 36).

## The Plan

On July 30, 2004, the Debtors filed the amended Plan with the Bankruptcy Court. Upon Bankruptcy Court approval of the Disclosure Statement, the Debtors will solicit acceptances of the Plan, a copy of which is attached hereto as Exhibit II. See "Overview of the Plan" (page 7), "General Information Concerning the Plan" (page 122) and "Distributions Under the Plan" (page 130). The Plan is supported by, and represents a valuable settlement with, the Creditors' Committee (a statutory committee established to represent the interests of unsecured creditors of the Debtors' Estates) and certain creditors holding a majority of the Debtors' outstanding indebtedness. See "Introduction" (page 5).

## Voting and Confirmation of the Plan

Holders of Claims against a Debtor in certain impaired Classes under the Plan are entitled to vote to accept or reject the Plan. If you hold Claims in more than one voting Class, or hold multiple Claims, you may receive more than one Ballot. You should complete, sign and return each Ballot that you receive. Please carefully follow all of the instructions contained on the Ballot provided to you. To be counted, your Ballot must be received by 5:00 p.m., Eastern Time, on [_____] [__], 2004 (or such other time identified on your Ballot) (the "Voting Deadline") at the address set forth on the pre-addressed envelope provided to you. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the voting agent, Trumbull, at 860-687-3952. See "Voting and Confirmation of the Plan" (page 136).

**Recommendation**

The Debtors' Boards of Directors recommend that all parties entitled to vote on the Plan vote to **ACCEPT** the Plan. The Creditors' Committee also supports the Plan, and has recommended that creditors vote to **ACCEPT** the Plan. See "Recommendation and Conclusion" (page 148).

**Confirmation and Effective Date**

The Confirmation Hearing, at which the Bankruptcy Court will consider approval of the Plan, currently is scheduled for September 29, 2004, beginning at 9:30 a.m., Eastern Time. Assuming that the requisite votes to accept the Plan are received, that the applicable requirements under the Bankruptcy Code are met and that the other conditions to the Confirmation of the Plan are satisfied, the Effective Date of the Plan currently is expected to occur on October 25, 2004, or as soon thereafter as practicable.

**Conditions to Confirmation and the Effective Date**

There are several conditions precedent to Confirmation of the Plan and the Effective Date, including the completion and execution of agreements relating to new financing and the raising of substantial new capital. If these conditions are not satisfied or waived, the Plan will not become effective. See "Overview of the Plan — Conditions to Confirmation and the Effective Date of the Plan" (page 23).

**Treatment of Claims and Interests**

For a summary of the classification of Claims and Interests, the estimated aggregate amount of Claims and Interests in each Class and the estimated amount and nature of distributions to holders of Claims and Interests in each Class under the Plan, see "Overview of the Plan — Summary of Classes and Treatment of Claims and Interests" (page 8).

The treatment of Classes under the Plan generally is as follows:

- Class 1 (Priority Claims) – Holders of Allowed Claims in Class 1, including certain employee wage Claims and certain other Claims entitled to priority under the Bankruptcy Code, will receive distributions of Cash in the full amount of their Allowed Claims (see page 9). Class 1 Claims are unimpaired;

- Class 2 (Vessel Term Loan Claims) – The Vessel Term Loan Agreement will be Reinstated on the Effective Date in accordance with Section I.A.91.b of the Plan (see page 9). Class 2 Claims are unimpaired;

- Class 3 (Old Senior Secured Note Claims) – Holders of Allowed Claims in Class 3, relating to the Old Senior Secured Notes issued by Oglebay, will have their Allowed Claims Reinstated pursuant to Section I.A.91.b of the Plan and thereafter such Allowed Claims will be redeemed and satisfied in full by the Reorganized Debtors with a Cash payment of 106% of principal amount of the Old Senior Secured Notes (which amount shall include the paid-in-kind interest), plus the accrued and unpaid interest thereon at the non-default rate through the date of such payment, in accordance with the terms of the Old Senior Secured Notes Purchase Agreement. Certain holders of Class 3 Claims have asserted the right to collect additional amounts from holders of Class 7 Claims pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture. The Debtors and the Creditors' Committee dispute this assertion and the parties intend to have the Bankruptcy Court resolve this dispute at or before the Confirmation Hearing (see page 9). Class 3 Claims are unimpaired;

- Class 4 (Other Secured Claims) – Holders of Allowed Claims in Class 4, relating to certain secured debt, will, at the election of the applicable Debtor, either receive distributions of Cash in the full amount of their Allowed Claims, have their Allowed Claims Reinstated or receive the collateral securing their Allowed Claims (see page 11). Class 4 Claims are unimpaired;

- Class 5 (General Unsecured Claims) – Holders of Allowed Claims in Class 5, relating to certain unsecured debt, will, at the election of the applicable Debtor or Reorganized Debtor, either receive distributions of Cash in the full principal amount of their Allowed Claims or have the full principal amount of their Allowed Claims Reinstated. On the Effective Date, all Tort Claims will be Reinstated in accordance with Section I.A.91.a of the Plan (see page 11). Class 5 Claims are unimpaired;

- Class 6 (MLO Claims) – The MLO Contract will be amended as set forth on Exhibit III.C.2 to the Plan and, as of the Effective Date, will be assumed (as amended) by Reorganized Oglebay (see page 12). Class 6 Claims are impaired;

- Class 7 (Old Senior Subordinated Note Claims) – Holders of Allowed Claims in Class 7, relating to the Old Senior Subordinated Notes issued by Oglebay, will receive their Pro Rata distribution of approximately 2,928,571 shares of New Common Stock in Reorganized Oglebay in satisfaction of their Allowed Claims (and any accompanying Share Purchase Rights in accordance with the Share Purchase Rights Agreement and Section IV.I of the Plan). Certain holders of Class 3 Claims have asserted the right to collect additional amounts from holders of Class 7 Claims pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture, which may dilute the ultimate recovery of Class 7 Claims under the Plan. The Debtors and the Creditors' Committee dispute this assertion and the parties intend to have the Bankruptcy Court resolve this dispute at or before the Confirmation Hearing (see page 12). Class 7 Claims are impaired;

- Class 8 (Intercompany Claims) – Holders of Allowed Claims in Class 8, relating to Claims by any Debtor against another Debtor, will not receive any property under the Plan (see page 12). Class 8 Claims are impaired;

- Class 9 (Subsidiary Debtor Equity Interests) – Holders of Allowed Interests in Class 9, relating to the subsidiary interests held directly or indirectly by Oglebay, will have their Allowed Interests Reinstated, subject to the Restructuring Transactions (see page 12). Class 9 Interests are unimpaired; and

- Class 10 (Old Common Stock of Oglebay) – The Old Common Stock of Oglebay will be cancelled on the Effective Date. Holders of Allowed Interests in Class 10 relating to the Old Common Stock of Oglebay will receive New Warrants to purchase one-tenth ($1/10^{th}$) of a share of New Common Stock (and any accompanying Share Purchase Rights in accordance with the Share Purchase Rights Agreement and Section IV.I of the Plan) for each share of Old Common Stock held on the Distribution Record Date (see page 13). Class 10 Interests are impaired.

**Acceptance or Cramdown**

The Plan will be treated as accepted by an impaired Class of Claims entitled to vote if holders of at least two-thirds in dollar amount and a majority in number of Claims of that Class vote to accept the Plan. In addition, pursuant to the Bankruptcy Code, a plan of reorganization may be confirmed even if it is not accepted by all impaired classes — a process referred to as "cramdown" — as long as the plan is accepted by at least one impaired class of claims (excluding the accepting votes of insiders) and the Bankruptcy Court finds that such a plan is fair and equitable and does not discriminate unfairly with

respect to dissenting impaired classes. The Debtors believe that the Plan may be crammed down over the dissent of certain Classes of Claims and Interests. See "Voting and Confirmation of the Plan — Acceptance or Cramdown" (page 138).

**Tax Consequences of the Plan**

For a summary description of certain federal tax consequences of the Plan, see "Certain U.S. Federal Income Tax Consequences of the Plan" (page 141).

**Risk Factors**

The success of the transactions contemplated by the Plan and the value of the securities to be issued under the Plan to holders of Allowed Claims and Interests in certain Classes are subject to numerous risks and uncertainties. See "Risk Factors" (page 109).

## INTRODUCTION

The Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit II. This Disclosure Statement is submitted by the Debtors in connection with the solicitation of acceptances of the Plan.

The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. The primary objectives of the Plan are to: (a) alter the Debtors' debt and capital structures to permit them to emerge from the Chapter 11 Cases with viable capital structures; (b) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis; and (c) settle, compromise or otherwise dispose of certain Claims and Interests on terms that the Debtors believe to be fair and reasonable and in the best interests of their respective Estates. The Plan provides for, among other things: (a) the cancellation of certain indebtedness in exchange for, as applicable, Cash or New Common Stock, as described below; (b) the Reinstatement of the Vessel Term Loan Agreement and the Old Senior Secured Notes; (c) the cancellation of Interests in the Old Common Stock of Oglebay; (d) the receipt by the holders of Allowed Interests in Class 10 of New Warrants to purchase shares of New Common Stock, as described below; (e) the consummation of the Confirmation Facility; (f) the assumption, assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases to which one or more of the Debtors is a party; (g) certain restructuring transactions designed to modify the existing Oglebay corporate structure; and (h) the settlement and release of claims by and against certain parties.

It will be a condition to the Effective Date that new financing be raised. To meet this condition, Oglebay intends to issue the New Preferred Stock, with terms substantially as described below under "Overview of the Plan—Summary of Terms of Certain Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness— New Preferred Stock" and "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Preferred Stock." Oglebay presently intends that the shares of New Preferred Stock will be offered and sold pursuant to (a) a rights offering (the "Rights Offering") made to all holders of Old Senior Subordinated Notes, (b) standby commitments made by certain of these holders and third party accredited investors who have agreed to purchase shares not subscribed for in the Rights Offering, and (c) commitments made by certain of these same holders and third party accredited investors to purchase in the aggregate 500,000 additional shares of New Preferred Stock. It is anticipated that the offering and sale of New Preferred Stock will be registered under the Securities Act of 1933, as amended (the "Securities Act"). A registration statement for this offering was filed with the SEC on May 14, 2004. If the Rights Offering cannot be consummated in the form and manner currently contemplated, Oglebay intends to raise new financing pursuant to an alternative financing structure also involving the issuance of the shares of New Preferred Stock **THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OF THE NEW PREFERRED STOCK.**

Oglebay following the Effective Date is referred to herein as Reorganized Oglebay.

PLEASE REFER TO THE CHART BEGINNING ON PAGE 9 OF THIS DISCLOSURE STATEMENT FOR A SUMMARY OF THE PROPOSED TREATMENT OF EACH CLASS OF CLAIMS AND INTERESTS.

If the Plan is confirmed and consummated in accordance with its terms, on the Effective Date, (a) 100% of the New Common Stock initially will be owned by holders of Allowed Claims in Class 7 (see "Overview of the Plan—Summary of Classes and Treatment of Claims and Interests" and "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims" for a discussion of the possible alternative treatment of Class 7 under the Plan), (b) the New Warrants will be owned by holders of Allowed Interests in Class 10, and (c) it is anticipated that the New Preferred Stock of Reorganized Oglebay will be owned by holders of Old Senior Subordinated Notes (or permitted transferees of

subscription rights) who exercise their subscription rights and those holders of Old Senior Subordinated Notes and certain third party accredited investors with purchase and standby commitments as described above. Ownership of the New Common Stock distributed pursuant to the Plan will be subject to dilution from (a) issuance of New Common Stock upon exercise of the New Warrants, (b) issuance of New Common Stock upon conversion of the New Preferred Stock, and (c) issuance of New Common Stock to certain employees under the Management Stock Plan. On the Effective Date, Reorganized Oglebay expects that (a) 8,500,000 shares of New Preferred Stock will be issued to certain holders of Old Senior Subordinated Notes and certain third party accredited investors (constituting 100% of the shares of New Preferred Stock), (b) approximately 2,928,571 shares of New Common Stock will be distributed to holders of Allowed Claims in Class 7 (constituting 100% of the shares of New Common Stock to be issued on the Effective Date) (see "Overview of the Plan—Summary of Classes and Treatment of Claims and Interests" and "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims" for a discussion of the possible alternative treatment of Class 7 under the Plan), (c) a number of shares of New Common Stock equal to one-tenth $(1/10^{th})$ of the number of shares of Old Common Stock held by holders of Allowed Interests in Class 10 on the Distribution Record Date (which number is currently expected to be an aggregate of approximately 523,869 shares of New Common Stock) will be reserved for issuance upon exercise of the New Warrants, (d) 17,233,091 shares of New Common Stock will be initially reserved for issuance upon conversion of the New Preferred Stock (which number consists of (i) 8,500,000 shares initially reserved for issuance upon conversion of the 8,500,000 shares of New Preferred Stock to be issued on the Effective Date plus (ii) additional shares reserved for issuance as a result of the accretion of dividends thereon through the fifth anniversary of the Effective Date), and (e) approximately 1,325,397 shares of New Common Stock will be reserved for issuance under the Management Stock Plan, a portion of which are expected to be granted shortly following the Effective Date. See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness" and "Reorganized Oglebay–Employee Benefit Matters–New Benefit Programs—Management Stock Plan."

The approximately 2,928,571 shares of New Common Stock and the 8,500,000 shares of New Preferred Stock to be issued and outstanding on the Effective Date will represent approximately 25.6% and 74.4%, respectively, of the total voting power and equity interests in Reorganized Oglebay (before giving effect to the issuance of the shares of New Common Stock reserved for issuance as described above).

In accordance with the Bankruptcy Code, Confirmation of the Plan and the occurrence of the Effective Date will result in the discharge of certain Claims and Interests against or in the Debtors. See "General Information Concerning the Plan — Legal Effects of the Plan — Injunctions."

**By an order of the Bankruptcy Court dated [_____] [\_\_\_\_], 2004, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).**

**THE DEBTORS' BOARDS OF DIRECTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED BY THE DEBTORS TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., EASTERN TIME, ON THE VOTING DEADLINE. THE CREDITORS' COMMITTEE ALSO SUPPORTS THE PLAN AND HAS RECOMMENDED ACCEPTANCE OF THE PLAN.**

The requirements for Confirmation, including the vote of eligible parties to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in "Voting and Confirmation of the Plan." Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of significant conditions, which are summarized in "Overview of the Plan — Conditions to Confirmation and the Effective Date of the Plan." There is no assurance that these conditions will be satisfied or waived.

## OVERVIEW OF THE PLAN

### Introduction

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, which is attached hereto as Exhibit II, and the Exhibits thereto, as amended from time to time, which are or will be available for inspection at the Document Website. See "Additional Information." For a description of certain other significant terms and provisions of the Plan, see "General Information Concerning the Plan" and "Distributions Under the Plan."

### General Information Concerning Treatment of Claims and Interests

The Plan provides that holders of Allowed Claims in certain Classes will be entitled to distributions of Cash or New Common Stock in respect of their Claims. Oglebay anticipates that the Cash required to make these distributions will be funded, in general, from (a) the Reorganized Debtors' cash balances and operations and (b) the Confirmation Facility. The proceeds from the issuance of the New Preferred Stock pursuant to the terms of the new financing, which is currently contemplated to consist of (i) the Rights Offering, (ii) the standby commitments made by certain holders of Old Senior Subordinated Notes and third party accredited investors who have agreed to purchase shares not subscribed for in the Rights Offering, and (iii) the commitments made by certain of these same holders and third party accredited investors to purchase in the aggregate 500,000 additional shares of New Preferred Stock, will be used to redeem the Old Senior Secured Notes after the Effective Date in accordance with the optional redemption provisions of the Old Senior Secured Notes Purchase Agreement. In connection with the Plan, Reorganized Oglebay will issue 2,928,571 shares of New Common Stock to holders of Allowed Claims in Class 7 (and any accompanying Share Purchase Rights in accordance with the Share Purchase Rights Agreement, if adopted). See "Overview of the Plan— Summary of Classes and Treatment of Claims and Interests" and "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims" for a discussion of the possible alternative treatment of Class 7 under the Plan. In addition, shares of Old Common Stock of Oglebay and any option or any associated share purchase right relating to such common stock will be cancelled on the Effective Date. Holders of Allowed Interests in Class 10 (Old Common Stock of Oglebay) will receive New Warrants to purchase one-tenth (1/10th) of a share of New Common Stock for each share of Old Common Stock held on the Distribution Record Date (which number is currently expected to be an aggregate of approximately 523,869 shares of New Common Stock). If the Share Purchase Rights Agreement is adopted, shares of New Common Stock issued upon exercise of the New Warrants will also be accompanied by Share Purchase Rights. Shares of the Subsidiary Debtors' common stock and any option or any associated share purchase right relating to such common stock outstanding immediately prior to the Effective Date will be Reinstated, subject to the Restructuring Transactions, on the Effective Date. See "—Summary of Terms of Certain Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness" for a description of the New Common Stock, the New Warrants and the New Preferred Stock to be issued on the Effective Date. For an explanation of the treatment of the Allowed Claims and Allowed Interests not discussed above and for further explanation of the treatment of Allowed Claims and Allowed Interests in general, see also "— Summary of Classes and Treatment of Claims and Interests."

For purposes of computations of Claim amounts, administrative and other expenses and similar computational purposes, the Effective Date is assumed to occur on October 31, 2004 (the actual Effective Date, however, will occur after this time). There is no assurance as to if or when the Effective Date will actually occur. Procedures for the distribution of Cash and securities pursuant to the Plan are described in "Distributions Under the Plan."

The determination of the relative distributions to be received under the Plan by the holders of Allowed Claims and Allowed Interests in certain Classes was based upon, among other factors, estimates of the amounts of Allowed Claims and Allowed Interests in such Classes and the relative priorities of such Allowed Claims and Allowed Interests. The estimates of the amounts of Allowed Claims and Allowed Interests in each Class are set forth below in "— Summary of Classes and Treatment of Claims and Interests" and are calculated as of the assumed Effective Date of October 31, 2004. The distributions to be received by holders of Allowed Claims or Allowed Interests in certain Classes could differ from these estimates if the estimates, despite the Debtors' best efforts, prove to be inaccurate.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization in certain circumstances even if the plan is not accepted by all impaired classes of Claims and Interests. See "Voting and Confirmation of the Plan — Acceptance or Cramdown." The Debtors intend to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code with respect to Class 10 and any other impaired Class of Claims or Interests that rejects the Plan and reserve the right to amend the Plan, if necessary, in connection therewith. If such request were granted by the Bankruptcy Court, the dissenting Classes, in certain cases, may receive alternative treatment under the Plan. Although the Debtors believe that the Plan can be confirmed under the cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

**Summary of Classes and Treatment of Claims and Interests**

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class (calculated as of the assumed Effective Date of October 31, 2004) and the estimated amount and nature of distributions to holders of Allowed Claims or Allowed Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see "— Information Regarding Assertion and Treatment of Administrative Claims and Priority Tax Claims" below.

*The information set forth in the table below with respect to each Class of Claims or Interests is presented on a combined basis for all of the Debtors to which such information is applicable. The Estimated Aggregate Claims Amounts shown in the table below are based upon the Debtors' preliminary review of their books and records and reflect the Debtors' estimates of the aggregate amounts of such Claims that the Debtors believe will be asserted upon resolution of all Disputed Claims. Certain of these Disputed Claims may be material, and the total amount of all such Claims, including Disputed Claims, may be materially in excess of the total amount of all Allowed Claims assumed in the development of the Plan.*

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of, as applicable, the Cash or the assumed value of the New Common Stock or the assumed value of the New Warrants to be distributed to all holders of Allowed Claims or Allowed Interests, as applicable, in such Class, divided by the estimated aggregate amount of Allowed Claims or Allowed Interests, as applicable, in such Class. For purposes of these calculations, a value of $8.54 per share of New Common Stock has been assumed, based upon the midpoint of the estimated going concern enterprise value of Reorganized Oglebay, as set forth in "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—Valuation," and the approximately 2,928,571 shares of New Common Stock assumed to be issued on the Effective Date. See "Securities to be Issued on the Effective

Date and Other Post-Reorganization Indebtedness—Valuation" for a description of the manner in which the estimated enterprise value of Reorganized Oglebay was calculated and the assumptions used in connection with the foregoing and the limitations thereon, and "Risk Factors" for a discussion of various other factors that could materially affect the value of New Common Stock and the New Warrants distributed on the Effective Date.

*Although the Debtors' management believes that these valuation assumptions are reasonable, there is no assurance that the New Common Stock will have the value assumed herein. See "Risk Factors." Reorganized Oglebay intends to apply to list the New Common Stock on The Nasdaq National Market as soon as practicable after the Effective Date when Reorganized Oglebay meets the listing requirements. However, it is unlikely that the New Common Stock will qualify for listing at the time it is issued, and there can be no assurance that the New Common Stock will ever be listed on the Nasdaq National Market. If Reorganized Oglebay is not able to list such securities on the Nasdaq National Market, it intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Common Stock on the OTC Bulletin Board. Again, however, no assurance can be made that such securities will be quoted on the OTC Bulletin Board or that an active trading market will exist. The Old Common Stock of Oglebay currently is quoted on the Pink Sheets. The value of the New Common Stock ultimately may be substantially higher or lower than reflected in the valuation assumptions provided herein because of a number of other factors, including those discussed in "Risk Factors." The value of equity securities, such as the New Common Stock, issued under a plan of reorganization is subject to numerous unforeseeable circumstances and, therefore, cannot be predicted.*

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| Class 1 (Priority Claims): Consists of all Claims against any Debtor entitled to priority under Section 507(a) of the Bankruptcy Code that are not an Administrative Claim or a Priority Tax Claim. <br><br> Estimated Aggregate Claims Amount: $0[1] | Unimpaired. On the Effective Date, each holder of an Allowed Claim in Class 1 will receive Cash equal to the amount of such Allowed Claim, unless the holder of such Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment. <br><br> Estimated Percentage Recovery: 100% |
| Class 2 (Vessel Term Loan Claims): Consists of all Claims against a Debtor under or evidenced by the Vessel Term Loan Agreement. <br><br> Estimated Aggregate Claims Amount: $12,537,151.00, plus accrued and unpaid interest at the non-default rate. | Unimpaired. On the Effective Date, the Vessel Term Loan Agreement will be Reinstated in accordance with Section I.A.91.b of the Plan. In addition, each holder of an Allowed Vessel Term Loan Claim shall be entitled to retain any amounts paid to it or on its behalf as adequate protection (and receive and retain any other amounts that as of the Effective Date are due as adequate protection under the First Final DIP Order, the Second Final DIP Order or any other Final Order of the Bankruptcy Court but not previously paid). <br><br> Estimated Percentage Recovery: 100% |
| Class 3 (Old Senior Secured Note Claims): Consists of all Claims against a Debtor under or evidenced by the Old Senior Secured Notes | Unimpaired. On the Effective Date, the Old Senior Secured Notes will be Reinstated pursuant to Section I.A.91.b of the Plan and thereafter the |

---

[1]    A nominal amount of Priority Claims may be asserted against the Debtors.

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| Purchase Agreement, including any Claims pursuant to any guaranty agreement<br><br>Estimated Aggregate Claims Amount: $92,642,241.00, which includes $75,000,000.00 outstanding principal, plus paid-in-kind interest in the amount of $8,842,718.00 and accrued and unpaid cash interest in the amount of $8,799,523.00 | Reinstated Old Senior Secured Notes will be redeemed and satisfied in full by the Reorganized Debtors with a Cash payment of 106% of principal amount of the Old Senior Secured Notes (which amount shall include the paid-in-kind interest), plus the accrued and unpaid interest thereon at the non-default rate through the date of such payment, in accordance with the terms of the Old Senior Secured Notes Purchase Agreement.<br><br>Each holder of an Allowed Senior Secured Note Claim may retain any amounts paid to it or on its behalf as adequate protection (and receive and retain any other amounts that as of the Effective Date are due as adequate protection under the First Final DIP Order or the Second Final DIP Order but not previously paid); *provided, however*, that the Debtors reserve the right to seek to have some or all of such amounts applied to the principal balance of a holder's Old Senior Secured Note Claim.<br><br>In addition, to the extent that attorneys' fees and expenses for the *Ad Hoc* Noteholders' Committee and/or the predecessor thereto remain outstanding as of the Effective Date, such attorneys may submit a request for the payment of such reasonable fees and expenses as follows: (a) such attorneys shall provide reasonable detail in support of their respective Claims to the parties identified in Section XIII.G of the Plan no later than ten days after the Effective Date; (b) such parties shall have the right to File objections to such Claims based on a "reasonableness" standard and/or the terms of the Old Senior Secured Notes and the Old Senior Secured Notes Purchase Agreement within 20 days after receipt of supporting documentation; and (c) the Reorganized Debtors shall pay any such Claims by the later of (i) 30 days after the receipt of supporting documentation from such attorneys or (ii) ten Business Days after the resolution of any objections to the Claims of such attorneys. The Reinstatement of the Old Senior Secured Notes under the Plan and any distributions under such notes will not be affected or reduced on account of the payment of reasonable attorneys' fees and expenses pursuant to Section III.B.3 of the Plan.<br><br>Certain holders of Class 3 Claims have asserted the right to collect additional amounts from holders of Class 7 Claims pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture. The Debtors and the Creditors' |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| | Committee dispute this assertion and the parties intend to have the Bankruptcy Court resolve this dispute at or before the Confirmation Hearing.<br><br>Estimated Percentage Recovery: 100% |
| Class 4 (Other Secured Claims): Consists of all Secured Claims against any Debtor other than a Prepetition Bank Loan Claim, an Old Senior Secured Note Claim or a Vessel Term Loan Claim.<br><br>Estimated Aggregate Claims Amount: $189,279.00 | Unimpaired. On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Claim in Class 4 will receive treatment on account of such Allowed Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor. The applicable Debtor will be deemed to have elected Option B except with respect to any Allowed Claim as to which the applicable Debtor elects Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing.<br><br>Option A: On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects Option A will be paid in Cash in full.<br><br>Option B: On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.<br><br>Option C: On the Effective Date, a holder of an Allowed Claim in Class 4 with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim<br><br>Estimated Percentage Recovery: 100% |
| Class 5 (General Unsecured Claims): Consists of all Claims that are not an Administrative Claim, Cure Amount Claim, Priority Claim, Priority Tax Claim, Prepetition Bank Loan Claim, Old Senior Secured Note Claim, Vessel Term Loan Claim, Other Secured Claim, Old Senior Subordinated Note Claim or MLO Claim.<br><br>Estimated Aggregate Claims Amount: $26,933,677.00 | Unimpaired. On the Effective Date, holders of Allowed General Unsecured Claims, at the election of the applicable Debtor or Reorganized Debtor, will (a) receive Cash equal to the principal amount of its Allowed General Unsecured Claim or (b) have the principal amount of its Allowed General Unsecured Claim Reinstated. On the Effective Date, all Tort Claims will be Reinstated in accordance with Section I.A.91.a of the Plan.<br><br>Estimated Percentage Recovery: 100% |

| | |
|---|---|
| Class 6 (MLO Claims): Consists of all Claims against a Debtor under or evidenced by the MLO Contract.<br><br>Estimated Aggregate Claims Amount: $14,000,000.00 to $26,100,000.00 | Impaired. The MLO Contract will be amended as set forth on Exhibit III.C.2 of the Plan and, as the Effective Date, will be assumed (as amended) by Reorganized Oglebay pursuant to Section V.A of the Plan and section 365 of the Bankruptcy Code. The MLO Claims will be paid in accordance with the amended MLO Contract.<br><br>Estimated Percentage Recovery: See "Treatment of Certain Claims Under the Plan—Treatment of MLO Claims." |
| Class 7 (Old Senior Subordinated Note Claims): Consists of all Claims against a Debtor under or evidenced by the Old Senior Subordinated Note Indenture, including any Claims pursuant to any guaranty agreement.<br><br>Estimated Aggregate Claims Amount: $105,611,111.11, which includes accrued and unpaid prepetition interest. | Impaired. The Old Senior Subordinated Note Claims will be allowed in the aggregate amount of $105,611,111.11. On the Effective Date, each holder of an Allowed Old Senior Subordinated Note Claim will receive in respect of such Allowed Claim against all of the Debtors its Pro Rata share of approximately 2,928,571 shares of New Common Stock (and any accompanying Share Purchase Rights in accordance with the Share Purchase Rights Agreement and Section IV.I of the Plan).<br><br>Certain holders of Class 3 Claims have asserted the right to collect additional amounts from holders of Class 7 Claims pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture, which may dilute the ultimate recovery of Class 7 Claims under the Plan. The Debtors and the Creditors' Committee dispute this assertion and the parties intend to have the Bankruptcy Court resolve this dispute at or before the Confirmation Hearing.<br><br>Estimated Percentage Recovery: 24% |
| Class 8 (Intercompany Claims): Consists of any Claim by any Debtor against another Debtor. | Impaired. No property will be distributed to the holders of Allowed Intercompany Claims. Notwithstanding this treatment of Class 8 Claims, each of the holders of an Intercompany Claim will be deemed to have accepted the Plan.<br><br>Estimated Percentage Recovery: 0% |
| Class 9 (Subsidiary Debtor Equity Interests): Consists of, as to a particular Subsidiary Debtor, any Interests in such Debtor held directly or indirectly by Oglebay. | Unimpaired. On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions.<br><br>Estimated Percentage Recovery: 100% |

| Class 10 (Old Common Stock of Oglebay): Consists of Interests in respect of the Old Common Stock of Oglebay and any Claims related thereto | Impaired. On the Effective Date, the Old Common Stock of Oglebay will be cancelled. Each holder of an Allowed Interest on account of Old Common Stock of Oglebay will receive New Warrants to purchase one-tenth ($1/10^{th}$) of a share of New Common Stock (and any accompanying Share Purchase Rights in accordance with the Share Purchase Rights Agreement and Section IV.I of the Plan) for each share of Old Common Stock held on the Distribution Record Date. Based on the number of shares of Old Common Stock currently outstanding, the Debtors anticipate that the New Warrants will be exercisable for an aggregate of approximately 523,869 shares of New Common Stock. A holder of Old Common Stock of Oglebay who does not hold an Allowed Interest on the Distribution Record Date will not receive any New Warrants. Estimated Percentage Recovery: 0% |

**Information Regarding Assertion and Treatment of Administrative Claims and Priority Tax Claims**

*Administrative Claims*

Except as specified in Section III.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim. Administrative Claims are defined in the Plan as Claims for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) Claims under the Second DIP Credit Agreement (including any adequate protection rights granted in connection with the approval thereof by the Bankruptcy Court); (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; (d) Claims for reclamation allowed in accordance with section 546(c)(2) of the Bankruptcy Code and Section 2-702 of the Uniform Commercial Code; (e) all fees and charges assessed against the Estates under chapter 123 of the title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (f) all postpetition Intercompany Claims.

In addition to the types of Administrative Claims described above, section 503(b) of the Bankruptcy Code provides for payment of compensation or reimbursement of expenses to creditors and other entities making a "substantial contribution" to a chapter 11 case and to attorneys for and other professional advisors to such entities. The amounts, if any, that such entities will seek or may seek for such compensation or reimbursement are not known by the Debtors at this time. Requests for such

compensation or reimbursement must be approved by the Bankruptcy Court after notice and a hearing at which the Debtors and other parties in interest may participate and, if appropriate, object to the allowance of any such compensation or reimbursement.

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years commencing after the Petition Date), Cure Amount Claims, Administrative Claims arising from those contracts and leases of the kind described in Section V.C of the Plan and Intercompany Claims that are Administrative Claims will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims.

The Allowed Administrative Claims of the First DIP Lenders were paid in full by the Debtors on or about July 15, 2004, and the Debtors have no further obligations with respect thereto; *provided*, *however*, that certain funds are being held in escrow on account of certain Fee Claims of the Professionals to the Prepetition Lenders and the First DIP Lenders pending the approval of such Fee Claims by the Bankruptcy Court. Such escrow for Fee Claims shall be governed by the letter agreements executed among the parties and dated July 15, 2004. Unless otherwise agreed by the Second DIP Lenders pursuant to the Second DIP Credit Agreement, on or before the Effective Date, Allowed Administrative Claims on account of Second DIP Lender Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims. The treatment afforded to holders of Vessel Term Loan Claims and Old Senior Secured Note Claims as provided in Sections III.B.2 and III.C.1 of the Plan, respectively, shall satisfy any and all adequate protection rights related to such Claims.

In full satisfaction of the Old Senior Subordinated Note Fee Claims, subject to the terms and conditions of Section III.A.1.e of the Plan, the Indenture Trustee and the Old Senior Subordinated Note Professionals will receive from the Reorganized Debtors Cash equal to the amount of their respective Old Senior Subordinated Note Fee Claims. Any charging lien held by the Indenture Trustee or the Old Senior Subordinated Note Professionals against distributions to holders of the Old Senior Subordinated Notes will be deemed released upon payment of such Claims. To receive payment pursuant to Section III.A.1.e of the Plan, (a) the Indenture Trustee and the Old Senior Subordinated Note Professionals shall provide reasonable detail in support of their respective Claims to the parties identified in Section XIII.G of the Plan no later than ten days after the Effective Date; (b) such parties shall have the right to File objections to such Claims based on a "reasonableness" standard within 20 days after receipt of supporting documentation; and (c) the Reorganized Debtors shall pay any such Claims by the later of (i) 30 days after the receipt of supporting documentation from the Indenture Trustee or the Old Senior Subordinated Note Professionals as applicable, or (ii) ten Business Days after the resolution of any objections to the Claims of the Indenture Trustee or Old Senior Subordinated Note Professionals, as applicable. Distributions received by holders of Allowed Claims in respect of the Old Senior Subordinated Notes pursuant to the Plan will not be reduced on account of the payment of the Allowed Old Senior Subordinated Note Fee Claims.

Except as otherwise provided in Section III.A.1.f.ii of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request

by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Claims.

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; *provided, however*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

Holders of Administrative Claims arising from liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, Administrative Claims of governmental units for Taxes (including Tax Claims relating to audits arising after the Petition Date), Cure Amount Claims, Administrative Claims arising from those contracts and leases of the kind described in Section V.C of the Plan and Intercompany Claims that are Administrative Claims, will not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims will be satisfied pursuant to Section III.A.1.c of the Plan.

Holders of Administrative Claims on account of Second DIP Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section III.A.1.d of the Plan.

### *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim in a principal amount equal to the amount of its Priority Tax Claim. Payments will be made in equal quarterly installments of principal (commencing on the later of the first Quarterly Distribution Date or the first Quarterly Distribution Date following the date such Claim becomes an Allowed Claim), plus simple interest accruing from the Effective Date at 5% per annum on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims). The Reorganized Debtors will have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty.

Notwithstanding the provisions of Section III.A.2.a of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will

be subject to treatment in Class 5, if not subordinated to Class 5 Claims pursuant to an Order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors or their property.

## Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery

The classification and treatment of Allowed Claims under the Plan take into consideration all Secondary Liability Claims. Consistent with Article VIII of the Plan, holders of Allowed Secondary Liability Claims will be entitled to only one distribution on account of such underlying Claim. No multiple recovery on account of any Allowed Secondary Liability Claim will be provided or permitted.

Notwithstanding any provision of the Plan to the contrary, a creditor holding multiple Allowed Claims against more than one Debtor that do not constitute Secondary Liability Claims and that arise from the contractual joint, joint and several or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances may not receive in the aggregate from all Debtors more than 100% of the amount of the underlying Claim giving rise to such multiple Claims.

## Summary of Terms of Certain Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness

### New Common Stock

As of the Effective Date, Reorganized Oglebay will be authorized to issue 90,000,000 shares of common stock, par value $0.01 per share (the "New Common Stock"), of which: (a) approximately 2,928,571 shares will be distributed to holders of Allowed Claims in Class 7 (see "Overview of the Plan—Summary of Classes and Treatment of Claims and Interests" and "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims" for a discussion of the possible alternative treatment of Class 7 under the Plan); (b) 17,233,091 shares will be initially reserved for issuance upon conversion of the New Preferred Stock (which number consists of (i) 8,500,000 shares initially reserved for issuance upon conversion of the 8,500,000 shares of New Preferred Stock to be issued on the Effective Date plus (ii) additional shares reserved for issuance as a result of the accretion of dividends thereon through the fifth anniversary of the Effective Date); (c) a number of shares of New Common Stock equal to one-tenth $(1/10^{th})$ of the number of shares of Old Common Stock held by holders of Allowed Interests in Class 10 on the Distribution Record Date (which number is currently expected to be an aggregate of approximately 523,869 shares of New Common Stock) will be reserved for issuance upon the exercise of New Warrants; and (d) approximately 1,325,397 shares will be reserved for issuance under the Management Stock Plan.

The approximately 2,928,571 shares of New Common Stock and the 8,500,000 shares of New Preferred Stock to be issued and outstanding on the Effective Date will represent approximately 25.6% and 74.4%, respectively, of the total voting power and equity interests in Reorganized Oglebay (before giving effect to the issuance of the shares of New Common Stock reserved for issuance as described above).

In addition to the New Common Stock to be issued pursuant to the Plan, Reorganized Oglebay also will be authorized to issue additional shares of New Common Stock from time to time following the Effective Date under the provisions of the Amended and Restated Articles of Incorporation of Reorganized Oglebay (the "Amended and Restated Articles"), the Amended and Restated Code of Regulations of Reorganized Oglebay (the "Amended and Restated Code of Regulations") and applicable law. The holders of New Common Stock will be entitled to one vote per each share held of record on all

matters submitted to a vote of shareholders, except for the election of directors or as otherwise limited by the terms of the New Preferred Stock or any preferred stock issued after the Effective Date.

Subject to the terms of the New Preferred Stock or any preferred stock issued after the Effective Date, holders of the New Common Stock will be entitled to receive ratably such dividends as may be declared by Reorganized Oglebay's Board of Directors out of funds legally available for payment of dividends. Reorganized Oglebay will be required, subject to restrictions described herein, to pay dividends on the New Preferred Stock, but does not anticipate paying dividends on the New Common Stock. See "Risk Factors–Risks Related to the Securities–Dividend Policies; Restrictions on Payment of Dividends and Other Payments." In the event of a liquidation, dissolution or winding up of Reorganized Oglebay, holders of the New Common Stock will be entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preference of any additional issuances of preferred stock, including the New Preferred Stock. All of the outstanding shares of the New Common Stock to be issued pursuant to the Plan, upon such issuance, will be validly issued, fully paid and nonassessable. Holders of the New Common Stock will have no preemptive, subscription, redemption or conversion rights. Subject to the terms and conditions set forth in the Share Purchase Rights Agreement, if adopted, each share of New Common Stock issued pursuant to the Plan will be accompanied by a Share Purchase Right. See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Common Stock."

## New Warrants

Set forth below is a brief summary of the material provisions relating to the New Warrants. This summary is not intended to be complete and is qualified in its entirety by the provisions of the New Warrant Agreement and the New Warrant Certificate setting forth the terms and conditions of the New Warrants. See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Warrants."

***General.*** Under the absolute priority rule of the Bankruptcy Code, holders of Allowed Interests in Class 10 are not entitled to any distributions on account of such Interests. Nevertheless, as a result of the negotiations relating to the Commitment Agreement and the Plan, holders of Claims in Class 7, as a Class, have agreed to the treatment proposed by the Debtors for Class 10 under the Plan. Accordingly, on the Effective Date, holders of Allowed Interests in Class 10 will receive warrants to purchase shares of New Common Stock (the "New Warrants") on account of such Allowed Interests. Each New Warrant will represent the right to purchase one-tenth ($1/10^{th}$) of a share of New Common Stock for every share of Old Common Stock of Oglebay held on the Distribution Record Date at an exercise price of $10 per share. Based on the number of shares of Old Common Stock currently outstanding, the Debtors anticipate that the New Warrants will be exercisable for an aggregate of approximately 523,869 shares of New Common Stock. If the Share Purchase Rights Agreement is adopted, shares of New Common Stock issued upon exercise of the New Warrants will also be accompanied by Share Purchase Rights. Oglebay will enter into a warrant agreement (the "New Warrant Agreement") with National City Bank, as warrant agent (the "New Warrant Agent"). The New Warrant Agreement will govern the terms relating to the issuance, form, registration, exercise, transfer and exchange of the New Warrants, as well as adjustment provisions, if any. The New Warrants may only be exercised by their holders, in whole or in part, at any time and from time to time prior to 5:00 p.m., Eastern time, on the date that is 30 days after the Effective Date. Each New Warrant that is not exercised before such time will become void, and all rights of the holder in respect of such New Warrant will cease as of such date.

The New Warrants will be issued in either global form or in definitive, certificated form representing individual warrants. The global warrant will represent such number of the outstanding New Warrants as specified in the global warrant and will provide that it will represent the aggregate amount of outstanding New Warrants from time to time endorsed on the global warrant and that the aggregate amount of outstanding New Warrants may from time to time be reduced or increased, as appropriate.

Any such endorsement will be made by the New Warrant Agent and The Depository Trust Company ("DTC") which will be acting as the depositary. Upon request, a holder of New Warrants may receive from the New Warrant Agent separate definitive warrants.

*Delivery.* On the Effective Date, Reorganized Oglebay will deliver, by first class mail, to the holders of the New Warrants either a certificate representing the New Warrants, or notice of such holder's position in a global New Warrant representing the New Warrants in the case where such holders' Old Common Stock is held in the name of a broker, bank, depositary or other nominee, which notice will indicate the material terms and conditions and exercise instructions of the New Warrant and a form of election to purchase.

*Undeliverable New Warrants.* If any distribution of a certificate representing the New Warrants or notice of New Warrants is returned to the New Warrant Agent as undeliverable, no further distributions will be made to the holder unless and until the New Warrant Agent and Reorganized Oglebay are notified in writing of such holder's then-current address. Generally, such undeliverable distributions will remain in the New Warrant Agent's possession until they become deliverable. The right to exercise any New Warrant will terminate at 5:00 p.m., Eastern time, on the date that is 30 days after the Effective Date, regardless of whether the certificate representing, or notice of, the New Warrant has been delivered.

*Exercise.* The New Warrants will be exercisable by surrendering the following to the New Warrant Agent: (a) the New Warrant certificate, if any; (b) the form of election to purchase, properly completed and signed, which signature must be guaranteed by an Eligible Guarantor Institution pursuant to SEC rule 17Ad-15; and (c) payment to the New Warrant Agent, by certified check, official bank check or wire transfer, for Reorganized Oglebay's account, of the aggregate New Warrant exercise price for the number of shares of New Common Stock in respect of which such New Warrants are then exercised.

*Fractional Shares.* Reorganized Oglebay will not issue any fractional shares of New Common Stock upon the exercise of the New Warrants. If more than one New Warrant is presented for exercise at the same time by the same holder, the number of full shares of New Common Stock issuable upon the exercise of such New Warrants will be computed on the basis of the aggregate number of shares purchasable upon exercise of such New Warrants. If any fraction of a share of New Common Stock would otherwise be issuable upon the exercise of any New Warrants, Reorganized Oglebay will round to the nearest whole number of shares of New Common Stock to be issued (up or down), with half shares being rounded up.

*Taxes.* Reorganized Oglebay will not be required to pay any taxes that may be payable upon the issuance of new certificates evidencing the New Warrants or shares of New Common Stock in a name other than that of the registered holder. Reorganized Oglebay will not issue or deliver such New Warrant certificates evidencing the New Warrants or shares of New Common Stock unless and until the person requesting the issuance shall have paid Reorganized Oglebay such tax or established that such tax has been paid.

*Listing.* The New Warrants will not be listed on any securities exchange. However, Reorganized Oglebay intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Warrants on the OTC Bulletin Board. The ability to publicly trade the New Warrants on the OTC Bulletin Board is entirely dependent upon registered broker-dealers applying to the OTC Bulletin Board to initiate quotation of such securities. Reorganized Oglebay intends to notify market makers to request them to apply to the OTC Bulletin Board to initiate quotations in the New Warrants. Other than furnishing to registered broker-dealers copies of this Disclosure Statement, Reorganized Oglebay will have no control over the process of quotation initiation on the OTC Bulletin Board.

This summary of the New Warrants is qualified by reference to the terms set forth on Exhibit I A 60 of the Plan.

**New Preferred Stock**

The Amended and Restated Articles will provide that, as of the Effective Date, Reorganized Oglebay will be authorized to issue 30,000,000 shares of preferred stock, of which 8,500,000 shares are designated as Series A Convertible Preferred Stock, par value $0.01 per share (the "New Preferred Stock").

On February 23, 2004, Oglebay entered into a commitment agreement (as further amended and modified from time to time, the "Commitment Agreement") with certain holders of the Old Senior Subordinated Notes holding an aggregate of $40,316,000 in principal amount of Old Senior Subordinated Notes and certain third party accredited investors (collectively, the "Subscribers"). Under the terms of the Commitment Agreement, Oglebay agreed to conduct the Rights Offering. In addition, each of the holders of Old Senior Subordinated Notes party to the Commitment Agreement severally agreed to subscribe for and purchase its ratable share of $80 million of the New Preferred Stock, and certain of such holders, along with certain third party accredited investors party thereto, severally agreed to purchase specified amounts of shares of the New Preferred Stock that are not subscribed for in the Rights Offering, all subject to the satisfaction or waiver of certain conditions contained in the Commitment Agreement. On June 29, 2004, Oglebay entered into an amendment to the Commitment Agreement under which certain of the holders of Old Senior Subordinated Notes who, together with certain third party accredited investors, had agreed to purchase the shares of New Preferred Stock not subscribed for in the Rights Offering, further agreed to purchase an aggregate of 500,000 additional shares of the New Preferred Stock at $10 per share for a total purchase price of $5 million, subject to the satisfaction or waiver of the conditions set forth in the Commitment Agreement. The additional 500,000 shares will be allocated among such holders of Old Senior Subordinated Notes and such third party accredited investors in proportion to their respective standby commitments under the Commitment Agreement in respect of the Rights Offering. Accordingly, assuming that the Rights Offering is consummated in the form and manner currently contemplated, even if the subscription rights are not exercised in full before they expire, Oglebay will be guaranteed to receive a total of $85 million in cash, before deducting the expenses of the Rights Offering.

Set forth below is a brief outline of the material provisions relating to the New Preferred Stock. This outline is not intended to be complete and is qualified in its entirety by the provisions of the Amended and Restated Articles setting forth the rights, preferences, privileges and restrictions of the New Preferred Stock, a copy of the form of which will be filed as an Exhibit to the Plan. See "Reorganized Oglebay—Amended and Restated Articles and Amended and Restated Code of Regulations of Reorganized Oglebay."

*Ranking*   The New Preferred Stock will, with respect to dividend rights and rights upon Reorganized Oglebay's liquidation, winding-up or dissolution, rank senior to the New Common Stock and, except as otherwise approved by the holders of a majority of the outstanding shares of the New Preferred Stock or contemplated by the terms of the New Preferred Stock, all other classes of capital stock or series of preferred stock established by Reorganized Oglebay after the Effective Date ("Junior Stock"). The rights of the holders of New Preferred Stock, however, will be subordinate to the rights of the lenders under the Confirmation Facility, other holders of Reorganized Oglebay's indebtedness and other general creditors.

*Dividend Rights*   Holders of the New Preferred Stock will be entitled to receive, out of Reorganized Oglebay's assets legally available for payment, dividends on the then effective Liquidation Preference (as defined below), payable quarterly, at an annual rate that Oglebay anticipates to be equal to 14.25%, which is 200 basis points over the anticipated highest applicable interest rate payable under the Confirmation Facility as of the Effective Date. Until the third anniversary of the Effective Date, dividends will be deemed paid by accreting and adding the amount of the per share dividend to the then effective Liquidation Preference of each share of New Preferred Stock. After that date, dividends will be

payable in cash, unless Reorganized Oglebay is prohibited under statutory law, or by the terms of the Confirmation Facility, or any facility or security refinancing the Confirmation Facility, from paying cash dividends, in which case, the dividends will be deemed paid by accreting and adding the amount of the per share dividend to the then effective Liquidation Preference. Dividends on the New Preferred Stock will be cumulative

In addition to the dividends provided above, holders of the New Preferred Stock will be entitled to receive an additional dividend in an amount equal to the amount by which (a) the aggregate amount of dividends that would have been received by holders of the New Preferred Stock in any dividend period if the holders' New Preferred Stock had been converted at the beginning of such dividend period into shares of New Common Stock at the Conversion Price (as defined below) exceeds (b) the aggregate New Preferred Stock dividend amount accrued or received in such dividend period described in the paragraph above. However, any dividend for which an adjustment in the Conversion Price of the New Preferred Stock is made pursuant to the applicable anti-dilution provisions will not be deemed a dividend or otherwise give rise to any rights under this paragraph Any such additional dividend will be payable to the holders of New Preferred Stock in the form of cash

***Conversion Rights*** A holder of New Preferred Stock will have the right, at his or her option, to convert any or all of his or her shares of New Preferred Stock into the number of shares of New Common Stock obtained by dividing the aggregate then effective Liquidation Preference of the shares of New Preferred Stock being converted by the conversion price (the "Conversion Price"). The initial Conversion Price equals $10 and will be adjusted upon the occurrence of specified events. See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Preferred Stock—Conversion Rights."

***Redemption.*** Shares of New Preferred Stock will not be subject to redemption prior to the first anniversary of the Effective Date. On or after the first anniversary of the Effective Date, the shares of New Preferred Stock will be redeemable at Reorganized Oglebay's option, in whole or in part, at any time or from time to time, out of funds legally available for payment, at the following redemption prices (expressed as a percentage of the then effective Liquidation Preference per share), plus, without duplication, accrued and unpaid dividends, if any, up to, but excluding, the date fixed for redemption:

| Year | Redemption Prices (expressed as a percentage of the then effective Liquidation Preference) |
|---|---|
| On or after the first anniversary of the Effective Date until, but excluding, the second anniversary of the Effective Date | 110% |
| On or after the second anniversary of the Effective Date until, but excluding, the third anniversary of the Effective Date | 108% |
| On or after the third anniversary of the Effective Date until, but excluding, the fourth anniversary of the Effective Date | 106% |
| On or after the fourth anniversary of the Effective Date | 104% |

In each case, however, the New Common Stock must be trading at or above an average of 130% of the Conversion Price for 30 consecutive trading days at any time prior to the date that Reorganized Oglebay provides the redemption notice

***Change of Control Repurchase.*** The Debtors are currently negotiating with the Creditors' Committee the possible adoption of a change of control repurchase provision that would provide each holder of New Preferred Stock the right, upon the occurrence of a "change of control" (to be defined) and subject to certain conditions and limitations, to require Reorganized Oglebay to repurchase any or all of such holder's shares of the New Preferred Stock. The terms of any change of control repurchase provision will be disclosed in Exhibit IV.C.1.a of the Plan.

***Voting Rights.*** Each holder of the New Preferred Stock will be entitled to the number of votes equal to the number of shares of New Common Stock into which shares of New Preferred Stock so held could be converted at the record date for determination of the shareholders entitled to vote, or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited. Except as required by law or as otherwise set forth below, all shares of New Preferred Stock and all shares of New Common Stock will vote together as a single class on all matters to come before the shareholders of Reorganized Oglebay. Fractional votes by the holders of New Preferred Stock will not be permitted, and any fractional voting rights (after aggregating all shares into which shares of New Preferred Stock held by each holder could be converted) will be disregarded.

For as long as shares of New Preferred Stock are outstanding, the affirmative vote of the holders of a majority of the outstanding shares of the New Preferred Stock shall be necessary for Reorganized Oglebay to:

- authorize or adopt an amendment to, or repeal any provision of, Reorganized Oglebay's Amended and Restated Articles (including by way of merger, consolidation or otherwise); provided that no modification or amendment may, without the consent of each holder of New Preferred Stock affected by the modification or amendment, decrease the Liquidation Preference or dividend rate of the New Preferred Stock;

- authorize, create, amend or issue, or increase the authorized amount of, any class or series of capital stock ranking equal to the New Preferred Stock ("Parity Stock") or senior to the New Preferred Stock ("Senior Stock"), or authorize or issue any derivative securities evidencing the right to acquire these shares of Senior Stock or Parity Stock; *provided, however,* that the affirmative vote of the holders of a majority of the outstanding shares of the New Preferred Stock will not be necessary for Reorganized Oglebay to authorize, create, amend or issue, or increase the authorized amount of, any class or series of Parity Stock or Senior Stock if either (a) all of the proceeds of such issuance will be used to redeem the New Preferred Stock, in whole or in part, or (b) a portion of the proceeds will be used to redeem all of the New Preferred Stock;

- increase the authorized amount of, or issue any additional shares of, New Preferred Stock;

- directly or indirectly recapitalize or reclassify any shares of Reorganized Oglebay capital stock into New Preferred Stock, Senior Stock or Parity Stock;

- pay or declare any dividend on any shares of Junior Stock (other than a dividend payable solely in shares of Junior Stock paid to holders of Junior Stock);

- take any action that results in the purchase or redemption by Reorganized Oglebay of any Parity Stock or Junior Stock;

- create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to any indebtedness other than (a) the maximum borrowing capacity provided for under the Confirmation Facility or any indebtedness to refinance, extend, renew, refund, repay, prepay, redeem, defease, or retire, or to exchange or replace, the Confirmation Facility

("Refinancing Indebtedness"), (b) any "permitted indebtedness," as such term is defined under the Confirmation Facility or any Refinancing Indebtedness and (c) any other indebtedness in an aggregate principal amount outstanding at any time not exceeding $30 million; provided that, the amount referred to in clause (c) will be increased to the extent that the borrowing capacity under the Confirmation Facility is permanently reduced; provided however, that this entire provision will cease to be effective as of the third anniversary date of the Effective Date; and

- effect a liquidation or other winding-up of Reorganized Oglebay.

Each holder of New Preferred Stock will be deemed to have voted or, in the case where the affirmative vote of the holders of New Preferred Stock is required by any law, statute or regulation applicable to Reorganized Oglebay, will vote all of the shares of New Preferred Stock held by such holder to approve:

- any authorization, creation, amendment or issuance of Parity Stock or Senior Stock requiring the approval of the holders of shares of New Preferred Stock if either (a) all of the proceeds of such issuance will be used to redeem the New Preferred Stock, in whole or in part, or (b) a portion of the proceeds will be used to redeem all of the New Preferred Stock; and

- any authorization, creation, amendment or issuance of Junior Stock requiring the approval of the holders of shares of New Preferred Stock

The Board of Directors of Reorganized Oglebay will consist of seven members. Following the issuance of the New Preferred Stock, the holders of New Preferred Stock will be entitled, voting as a separate class, to elect a maximum of four directors (subject to adjustment as the number of shares of New Preferred Stock outstanding on the Effective Date decreases). The remaining directors will be elected by holders of New Common Stock voting separately as a single class

*Liquidation Preference* In the event of Reorganized Oglebay's liquidation, dissolution or winding up, after payment or provision for payment of Reorganized Oglebay's debts and other liabilities, holders of outstanding shares of New Preferred Stock will be entitled to receive out of Reorganized Oglebay's assets available for distribution to shareholders (and before any distribution of assets is made to the holders of the New Common Stock or any Junior Stock as to distributions), $10 per share of New Preferred Stock, as adjusted by accreting and adding thereto any dividends thereon not paid in cash, in accordance with the terms of the New Preferred Stock (the "Liquidation Preference"), plus the amount of any accrued and unpaid dividends, to the date fixed for liquidation, dissolution or winding up.

Upon any liquidation, dissolution or winding up of Reorganized Oglebay, the holders of shares of New Preferred Stock will be entitled to receive the greater of (a) the Liquidation Preference, plus the amount of any accrued and unpaid dividends, to the date fixed for liquidation, dissolution or winding up and (b) the amounts that such holders would have received if all of the then outstanding shares of New Preferred Stock had been converted into New Common Stock immediately prior to such liquidation, dissolution or winding up.

All distributions made with respect to the New Preferred Stock in connection with any liquidation, dissolution or winding up will be made *pro rata* to the holders of the New Preferred Stock

*Preemptive Rights.* No holder of any shares of New Preferred Stock will have any preemptive right to subscribe for stock, obligations, warrants or other securities of any class, whether now or authorized in the future.

*No Other Rights*. Shares of New Preferred Stock do not have any preferences, voting powers or relative, participating, option or other special rights, except as set forth in the Amended and Restated Articles (some of which are described above) or as otherwise required by law

*Book-Entry, Delivery and Form*. DTC will act as securities depositary for the New Preferred Stock. Initially, the New Preferred Stock will be represented only by one or more fully-registered global security certificates registered in the name of Cede & Co., the nominee of DTC, and deposited with DTC

**New Term Loan**

On the Effective Date, the Debtors may enter into a new term loan (the "New Term Loan"). The New Term Loan would be for an aggregate original principal amount not to exceed $5 million. Based upon the current Projections (as defined below), the Debtors do not believe that the New Term Loan is necessary to implement the Plan. The Debtors, however, are currently reviewing the necessity, if any, for such a loan to maintain liquidity through peak borrowing seasons in their operations. See "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Notes."

**The Confirmation Facility**

As of the Effective Date, Reorganized Oglebay, the Confirmation Facility Agent and certain lenders will enter into the confirmation facility (the "Confirmation Facility"). See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—Confirmation Facility."

The Debtors anticipate that the Confirmation Facility will consist of a senior secured revolving credit facility (the "New Revolver"), a senior secured term loan A (the "New Term Loan A") and a senior secured term loan B (the "New Term Loan B"). The New Revolver will be in an aggregate principal amount at any one time outstanding not to exceed $55 million (provided that from March 1, 2005 through September 30, 2005 the amount available for borrowings under the New Revolver will increase to $65 million), with a $20 million sublimit for letter of credit accommodations. Availability under the New Revolver will be subject to a borrowing base. The New Term Loan A will be in an outstanding principal amount of up to $105 million. The New Term Loan B will be in an outstanding principal amount of up to $150 million, and will include amounts currently outstanding under the term loan A-1 of the Second DIP Facility (as defined below) and amounts currently outstanding under the term loan B of the Second DIP Facility.

The pricing of the loans under the New Revolver and the New Term Loan A is to be on the same terms as those of the Second DIP Facility, as described herein under "Operations During the Chapter 11 Cases - Postpetition Operations and Liquidity - Second DIP Facility." Amounts outstanding under the New Term Loan B will bear interest at either (a) the greater of 14.25% and the prime rate plus 9.75% for prime rate loans or (b) the greater of 12.25% and LIBOR plus 10.25% for LIBOR rate loans.

The Confirmation Facility will mature five years after the Effective Date and will include restrictive covenants, including requirements of minimum EBITDA, a limitation on capital expenditures and restrictions on the payment of dividends by the Reorganized Debtors, as well as other restrictions customary in facilities of this nature.

This summary of the Confirmation Facility is qualified by reference to the terms set forth on Exhibit I.A.19 to the Plan.

**Conditions to Confirmation and the Effective Date of the Plan**

There are several conditions precedent to Confirmation and the Effective Date. Subject to applicable legal requirements, any of these conditions may be waived in whole or part at any time by the agreement of the Debtors and the Creditors' Committee without an order of the Bankruptcy Court.

### *Conditions to Confirmation*

The Bankruptcy Court will not be requested to enter the Confirmation Order, unless and until the following conditions have been satisfied or duly waived pursuant to Section IX C of the Plan:

- The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Creditors' Committee

- The Plan shall not have been materially amended, altered or modified from the Plan as Filed on July 30, 2004, unless such material amendment, alteration or modification has been made in accordance with Section XIII C of the Plan

- All Exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee

In addition to the foregoing conditions to Confirmation, there are a number of substantial confirmation requirements under the Bankruptcy Code that must be satisfied for the Plan to be confirmed. See "Voting and Confirmation of the Plan — Confirmation "

### *Conditions to the Effective Date*

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions has been satisfied or duly waived pursuant to Section IX C of the Plan:

- The Bankruptcy Court shall have entered the Confirmation Order.

- The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

- The documents effectuating the Confirmation Facility shall be in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee and shall have been executed and delivered by the Reorganized Debtors, the Confirmation Facility Agent and each of the lenders under the Confirmation Facility

- The Debtors shall have received at least $85 million in connection with the issuance of the New Preferred Stock

- The Effective Date shall occur on or after October 25, 2004.

- The Plan and all Exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section XIII C of the Plan.

### *Effect of Nonoccurrence of Conditions to the Effective Date*

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section IX C of the Plan, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the

Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section IX D of the Plan: (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Sections V A and V D of the Plan and (iii) the releases described in Section IV E.3 of the Plan; and (b) nothing contained in the Plan will (i) constitute a waiver or release of any claims by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

### Modification or Revocation of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any claims by or against, or any Interests in, any Debtor; (b) prejudice in any manner the rights of any Debtor or any other party in interest; or (c) constitute an admission of any sort by any Debtor or any other party in interest.

## TREATMENT OF CERTAIN CLAIMS UNDER THE PLAN

### Treatment of Old Senior Secured Note Claims

The Old Senior Secured Notes Purchase Agreement provides for the payment of a "prepayment premium" upon the occurrence of an optional redemption, event of default or acceleration. The amount of the prepayment premium varies from 2% to 18% of the original principal amount of the Old Senior Secured Notes, depending on when the obligation to pay the prepayment premium is triggered. The filing of the Chapter 11 Cases constituted an event of default under the Old Senior Secured Notes Purchase Agreement and resulted in the automatic acceleration of the Debtors' obligations under the Old Senior Secured Notes. Because the filing of the Chapter 11 Cases occurred prior to October 25, 2004, certain holders of the Old Senior Secured Notes assert that they are entitled to receive a prepayment premium of 18% (the "Early Prepayment Premium") of the original principal amount of such notes. In addition, these holders of the Old Senior Secured Notes assert that they are entitled to receive the payment of interest at a default rate of 21% per annum (the "Default Interest"), which is the interest rate triggered by an event of default under the Old Senior Secured Notes Purchase Agreement. Section 506 of the Bankruptcy Code permits oversecured creditors to recover, among other things, interest on an oversecured claim and any reasonable fees, costs or charges provided for under the agreement under which such claim arose. The Creditors' Committee and the Debtors dispute that the holders of the Old Senior Secured Notes are entitled to the Default Interest and Early Prepayment Premium on a variety of grounds, including that such charges are unreasonable and not recoverable by the holders of the Old Senior Secured Notes from the Debtors, pursuant to section 506 of the Bankruptcy Code or otherwise. On June 24, 2004, certain holders of the Old Senior Secured Notes filed an adversary proceeding, captioned MW Post Portfolio Fund Ltd. v. Norwest Bank Minn. (In re ONCO Inv. Co.), Case No. 04-10558, Adv. Proc. No. 04-54122 (the "Adversary Proceeding"), against Oglebay and the Indenture Trustee asserting, among other things, their entitlement to the Early Prepayment Premium and the Default Interest. See "Operations During the Chapter 11 Cases— Case Administration and Related Activities — Adversary Proceeding Relating to Old Senior Secured Notes."

The Adversary Proceeding also seeks an order, pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture and section 510(a) of the Bankruptcy Code: (a) declaring that no amounts may be paid by the Debtors to the holders of the Old Senior Subordinated Notes or the Indenture Trustee on account of Old Senior Subordinated Note Claims until such time as the holders of the Old Senior Secured Notes have been paid in full in cash all amounts owed to them under the Old Senior Secured Notes Purchase Agreement, including the Early Prepayment Premium and Default Interest, irrespective of whether such amounts are recoverable against the Debtors; and (b) requiring the Indenture Trustee to turn over any property received from the Debtors on account of Old Senior Subordinated Note Claims until such time as the Old Senior Secured Note Claims have been paid in full in cash all amounts owing on account of such Claims under the Old Senior Secured Notes Purchase Agreement, including the Early Prepayment Premium and Default Interest

As discussed above, the Debtors and the Creditors' Committee dispute the ability of the holders of the Old Senior Secured Notes to recover the Early Prepayment Premium and Default Interest from the Debtors. In addition, the Creditors' Committee has asserted that neither the PIK Interest (as defined below) nor the Early Prepayment Premium constitutes Senior Debt as that term is defined in the Old Senior Subordinated Note Indenture, and thus the Old Senior Subordinated Note Claims are not subordinate to the payment of such amounts under the subordination provisions of the Old Senior Subordinated Note Indenture and applicable law. Prior filings of the Plan and this Disclosure Statement reflect that position, which the Debtors and the Creditors' Committee maintain is a likely outcome if the same were to be litigated to conclusion.

However, to avoid the significant cost of litigating the matter among the parties, and to promote a speedy exit from bankruptcy by mooting the Adversary Proceeding, the Debtors, in consultation with the Creditors' Committee, have elected to amend the Plan to render Allowed Class 3 Claims unimpaired. This election is unquestionably available to the Debtors. Under the Plan, the Old Senior Secured Notes will be Reinstated on the Effective Date, pursuant to section 1124(2) of the Bankruptcy Code and Section I.A 91 b of the Plan. Specifically, (a) section 1124(2) of the Bankruptcy Code and section I.A 91 b of the Plan permit the Debtors to Reinstate debt obligations, such as the Old Senior Secured Notes, which, among other things, de-accelerates the debt, cures all defaults and reinstates the original terms and maturity and (b) the terms of the Old Senior Secured Notes Purchase Agreement permit the Debtors to redeem the Old Senior Secured Notes on or after October 25, 2004 for a prepayment premium of 6%. After the Effective Date, the Debtors anticipate that they will exercise their redemption rights under the Old Senior Secured Notes Purchase Agreement, and redeem the Old Senior Secured Notes in full with a Cash payment of 106% of principal amount of the Old Senior Secured Notes (which amount shall include the paid-in-kind interest), plus the accrued and unpaid interest thereon at the non-default rate through the date of such payment, in accordance with the terms of the Old Senior Secured Notes Purchase Agreement. Based upon their current Projections, the Debtors believe that they have the ability to redeem the Old Senior Secured Notes as described herein. The Debtors, however, also have available to them the New Term Loan if they determine that such additional financing is necessary to maintain liquidity through peak borrowing seasons in their operations. See "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Term Loan." The Debtors believe that the treatment provided to holders of Old Senior Secured Notes under the Plan resolves the issues described above and moots the Adversary Proceeding. However, certain holders of the Old Senior Secured Notes have asserted that the Reinstatement of the Old Senior Secured Notes under the Plan does not moot the Adversary Proceeding and have asserted that, notwithstanding the Reinstatement of the Old Senior Secured Notes, they have the right to collect additional amounts from holders of Class 7 Claims pursuant to the subordination provisions of the Old Senior Subordinated Note Indenture. The Debtors and the Creditors' Committee dispute this assertion and the parties intend to have the Bankruptcy Court resolve this dispute at or before the Confirmation Hearing. A resolution by the Bankruptcy Court in favor of holders of the Old Senior Secured Notes may dilute the ultimate recovery of Class 7 Claims under the Plan, which may result in the holders of such Claims not receiving the amount of New Common Stock described in the Disclosure Statement.

**Treatment of MLO Claims**

As noted below, in the second quarter of 2000, the Debtors acquired all of the partnership interests in Michigan Limestone Operations Limited Partnership and two related businesses from their prior owners (collectively, the "MLO Sellers") for $53 million in cash at closing and the assumption of approximately $8 million in debt, plus additional contingent payments to be made over several years (the "MLO Transaction"). See "Summary—Treatment of Claims and Interests; Overview of the Plan—Summary of Classes and Treatment of Claims and Interests; and Reorganized Oglebay—Related Party Transactions—Michigan Limestone Operations." Pursuant to the MLO Contract, the contingent payments to be made by Oglebay to the MLO Sellers (collectively, the "MLO Payments") are subject to the purchased operations combined with the Debtors' Port Inland, Michigan quarry (collectively, the "Purchased Operations"), considered as separate corporate entities, achieving specific levels of yearly performance within established parameters. Specifically, the MLO Sellers were to receive (a) a MLO Payment tied to the aggregate annual tonnage shipped from the Purchased Operations (collectively, the "Tonnage Payments") and (b) MLO Payments tied to the aggregate amount of annual EBITDA for (i) the two purchased operations, the Rogers City, Michigan quarry (the "Rogers City Quarry") and the Cedarville, Michigan quarry (the "Cedarville Quarry"), (ii) the Purchased Operations (which includes the Rogers City Quarry, the Cedarville Quarry and the Port Inland, Michigan quarry), or (iii) both (collectively, the "EBITDA Payments"). Under the MLO Contract, the maximum aggregate amount of annual MLO Payments was $4 million. The MLO Payments were to be made on an annual basis for a period of 10 to 12 years from the closing of the MLO Transaction, depending upon the Purchased Operations' performance. Under the terms of the MLO Contract, upon a "change in control" (as defined in the MLO Contract), which includes a bankruptcy filing by Oglebay, the MLO Sellers have the right to accelerate the MLO Payments in full. The Debtors believe that the MLO Sellers could assert a Claim against the Estates on account of (a) the change in control provision in an amount not more than $14.7 million and (b) other alleged obligations arising under the MLO Contract in an amount not more than $12.1 million. Although the Debtors may have certain defenses to the payment of these Claims, there could be no certainty regarding the resolution of these Claims. As part of the MLO Transaction, Mr. Michael D. Lundin, formerly one of the owners of one of the MLO Sellers and currently chief executive officer of Oglebay, was scheduled to receive a share of the MLO Payments. At the time of the MLO Transaction, Mr. Lundin was not an employee or Board member of, or otherwise associated with, any of the Debtors.

Subsequent to the commencement of the Chapter 11 Cases, the Creditors' Committee entered into negotiations with the MLO Sellers regarding the possible amendment of the MLO Contract. Mr. Lundin had no involvement with these negotiations. The Cary Mining Company, Inc., one of the MLO Sellers, is a member of the Creditors' Committee, but took no part in, and was excluded from any involvement in, all of the negotiations and discussions of the Creditors' Committee regarding the MLO Contract. As a result of the Creditors' Committee's negotiations with the MLO Sellers, Oglebay, Debtor Michigan Limestone Operations, Inc. and the Sellers have agreed to amend the MLO Contract pursuant to the terms of Amendment No. 1 to Interest Purchase Agreement, by and among Oglebay, Johnson Mining Inc., The Cary Mining Company Inc., Michigan Minerals Associates, Inc. and Debtor Michigan Limestone Operations, Inc. (the "MLO Amendment"). The parties are still finalizing the terms of the MLO Amendment and currently anticipate executing the MLO Amendment prior to the Effective Date. Specifically, pursuant to the MLO Amendment, the parties have agreed to reduce significantly the aggregate annual amount of the MLO Payments and to extend the time period within which the MLO Payments are to be made by four-to-six years. Pursuant to the terms of the MLO Amendment, the maximum aggregate amounts of annual MLO Payments in respect of 2003 and no more than 11 of the 13 years in the period 2004 through 2016 are as follows: (a) $625,000 for 2003; (b) $1.025 million for the period 2004-2006; and (c) $2.675 million for the period 2007-2016. In addition, the MLO Amendment provides that (a) the EBITDA Payments will be determined based upon the consolidated EBITDA of Oglebay and all of its subsidiaries rather than the aggregate EBITDA of the purchased quarries and/or the Purchased Operations, beginning with Oglebay's 2004 fiscal year; (b) Oglebay's domestic subsidiaries