will execute and deliver guaranty agreements as adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code; (c) the MLO Sellers shall waive any right, upon Oglebay's assumption and assignment to Reorganized Oglebay of the MLO Contract, to any cure amounts or adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, other than as provided in the MLO Amendment; and (d) the MLO Sellers shall consent to any Change in Control resulting from the Debtors' emergence from the Chapter 11 Cases and shall waive any rights that they might have (or might have had) to demand accelerated MLO Payments as a result of the commencement or pendency of the Chapter 11 Cases or the Debtors' emergence from the Chapter 11 Cases.

The Creditors' Committee and certain holders of the MLO Claims conducted extensive arm's-length negotiations to restructure the MLO Contract before the Debtors agreed to assume those obligations under the Plan. In formulating its proposals, the Creditors' Committee considered several factors including, among others, (a) the timing and magnitude of the payments, (b) the contingent nature of the obligations and (c) the projected recovery of the only other impaired class, the Old Senior Subordinated Notes. Additionally, given the unliquidated nature of the MLO Claims, there was the potential for dispute among the parties as to the appropriate claim amount if the MLO Contract was rejected and the risk to the holders of the MLO Claims that the claims could be challenged by the Creditors' Committee or others and recharacterized as equity. (As explained in the discussion of Recovery Actions below, the Debtors do not believe that the MLO Contract could be successfully challenged or recharacterized; rather, the Debtors believe that the MLO Contract was negotiated in good faith and at arms' length, was in exchange for reasonably equivalent value and is integral to their ongoing business plan. See "Recovery Actions.") The Debtors and the Creditors' Committee believe that the settlement reached represents a fair compromise, given the significant concessions by the holders of the MLO Claims in the form of (a) the extension of the timing of the payments, (b) the reduction in the magnitude of the payments and (c) the tying of a significant percentage of the future payments to the EBITDA performance of the Debtors for periods beyond where the Debtors could reasonably forecast the performance of the business.

The Debtors and the Creditors' Committee have conducted a net present value analysis on the MLO Amendment, and estimate that the present value of these future payments range from $9.9 - 11.0 million or 37.9% to 42.1% of the $26.1 million claim that the holders of the MLO Claims have asserted could have arisen under the MLO Contract.

**Treatment of Tort Claims**

As discussed herein, several of Oglebay's subsidiaries have been and continue to be named as defendants in a large number of cases relating to the exposure of people to asbestos and silica (collectively, the "Asbestos/Silica Plaintiffs"). See "Reorganized Oglebay—Business and Properties of the Reorganized Debtors—Legal Proceedings." Under the Plan, the rights, claims, causes of action and defenses of the Asbestos/Silica Plaintiffs and Oglebay's subsidiaries who have been or may be named as defendants in actions by these parties will be Reinstated, pursuant to Section I.A.91.a. of the Plan and, therefore, will be passed through the Chapter 11 Cases unimpaired. On and after the Effective Date, the Reorganized Debtors will continue to defend, settle and/or resolve pending and future actions commenced by the Asbestos/Silica Plaintiffs in the ordinary course of their businesses and consistent with past practices.

As also discussed herein, the Debtors believe that both the asbestos and silica product liability claims are covered by multiple layers of insurance policies and insurance trust from multiple sources. See "Reorganized Oglebay—Business and Properties of the Reorganized Debtors—Legal Proceedings." The Debtors routinely review and re-evaluate their insurance coverage for asbestos and silica product liability claims on, at least, a quarterly basis. As part of this quarterly review, the Debtors analyze the level of payments made on account of asbestos and silica product liability claims over the past five years and then

project these costs forward based upon asbestos claims currently in the Debtors' claims database to evaluate the amount of insurance coverage remaining for such claims. The Debtors believe that this five-year historical analysis is the most appropriate method for evaluating the Debtors' insurance coverage because, among other things, the Debtors' products that allegedly contained asbestos were all produced and, based upon current management's belief, were consumed by 1979. The Debtors are not subject to liability for the ongoing production of asbestos-containing products. As a result, there is no accurate way to predict the number or type of future asbestos claimants, and the Debtors believe that their five-year historical approach is the most reliable and reasonable method to assess future risk and the sufficiency of existing insurance coverage.

Based upon the Debtors' most recent review of five-year historical costs and the current claims database, the Debtors believe that they have insurance coverage sufficient to cover asbestos and silica products liability claims asserted against the Debtors well beyond the next ten years. Moreover, with respect to silica product liability claims, the Debtors are still operating within their primary layer of insurance coverage for these claims and believe that this fact, coupled with the multiple layers of insurance available for these types of claims, demonstrates the adequacy of their insurance coverage for silica product liability claims for, at least, the same time period. The Debtors have taken these factors into account in formulating the Plan and developing the Projections. As demonstrated by the Projections, the Debtors have the ability to implement the Plan and make the payments contemplated thereunder. If the Debtors reach settlement agreements with the Tort Claimants as discussed below, the Debtors will re-evaluate their asbestos insurance coverage, factoring these settlements into their analysis. The Debtors, however, do not anticipate that such settlements would significantly change their analysis or their conclusion that the Plan is feasible.

Given, among other things, the unique facts surrounding the Debtors' asbestos liability, the Debtors do not believe that an actuarial analysis of the Tort Claims is an appropriate or reasonable measure of the Debtors' future liability on account of such Claims and, accordingly, the Debtors have never commissioned such an analysis. Rather, the Debtors evaluate and manage their alleged asbestos and silica product liability claims as discussed above. The Debtors have reviewed in depth their alleged asbestos and silica product liability claims and related insurance information with the Creditors' Committee, and the Creditors' Committee believes that the Debtors more than adequately manage their claims database and insurance and agrees with the Debtors' assessment of the sufficiency of the Debtors' insurance coverage. The Debtors believe that allowing the Tort Claims to pass through the Chapter 11 Cases unimpaired will permit the Debtors to continue to manage and address such Claims in a manner consistent with their past practices and subject to their insurance coverage. The Debtors further believe that this treatment of the Tort Claims provides a better recovery to all creditors than the establishment of a trust pursuant to section 524(g) of the Bankruptcy Code or any other mechanism to address the Tort Claims within bankruptcy.

Because several of Oglebay's subsidiaries are subject to pending and future litigation regarding asbestos and silica product liability claims, the Debtors are appropriately cautious regarding the disclosure of their insurance information to third parties. The Debtors treat this information as highly confidential and proprietary. Nevertheless, upon the execution of appropriate confidentiality agreements, the Debtors have shared this information with the Creditors' Committee and its advisors and counsel to the Tort Claimants (as defined below). The Creditors' Committee and its advisors have independently reviewed this information and agree with the Debtors' assessment of their insurance coverage and the feasibility of the Plan.

The Debtors also have been in discussions with counsel to the Tort Claimants regarding the motions for relief from the automatic stay and for the appointment of a toxic tort committee and the Plan. See "Operations During the Chapter 11 Cases—Case Administration and Related Activities—Motion of Tort Claimants for Relief from Automatic Stay and —Motion to Appoint Committee of Toxic Personal Injury Claimants." As noted above, the Debtors have shared certain information with counsel to the Tort

Claimants and have participated in several meetings with counsel to the Tort Claimants. The Debtors also have kept the Creditors' Committee and its advisors informed of their discussions with this group of claimants. As a result of these discussions, some Tort Claimants have decided that they are satisfied with the Debtors' proposed treatment of Tort Claims under the Plan and will pass through the Chapter 11 Cases unimpaired. The Debtors are still in discussions with certain other groups of Tort Claimants and are working with counsel to these claimants to achieve a favorable resolution of the underlying asbestos and silica products liability claims and the pending bankruptcy motions. If the Debtors are able to reach settlement agreements with these Tort Claimants, the Debtors will file a motion with the Bankruptcy Court seeking approval of such settlements prior to the Confirmation Hearing.

## CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS

### Background

The businesses of the Debtors began in 1854 as an iron ore agency business. In the 1920s, the Debtors entered into Great Lakes shipping, coal mining and manufacturing industries, followed by their entry into docks and terminals in the 1930s; rail-to-barge coal transfer in the 1950s; and industrial minerals in the 1960s. Beginning in the late 1990s, the Debtors engaged in a series of acquisitions in order to capitalize on their core competencies in the industrial mineral industry as well as to expand their scope of operations to include the mining and processing of limestone and the production of lime. Today, after reincorporating as an Ohio corporation in 2001, the Debtors mine, process, transport and market industrial minerals and aggregates. In addition, the Debtors own strategically located, proven long-life reserves of high-quality limestone, industrial sand and mica. The Debtors also own related mineral extraction equipment, processing plants and transportation equipment, including marine vessels and docks, trucks, railway lines and equipment. With these assets, the Debtors serve a broad customer base primarily in four major categories: building products, energy, environmental and industrial. The Debtors enjoy a significant market share in each of their core markets, benefiting from long-term relationships with market-leading customers, many of whom have multi-year purchase contracts with the Debtors.

The Debtors have aligned their businesses into three reporting segments that share business strategies, are related by geography and product mix and reflect the way management evaluates the operating performance of the businesses. The operations are reported as: Great Lakes Minerals, Global Stone and Performance Minerals. Great Lakes Minerals mines and distributes limestone from three facilities located in northern Michigan. Great Lakes Minerals also holds one of the largest fleets of self-unloading vessels on the Great Lakes, which is currently comprised of 12 vessels, operates two trans-loading dock facilities and provides transportation services for limestone, as well as for coal and iron ore. Global Stone mines and processes limestone and manufactures lime at six operations in the mid-Atlantic and southeastern United States and one operation in the Great Lakes region. Performance Minerals mines and processes industrial sands and mica at eight operations located in Ohio, North Carolina and the southwestern United States. The Debtors believe that they are one of the five largest producers of lime and one of the ten largest producers of limestone in the United States. The Debtors also believe that they are the fourth largest producer of industrial sands and the largest producer of muscovite mica in the United States.

For the fiscal year ended December 31, 2003 and the three months ended March 31, 2004, the Debtors generated consolidated net sales and operating revenues of approximately $404 million and $69 million, respectively. As of December 31, 2003 and as of March 31, 2004, the Debtors had approximately $649 million and $657 million, respectively, in assets and approximately $561 million and $587 million, respectively, in liabilities on a consolidated book basis. At July 21, 2004, the Debtors' workforce consisted of approximately 1,869 employees, approximately 46% of which are covered by collective bargaining agreements.

The Debtors are headquartered in Cleveland, Ohio. The principal offices of the Debtors are located in North Point Tower, 1001 Lakeside Avenue, 15th Floor, Cleveland, Ohio 44114-1151.

## Prepetition Operations and Liquidity

### Recent Corporate Acquisitions

Beginning in the late 1990s, the Debtors engaged in the following transactions to capitalize on their core competencies in the industrial minerals industry as well as to expand their scope of operations to include the mining and processing of limestone and the production of lime.

*Acquisitions in Fiscal Year 1998.* In the first quarter of 1998, the Debtors acquired all of the outstanding common shares of Colorado Silica Sands, Inc., a producer of industrial sands, for approximately $6.127 million in cash and a $1.067 million note, payable over three years.

In the second quarter of 1998, the Debtors acquired: (a) the assets of a limestone operation in Port Inland, Michigan, which included inventory, land, mineral reserves, equipment and other property used in mining, processing, marketing and distributing limestone, chemical limestone and construction aggregates, for $35.2 million in cash; and (b) all of the outstanding common stock of Global Stone Corporation, a publicly traded Canadian company engaged in the mining, production and marketing of lime, chemical limestone and construction aggregates, for $173.6 million in cash and $54 million in assumed debt (collectively, the "Global Stone Acquisition"). In the third quarter of 1999, the Debtors sold all of the stock of two companies acquired in the Global Stone Acquisition, Global Stone Detroit Lime Company and Global Stone Ingersoll Ltd., to affiliates of Carfin, S.A., a Belgian corporation and a member of the Carmeuse Group, for $60.95 million in cash. The proceeds of this sale were used to reduce the Debtors' obligations under their then current senior credit facility.

In the third quarter of 1998, the Debtors acquired the assets of Filler Products, Inc., a privately owned producer of chemical limestone, located in Chatsworth, Georgia, for $24 million in cash.

*Acquisitions in Fiscal Year 1999.* In the first quarter of 1999, the Debtors acquired a high purity limestone quarry, a lime production facility and related assets from the W.S. Frey Company for: (a) $12.008 million in cash; (b) shares of Old Oglebay Common Stock, issued from treasury and having a guaranteed value of $1.5 million (the $1.5 million has since been paid and such shares no longer are outstanding); and (c) non-competition and royalty payments of $3.5 million.

In the fourth quarter of 1999, the Debtors acquired mica mining reserves, production facilities, equipment and other assets located in North Carolina and New Mexico, from Franklin Industries for $32 million in cash.

*Acquisitions in Fiscal Year 2000.* In the second quarter of 2000, the Debtors acquired all of the partnership interests in Michigan Limestone Operations Limited Partnership, a producer of high calcium and dolomitic limestone, for (a) $53 million in cash, (b) $8.247 million in assumed debt, and (c) certain contingent payments payable over ten years.

In the third quarter of 2000, the Debtors acquired a limestone processing facility and related assets from J.M. Huber Corporation for $12.512 million in cash.

*Acquisition in Fiscal Year 2003.* In January 2003, the Debtors acquired all of the outstanding common shares and other ownership interests in the Erie Sand and Gravel Company, Inc. and certain affiliates and distributors of construction sand and aggregates in Northwestern Pennsylvania/Western New York, for approximately $6.8 million in cash and approximately $4 million in assumed debt.

### Recent Material Divestitures

*Disposition in Fiscal Year 2003* In October 2003, as part of their ongoing business restructuring, the Debtors sold the Lawn and Garden business unit (the "Lawn and Garden Business Unit") of Global Stone to Oldcastle Retail, Inc ("Oldcastle") for $10 million in cash (the "L & G Purchase Price"), subject to a final net working capital adjustment within 90 days of the closing date. $6.871 million of the L & G Purchase Price was paid in cash at closing. Five hundred thousand dollars, constituting the remaining amount of the L & G Purchase Price after the final net working capital adjustment, remains in escrow pending the payment of certain receivables of the Lawn and Garden Business Unit. In conjunction with the sale of the Lawn and Garden Business Unit, the Debtors also entered into (a) a long-term supply agreement with Oldcastle for the provision of certain raw materials; and (b) a lease and operation of equipment agreement with Oldcastle, under which certain areas of the Debtors' York, Pennsylvania plant previously used by the Lawn and Garden Business Unit are being leased to Oldcastle through December 31, 2005. The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Credit Facility. The long-term supply agreement and the lease and operation of equipment agreement with Oldcastle will be assumed by Reorganized Oglebay as of the Effective Date.

*Dispositions in Fiscal Year 2004.* In January 2004, as part of their ongoing business restructuring, the Debtors sold their equity interests in S&J Trucking, Inc. and Serv-All Concrete, Inc., which owned the Debtors' ready-mix concrete business (the "Redi-Mix Business"), to EE Austin and Son, Inc. ("EE Austin") for $1.25 million in cash. In conjunction with the sale of the Redi-Mix Business, the Debtors entered into (a) a fifteen-year supply agreement (the "Supply Agreement") with EE Austin for the provision of certain raw materials and (b) a sublease agreement with EE Austin, under which certain areas of the Debtors' Erie, Pennsylvania facility are subleased to EE Austin for the term of the Supply Agreement. The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Credit Facility. This sublease agreement with EE Austin will be unimpaired and assumed by Reorganized Oglebay as of the Effective Date.

Also, in January 2004, as part of their ongoing business restructuring, the Debtors sold the marine vessel Richard Reiss to Grand River Navigation Company, Inc. for $1.8 million in cash. The proceeds of this sale were used to reduce the Debtors' obligations under the Prepetition Credit Facility.

### Overview of Prepetition Capital Structure

The Debtors incurred significant debt in connection with the acquisitions described above, which resulted in a highly leveraged balance sheet. The facilities and instruments evidencing this debt and the other primary elements of the Debtors' capital structure are described below.

***Prepetition Credit Facility.*** Pursuant to the Credit Agreement, dated as of May 15, 1998, as amended and restated as of April 3, 2000, by and among Oglebay (as borrower), the other Debtors (as guarantors), General Electric Capital Corporation (as successor agent) and the other Prepetition Lenders party thereto, Oglebay obtained the Prepetition Credit Facility. The Prepetition Credit Facility was comprised of a $147 million senior revolving credit facility with a $15 million sublimit for letters of credit. The Prepetition Credit Facility would have matured on October 31, 2004.

The Prepetition Credit Facility was guaranteed by each of the Debtors other than Oglebay and was secured by a first priority lien on substantially all of the Debtors' assets, equal in priority to the liens securing the Prepetition Term Loan. As of the Petition Date, approximately $120.703 million of indebtedness was outstanding under the Prepetition Credit Facility (excluding outstanding letters of credit in the amount of approximately $9.3 million).

*Prepetition Term Loan.* Pursuant to the Prepetition Term Loan Agreement, Oglebay obtained a senior secured term loan in the principal amount of $118 million (the "Prepetition Term Loan" and, collectively with the Prepetition Credit Facility, the "Prepetition Facilities"). The Prepetition Term Loan would have matured on October 31, 2004.

The Prepetition Term Loan was guaranteed by each of the Debtors other than Oglebay and was secured by a first priority lien on substantially all of the Debtors' assets. As of the Petition Date, approximately $113.209 million of indebtedness was outstanding under the Prepetition Term Loan.

On or about July 15, 2004, all outstanding amounts under the Prepetition Facilities were paid in full in Cash from borrowings under the Second DIP Facility; *provided, however*, that certain funds are being held in escrow on account of certain Fee Claims of the Professionals to the Prepetition Lenders pending the approval of such Fee Claims by the Bankruptcy Court. Such escrow for Fee Claims shall be governed by the letter agreements executed among the parties and dated July 15, 2004.

*Old Senior Secured Notes.* Pursuant to the Old Senior Secured Note Purchase Agreement, Oglebay sold the Old Senior Secured Notes. The interest rate on the Old Senior Secured Notes was 18% per year, comprised of (a) 13% interest payable in cash on a quarterly basis and (b) 5% interest payable, at Oglebay's option, in cash or added automatically to the unpaid principal amount of the Old Senior Secured Notes (the "PIK Interest"), in each case on a quarterly basis. Pursuant to the Waiver and Amendment No. 2 to the Note Purchase Agreement, dated September 11, 2003, by and among Oglebay and the noteholders signatory thereto, the PIK Interest was increased by 1% (from 5% to 6%). Fifty percent of the unpaid principal amount of the Old Senior Secured Notes would have been due on October 25, 2007 and the remaining 50% would have been due on October 25, 2008.

The Old Senior Secured Notes are guaranteed by each of the Debtors other than Oglebay and are secured by a second priority lien on substantially all of the Debtors' assets junior only to the liens securing the Second DIP Facility and the Vessel Term Loan. As of the Petition Date, $80.469 million, plus accrued interest, was outstanding under the Old Senior Secured Notes.

The Creditors' Committee has asserted, among other things, that the PIK Interest does not constitute Senior Debt as that term is defined in the Old Senior Subordinated Note Indenture, and thus is not entitled to senior debt status vis-a-vis the Old Senior Subordinated Notes. The Creditors' Committee and the Debtors also dispute the entitlement of the holders of the Old Senior Secured Notes to a prepayment premium and default interest under the Old Senior Secured Notes Purchase Agreement. That dispute remains unresolved.

*Vessel Term Loan Agreement.* Pursuant to the Vessel Term Loan Agreement, the Debtors obtained a $17 million term loan (the "Vessel Term Loan"), which was used to purchase two marine vessels: the Wolverine and the David Z. Norton. The Vessel Term Loan is secured by a purchase money security interest in these vessels and matures on July 15, 2007. As of the Petition Date, $13.4 million, plus accrued interest, was outstanding under the Vessel Term Loan Agreement.

*Old Senior Subordinated Notes.* Pursuant to the Old Senior Subordinated Note Indenture, Oglebay issued the Old Senior Subordinated Notes. As of the Petition Date, $100 million, plus accrued interest, was outstanding under the Old Senior Subordinated Notes.

The Old Senior Subordinated Notes are unsecured debt obligations of Oglebay, generally subordinate in right of payment to the indebtedness under the Second DIP Facility, the Old Senior Secured Notes and the Vessel Term Loan. See "—Old Senior Secured Notes" above. Oglebay's obligations under the Old Senior Subordinated Notes are guaranteed by certain of Oglebay's subsidiaries.

*Industrial Revenue Bond.* Pursuant to the New Mexico Floating Rate Demand Industrial Revenue Bond (Franklin Industries, Inc. Project) (the "IRB Bond"), issued in the original principal amount of $5 million under the trust indenture, dated as of September 1, 1990 (the "Bond Trust Indenture"), between The Bank of New York ("BONY") (as successor trustee) and the County of Rio Arriba, New Mexico, a predecessor to Oglebay Norton Specialty Minerals, Inc. became obligated in 1990 to make payments on the IRB Bond. Oglebay Norton Specialty Minerals, Inc. became obligated to pay the remaining amounts outstanding when it acquired the Franklin Industries, Inc. Project and assumed the obligations relating to the IRB Bond in May 2000. The IRB Bond was fully collateralized by a letter of credit, which was drawn by BONY following the Petition Date. The proceeds of the letter of credit were distributed to the holders of the IRB Bond and no further amounts are due or outstanding under the IRB Bond.

*Other Unsecured Debt.* In addition to the debt obligations described above, the Debtors are also obligated to certain other unsecured creditors, including employees and retirees, vendors, contract parties and the like. See "Overview of the Plan—Summary of Classes and Treatment of Claims and Interests". Certain of the Debtors are also defendants in product liability litigation, including asbestos- and silica-related litigation. Finally, the Debtors are obligated to the holders of certain claims arising from the Debtors' prepetition purchases of certain businesses (among others, the MLO Claims).

## Factors Leading to Chapter 11 Filings

*Substantial Indebtedness.* As of the Petition Date, the Debtors had approximately $430 million in outstanding funded debt as described in "—Overview of Prepetition Capital Structure" above. The Debtors' continuing net losses in periods leading up to the Petition Date had caused them to be net borrowers in 2001, 2002 and 2003, when the Debtors utilized available funds under the Prepetition Facilities to fund working capital.

*Economy and Market Conditions.* Although there is limited competition in the markets in which the Debtors do business, primarily due to the transportation costs associated with the Debtors' products, the Debtors have been significantly affected by various economic factors over the last three years. In particular, the general economic slowdown in the United States, and specifically in the integrated steel industry, over the past few years contributed to net losses of $18.8 million in 2001, $6.6 million in 2002 and $33.2 million in 2003. Notwithstanding the foregoing, the Debtors' net sales and operating revenues in 2003 were approximately $3.7 million higher than in 2002. This gain was offset, however, by various factors, including but not limited to (a) decreased revenues and the effect of lower volumes on gross margins of the Great Lakes Minerals segment's limestone quarries and vessels; (b) increased general and administrative expenses, including the costs of legal and professional advisors arising from Oglebay's bank compliance issues and the rising costs of retirement benefits; (c) an increase in the cost of providing health care benefits to active employees; (d) higher energy prices; (e) lower water levels on the Great Lakes; and (f) the effects of poor weather conditions in early 2003.

*Restructuring Efforts.* In an effort to remedy their heavily burdened balance sheet and return to profitability, the Debtors began implementing a restructuring initiative in 2001 that focused on the transition of their businesses from a decentralized organization into an integrated business model that capitalizes on core strengths in the industrial mineral business. In particular, since 2001, the Debtors have, among other things, (a) closed two subsidiary office headquarters; (b) closed three underperforming mineral processing operations; (c) reduced the number of salaried level employees by 15%, resulting in a flattened and more responsive management structure; (d) reduced administrative overhead by consolidating certain administrative functions of each of the operating segments of Oglebay under centralized control; (e) reduced capital expenditures; (f) reduced annual benefit offerings and payments; and (g) divested their businesses of certain underperforming assets.

**Prepetition Restructuring Negotiations**

*Initiation of Restructuring Negotiations.* At times during the second and third quarters of 2003, the Debtors were not in compliance with various financial-based covenants under the Prepetition Facilities, the Old Senior Secured Note Purchase Agreement and Vessel Term Loan Agreement. In mid-2003, the Debtors obtained waivers (collectively, the "Waivers") of these covenants from the lenders and the holders of Old Senior Secured Notes until August 15, 2003. During this time, the Debtors continued to negotiate long term amendments to the Prepetition Facilities and the Old Senior Secured Note Purchase Agreement (collectively, the "Prepetition Secured Credit Agreements") that would, among other things, modify certain financial covenants in the Prepetition Secured Credit Agreements to levels that would be achievable by the Debtors in the current economic environment.

*Old Senior Subordinated Notes' August 2003 Interest Payment.* On August 1, 2003, the Debtors announced that, although they had sufficient liquidity, they would not make the August 1, 2003 interest payment (the "August Interest Payment") due on account of the Old Senior Subordinated Notes until such time, if any, that satisfactory amendments could be obtained to the Prepetition Secured Credit Agreements. As a result of the deferral of the August Interest Payment, the Debtors' ability to draw on the Prepetition Credit Facility was at the discretion of the lenders. On August 15, 2003, no amendments to the Prepetition Secured Credit Agreements had been entered into, and the Waivers expired. On August 31, 2003, the 30-day grace period to make the August Interest Payment on the Old Senior Secured Notes expired, and the Debtors were in default under the Old Senior Subordinated Note Indenture.

*Amendments to Prepetition Secured Credit Agreements.* On September 11, 2003, the Debtors entered into agreements (collectively, the "Amendments") with the lenders and the holders of Old Senior Secured Notes to amend the Prepetition Secured Credit Agreements and, thereby, provide the Debtors with relief on certain restrictive covenants. The Amendments also restored the Debtors' ability to draw on the Prepetition Credit Facility to fund operations and make the August Interest Payment (which was paid on September 29, 2003). Among other things, the Amendments (a) imposed a requirement to, on or before February 25, 2004, pay down the Prepetition Facilities by $100 million (the "$100 Million Payment") with the proceeds from permitted asset sales; (b) increased certain interest rates on the Prepetition Secured Credit Agreements; and (c) established a dominion of funds arrangement.

*Potential Sale of Assets.* Both prior to and subsequent to the Amendments, the Debtors, with the assistance of Harris Williams & Company ("Harris Williams") (with respect to the Debtors' lime business (the "Lime Business")) and Cobblestone Advisors, a division of Harris Williams (with respect to the Debtors' mica mining and processing business (the "Mica Business")), diligently marketed the Lime Business and the Mica Business to permit the Debtors to make the $100 Million Payment. Although the Debtors received several offers to purchase the Lime Business, the Debtors chose, in February 2004, to abandon their efforts to sell the Lime Business because nearly all of the potential new equity investors and new lenders indicated that they wanted the Debtors to retain the Lime Business and management did not believe that the offers to purchase the Lime Business provided sufficient value for such business. The Debtors also received several offers to purchase the Mica Business during the marketing period. The Debtors did not sell the Mica Business for a variety of reasons prior to the Petition Date, but they are currently working towards completing a sale with potential buyers.

*Retention of Lazard Frères & Co. LLC.* On August 27, 2003, the Debtors retained Lazard Frères & Co. LLC ("Lazard") to act both as financial advisors and investment bankers. Together with Lazard, the Debtors and Lazard have conducted a comprehensive review and analysis of various financial restructuring alternatives available to the Debtors, including the sale of the Lime Business, refinancing the Prepetition Facilities, raising new equity, the conversion of other existing funded debt to equity and combinations of all of the foregoing.

*Restructuring Discussions.* In an effort to restructure the Debtors' funded debt, the Debtors, with the assistance of Lazard, (a) solicited interest from (i) potential equity investors with experience in investing in financially troubled companies and (ii) alternative financing sources, including commercial banks, investment banks, hedge funds and asset-based lending institutions regarding the refinancing of all, or a portion of, the Prepetition Facilities; and (b) entered into lengthy discussions with an *ad hoc* committee consisting of certain holders of the Old Senior Subordinated Notes (the "*Ad Hoc* Committee"), which holders held more than two-thirds of the outstanding principal amount of the Old Senior Subordinated Notes, and with certain holders of the Old Senior Secured Notes regarding the restructuring of such debt obligations

In spite of these efforts, the Debtors determined that due to, among other things, declining liquidity and impending defaults under the Old Senior Subordinated Note Indenture (due to the Debtors' prospective inability to make the February interest payment owing thereunder) and the Prepetition Secured Credit Agreements (due to the Debtors' prospective inability to make the $100 Million Payment), it was necessary to complete their restructuring efforts under the protection of the Bankruptcy Code. Accordingly, the Debtors commenced the Chapter 11 Cases to (a) permit the final development and implementation of a restructuring plan and (b) preserve the value of their businesses for the benefit of all stakeholders  Prior to commencing their Chapter 11 Cases, the Debtors entered into the Commitment Agreement that, among other things, contemplated an investment by certain holders of the Old Senior Subordinated Notes and certain third party investors, the proceeds of which would be applied to the redemption of the Old Senior Secured Notes at par  See "Rights Offering— the Commitment Agreement " Further, prior to commencing their Chapter 11 Cases, the Debtors made substantial progress toward obtaining post-emergence financing by executing two letter agreements with Silver Point Finance, LLC ("Silver Point") pursuant to which Silver Point committed to provide (a) an interim debtor in possession credit facility with availability of up to $75 million to cover the Debtors' working capital needs upon the commencement of the bankruptcy cases, (b) a $305 million debtor in possession credit facility that contemplated the refinancing of the interim debtor in possession credit facility and the refinancing and effective repayment of amounts outstanding under the Prepetition Facilities, and (c) the Confirmation Facility.

## OPERATIONS DURING THE CHAPTER 11 CASES

### Commencement of Chapter 11 Cases and First Day Relief

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "First Day Motions") seeking authority to take a broad range of actions, to preserve customer, vendor and supplier relationships, maintain employee confidence and morale and to promote a "business as usual" atmosphere with key constituencies. In particular, the First Day Motions, among other things, requested authority for the Debtors to:  (a) pay employees in the normal course and to continue all employee health and welfare benefit plans; (b) take measures to assure the continued availability of gas, water, electric, telephone and other utility services; (c) afford administrative expense priority to Claims arising from the postpetition provision of goods or services by suppliers to the Debtors; (d) pay certain prepetition Claims of critical vendors and service providers essential to the operation of the Debtors' businesses; (e) honor or pay customer Claims for refunds, rebates, adjustments (including adjustments to billing), product returns or exchanges, promotional discounts, warranty claims and other credits, allowances or outlays relating to sales; (f) pay outstanding trust fund and franchise taxes; (g) maintain the Debtors' cash management systems and the use of prepetition bank accounts, checks and other business forms; (h) obtain debtor in possession financing and use cash collateral on an interim and final basis; and (i) pay professionals to assist in the Debtors' reorganization efforts as well as pay ordinary course professionals to assist in the day-to-day performance of the Debtors' duties  All of the Debtors' First Day Motions were ultimately granted.

In addition, motions and applications were granted on and shortly after the Petition Date addressing a variety of administrative matters relating to the Chapter 11 Cases  All of the foregoing relief was essential to minimize disruptions to the Debtors' businesses as a result of the commencement of the Chapter 11 Cases and to permit the Debtors to make a smooth transition to operations in chapter 11

## Case Administration and Related Activities

### Retention of Professionals

In connection with the commencement of the Chapter 11 Cases, the Debtors sought and obtained Bankruptcy Court approval of the retention of Lazard as their financial advisor; Jones Day as their counsel; Richards, Layton & Finger, P.A. as their co-counsel; Ernst & Young LLP as their independent auditors and tax advisors; Edward Howard & Co. as their corporate communications consultants; Cobblestone Advisors as their investment bankers in connection with the sale of the Debtors' mica operations; Trumbull as their claims and noticing agent; Mercer Human Resources Consulting, Inc. as their compensation consultants; and John T. Boyd Company as their appraisers.  On June 25, 2004, the Debtors filed an application to retain Dufour, Laskay & Strouse, Inc. to appraise the Debtors' fleet of self-unloading marine vessels and related assets in connection with the Debtors' "fresh-start" accounting (D.I. 1249)  The application will be heard at the July 27, 2004 hearing.

### The Creditors' Committee and Its Advisors

On March 8, 2004, the Office of the United States Trustee appointed the Creditors' Committee, consisting of seven members.  The current membership of the Creditors' Committee and its professional advisors are as follows:

Creditors' Committee Members:

| | |
|---|---|
| B.S.C. Holding, Inc.<br>4919 Lamar<br>Mission, Kansas 66202 | Ingalls & Snyder Value Partners LP<br>61 Broadway<br>New York, NY 10006 |
| Carey Mining Company<br>c/o Johnson, Killen & Seiler, P.A.<br>230 W. Superior St. Suite 800<br>Wells Fargo Center<br>Duluth, MN 55808 | Marine Systems, Inc.<br>c/o Vinson & Elkins LLP<br>666 Fifth Avenue<br>26th Floor<br>New York, NY 10103-0040 |
| The Clutterbuck Group<br>10 Kensington Oval<br>Rocky River, OH 44116 | Pacholder Associates/Bank<br>One High Yield Partners<br>8044 Montgomery Road<br>Suite 555<br>Cincinnati, OH 45236 |
| Wells Fargo Bank, N.A.<br>6th & Marquette<br>MAC N9303-120<br>Minneapolis, MN 55479 | Airlie Opportunity Fund<br>Cayman, L.P.<br>115 East Putnam Avenue<br>Greenwich, Connecticut 06830<br>(ex officio member) |

Counsel:

|                                          |                                       |
|------------------------------------------|---------------------------------------|
| Stroock & Stroock & Lavan LLP            | Morris, Nichols, Arsht & Tunnel       |
| 180 Maiden Lane                          | Chase Manhattan Centre                |
| New York, NY 10038-4982                  | 18th Floor                 |
|                                          | 1201 North Market Street              |
|                                          | P.O. Box 1347                         |
|                                          | Wilmington, DE 19899-1347             |

Financial Advisors:

Jefferies & Company, Inc.
520 Madison Avenue
12th Floor
New York, NY 10022

### Certain Executory Contracts and Unexpired Leases

The Debtors are reviewing each of their Executory Contracts and Unexpired Leases. Based on this ongoing review, the Debtors anticipate that they may File motions to assume, assume and assign or reject certain Executory Contracts and Unexpired Leases, where appropriate, prior to the Effective Date. Other Executory Contracts and Unexpired Leases will be assumed, assumed and assigned or rejected pursuant to the Plan. See "General Information Concerning the Plan — Legal Effects of the Plan — Executory Contracts and Unexpired Leases."

### Schedules

On April 23 and 24, 2004. the Debtors Filed their Schedules, identifying the assets and liabilities of their Estates.

### Insurance Premium Financing Agreement

The Debtors require a wide variety of insurance coverage, including general liability, property, automobile and truck liability, workers' compensation, excess coverage and umbrella liability coverage. Certain of these insurance policies were subject to renewal or replacement on March 15, 2004. Because the insurance carriers were seeking payment in full, the Debtors filed a motion with the Bankruptcy Court on or about March 4, 2004 (D.I. 97) seeking authority to finance the premiums for the insurance policies pursuant to a Premium Financing Agreement with Cananwill, Inc. ("Cananwill") The Bankruptcy Court entered an order granting this motion on or about March 22, 2004 (D.I. 224). The total amount of premiums financed under the Premium Financing Agreement is $1,446,249.35. The financed premiums are to be repaid in eight equal payments of $184,016, with the first payment due on April 15, 2004. The aggregate finance charge is $25,880.01. The Debtors' obligations under the Premium Financing Agreement are collateralized by a security interest in all unearned premiums, returned premiums or other amounts due under the insurance policies to the applicable Debtors that are insureds under the policies. Cananwill has the right to cancel the insurance policies in accordance with the Premium Financing Agreement and as permitted by applicable law and to obtain any unearned premiums, returned premiums or other amounts due thereon in the event of the Debtors' default in the payment of any installment due under the Premium Financing Agreement.

*Assumption and Renewal of Insurance Contracts with Certain Affiliates of American International Group, Inc.*

Since March 15, 2002, AIG has provided the Debtors with various types of insurance coverage, including: (a) workers' compensation, general liability and automobile and truck coverage (collectively, "Casualty Insurance"), with a policy year beginning on March 15th of each year; (b) umbrella liability, with a policy year beginning on March 15th of each year; and (c) a portion of the base layer of the Debtors' property insurance, with a policy year beginning on May 1st of each year. The Debtors must reimburse AIG for its obligations arising under the Casualty Insurance. Notwithstanding that the policy periods for some of the Casualty Insurance have expired, the Debtors and AIG have ongoing obligations with respect thereto. To secure the Debtors' reimbursement obligations under the Casualty Insurance, the Debtors have posted (a) a letter of credit in the amount of $1,800,000 for the 2002-2003 policy year and (b) a letter of credit in the amount of $2,000,000 for the 2003-2004 policy year. In December 2003, AON Risk Services, the Debtors' insurance broker, solicited bids for the renewal or replacement of the Debtors' insurance. Only AIG expressed interest.

The Debtors and AIG agreed to renew the Debtors' insurance programs. Under the renewed insurance programs, the Debtors were required to: (a) pay an aggregate premium of $1,966,554 for the 2004-2005 policy year, of which $250,000 was due prior to March 15, 2004 and the remainder of $1,716,554 was due no later than March 31, 2004; and (b) post a letter of credit in the amount of $500,000 prior to March 15, 2004 as additional collateral for the Casualty Insurance. AIG, however, conditioned its entry into the renewed insurance programs upon the Debtors' assumption of the contracts underlying the Casualty Insurance. Accordingly, the Debtors filed a motion with the Bankruptcy Court on or about March 12, 2004 (D.I. 146) seeking to assume the contracts underlying the Casualty Insurance and to enter into the renewed insurance programs with AIG. This motion was granted by the Bankruptcy Court on April 28, 2004 (D.I. 552).

*Indemnity Agreement with RLI Insurance Company*

The Debtors maintain various types of bonds, including customs entry bonds, reclamation bonds, and license/permit bonds. The Debtors require bonds because, among other things: (a) they are required by law to provide bonds to state and municipal agencies for sales and use taxes, public weighing certification, potential highway damage and the reclamation of property that the Debtors are mining or have mined; and (b) the Debtors must post performance bonds to obtain contracts representing significant sales of aggregates with state and local governments, the majority of which are solicited at this time of year. As of the Petition Date, the Debtors had approximately 70 bonds outstanding with a total face amount of $3,700,000. The Debtors' prepetition bond carriers were unwilling either to renew or replace existing bonds or to issue new bonds. The Debtors thus selected RLI Insurance Company ("RLI") to provide bonds postpetition because RLI was willing to provide reasonable terms and conditions, and the Debtors wanted to consolidate their bonding needs with one surety. The Debtors filed a motion with the Bankruptcy Court on or about March 12, 2004 (D.I. 150) seeking authority to enter into an indemnity agreement with RLI to facilitate this postpetition bonding program. The Bankruptcy Court entered an order granting this motion on or about March 22, 2004 (D.I. 228).

*Motion to Appoint Committee of Equity Security Holders*

On or about March 24, 2004, a small group of Oglebay's equity security holders filed a motion with the Bankruptcy Court, pursuant to section 1102(a)(2) of the Bankruptcy Code, for an order directing the United States Trustee to appoint an official committee of equity security holders (an "Equity Committee") (D.I. 235). After the filing of this motion, the United States Trustee denied the request for the appointment of an Equity Committee previously submitted to her by the movants. The Debtors, the Creditors' Committee, the United States Trustee and the Debtors' prepetition lenders all filed objections

to the motion (D I  324, 320, 330 and 321, respectively)  The motion was denied by an order of the Bankruptcy Court entered on April 29, 2004 (D I  538)

### *Motion to Appoint Committee of Toxic Tort Personal Injury Claimants*

On or about March 29, 2004, certain parties alleging asbestos– and silica–related diseases (collectively, the "Tort Claimants"), represented by Maritime Asbestos Legal Clinic, a division of the Jacques Admiralty Law Firm, Kelley & Ferraro, LLP, Bevan Associates LPA, Inc., Baron & Budd, P.C and Silber Pearlman, LLP, filed a motion with the Bankruptcy Court, pursuant to section 1102(a)(2) of the Bankruptcy Code and Bankruptcy Rule 2020, for the appointment of an official committee of toxic tort personal injury claimants (D I  269). The Debtors, the Creditors' Committee, the United States Trustee and the Debtors' prepetition lenders have filed objections to the motion (D I  783, 778, 782 and 323, respectively). The motion is set for hearing before the Bankruptcy Court on August 24, 2004. See "Treatment of Certain Claims Under the Plan—Treatment of Tort Claims."

### *Motions of Tort Claimants for Relief from Automatic Stay*

Certain of the Tort Claimants filed motions with the Bankruptcy Court, pursuant to section 362(d) of the Bankruptcy Code, for relief from the automatic stay to allow the Tort Claimants to pursue their alleged claims and lawsuits against the Debtors outside of the chapter 11 process (D.I. 215, 240, 262, 264, 308). The Debtors filed an omnibus objection to the motions (D I  371), and the Creditors' Committee filed a limited response to the motions (D I  381). These motions are set for hearing before the Bankruptcy Court on August 24, 2004. See "Treatment of Certain Claims Under the Plan—Treatment of Tort Claims."

### *Solicitation Procedures Motion*

On May 25, 2004, the Debtors filed the Motion of Debtors for an Order (A) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Scheduling Hearing on Confirmation of Proposed Joint Plan of Reorganization, (C) Deeming the Proposed Joint Plan of Reorganization Rejected by the Holders of Old Common Stock of Oglebay Norton Company and (D) Granting Certain Related Relief (D I  905) (the "Solicitation Procedures Motion"). By the Solicitation Procedures Motion, the Debtors requested approval of, among other things:  (a) certain procedures relating to the solicitation and tabulation of votes on the Plan; (b) the date of the hearing to approve the Disclosure Statement; (c) if the Disclosure Statement is approved, the mailing of solicitation packages to parties entitled to vote on the Plan on or before July 30, 2004; and (d) certain voting, objection and filing deadlines with respect to the Plan. On June 15, 2004, the Bankruptcy Court entered an order approving the Solicitation Procedures Motion (D I  1205).

### *Exclusivity*

Under section 1121 of the Bankruptcy Code, a debtor has the exclusive right to (a) file a plan of reorganization during the first 120 days of its chapter 11 case and (b) solicit acceptances of the plan during the first 180 days of the case. These periods (the "Exclusive Periods") may be extended for "cause." On June 9, 2004, the Debtors filed a motion seeking two-month extensions of the Exclusive Periods through August 21, 2004 and October 20, 2004, respectively (D I  1067) (the "Exclusivity Motion"). On June 28, 2004, the Bankruptcy Court entered an order approving the Exclusivity Motion (D I  1407).

### *Adversary Proceeding Relating to Old Senior Secured Notes*

On June 24, 2004, certain holders of the Old Senior Secured Notes filed an adversary complaint (the "Adversary Complaint") against the Indenture Trustee and Oglebay  The Adversary Complaint seeks:  (a) a declaration that no distributions may be made under the Plan by Oglebay or any other

Debtors to the holders of Old Senior Subordinated Notes unless and until the holders of the Old Senior Secured Notes have been paid in full in cash all amounts allegedly owing to them under the Old Senior Secured Notes Purchase Agreement, including principal, postpetition interest (including default interest from and after January 31, 2004) and any prepayment premium, whether or not any such amounts would be recoverable against the Debtors; and (b) an order requiring the Indenture Trustee to turn over any property received from the Debtors on account of the Old Senior Subordindated Notes to the extent necessary to satisfy the alleged obligations identified in the foregoing sentence. The Adversary Complaint also asserts that the Plan (a) does not enforce the subordination provisions contained in the Old Senior Subordinated Note Indenture and (b) seeks to enjoin the holders of the Old Senior Secured Notes from enforcing the subordination rights contained in the Old Senior Subordinated Note Indenture. The Debtors believe that the treatment of the Old Senior Secured Note Claims under the Plan is appropriate and in the best interests of the Estates. The Debtors will timely respond to the Adversary Complaint. See "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims."

## Postpetition Operations and Liquidity

### *First DIP Facility*

In connection with their preparations for the Filing of the Chapter 11 Cases, the Debtors determined that they would need to obtain debtor-in-possession financing to ensure sufficient liquidity to meet their ongoing operating needs. See "— Commencement of Chapter 11 Cases and First Day Relief." On February 25, 2004, the Debtors obtained interim Bankruptcy Court approval (D.I. 61) for the Debtors to utilize cash collateral and borrow up to $40 million (including a $15 million letter of credit subfacility) under an interim debtor in possession credit facility (the "First DIP Facility") pursuant to the First DIP Credit Agreement. On April 8, 2004, the Bankruptcy Court entered an order (D.I. 365) granting final approval of the First DIP Facility and thereby authorizing total borrowings under the First DIP Facility of up to $70 million (including a $20 million letter of credit subfacility).

### *Second DIP Facility*

On April 30, 2004, the Bankruptcy Court entered an order (D.I. 549) permitting the Debtors to enter into a second debtor in possession credit facility (the "Second DIP Facility") in an amount of up to $305 million, to provide adequate working capital for the duration of their bankruptcy proceedings and to pay off amounts outstanding under the First DIP Facility and the Prepetition Facilities. The Debtors entered into the Second DIP Facility on July 15, 2004. The Second DIP Facility is being provided by a syndicate that includes Silver Point and some of the same lenders under the First DIP Facility, among other lenders.

The Second DIP Facility includes a senior secured revolving credit facility in an aggregate principal amount at any time outstanding not to exceed $55 million, with a sublimit of $20 million for letter of credit accommodations. Principal amounts of the revolving facility that the Debtors repay may be reborrowed in accordance with the terms of the Second DIP Facility. The revolving credit facility under the Second DIP Facility bears interest at a floating rate linked to the prime rate or to LIBOR, at the Debtors' option. The revolving loans linked to the prime rate bear interest at the greater of 5.50% and the prime rate plus 1.00%, and the revolving loans linked to LIBOR bear interest at the greater of 5.50% and LIBOR plus 3.50%.

The Second DIP Facility also includes three term loan facilities, which are comprised of a term loan A facility in the initial principal amount of $105 million, a term loan A-1 facility in the initial principal amount of $20 million, and a term loan B facility in the initial principal amount of $125 million. Principal amounts under the term loan facilities may not be reborrowed if the Debtors repay them.

Each of the term loan facilities under the Second DIP Facility bears interest at a floating rate linked to the prime rate or to LIBOR, at the Debtors' option. The loans under the term loan A facility and the term loan A-1 facility linked to the prime rate bear interest at the greater of 6.00% and the prime rate plus 1.50%. The term A loans and term A-1 loans linked to LIBOR bear interest at the greater of 6.00% and LIBOR plus 4.00%. The term B loans bearing interest at a rate linked to the prime rate initially bear interest at the greater of 10.50% and the prime rate plus 6.00%, and the term B loans bearing interest at a rate linked to LIBOR initially bear interest at the greater of 8.50% and LIBOR plus 6.50%. The term loan B facility is subject to an increase in interest rates on August 15, 2004. The increased rates will remain in effect from the time of the increase until the loan is repaid or otherwise refinanced. The Term B Loans will bear interest at (a) the greater of 13.75% or the prime rate plus 9.25% or (b) the greater of 11.75% and LIBOR plus 9.75% after the interest rate increase date.

The Second DIP Facility is secured by liens senior to the liens securing the Old Senior Secured Notes and is guaranteed by each of the Debtors other than Oglebay. The Second DIP Facility will mature on the earlier to occur of June 30, 2005 and the Effective Date, at which time the Debtors anticipate replacing the Second DIP Facility with the Confirmation Facility. The Second DIP Facility includes restrictive covenants, including requirements of a minimum EBITDA, a limitation on capital expenditures and restrictions on the payment of dividends by the Debtors, as well as other restrictions customary in facilities of this nature.

**Consortium Letters of Intent**

On March 19, 2004, the Debtors received an expression of interest in their assets (the "March Letter") from a consortium of potential buyers comprised of Lafarge North America, Inc. ("Lafarge"), Franklin Industries ("Franklin"), Fairmount Minerals ("Fairmount") and Ensign Capital Corp. ("Ensign") Lafarge, Franklin and Fairmount are direct competitors of the Debtors. On April 6, 2004, the Debtors received a more detailed expression of interest (the "April 6, 2004 Letter") from Lafarge, Franklin and Ensign (collectively, the "Consortium") that proposed an aggregate purchase price for substantially all of the Debtors' assets of between $380 to $420 million. On April 27, 2004, the Debtors received a revised version of the April 6, 2004 expression of interest (together with the April 6, 2004 Letter, the "April Letters") adding CapitalWorks, LLC ("Capital Works") as a member of the Consortium. The March Letter and the April Letters were all provided to, and discussed with, the Creditors' Committee. On April 26, 2004, Oglebay's Board of Directors met and considered the April Letters and determined that the proposed transaction would not be as beneficial to the Debtors' creditors as the treatment proposed for such creditors under the Plan. Representatives of the Creditors' Committee agreed with the Debtors' assessment of the April Letters. On April 28, 2004, counsel to the Debtors informed counsel to the Consortium of the Board of Directors' decision. On May 26, 2004, the Consortium sent the Debtors another expression of interest (the "May Letter") that, among other things, proposed a $456 million purchase price for substantially all of the Debtors' assets, but contemplated leaving substantially all of the Debtors' liabilities behind and required the establishment of a trust to resolve all current and future asbestos and silicosis claims against the Debtors. Subsequent to the Debtors' receipt of the May Letter, John Mueller, the only signatory to the May Letter, contacted the Debtors to inform them that the May Letter had been sent to the Debtors in error and should be disregarded and that a revised version of the May Letter would be forthcoming in the next two days.

Over one month later, on July 2, 2004, the Debtors received another expression of interest (the "July Letter") from the Consortium that was identical to the May Letter except that (a) Lafarge was removed from, and NuFleet, LLC added to, the Consortium and (b) the proposed purchase price for the Debtors' assets was reduced to $451 million. NuFleet, LLC is an entity that is associated with certain of the Debtors' former executives and other individuals familiar with the Debtors' businesses and industry. Moreover, notwithstanding the removal of Lafarge from the July Letter, subsequent conversations between the Debtors, the Debtors' representatives and members and representatives of the Consortium suggest that Lafarge is still an active participant in the Consortium. Because the Consortium is comprised

of or associated with direct competitors of the Debtors, the Debtors have been appropriately cautious regarding the sharing of information (in particular, confidential and proprietary information) with the Consortium. The Debtors or their representatives, however, have provided the Consortium with certain financial information (including the Debtors' analysis of their liabilities under the Plan) and have discussed the details of the July Letter with the Consortium.

Consistent with the Debtors' analysis of the April Letters, the Debtors have determined that the transaction proposed by the July Letter, if consummated, would result in substantially lower recoveries for unsecured creditors than what currently is proposed by the Plan. Moreover, given (a) uncertainties regarding the funding of the Consortium's offer, (b) the delay and additional expense associated with the Consortium's offer and (c) the Consortium's proposal to leave substantially all liabilities (including all asbestos, silica and pension liabilities) of the Debtors with the Debtors' Estates, the Debtors do not believe that the pursuit of the transaction proposed by the Consortium is in the best interests of their Estates or creditors. See also "Treatment of Certain Claims Under the Plan—Treatment of Tort Claims."

More specifically, the Debtors, with the assistance of their financial advisor and counsel, have thoroughly analyzed the structure and economics of the July Letter and such proposal's impact on the recoveries of unsecured creditors in the Chapter 11 Cases. As drafted, the Debtors believe that the July Letter has a number of deficiencies relative to the Plan, making the pursuit of the July Letter inconsistent with the Debtors' aim of maximizing the value of their estates for the benefits of their stakeholders. In particular, Lazard has estimated the recoveries for all of the Debtors' unsecured creditors under the July Letter to be approximately 12% on a consolidated basis, taking into account the July Letter's exclusion of all post-closing liabilities, as well as the costs (including professional fees and additional non-default interest accruing on the Old Senior Secured Notes) associated with implementing the July Letter. This analysis took no discount for the risk of implementing the July Letter (including risks associated with closing the type of transaction contemplated by such proposal, i.e., the simultaneous closing of multiple transactions with multiple parties), even though the Consortium does not guarantee the closing of any of the transactions or any specific level of recovery to unsecured creditors. The Debtors have shared this analysis with the Creditors' Committee and the Consortium. The Creditors' Committee and its advisors agree with Lazard's analysis of the July Letter. The Debtors have not received any specific feedback from the Consortium regarding Lazard's analysis of the July Letter. The Consortium has informed the Creditors' Committee that it disagrees with Lazard's analysis of the July Letter. Based upon the information currently available to the Debtors, the Debtors continue to believe that the Plan is the best alternative for their Estates and stakeholders.

As detailed above, the Committee is comprised of seven members, with one member holding Trade Claims against the Debtors, one member holding MLO Claims, four members holding Old Senior Subordinated Note Claims and the final member being the Indenture Trustee. Together with an ex officio member of the Creditors' Committee, the Creditors' Committee members who hold Old Senior Subordinated Note Claims represent more than two-thirds of the amount of the Old Senior Subordinated Notes. As the Committee has either taken part in, or been fully apprised of, the ongoing discussions between the Debtors and the Consortium, the majority of holders of Old Senior Subordinated Note Claims are acutely aware of all issues related to the Consortium's expression of interest in purchasing the Debtors' assets. Although two putative holders of Old Senior Subordinated Note Claims, which holders are also members of the Consortium, disagree with the Committee's position, the Committee concurs in the Debtors' assessment of the transaction proposed by the Consortium in the July Letter and believes that the consummation of such a transaction would result in a far lower recovery for unsecured creditors, including the holders of the Old Senior Subordinated Notes, than what currently is proposed in the Plan.

On July 28, 2004, the Debtors, the Creditors' Committee and their respective advisors met with all of the members of the Consortium and their counsel, as well as representatives of Lafarge and its counsel, for several hours to discuss certain specific issues relating to the July Letter and to explain the need for the Consortium to revisit the structure and economics of the July Letter to be more competitive

with the Plan. Based upon the information provided at the July 28 meeting, the Consortium has indicated that it may request additional due diligence and will consider whether to revise its offer in the July Letter, which, if revised, the Debtors and the Creditors' Committee encouraged to be submitted within the next two to three weeks. The Debtors and Creditors' Committee will consider such revised offer if and when submitted. The Creditors' Committee supports the Consortium having continued access to appropriate due diligence and, as noted above, will consider a revised offer if submitted.

### Expressions of Interest in Certain of Debtors' Assets

As explained in other parts of this Disclosure Statement, over the course of the Debtors' restructuring, both prior to and during the Chapter 11 Cases, the Debtors have marketed certain assets to determine if an appropriate offer would be made that would de-lever the balance sheet and add value to the Debtors' Estates. In addition, various parties, including individuals, financial and strategic buyers and competitors have expressed interest in acquiring certain of the Debtors' assets. These expressions include desires to purchase individual marine vessels, groups of vessels, the entire fleet, individual quarries, certain divisions, abandoned quarries (should the Debtors decide to abandon quarries), scrap equipment and movable equipment. Other than the interest expressed by the Consortium described above, no one offer was for substantially all of the assets. A group of vessel employees expressed interest in creating an ESOP to acquire all of the Marine Group assets as a going concern. The suggested price was less than book value, although the group would be willing to assume liabilities relating to Marine Group employees. Similarly, NuFleet, LLC, which is a member of the Consortium, has expressed a similar interest. A firm offer was not received, although again the suggested price was less than book value.

The Debtors, by and through management and their advisors, duly investigated each proposal received, returned each phone call and maintain records of each discussion held with interested parties. In each case, a determination was made that the value offered would not improve the value of the Plan to stakeholders and would delay and detract from implementation of the Plan, which the Debtors believe provides the highest value to stakeholders. The Creditors' Committee is fully informed regarding these inquiries and supports the Debtors' determination.

## RECOVERY ACTIONS

### Introduction

Recovery Actions include, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 547, 548, 549 and 550 of the Bankruptcy Code and other similar state law claims and causes of action.

### Preference Claims

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain prepetition payments made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (a) was made when the debtor was insolvent and (b) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor in a chapter 7 case where the transfer has not been made. Transfers made to a creditor who was an "insider" of the debtor are subject to these provisions generally only if the payment was made within one year prior to the debtor's filing of a petition under chapter 11. Transfers made to a creditor who was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11. Under section 547, certain defenses, in addition to the solvency of the debtor at the time of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not make an otherwise unavoidable transfer to or for the benefit of the creditor. A debtor may not recover a payment

to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor. Further, a debtor may not recover a payment if such payment was made in the ordinary course of business of both the debtor and the creditor. The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference, including its insolvency, at the time of the payment. The creditor has the initial burden of proof as to the aforementioned defenses. Based upon their preliminary review of their books and records and the proposed treatment for Allowed General Unsecured Claims in Class 5 under the Plan, the Debtors do not believe that any meaningful preference claims exist. Accordingly, all such claims are being waived and released by the Debtors under the Plan.

**Fraudulent Conveyance Actions**

Generally, a conveyance or transfer is fraudulent if: (a) it was made with the actual intent to hinder, delay or defraud a creditor (*i e*, an intentional fraudulent conveyance); or (b)(i) reasonably equivalent value was not received by the transferee in exchange for the transfer and (ii) the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (*i e*, a constructive fraudulent conveyance). Two primary sources of fraudulent conveyance law exist in a chapter 11 case.

The first is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred on or within one year before the date that a bankruptcy case is filed.

The second source is section 544 of the Bankruptcy Code — the so-called "strong-arm provision" — under which the debtor in possession (or creditors with bankruptcy court permission) may look to state law to avoid transfers as fraudulent. State fraudulent conveyance laws generally have statutes of limitations longer than one year and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case. If such statute of limitations has not expired, the debtor in possession (or creditors with bankruptcy court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the statute of limitations period expires prior thereto. Generally, section 546 of the Bankruptcy Code permits a state fraudulent conveyance action to be brought within the later of (a) two years after the commencement of the bankruptcy case or (b) one year after the appointment or election of a trustee for the debtor if such appointment or election occurs within such two-year period.

The primary sources of applicable state fraudulent conveyance law are state enactments of the Uniform Fraudulent Conveyance Act ("UFCA") and the Uniform Fraudulent Transfer Act ("UFTA"). Like section 548 of the Bankruptcy Code, under both the UFCA and the UFTA, a conveyance or transfer is generally fraudulent if: (a) it was made with the actual intent to hinder, delay or defraud a creditor (*i e*, an intentional fraudulent conveyance); or (b)(i) reasonably equivalent value was not received by the transferee in exchange for the transfer and (ii) the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (*i e*, a constructive fraudulent conveyance).

The Debtors are not aware of any transactions that might be successfully challenged as fraudulent conveyances. Based upon management's knowledge and belief, all of the Debtors; material transactions (a) have been disclosed either in their public filings or in this Disclosure Statement, (b) were approved by Oglebay's Board of Directors, (c) were negotiated in good faith and constituted arms' length transactions and (d) were done for reasonably equivalent value. The Debtors further believe that the businesses and/or assets acquired by the Debtors prior to the Chapter 11 Cases are integral to their business plan and the Debtors' ability to implement the Plan. Moreover, it is imperative that each of the Reorganized Debtors be able to emerge from its respective Chapter 11 Case, and concentrate upon the implementation of its

post-confirmation business strategy, unburdened by the strife, instability and cost attendant upon possibly prolonged and contentious litigation against past, and possibly future, business partners. The Debtors have consulted with the Creditors' Committee with respect to the Debtors' decision to waive and release any potential fraudulent conveyance claims and the Creditors' Committee supports the Debtors' business judgment. Accordingly, all such claims are being waived and released by the Debtors under the Plan.

## Fiduciary Duties

Applicable state law provides a cause of action against officers and directors of a corporation who breach their fiduciary duties to the corporation. The two primary fiduciary duties of officers and directors of corporations are the duty of care and the duty of loyalty.

The duty of care requires that officers and directors act in an informed manner, meaning that, prior to making a business decision, the directors must have informed themselves of all material information reasonably available to them, and, having been so informed, they must then act with requisite care in the discharge of their duties. In turn, "requisite care" has been defined as the care an ordinarily prudent person in a like position would use under similar circumstances.

The duty of loyalty requires that officers and directors act in good faith and in the good faith belief that the action taken is in the best interests of the corporation.

In a solvent corporation, these duties are generally owed exclusively to stockholders. In an insolvent or near-insolvent corporation, most courts have held that these fiduciary duties may be owed to the corporation's creditors, either in addition to or in lieu of its stockholders. In determining whether a corporation is solvent or insolvent, courts generally look to two tests: the "balance sheet test" and the "equity" or "cash-flow" test. The balance sheet test inquires whether, both before and after the consummation of the challenged transaction, the fair market value of the corporation's liabilities exceeds the fair market value of its assets. In contrast, the "equity" or "cash-flow" test inquires whether, both before and after the consummation of the challenged transaction, the corporation was capable of paying its debts as they came due.

Generally, the business judgment rule shifts the burden of proof in a breach of fiduciary duty action and requires the plaintiff to establish the breach by the officer or director; however, courts are divided as to whether this protection applies to insolvent or near-insolvent corporations. In the event the business judgment rule is not applicable, the officers and directors are required to prove the "entire fairness" of such transactions.

The Debtors are not aware of any transactions that could reasonably be said to constitute a breach of fiduciary duty by any of the Debtors' current or former directors and officers. Accordingly, all such claims are being waived and released by the Debtors under the Plan.

## Other Types of Recovery Actions

Based upon, among other things, the proposed treatment for Allowed General Unsecured Claims in Class 5 under the Plan, the Debtors are not aware of any transactions that they could reasonably challenge as a Recovery Action. Accordingly, all such claims are being waived and released by the Debtors under the Plan.

## REORGANIZED OGLEBAY

## Restructuring Transactions

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such restructuring transactions and may take such actions as the Debtors or Reorganized Debtors may

determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors (collectively, the "Restructuring Transactions"), all to the extent not inconsistent with any other terms of the Plan. Such Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, all as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. Any Restructuring Transactions to be consummated by the Debtors prior to the Effective Date pursuant to the Plan will be subject to the review and approval of the Creditors' Committee.

## Business and Properties of the Reorganized Debtors

### *Business*

The Reorganized Debtors will continue to operate the existing businesses of the Debtors following the Effective Date. Certain aspects of the Debtors' businesses to be operated by the Reorganized Debtors are described below:

    1.    Principal Products and Services

    (a)    Great Lakes Minerals Segment

The Great Lakes Minerals segment mines limestone at three quarries located in northern Michigan and distributes it throughout the Great Lakes region. All three quarries have access to the Great Lakes and ship a majority of their output by marine vessel. The segment holds one of the largest reserves of metallurgical and chemical quality high-calcium carbonate and dolomitic limestone in the world and distributes these reserves on one of the largest fleets of self-unloading vessels on the Great Lakes. The fleet, which is currently comprised of 12 vessels, provides transportation services for limestone as well as for coal and iron ore. Additionally, the segment operates (i) dock terminals in Cleveland, Ohio and Erie, Pennsylvania, which are important points of distribution on the Great Lakes, and (ii) a sand dredging operation in Erie, Pennsylvania.

*Industry.* Limestone accounts for about three-quarters of crushed stone production in the United States. Crushed limestone has five primary end uses: construction aggregates and building materials, chemical and metallurgical processes, cement and lime manufacturing, environmental and agricultural. As transportation costs are significant in this industry, competition is limited based on geography. Chemical make-up of limestone varies by deposit, resulting in certain quarries having limited ability to meet performance specifications of certain end uses, such as flue gas desulphurization. Products from the Great Lakes Minerals segment are used primarily as aggregate for construction of schools, hospitals, shopping centers and highways; as an environmental cleaning agent for flue gas desulphurization, waste water treatment and soil stabilization; and as an essential chemical component in the manufacture of steel, paper and glass.

In general, demand for crushed limestone correlates with general economic cycles, principally new construction demand and government spending on highway construction and other infrastructure projects. The segment's long-lived mineral reserves and processing facilities allow capacity to meet increased demand during up-turns in general economic activity. Demand for vessel transportation on the Great Lakes is also related to general economic cycles and more particularly to construction activity and industrial production in the Great Lakes region. The business in the Great Lakes Minerals segment is seasonal. It is affected by weather conditions, such as the waterways freezing over, the closing/opening of the locks between the lakes, and water levels of the lakes and rivers. These factors cause the actual number of days of operation to vary each year. Annually, the locks are required by law to close on January 15 and re-open around March 25, unless otherwise prescribed by the U.S. Coast Guard. The Debtors believe that the overall Great Lakes shipping market in which their fleet competes operated at less than full capacity in 2003, 2002 and 2001, after approaching full capacity for the prior five years. The Debtors believe that the Great Lakes shipping market will operate at less than full capacity again in 2004.

*Operations* The Great Lakes Minerals segment operates four open pit quarries, 12 self-unloading vessels and two dock facilities, and has access to several additional docks on the Great Lakes. The Debtors assess mineral reserves at all of their quarries and mines utilizing external consulting geologists and mining engineers. The large reserves of the Great Lakes Minerals segment have been extensively mapped, and this mapping is regularly updated to provide the customer with specified, consistent-quality product. Limestone is extracted from the quarries by traditional drilling and blasting techniques. Following extraction, trucks or trains are used to deliver the "as-blasted" limestone to a primary crusher. It is then processed through several stages of crushing and screening to size products that can be sold as chemical limestone or aggregates.

Transportation costs represent a significant portion of the overall delivered price of limestone. Limestone quarried at the segment's operations are delivered, for the most part, by marine vessel, enabling the stone to be shipped to major markets located in excess of 800 miles away at a competitive price. The Debtors are the largest and only fully integrated producer and bulk transporter of limestone on the Great Lakes. The Debtors can mine, process and transport stone to their own docks or directly to customers on a delivered cost per ton basis using their own services or under long-term contracts.

Substantially all of the transportation services of the Debtors' vessel fleet are conducted between U.S. ports on the Great Lakes. The largest vessels in the fleet transport primarily iron ore and coal. Smaller vessels can be scheduled with more flexibility and tend to be better suited to transport limestone. In early 2002, the Debtors entered into a pooling agreement with American Steamship Company, which operates a fleet of 12 modern, self-unloading Great Lakes vessels comparable in size to the Debtors' fleet. The agreement combines the operations and customers of the two fleets to achieve more efficient overall operations and better customer service. With the pooling of vessels, the Debtors realize improved trade patterns for all cargo, including limestone, resulting in more efficient deployment and reduced delays across the combined fleet and better service to the customers of both companies. The agreement provides for the coordination of dispatch and other fleet operations but does not involve any transfer of assets.

The Great Lakes Minerals segment operates a bulk material dock facility in Cleveland, Ohio under an agreement with the Cleveland-Cuyahoga County Port Authority that was extended in 2002 through March 2017. The dock facility operates throughout the year, receiving cargo from Great Lakes vessels, storing it as needed, and transferring it for further shipment via rail or water transportation. In 2003, the Port Authority concluded the relocation of an automated vessel loader to the dock facility. The new loader enables the Debtors to trans-load iron ore pellets from their larger vessels to smaller vessels for delivery up the Cuyahoga River to a major customer. As a result of the vessel loader project, the Port Authority has postponed prior plans to construct a new access road that will enable the facility to trans-ship cargoes by truck as well as rail and water. If the access road is constructed, the Debtors expects that the new road will enable limestone delivery by truck, expanding their ability to serve the limestone

market. It is uncertain at this time when the Port Authority will resume plans for the access road construction.

The Erie Sand and Gravel operation does not operate a quarry. The majority of its product is received from the segment's quarries in Michigan via marine vessel to a bulk materials dock in Erie, Pennsylvania, for distribution into local markets. The operation has a vessel that dredges sand from Lake Erie, which is screened and sold into local markets as a filler in concrete and other construction applications. Additionally, the Erie dock is a distribution point for other products including salt and coke breeze. The addition of Erie Sand and Gravel expanded the geographic scope of the segment to the northwest Pennsylvania and western New York regions.

*Customers.* The segment's primary customers include purchasers and producers of construction aggregate and chemical limestone, integrated steel manufacturers, for whom the fleet transports iron ore, limestone and coal, and electric utility companies, for whom the fleet transports coal. The Debtors have long-established relationships with many of these customers and provide services to many of them pursuant to long-term contracts. The Debtors estimate that approximately 70% of the tonnage hauled by the vessel fleet was shipped pursuant to multi-year contracts. The Debtors estimate that, for 2003, industrial and chemical, building materials and construction, and energy customers accounted for approximately 44%, 41% and 15%, respectively, of this business segment's revenue.

Since the acquisition of Michigan Limestone Operations Limited Partnership in 2000, the Debtors have moved to diversify the fleet's shipping patterns in order to reduce its dependence on iron ore and the integrated steel industry. As recently as the late 1990s, iron ore accounted for as much as 60% of the fleet's revenues. In 2003, iron ore shipments accounted for approximately 47% of the fleet's revenues (46% in 2002 and 45% in 2001). Coal accounted for about 36% of the fleet's revenues in 2003 compared with 32% in 2002 and 31% in 2001. Shipments of limestone accounted for an estimated 16% of the fleet's revenues in 2003, compared with approximately 22% in 2002 and 23% in 2001. Approximately 70% of the limestone transported by the pooled fleet in 2003 came from the segment's quarries.

*Competition.* The building materials and construction aggregate industry in North America is highly fragmented. Many active operations are small scale or wayside locations operated by state or local governments, usually to meet the requirements of highway contracts in more remote locations. There also are a number of large companies in the industry, including Vulcan Materials Corporation, Martin Marietta Materials Inc. and Lafarge Corporation whose operations are often centered on a particular geographic region. The Great Lakes Minerals operations are centered on the Great Lakes region in this fashion and compete primarily with Lafarge Corporation, which has facilities in the same geographic region. Given that transportation costs represent a significant portion of the overall cost of lime and limestone products, competition generally occurs among participants in close geographic proximity. Additionally, the scarcity of high-purity limestone deposits on which the required zoning, extraction and emission permits can be obtained serves to limit competition from startup operations within this limestone market. The physical characteristics and purity of the limestone can be a distinguishing competitive factor for chemical limestone and price is an important factor for both chemical limestone and construction aggregate.

The most important competitive factors impacting the segment's marine transportation services are price, customer relationships and customer service. The Debtors believe that customers generally are willing to continue to use the same carrier assuming such carrier provides satisfactory service with competitive pricing. The Debtors' fleet directly competes only among U.S. flag Great Lakes vessels because of the U.S. federal law known as the Jones Act. The Jones Act requires that cargo moving between U.S. ports be carried in a vessel that was built in the United States, has a U.S. crew, and is owned (at least 75%) by U.S. citizens or corporations. As a result, Canadian-flagged Great Lakes vessels or foreign-flag oceanic vessels do not carry dry bulk cargo between U.S. ports. Moreover, the size limitation imposed by the Welland canal prevents large oceanic vessels from entering the Great Lakes. The

competitive landscape has remained relatively stable over the last ten years. There were approximately 56 and 60 U.S. flag vessels in service in 2003 and 2002, respectively. The Debtors are expected to continue to lay up some of their vessels in 2004 as a result of efficiencies realized from the pooling arrangement with American Steamship Company.

The pooled fleet will principally compete against two other similar-sized U.S. flag Great Lakes commercial fleets in 2004: (i) The Interlake Steamship Company and (ii) The U.S.S. Great Lakes Fleet. The fleet also competes with certain companies that operate smaller captive fleets and, to a lesser extent, with rail and truck transportation companies serving the Great Lakes region.

    (b)    Global Stone Segment

Through a series of transactions in 2000, 1999 and 1998, the Debtors acquired businesses that now form their Global Stone segment. These operations supply lime, crushed and ground limestone, construction aggregates and chemical limestone to a broad customer base in a variety of industries. The segment's products are used primarily as a filler in building materials, as an environmental cleaning agent for flue gas desulphurization, waste water treatment and soil stabilization, as a chemical in steel-making, paper-making and glass-making, and as an aggregate for construction of highways, shopping centers, hospitals and schools.

*Industry.* Lime is a value-added product, derived from limestone, and is widely used in a variety of manufacturing processes and industries, including iron and steel, pulp and paper, chemical, air purification, sewage, water and waste treatments, agricultural and construction. The wide range of end-uses and markets for lime offer some protection from the economic cycles experienced by individual sectors such as the steel industry. Additionally, a high proportion of lime is sold into end-uses that, unlike some construction-related end-uses, have year-round requirements largely unaffected by the weather. Limestone accounts for about three-quarters of crushed stone production in the United States. Transportation costs can be significant in this industry; therefore, competition is limited based on geography. Additionally, many of these applications require stone with specific chemical composition and a high degree of reactivity. Crushed limestone has four primary end uses: construction aggregates and building materials; chemical and metallurgical processes; cement and lime manufacturing; and agricultural purposes. High-purity chemical limestone like that processed by the segment may be processed into value-added products, such as lime or limestone fillers, or sold as chemical limestone for use in manufacturing products as diverse as poultry feed mixtures, fiberglass and roofing shingles. Fillers, which are finely ground limestone powders, are used in a wide range of manufacturing processes including vinyl flooring, carpet backing, adhesives, sealants and joint compound.

*Operations.* The Global Stone business segment produces products for the following primary end uses: construction aggregates and building materials, environmental, chemical and metallurgical processes, cement and lime manufacturing, and agricultural. The segment has seven lime and/or limestone operations in North America that collectively extract and process high-purity limestone. These operations are primarily centered in northwest Georgia and along the Interstate 81 corridor from southern Pennsylvania through Virginia and Tennessee.

The segment currently operates eight open pit quarries and four underground mines. Limestone is extracted from the quarries and mines by traditional drilling and blasting techniques. In an open pit quarrying operation, the high-purity limestone is often covered by an overburden of construction grade limestone that must first be removed. This overburden is used whenever possible to produce construction aggregates, usually in a dedicated crushing plant, in order to offset the overall cost of extracting high-purity limestone. Following extraction, trucks are used to deliver the "as-blasted" limestone to a primary crusher. It is then processed through several stages of crushing and screening to size products that are saleable as chemical limestone and aggregates or ready for further processing into lime, fillers and other

value-added products  The Debtors assess mineral reserves at all of their quarries and mines utilizing external consulting geologists and mining engineers.

High-purity limestone is processed into lime by heating it in a kiln  At March 31, 2004, the Debtors believe their daily lime production capacity was about 2,800 tons.  The capacity over a 24-hour period cannot be projected over a full calendar year because kilns require regular planned outages for maintenance and equipment and is subject to unplanned outages customary with any mechanical plant Typically, a kiln will operate between 92%-96% of the available hours in any year.  High-purity limestone is processed into fillers through grinding into course, medium or fine grades  The segment primarily competes in course ground filler products used in the manufacture of roofing shingles and carpet backing

*Customers*  In general, demand for lime and limestone correlates to general economic cycles, principally new construction demand, population growth rates and government spending on highway construction and other infrastructure projects, which affect the demand for the Debtors' customers' products and services  This business segment has a broad customer base covering all sectors of the demand for lime and limestone.  These customers vary by the type of limestone products they demand: lime, chemical limestone or construction aggregate  The Debtors estimate that building materials and construction, environmental, and industrial and chemical customers accounted for about 58%, 22% and 20%, respectively, of this business segment's revenue in 2003 and about 51%, 26% and 23%, respectively, of this business segment's revenue in the first quarter of 2004.

Transportation cost represents a significant portion of the overall cost of lime and limestone  As a result, the majority of lime and limestone production is sold within a 200-mile radius of the producing facility, while aggregates tend to be sold within a 50-mile radius  At certain of the segment's locations asphalt manufacturing customers have located their processing plants on the Debtors' property  The Debtors believe that their Global Stone lime and limestone operations are strategically located near major markets for their products and holds a significant share of these markets

*Competition*  The building materials and construction aggregate industry in North America is highly fragmented  Many of the active operations are small scale or wayside locations operated by state or local governments, usually to meet the requirements of highway contracts in more remote locations There also are a number of large companies in the industry, including Vulcan Materials Corporation, Martin Marietta Materials Inc. and Lafarge Corporation, whose operations are often centered on a particular geographic region

Lime is primarily purchased under annual contracts  For many customers, the cost of lime is quite small in comparison to their overall production costs  For 2003, the Debtors estimate that they were the fifth largest producer of lime in North America, with the eight largest producers accounting for approximately 80% of total industry capacity  The Global Stone business segment accounted for approximately 4% of the total North American market  The four largest companies with which the Debtors compete are privately owned  The most important competitive factors are the inherent quality and characteristics of the lime, price and ability to meet spikes in demand.

Given that transportation cost represents a significant portion of the overall cost of lime and limestone products, competition generally occurs among participants in close geographic proximity.  In addition, the scarcity of high-purity limestone deposits on which the required zoning, extraction and emission permits can be obtained serves to limit competition from startup operations within the limestone market.

(c)    Performance Minerals Segment

The Performance Minerals business segment is engaged in the mining and processing of high-quality specialty mineral products, primarily industrial sands and muscovite mica. The segment's businesses are focused on markets where excellent technical service and support are important to customers. Additionally, the segment's businesses share common end-use markets in building products and a geographic focus on the Southwestern United States. The Debtors believe that the segment is the fourth-largest producer of industrial sands in the United States and the largest producer of muscovite mica in North America. In September 2003, management announced its intention to sell the Mica Business. The Debtors received several offers to purchase the Mica Business during the marketing period. The Debtors did not sell the Mica Business for a variety of reasons prior to the Petition Date, but they are currently working towards completing a sale with potential interested buyers.

Performance Minerals' products include: (i) fracturing sands, which are used by oil and gas well service and exploration companies in the well fracturing process to hold rock structures open; (ii) specialty construction/industrial sands, which are used in the construction industry; (iii) silica flour used in the manufacture of building materials such as roofing shingles, stucco, mortar and grout, and in fiberglass and ceramics; (iv) whole grain sands and silica flour used in glass-making; (v) recreational sands, which are used in the construction of golf courses and other recreation fields, as well as in general landscaping applications; (vi) foundry sands, which are used in ferrous and non-ferrous metal die casting; (vii) filtration sands, which are used in liquid filtration systems; (viii) coated sand for industrial abrasive uses; and (ix) mica products used as a functional filler in building materials such as joint compound, coatings and paints, as well as in the manufacture of numerous industrial and consumer products, including automotive sound deadening materials, thermoplastics and cosmetics.

The Debtors' mica operation produces the widest array of mica products in North America–more than 40 different products–and is the only company currently supplying all major muscovite mica market segments. Performance Minerals also produces two other specialty minerals as a byproduct of mica production: kaolin clay and feldspathic sand.

*Industry.* Industrial sands, often termed "silica," "silica sand" and "quartz sand," are defined as high silicon dioxide content sands. While deposits of more common construction sand and gravel are widespread, industrial sand deposits are limited. The special properties of industrial sands–purity, grain size, color, inertness, hardness and resistance to high temperatures–make them often irreplaceable in a variety of industrial applications. Higher silica content allows for more specialized, higher-margin applications than construction sand and gravel. Mica, the segment's other primary product, is highly valued for its unique physical characteristics, including color, flexibility, durability, thermal properties and weight. Mica is used as a functional filler in building materials such as joint compound, coatings and paints, as well as in the manufacture of numerous industrial and consumer products including automotive sound deadening materials, thermoplastics and cosmetics. Mica is an essential component in many applications and in some cases can command premium pricing.

In general, demand for Performance Minerals' products is driven by a number of factors depending on end use. The three most important factors are demand for oil and natural gas, housing starts, and golf course construction activity in the Southwestern United States where most of the Debtors' industrial sand facilities are located. Oil and gas usage correlates with demand from oil and gas drilling service companies for fracturing or "frac" sands, which is the largest single market for the Debtors industrial sands. Housing starts correlate with demand for building products such as joint compound, paint, roofing shingles and grout, which are important end-uses for both mica and industrial sands. Demand for sand used in golf course construction and maintenance relates primarily to southern California locations.

*Operations.* The Performance Minerals segment has eight operations, five of which having strategically located, long-lived reserves of high-purity industrial sands and muscovite mica. Three of the segments operations function as distribution and/or processing points and are supplied by either the segment's quarries or by third-parties. The segment's operations are located in Ohio, North Carolina and the Southwest.

The industrial sands operations include four open pit sand quarries with two integrated processing plants and one remote processing plant. In an industrial sand quarry, the extracted sand is first washed to remove impurities like clay and dirt. The sand is then dried, screened and separated into different sized granules. At certain of the facilities, the sand is also pulverized into powder for use in ceramic and other applications. All of the segment's industrial sands operations have railroad and/or highway access.

The segment's two mica operations are located in Kings Mountain, North Carolina and Velarde, New Mexico. The Kings Mountain complex includes two mines and three plant sites that crush, dry, screen, mill and package mica products for shipment. Products include wet ground mica, dry ground mica, flake mica and micronized mica, as well as the byproducts kaolin clay and feldspathic sand. Several different kinds of mica are surface treated with various chemicals to improve their performance in plastic products. The Velarde operation in northern New Mexico includes a surface mine and a plant that processes dry ground and flake mica. Both the Velarde and Kings Mountain sites control sufficient mica reserves to meet all expected demand for many years to come.

*Customers.* The segment has a broad customer base for its many industrial sands and mica products. The Debtors have a long relationship with the majority of its large customers in this segment. Industrial sands customers participate in the oil and gas well service, building materials, glass, fiberglass, ceramic, foundry, filtration, and golf course and recreational industries. Mica is supplied to customers in the building materials, automotive, rubber and plastics and cosmetics industries, among others.

For bulk industrial sands materials, transportation cost represents a significant portion of the overall cost, and so the majority of production is sold within a 200-mile radius of the producing facility. In contrast, for fracturing sands and most mica products, transporting the materials long distances is not economically prohibitive because of their high unit value. Fracturing sands are transported throughout the entire North American continent to satisfy current supply needs. The Debtors estimate that the building materials and construction markets, energy, and industrial uses accounted for approximately 36%, 28% and 34%, respectively, of the business segment's revenue in 2003 and approximately 34%, 39% and 27%, respectively, of the business segment's revenue in the first quarter of 2004.

*Competition.* Competition generally occurs between participants in close geographic proximity. However, the scarcity of high-purity sand deposits for which the required zoning and extraction permits can be obtained serves to limit competition. The Debtors estimate that they are the fourth largest industrial sand producer in the country and the leader in the Southwestern U.S. market. The principal competition comes primarily from three companies: Unimin Corp., U.S. Silica Co., a wholly-owned subsidiary of Better Minerals and Aggregates Corp. and Fairmount Minerals Ltd. The most competitive factors include the inherent physical characteristics of the sand, price and ability to meet spikes in demand.

Due to limited sources, competition in the muscovite mica industry is international. The Debtors estimate that they are the largest producer of muscovite mica in North America, accounting for approximately 45% of the market. Competition comes primarily from privately held international businesses, with the only public competitors in 2003 being Zemex, Inc. (acquired by Cementos Pacasmayo S.A.A. in March 2003) and Engelhard Corporation.

2.    Environmental, Health and Safety Considerations

The Debtors are subject to various environmental laws and regulations imposed by federal, state and local governments. The Debtors are continually improving and updating their Environmental, Health and Safety Initiative and in 2002 implemented a new comprehensive program. During the year 2001, certain plant operations were closed in conjunction with the fourth quarter restructuring of the Debtors. As a result, the Debtors have incurred and may, in the future, be responsible for certain closure related expenses, including applicable reclamation of land to its original condition or to a condition as may be required by contract or law.

3    Employees

At July 21, 2004, the Debtors' workforce consisted of about 1,869 people, of whom 147 are management.   Approximately 46% of the employees are unionized, and the Debtors are parties to eleven collective bargaining agreements with various labor unions. The Debtors believe that they maintain good relations with each of these unions. In 2004, collective bargaining agreements representing approximately 567 employees expire. The Debtors either have or expect to be able to negotiate new contracts with each of these labor unions.

4.    Properties

The Debtors' principal operating properties are described below. Their executive offices are located at North Point Tower, 1001 Lakeside Avenue, 15th Floor, Cleveland, Ohio 44114-1151, under a lease expiring on December 31, 2013. The total area involved is approximately 22,329 square feet.

| Location | Use | Owned/ Leased | Reserves (1) (years remaining) |
|---|---|---|---|
| **Corporate Headquarters** Cleveland, Ohio | Offices | Leased | N/A |
| **Great Lakes Minerals** Cleveland, Ohio | Marine transportation bulk commodity dock | Leased | N/A |
| Cleveland, Ohio | Offices | Subleased | N/A |
| Rogers City, Cedarville and Gulliver, Michigan | Limestone quarries, vessel loading facility and processing plant | Owned (2) | See Chart |
| Erie, Pennsylvania | Marine transportation bulk commodity Dock | Leased | N/A |
| Toledo, Ohio | Warehouse of spare parts | Owned | N/A |
| **Global Stone** Luttrell, Tennessee | Limestone mine and lime works | (3) | See Chart |
| Chemstone Operations: Strasburg, Middletown, and Winchester, Virginia | Limestone quarries, processing plants and lime works | (4) | See Chart |

| Location | Use | Owned/ Leased | Reserves (1) (years remaining) |
|---|---|---|---|
| York. Pennsylvania | Limestone quarries and processing plants | Owned | See Chart |
| Marble City, Oklahoma | Limestone mine and lime works | Owned | See Chart |
| Buchanan, Virginia | Limestone quarries and processing plants | Owned | See Chart |
| Portage, Indiana | Limestone processing plant | Owned | N/A |
| Filler Products Operations: Chatsworth, Ellijay, and Cisco, Georgia | Limestone mines and processing plants | (5) | See Chart |
| **Performance Minerals** | | | |
| California Operations: Orange County, California (San Juan Capistrano) | Sand quarry and processing plant | (6) | 10 |
| Riverside, California | Sand processing plant | Owned | Supplied by third parties |
| Bakersfield, California | Transloading facility | Owned | N/A |
| Bakersfield, California | Sand processing plant | (7) | Supply by Voca Facility |
| Ohio Operations: Glenford and Howard, Ohio | Sand quarries and processing plants | Owned | See Chart |
| Texas Operations: Brady and Voca, Texas | Sand quarries and processing plants | Owned | See Chart |
| El Paso, Texas Colorado Springs, Colorado | Slag storage and processing plant Sand processing plant | Leased (8) | N/A Supplied by third parties |
| Kings Mountain, North Carolina | Mica mines and processing plant | Leased/ Owned (9) | See Chart |
| Velarde, New Mexico | Mica mines and processing plant | Owned | See Chart |

(1)  Please see the chart below for further information on average annual production and reserves
(2)  The Debtors. through long-term agreements. lease the mineral rights at Cedarville and the majority of mineral rights at Rogers City
(3)  The lime works is owned and the limestone mine is subject to a mineral lease agreement through 2015
(4)  The limestone quarry and lime works at Strasburg and Winchester and the processing plant at Middletown are owned  The limestone quarry at Middletown is subject to a 100-year mineral lease agreement.
(5)  The processing plants are owned and the limestone mines are subject to a 99-year mineral lease agreement.
(6)  The processing plant is owned and the sand quarry is subject to a mineral lease agreement through 2013.
(7)  The sand processing plants are owned. however. they are located on land. which is leased through December 31, 2005 with a right to renew for an additional 5-year term
(8)  The processing plant is owned and the operation acquires feedstock under supply agreements that support current production levels
(9)  The mica mine and one processing plant are leased  The remaining processing plants are owned

Set forth in the table below is the Debtors' annual average production tonnage, using the last three fiscal years and an estimate of the Debtors' measured and indicated reserves as of December 31, 2003.

| | Average Annual Production Tons | Measured and Indicated Reserves |
|---|---|---|
| | (In millions) | |
| **Great Lakes Minerals** | | |
| Rogers City, Cedarville, and Gulliver, Michigan | 17.3 | 1.372 |
| **Global Stone** | | |
| Luttrell, Tennessee | 1.0 | 38(1) |
| Strasburg, Middletown, and Winchester, VA | 2.6 | 170(2) |
| York, Pennsylvania | 1.2 | 14 |
| Marble City, Oklahoma | 0.7 | (3) |
| Buchanan, Virginia | 0.9 | 48(4) |
| Portage, Indiana | 0.5 | n/a |
| Chatsworth, Ellijay, and Cisco, Georgia | 0.6 | 22(5) |
| **Performance Minerals** | | |
| Orange County, California | 0.6 | (6) |
| Riverside, California | 0.0(9) | n/a |
| Bakersfield, California | 0.0(10) | n/a |
| Glenford and Howard, Ohio | 0.4 | 6(7) |
| Brady and Voca, Texas | 0.7 | 94(8) |
| Colorado Springs, Colorado | 0.7 | 0 |
| Kings Mountain, North Carolina | 0.1 | 1 |
| Velarde, New Mexico | 0.0(11) | 2 |

The Debtors have not included reserves that have not met the SEC Industry Guide 7 regulations. Below is additional information on potential reserves (defined as resources) that the Debtors have.

(1)     30 resource tonnage (in millions)

(2)     9 resource tonnage (in millions)

(3)     109 resource tonnage (in millions)

(4)     37 resource tonnage (in millions)

(5)     43 resource tonnage (in millions)

(6)     23 resource tonnage (in millions)

(7)     9 resource tonnage (in millions)

(8)     81 resource tonnage (in millions)

For the average annual production tonnage figures rounded to zero in the above schedule, the following are the actual averages.

(9)     14,000

(10)    10,000

(11)    19,000

*Legal Proceedings*

Oglebay and certain of its subsidiaries are involved in a limited number of claims and routine litigation incidental to operating their current business  In each case, the Debtors are actively defending or prosecuting the claims  Many of the claims are covered by insurance and none are expected to have a material adverse effect on the financial condition of the Debtors  While the Debtors are under chapter 11 bankruptcy protection, all legal proceedings that were or could have been commenced against the Debtors prior to the Petition Date are stayed by operation of federal law  For a description of certain motions and adversary proceedings filed after the Petition Date, see "Operations During the Chapter 11 Cases—Case Administration and Related Activities "  The following describes pending legal proceedings against the Debtors prior to the Petition Date

Several of Oglebay's subsidiaries have been and continue to be named as defendants in a large number of cases relating to the exposure of people to asbestos and silica.  The plaintiffs in the cases generally seek compensatory and punitive damages of unspecified sums based upon the Jones Act, common law or statutory product liability claims  Some of these cases have been brought by plaintiffs against Oglebay (or its subsidiaries) and other marine services companies or product manufacturer co-defendants  Considering the Debtors' past and present operations relating to the use of asbestos and silica, it is possible that additional claims may be made against the Debtors based upon similar or different legal theories seeking similar or different types of damages and relief.  The suits filed pursuant to the Jones Act are filed in Federal Court and have been assigned to the Multidistrict Litigation Panel (MDL); there are approximately 700 claims, all of which currently are dormant and have been so for many years

The Debtors believe that both the asbestos and silica product liability claims are covered by multiple layers of insurance policies and an insurance trust from multiple sources   In the third quarter of 2003, the Debtors agreed with one of their several insurers to fund a settlement insurance trust (the "Trust") to cover a significant portion of settlement and defense costs arising out of asbestos litigation.  The Debtors will have access to Trust funds to cover settlements and defense costs and will not have the obligation to cover such costs from their own funds  Additionally, the Trust provides that the Debtors may use up to $4,000,000 to cover the cost of any other insurable or insurance related expense.  At March 31, 2004, the Debtors were co-defendants in cases alleging asbestos-induced illness involving claims of approximately 72,000 claimants.

With respect to silica claims, the Debtors at March 31, 2004 were co-defendants in cases involving approximately 21,000 claimants.  The Debtors have been and will continue to be responsible for funding a small percentage of all settlements and defense costs  The Debtors believe that their share of settlements on an annual basis is not significant, although the Debtors continue to maintain a reserve on its balance sheet to address this contingency.

The exposure of persons to silica and the accompanying health risks have been and continue to be significant issues confronting the industrial minerals industry in general, and specifically the Performance Minerals segment.  Proposed changes to standards for exposure to silica are under review by the United States Occupational Safety and Health Administration  This review could result in more stringent worker safety standards or, in the alternative, requirements for additional action on the part of silica users regarding lower permissible exposure limits for silica  More stringent worker safety standards or additional action requirements, including the costs associated with these revised standards or additional action requirements, and actual or perceived concerns regarding the threat of liability, or health risks, including silicosis, associated with silica use, may affect the buying decisions of the users of their silica products  If worker safety standards are made more stringent, if the Debtors are required to take additional action regarding lower permissible exposure limits for silica, or if the Debtors' customers decide to reduce their use of silica products based on actual or perceived health risks or liability concerns, the Debtors' operating results, liquidity and capital resources could be materially adversely affected.  The

extent of any material adverse effect would depend on the nature and extent of the changes to the exposure standards, the cost of meeting and their ability to meet more stringent standards, the extent of any reduction in their customer's use of their silica products and other factors that cannot be estimated at this time

On February 20, 2004, Oglebay and Oglebay Norton Specialty Minerals, Inc , a wholly-owned subsidiary, were named in an action filed by Pueblo of Picuris, in the District Court of Taos County, New Mexico, seeking to quiet title to certain land upon which a mica mine is situated in Taos County, New Mexico  The action also includes a claim for money damages for allegations of trespass, denial of access, damage to property and other related claims  The Debtors are investigating the facts and circumstances surrounding this matter to determine if they have liability or significant risk of adverse finding

Litigation is inherently unpredictable and subject to many uncertainties  Adverse court rulings, determinations of liability or retroactive or prospective changes in the law could affect claims made against the Debtors and encourage or increase the number and nature of future claims and proceedings  Together with reserves recorded and available insurance, pending litigation is not expected to have a material adverse effect on the Debtors' operations, liquidity or financial condition

### Additional Information

For additional information concerning the business and property of the Debtors, and certain historical financial information regarding the Debtors, see Oglebay's Form 10-K for the year ended December 31, 2003 and Oglebay's Form 10-Q for the quarter ended March 31, 2004, which are attached hereto as Exhibit III  The information contained in such reports reflects the business and property of the Debtors only as of the dates and for the periods indicated therein  The information contained in such reports is not necessarily indicative of the business and financial condition of the Debtors as of the date of this Disclosure Statement or the results of operations of the Debtors for periods commencing after the respective dates of such reports

### Selected Historical Financial Information

Set forth below are (a) consolidated statements of operations for Oglebay for the fiscal years ended December 31, 2003, December 31, 2002 and December 31, 2001 and consolidated statement of operations for Oglebay for the three-month periods ended March 31, 2004 and March 31, 2003 and (b) consolidated balance sheets of Oglebay as of December 31, 2003 and December 31, 2002 and consolidated balance sheet of Oglebay as of March 31, 2004  Such selected consolidated financial information should be read in conjunction with the complete audited and unaudited historical consolidated financial statements of Oglebay, including the notes thereto, included in Exhibit III to this Disclosure Statement

The consolidated financial statements present the operating results and financial position of Oglebay and its subsidiaries

OGLEBAY NORTON COMPANY AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)

| | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| | | | 2003 | | 2002 | 2001 |
| Net Sales and Operating Revenues | | S | 404,229 | S | 400,572 | S | 404,211 |
| **Costs and Expenses** | | | | | | |
| Cost of goods sold and operating expenses | | | 315,244 | | 294,647 | 300,972 |
| Depreciation, depletion, amortization and accretion | | | 37,777 | | 33,665 | 32,801 |
| Goodwill amortization | | | -- | | -- | 2,93 |
| General, administrative and selling expenses | | | 42,302 | | 37,145 | 35,171 |
| Provision for doubtful accounts | | | 2,332 | | 527 | 1,060 |
| Provision for restructuring, asset impairments and early retirement programs | | | 13,221 | | (37) | 16,068 |
| | | | 410,876 | | 365,947 | 389,003 |
| **Operating (Loss) Income** | | | (6,647) | | 34,625 | 15,208 |
| (Loss) gain on disposition of assets | | | 3,686 | | 55 | 64 |
| Interest expense | | | (53,843) | | (43,595) | (40,084) |
| Other income (expense), net | | | 2,032 | | (4,121) | (6,768) |
| Loss Before Income Taxes and Cumulative Effect of Accounting Change | | | (62,144) | | (13,036) | (31,580) |
| Income (Benefit) Taxes | | | (30,343) | | (6,428) | (12,765) |
| Loss Before Cumulative Effect of Accounting Change | | | (31,801) | | (6,608) | (18,815) |
| Cumulative Effect of Accounting Change For Asset Retirement Obligations (net of income tax benefit of $889) | | | (1,391) | | -- | -- |
| **Net Loss** | | S | (33,192) | S | (6,608) | S | (18,815) |
| **Per Share Amounts-Basic and Assuming Dilution:** | | | | | | |
| Loss before cumulative effect of accounting change | | S | (6.21) | S | (1.32) | S | (3.76) |
| Cumulative effect of accounting change for asset retirement obligations (net of income tax benefit of $0.18) | | | (0.27) | | -- | -- |
| Net loss per share-basic and assuming dilution | | S | (6.48) | S | (1.32) | S | (3.76) |

OGLEBAY NORTON COMPANY AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)
(In thousands, except per share amounts)

| | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2004 | | 2003 |
| Net Sales and Operating Revenues | S | 69.434 | S | 62.884 |
| **Costs and Expenses** | | | | |
| Cost of goods sold and operating expenses | | 54.534 | | 49.544 |
| Depreciation, depletion, amortization and accretion | | 5.491 | | 5.473 |
| General administrative and selling expenses | | 9.341 | | 10.075 |
| Provision for restructuring, asset impairments and early retirement programs | | 1,315 | | 0 |
| | | 70,681 | | 65,092 |
| **Operating (Loss) Income** | | (1.247) | | (2.208) |
| Reorganization items, net | | (4.565) | | 0 |
| (Loss) gain on disposition of assets | | (15) | | 63 |
| Interest expense | | (12.555) | | (13.281) |
| Other income (expense), net | | 93 | | (1,591) |
| Loss before income taxes and cumulative effect of accounting change | | (18.289) | | (17.017) |
| Income tax benefit | | (552) | | (7,358) |
| Loss before cumulative effect of accounting change | | (17.737) | | (9.659) |
| Cumulative effect of accounting change for asset retirement obligations (net of tax benefit of $889) | | - | | (1,391) |
| **Net Loss** | S | (17,737) | S | (11,050) |
| **Per Share Amounts-Basic and Assuming Dilution:** | | | | |
| Loss before cumulative effect of accounting change | S | (3.40) | S | (1.90) |
| Cumulative effect of accounting change for asset retirement obligations (net of tax benefit of $0.18) | | - | | (0.27) |
| Net loss per share-basic and assuming dilution | S | (3.40) | S | (2.17) |

OGLEBAY NORTON COMPANY AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
(Dollars and shares in thousands, except per share amounts)

|  |  | December 31, | |
|---|---|---|---|
|  |  | 2003 | 2002 |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ | -- | $ 756 |
| Accounts receivable (net of reserve for doubtful accounts of $5,842 in 2003 and $3,866 in 2002) | | 50,422 | 55,675 |
| Inventories: | | | |
| Raw materials and finished products | | 35,236 | 39,273 |
| Operating supplies | | 12,795 | 14,746 |
| | | 48,031 | 54,019 |
| Deferred income taxes | | | |
| Other current assets | | 3,901 | 3,951 |
| | | 10,915 | 8,915 |
| **Total Current Assets** | | 113,269 | 123,316 |
| **Property and Equipment** | | | |
| Land, land reclamation and improvements | | 41,111 | 36,738 |
| Mineral reserves | | 153,362 | 156,069 |
| Buildings and improvements | | 42,183 | 41,423 |
| Machinery and equipment | | 509,984 | 498,191 |
| | | 746,640 | 732,421 |
| Less allowances for depreciation, depletion and amortization | | 332,447 | 295,163 |
| | | 414,193 | 437,258 |
| Goodwill (net of accumulated amortization of $11,093 in 2003 and 2002) | | 73,877 | 73,044 |
| **Prepaid Pension Costs** | | 35,319 | 37,695 |
| **Other Assets** | | 12,036 | 16,154 |
| **TOTAL ASSETS** | $ | 648,694 | $ 687,467 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| **Current Liabilities** | | | |
| Current portion of long-term debt | $ | 420,350 | $ 2,343 |
| Accounts payable | | 26,070 | 24,799 |
| Payrolls and other accrued compensation | | 4,857 | 9,374 |
| Accrued expenses | | 14,906 | 16,356 |
| Accrued interest expense | | 8,392 | 10,155 |
| Income taxes payable | | 480 | 5,887 |
| | | 475,055 | 68,914 |
| **Total Current Liabilities** | | 1,490 | 393,005 |
| **Long-Term Debt, less current portion** | | 50,049 | 47,808 |
| **Postretirement Benefits Obligations** | | 29,500 | 35,470 |
| **Other Long-Term Liabilities** | | 4,596 | 26,769 |
| **Deferred Income Taxes** | | | |
| | | | |
| **STOCKHOLDERS' EQUITY** | | | |
| Preferred stock, 5,000 shares authorized | | -- | -- |
| Common stock, par value $1.00 per share—authorized 30,000 shares; | | | |
| issued 7,253 shares | | 7,253 | 7,253 |
| Additional capital | | 9,312 | 9,727 |
| Retained earnings | | 106,075 | 139,267 |
| Accumulated other comprehensive loss | | (4,542) | (9,533) |
| | | 118,098 | 146,714 |
| Treasury stock, at cost— 2,193 and 2,275 shares at respective dates | | (30,094) | (31,213) |
| **TOTAL STOCKHOLDERS' EQUITY** | | 88,004 | 115,501 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | 648,694 | $ 687,467 |

OGLEBAY NORTON COMPANY AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEET (UNAUDITED)
(In thousands, except per share amounts)

|  |  | March 31, 2004 |
|---|---|---:|
| **Current Assets** |  |  |
| Cash and cash equivalents | $ | 7,441 |
| Accounts receivable, net of reserve for doubtful accounts (2004 - $5,571; 2003 - $3,998) |  | 36,970 |
| Inventories |  |  |
| Raw materials and finished products |  | 31,999 |
| Operating supplies |  | 12,072 |
|  |  | 44,071 |
| Deferred income taxes |  | 3,901 |
| Prepaid expenses and other current assets |  | 32,112 |
| **TOTAL CURRENT ASSETS** |  | 124,495 |
| **Property and Equipment** |  | 745,096 |
| Less allowances for depreciation, depletion and amortization |  | 334,339 |
|  |  | 410,757 |
| Goodwill, net of accumulated amortization ($11,093 in 2004 and 2003) |  | 73,877 |
| **Prepaid Pension Costs** |  | 34,758 |
| **Other Assets** |  | 13,517 |
| **TOTAL ASSETS** | $ | 657,404 |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** |  |  |
| **Current Liabilities** |  |  |
| Accounts payable | $ | 15,338 |
| Payroll and other accrued compensation |  | 2,107 |
| Accrued expenses |  | 7,836 |
| Accrued interest expense |  | 2,671 |
| Current portion of long-term debt |  | - |
| Income taxes payable |  | - |
| **TOTAL CURRENT LIABILITIES** |  | 27,952 |
| Long-Term Debt, less current portion |  | - |
| Other Long-Term Liabilities |  | 1,888 |
| Post Retirement Benefits Obligation |  | 366 |
| Deferred Income Taxes |  | 4,283 |
| **TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE** |  | 34,489 |
| **LIABILITIES SUBJECT TO COMPROMISE** |  | 552,251 |
| **STOCKHOLDERS' EQUITY** |  |  |
| Preferred Stock, authorized 5,000 shares in 2003 |  | -- |
| Common stock, par value $1 per share, authorized 30,000 shares; issued 7,253 shares |  | 7,253 |
| Additional capital |  | 9,272 |
| Retained earnings |  | 88,338 |
| Accumulated other comprehensive loss |  | (4,167) |
|  |  | 100,696 |
| Treasury stock, at cost - 2,198 and 2,250 shares at respective dates |  | (30,032) |
| **TOTAL STOCKHOLDERS' EQUITY** |  | 70,664 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | 657,404 |

**Projected Financial Information**

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement, i.e., Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtors, or any successor under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management developed a business plan and prepared financial projections (the "Projections" or the "Financial Projections") for the calendar years ending December 31, 2004 through December 31, 2008 (the "Projection Period").

The Debtors do not, as a matter of course, publish their business plans and strategies or projections, anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or Interests after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public.

The Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly affected by:

- business and financial risks associated with the Debtors' decision to file for protection under chapter 11 of the Bankruptcy Code;

- the Debtors' ability to restructure their debt, and the ability of such activities to provide adequate liquidity to sufficiently improve the Debtors' financial position;

- the Debtors' ability to complete their cost reduction initiatives;

- weather conditions, particularly in the Great Lakes region, flooding, and/or water levels;

- fluctuations in energy, fuel and oil prices;

- fluctuations in integrated steel production in the Great Lakes region;

- fluctuations in Great Lakes and Mid-Atlantic construction activity;

- economic conditions in California or population growth rates in the Southwestern United States;

- the outcome of periodic negotiations of labor agreements;

- changes in the demand for the Debtors' or Reorganized Oglebay's products due to changes in technology;

- the loss, insolvency or bankruptcy of major customers, insurers or debtors;

- difficulty in hiring sufficient staff that is appropriately skilled and licensed, particularly for Reorganized Oglebay's vessel operations;

- changes in environmental laws; and

- an increase in the number and cost of asbestos and silica product liability claims filed against the Debtors or Reorganized Oglebay and determinations by a court or jury against the Debtors' or Reorganized Oglebay's interest.

Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than set forth. The Projections included herein were prepared in July 2004. Management is unaware of any circumstances as of the date of this Disclosure Statement which would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

ALTHOUGH EVERY REASONABLE EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY. IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS, OR ANY OTHER PERSON THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS. THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS PUBLIC DISCLOSURE OR COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS. THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS. CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

1    *Pro Forma Projected Balance Sheet (Unaudited)* [a]
    *(As of October 31, 2004)*

Oglebay Norton Company and Subsidiaries

| (\$ in thousands) | Estimated Pre-Reorg. Balance Sheet (b) | Reorganization Adjustments | | Pro Forma Reorganized Balance Sheet |
|---|---|---|---|---|
| | | Recapitaliza-tion Adjustments | "Fresh Start" Adjustments | |
| **Assets:** | | | | |
| Cash | \$10,994 | (\$9,190) | \$0 | \$1,804 |
| Accounts receivable | 65,966 | 0 | 0 | 65,966 |
| Inventories | 47,254 | 0 | (454)  (1) | 46,800 |
| Deferred winter expense | 2,851 | 0 | 0 | 2,851 |
| Deferred taxes | 3,901 | 0 | 0 | 3,901 |
| Other current assets | 8,417 | 0 | | 8,417 |
| Total current assets | 139,383 | (9,190) | (454) | 129,739 |
| | | | | |
| Property, plant and equipment, net | 385,996 | 0 | 3,202  (m) | 389,198 |
| Goodwill | 73,877 | 0 | (67,269)  (n) | 6,607 |
| Deferred financing fees | 10,496 | (616)  (c) | 0 | 9,880 |
| Prepaid pension assets | 35,203 | 0 | (35,203)  (o) | 0 |
| Other noncurrent assets | 11,133 | 0 | 0 | 11,133 |
| | | | | |
| Total assets | \$656,088 | (\$9,806) | (\$99,724) | \$546,557 |
| | | | | |
| **Liabilities and Shareholders' Equity:** | | | | |
| Accounts payable prepetition | 19,720 | (19,720)  (d) | 0 | 0 |
| Accounts payable postpetition | 26,907 | 19,720  (d) | 0 | 46,627 |
| Other current liabilities | 44,273 | (16,511)  (e) | 0 | 27,763 |
| Total current liabilities | 90,900 | (16,511) | 0 | 74,389 |
| | | | | |
| Confirmation Facility | 0 | 262,000  (f) | 0 | 262,000 |
| Second DIP Facility | 250,000 | (250,000)  (g) | 0 | 0 |
| Old Senior Secured Notes | 83,843 | (83,843)  (h) | 0 | 0 |
| Old Senior Subordinated Notes | 100,000 | (100,000)  (i) | 0 | 0 |
| Vessel Term Loan and Other Debt | 13,381 | 0 | 0 | 13,381 |
| Total debt | 447,223 | (171,843) | 0 | 275,381 |
| | | | | |
| Deferred taxes | 4,168 | 0 | 0 | 4,168 |
| Postretirement benefits | 52,187 | 0 | 6,455  (p) | 58,642 |
| Other noncurrent liabilities | 27,372 | 0 | (3,405)  (q) | 23,967 |
| Total liabilities | 621,851 | (188,353) | 3,050 | 436,547 |
| | | | | |
| New Preferred Stock | 0 | 85,000  (j) | 0 | 85,000 |
| Common equity | 34,237 | 93,547  (k) | (102,774)  (r) | 25,010 |
| Shareholders' equity | 34,237 | 178,547 | (102,774) | 110,010 |
| | | | | |
| Total liabilities & shareholders' equity | \$656,088 | (\$9,806) | (\$99,724) | \$546,557 |

## NOTES TO PRO FORMA PROJECTED BALANCE SHEET

a.   The pro forma balance sheet adjustments contained herein for periods October 31, 2004 and after account for (i) the reorganization and related transactions pursuant to the Plan and (ii) the implementation of "fresh start" accounting pursuant to Statement of Position 90-7 ("*SOP 90-7*"), *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code*, as issued by the American Institute of Certified Public Accountants (the "AICPA"). The fresh start adjustments are based on a total equity value of approximately $110 million consistent with Lazard's mid-point valuation.

b.   Net property, plant and equipment and shareholders' equity are shown pro forma for the proposed accounting treatment of stripping costs, which is expected to be implemented post-bankruptcy.

c.   Represents the writeoff of the unamortized portion of deferred financing fees associated with the Old Senior Secured Notes and the Old Senior Subordinated Notes.

d.   Represents the reclassification of prepetition accounts payable to postpetition. These Claims will be Reinstated according to the Plan, but not necessarily paid upon emergence.

e.   Reflects: (a) the elimination of interest payable totaling $14.4 million associated with the Old Senior Secured Notes and Old Senior Subordinated Notes and (b) the elimination of the $2.1 million contingent purchase price obligation related to the acquisition of the Michigan Limestone Operations, of which approximately $0.6 million will be paid upon emergence and the balance forgiven.

f.   Represents outstanding balance under the Confirmation Facility consisting of $105 million New Term Loan A, the $150 million New Term Loan B and New Revolver borrowings of $7 million.

g.   Represents the refinancing of the Second DIP Facility with the Confirmation Facility.

h.   Represents the redemption of principal and paid-in-kind ("PIK") interest amounts related to the Old Senior Secured Notes.

i.   Reflects the conversion of Old Senior Subordinated Notes to New Common Stock pursuant to the Plan.

j.   Represents the issuance of New Preferred Stock on the assumed Effective Date.

k.   Reflects: (a) estimated cancellation of debt ("COD") income of $82.1 million, (b) writeoff of deferred financing fees of approximately $0.7 million, (c) $4.6 million of estimated normal course bankruptcy related Professional fees and expenses, (d) $5.0 million premium payable to holders of the Old Senior Secured Notes, (e) commitment fees of approximately $3.3 million associated with the issuance of $85.0 million of New Preferred Stock and (f) approximately $25.0 million of New Common Equity issued to holders of the Old Senior Subordinated Notes.

l.   Represents estimated fair value adjustment required under "fresh start" accounting of approximately $0.5 million related to a change in the policy in accounting for density factors.

m.   Represents estimated fair value adjustment required under "fresh start" accounting of approximately $3.2 million to correspond to the existing liability recorded pursuant to SFAS No. 143, *Accounting for Asset Retirement Obligations*.

n.   After accounting for all other "fresh start" accounting adjustments, management applied the remaining offsetting adjustment for shareholders' equity directly to goodwill.

o.   Represents estimated fair value adjustment required under "fresh start" accounting of approximately $35.6 million related to plan assets and projected benefit obligations.

p.   Represents estimated fair value adjustment required under "fresh start" accounting of approximately $6.5 million associated with postretirement benefit obligations.

q.   Represents estimated fair value adjustment required under "fresh start" accounting of approximately $3.4 million in other noncurrent liabilities related to pension liabilities.

r    Reflects adjustment to common equity based upon the approximate $25.0 million valuation for the New Common Stock issued to holders of the Old Senior Subordinated Notes to eliminate the Debtors' historical common stock, retained earnings, additional paid-in-capital, treasury stock and other comprehensive income.

2.    *Projected Statements of Operations (Unaudited)*

| Oglebay Norton Company and Subsidiaries<br>(\$ in thousands) | Pro forma (a) (b)<br>FY Ended December 31, | | Projected (b)<br>Fiscal Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| Net sales | \$375,856 | \$382,726 | \$425,184 | \$430,421 | \$437,331 | \$449,000 | \$460,978 |
| Cost of sales | 279,012 | 300,330 | 323,517 | 326,864 | 331,050 | 337,310 | 343,684 |
| **Gross profit** | 96,844 | 82,396 | 101,667 | 103,557 | 106,281 | 111,690 | 117,295 |
| Selling, general and administrative expenses | 35,794 | 38,788 | 39,709 | 39,475 | 40,476 | 41,415 | 42,361 |
| Other expense (income) | 303 | 753 | 406 | 400 | 400 | 400 | 400 |
| **EBITDA** | 60,747 | 42,854 | 61,552 | 63,682 | 65,404 | 69,874 | 74,534 |
| Depreciation, depletion and amortization | 31,310 | 33,966 | 35,221 | 34,888 | 35,772 | 36,630 | 31,512 |
| **EBIT** | 29,437 | 8,888 | 26,332 | 28,795 | 29,632 | 33,245 | 37,022 |
| Nonoperating expense (income) | | | (1,444) | 817 | 841 | 866 | 891 |
| Loss (Gain) on Sale of Assets | | | 13 | 0 | 0 | 0 | 0 |
| Loss (Gain) on extinguishment of debt and other | | | (67,899) | 0 | 0 | 0 | 0 |
| Restructuring charges | | | 25,432 | 0 | 0 | 0 | 0 |
| Interest expense, net | | | 44,605 | 32,820 | 32,094 | 30,651 | 29,314 |
| **Income before taxes** | | | 25,625 | (4,843) | (3,303) | 1,727 | 6,817 |
| Income tax provision | | | (667) | 0 | 0 | 0 | 0 |
| **Net income (loss)** | | | 26,292 | (4,843) | (3,303) | 1,727 | 6,817 |
| Change in aggregate liquidation preference of New Preferred Stock | | | 2,019 | 13,079 | 15,044 | 17,306 | 19,906 |
| **Net income (loss) to common shares** | | | \$24,273 | (\$17,921) | (\$18,347) | (\$15,578) | (\$13,089) |

(a) Pro forma for divestiture of the Lawn & Garden Business Unit. Revenues and EBITDA were \$21.5 million and \$1.6 million and \$24.7 million and \$3.5 million for fiscal year ended 2003 and 2002, respectively.

(b) Pro forma for proposed accounting treatment of stripping costs which is expected to be implemented post-bankruptcy.

3    *Projected Balance Sheets (Unaudited)*

| Oglebay Norton Company and Subsidiaries ($ in thousands) | Projected Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008** |
| **Assets:** | | | | | |
| Cash | $4,813 | $1,868 | $2,019 | $2,222 | $12,711 |
| Accounts receivable | 49,669 | 51,411 | 52,237 | 53,631 | 55,061 |
| Inventories | 44,189 | 45,628 | 46,238 | 47,125 | 48,028 |
| Deferred taxes | 3,901 | 3,901 | 3,901 | 3,901 | 3,901 |
| Other current assets | 8,417 | 8,417 | 8,417 | 8,417 | 8,417 |
| Total current assets | 110,990 | 111,225 | 112,813 | 115,296 | 128,119 |
| Property, plant and equipment, net | 387,603 | 373,526 | 357,546 | 342,442 | 326.567 |
| Goodwill | 6,607 | 6,607 | 6,607 | 6,607 | 6,607 |
| Deferred financing fees | 9,533 | 7,453 | 5,373 | 3,293 | 1,213 |
| Other noncurrent assets | 11,133 | 11,133 | 11,133 | 11,133 | 11,133 |
| Total noncurrent assets | 414,877 | 398,720 | 380,660 | 363,476 | 345,521 |
| Total assets | $525,867 | $509,945 | $493,473 | $478,772 | $473,640 |
| **Liabilities and Shareholders' Equity:** | | | | | |
| Accounts payable | 37,163 | 28,321 | 28,733 | 29,292 | 29,860 |
| Other current liabilities | 29,995 | 29,687 | 29,675 | 31,283 | 31,265 |
| Total current liabilities | 67,158 | 58,007 | 58,408 | 60,575 | 61,126 |
| New Revolver | 0 | 2,000 | 1,000 | 2,000 | 0 |
| New Term Loan A | 105,000 | 103,250 | 92,750 | 82,250 | 71,750 |
| New Term Loan B | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Vessel Term Loan and Other Debt | 13,345 | 11,166 | 9,095 | 0 | 0 |
| Total debt | 268,345 | 266,416 | 252,845 | 234,250 | 221,750 |
| Deferred taxes | 4,168 | 4.168 | 4,168 | 4,168 | 4,168 |
| Postretirement benefits | 59,063 | 59,063 | 59,063 | 59,063 | 59,063 |
| Other noncurrent liabilities | 23,767 | 23,767 | 23,767 | 23,767 | 23,767 |
| Total liabilities | 422,501 | 411,421 | 398,251 | 381,823 | 369,874 |
| New Preferred Stock | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |
| Accretion on New Preferred Stock (a) | 2,019 | 15,097 | 30,142 | 47,447 | 67,354 |
| New Common Equity | 16,348 | (1,573) | (19,921) | (35,499) | (48,588) |
| Shareholders' equity | 103,366 | 98,524 | 95,221 | 96,949 | 103,766 |
| Total liabilities and shareholders' equity | $525,867 | $509,945 | $493,473 | $478,772 | $473,640 |

(a) Accretion on the New Preferred Stock is presented on the balance sheet as though it were paid-in-kind

4    *Projected Statements of Cash Flow (Unaudited)*

**Oglebay Norton Company and Subsidiaries**
*(\$ in thousands)*

| | Projected Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| Net income (loss) | $26.292 | ($4,843) | ($3,303) | $1.727 | $6.817 |
| **Cash Flows from Operations:** | | | | | |
| PIK interest on Old Senior Secured Notes | 4,061 | 0 | 0 | 0 | 0 |
| Adjustment for debt discharge income and other | (67,886) | 0 | 0 | 0 | 0 |
| Amortization of deferred financing fees | 5.996 | 2.080 | 2,080 | 2,080 | 2,080 |
| Depreciation. depletion and amortization | 35.221 | 34.888 | 35.772 | 36,630 | 37,512 |
| Changes in other assets and liabilities | 14,417 | (12,331) | (1,035) | (1,739) | (1,783) |
| **Net Cash Flow from Operations** | 18,101 | 19.794 | 33,515 | 38.698 | 44.626 |
| **Cash Flows from Investing:** | | | | | |
| Capital expenditures | (22,411) | (19,785) | (18,767) | (18,876) | (18,987) |
| MLO contingent purchase price payments | (625) | (1.025) | (1.025) | (1.025) | (2.650) |
| Proceeds from asset sales | 3,027 | 0 | 0 | 0 | 0 |
| **Net Cash Flow from Investing** | (20,009) | (20,810) | (19,792) | (19,901) | (21,637) |
| **Cash Flows from Financing:** | | | | | |
| Borrowings (repayment) of debt | (56,365) | (1,929) | (13.571) | (18.594) | (12.500) |
| Financing costs | (21,913) | 0 | 0 | 0 | 0 |
| New Preferred Stock | 85,000 | 0 | 0 | 0 | 0 |
| **Net Cash Flow from Financing** | 6.722 | (1.929) | (13.571) | (18.594) | (12.500) |
| **Beginning Cash** | $0 | $4,813 | $1,868 | $2,019 | $2,222 |
| Change in Cash | 4.813 | (2.946) | 151 | 203 | 10,489 |
| **Ending Cash** | $4,813 | $1,868 | $2,019 | $2,222 | $12,711 |

## ASSUMPTIONS TO FINANCIAL PROJECTIONS

### Projections

Management prepared the Projections for the five years ending December 31, 2004 through December 31, 2008.

The Projections are based on a number of operating assumptions made by management with respect to the future performance of Reorganized Oglebay's various lines of business. Although management has prepared the Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. As outlined in "Risk Factors" below, a variety of risk factors could affect Reorganized Oglebay's financial results and must be considered. The Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

### Key Assumptions

A.    **General**

1.    *Methodology.* The Projections are based upon the Debtors' detailed reforecasted operating budget for the 12 months ending December 31, 2004, which was developed at the business unit/plant level for the Debtors' six business segments. The projections for the calendar years 2005 through 2008 were prepared on the same basis, but developed through trending analysis using key top-down assumptions. The Debtors are currently marketing the Mica Business. However, given the current status of the sale process, no adjustments have been made to the Projections to reflect this contemplated divestiture.

2.    *Plan Consummation.* The operating assumptions assume the Plan will be confirmed and consummated by October 31, 2004.

3.    *Macroeconomic and Industry Environment.* The Projections reflect a cyclical improvement in the overall economic environment over the Projection Period and a relatively flat interest rate environment.

B.    **Projected Statements of Operations**

1.    *Net Sales.* Consolidated revenues in 2004, estimated to be $425.2 million, are projected to increase by approximately 1.2% in 2005, 1.6% in 2006 and then to grow at nearly 3.0% annually for the projected period 2007-2008.

2.    *Gross Margin.* Gross margin is projected to be 23.9% in 2004, growing to 25.4% in 2008.

3.    *Selling, General and Administrative Expenses.* SG&A includes employee salaries and benefits, advertising, bad debt and performance reserve. SG&A expense is projected to remain relatively constant at approximately 9% of consolidated sales throughout the Projection Period.

4.    *Other Expense (Income).* Other Expense (Income) consists of projected expense associated with the Coal Act legislation.

5.    *Depreciation, Depletion and Amortization.* Book depreciation, depletion and amortization are projected based on estimates of useful life of Reorganized Oglebay's PP&E and mineral reserves.