6       *Nonoperating Expense (Income).* Includes miscellaneous income and expense.

7.      *Loss (Gain) on Extinguishment of Debt and Other.* Gain of $82.1 million on COD and accrued interest associated with (a) the Old Senior Subordinated Notes and (b) $1.5 million of the MLO contingent purchase price liability for 2004 is netted against a loss of $9.1 million due to the writeoff of deferred financing fees associated with the First DIP Facility, the Prepetition Credit Facility, the Prepetition Term Loan, the Old Senior Secured Notes and the Old Senior Subordinated Notes. An additional loss is recognized due to the payment of the 6% ($5.0 million) premium to holders of the Old Senior Secured Notes.

8.      *Restructuring Charges.* Expensed restructuring charges consist primarily of legal and professional fees.

9       *Interest Expense. Net.* Interest expense associated with the Confirmation Facility and Vessel Term Loan reflects a blended rate of approximately 10% at exit. The Confirmation Facility calculates interest based on a 2.0% LIBOR floor. The Projections implicitly assume that LIBOR (3-month currently at approximately 1.7%) does not exceed 2.0% at any point during the Projection Period. Interest income associated with excess cash reflects a rate of 2.0% throughout the post-emergence Projection Period.

10.     *Income Tax Provision.* Reorganized Oglebay expects to incur net operating losses over the Projection Period due to interest expense and accelerated tax depreciation and depletion. As a result, Reorganized Oglebay expects to record and adjust a valuation allowance to offset deferred taxes. Thus, the projected income statement does not recognize current or deferred taxes.

11      *Change in Aggregate Liquidation Preference of New Preferred Stock.* Reflects accretion on New Preferred Stock at a 14.25% annual rate, compounded quarterly throughout the post-emergence Projection Period.

## C.    Projected Balance Sheets and Statements of Cash Flow

1.      *Working Capital.* Accounts receivable, inventory and accounts payable are projected to remain stable at 43, 73 and 40 days, respectively throughout the post-emergence 2005-2008 projection period.

2.      *Capital Expenditures.* Capital expenditures are expected to be approximately $22 million in 2004, declining and remaining relatively stable at approximately $19 million for the balance of the Projection Period.

3.      *Borrowing (Repayment) of Debt.* Incorporates scheduled New Term Loan A and Vessel Term Loan and Other Debt amortization. Additional free cash flow is accumulated on the balance sheet, although the Confirmation Facility will likely have provisions requiring a certain portion of excess cash flow to be used to further amortize New Term Loan A and New Term Loan B if specific conditions are met.

## Management

### *Current Directors and Executive Officers of Oglebay*

The following table sets forth certain information concerning the directors and executive officers of Oglebay as of July 21, 2004. The members of Reorganized Oglebay's Board of Directors will be comprised of individuals who will be identified prior to the Confirmation Hearing. See "— Reorganized Oglebay Board of Directors." The Debtors contemplate that the executive officers will continue to serve in such capacities with Reorganized Oglebay after the Effective Date.

| Name | Age | Position | Director Since |
|------|-----|----------|----------------|
| Malvin E. Bank | 74 | Director | 1977 |
| William G. Bares | 63 | Director | 1982 |
| James T. Bartlett | 67 | Director | 1996 |
| Albert C. Bersticker | 70 | Non-Executive Chairman | 1992 |
| Madeleine W. Ludlow | 49 | Director | 1999 |
| Michael D. Lundin | 44 | Director, President and Chief Executive Officer | 2001 |
| John P. O'Brien | 63 | Director | 2003 |
| William G. Pryor | 65 | Director | 1997 |
| Julie A. Boland | 38 | Vice President, Chief Financial Officer and Treasurer | N/A |
| Sylvie A. Bon | 46 | Vice President, Administration and Chief Information Officer | N/A |
| Michael Minkel | 52 | Vice President, Marketing and Business Development | N/A |
| Rochelle F. Walk | 43 | Vice President, General Counsel and Secretary | N/A |

Malvin E. Bank served as director on Oglebay's Board of Directors since 1977. Mr. Bank is General Counsel of The Cleveland Foundation, a philanthropic foundation. He is a former Senior Partner of Thompson Hine LLP, Cleveland, Ohio, attorneys at law. In addition to serving on Oglebay's Board, Mr. Bank previously served as Chairman of the Board of Directors of Metropolitan Bank and Trust Company, a stock savings association, and on the Board of Directors of Metropolitan Financial Corp., a savings and loan holding company, from 1998 to May 2003.

William G. Bares has served as a director of Oglebay since 1982. Mr. Bares is Chairman of the Board of the Lubrizol Corporation, a high performance fluid technologies company located in Cleveland, Ohio. He was appointed Chief Operating Officer of Lubrizol Corporation in 1987, Chief Executive Officer in January 1996 and Chairman in April 1996. Besides his corporate responsibilities, Mr. Bares is on the Boards of Directors of Applied Industrial Technologies and KeyCorp.

James T. Bartlett has served as a director of Oglebay since 1996. Mr. Bartlett is an Advising Director of Primus Venture Partners, Inc. located in Cleveland, Ohio. Prior to that, he was fund manager for Primus Capital Fund and Primus Capital Funds II, III, IV and V, venture capital limited partnerships, for more than five years. Mr. Bartlett currently serves as a member of the Boards of Directors of Keithley Instruments, Inc. and Lamson & Sessions. He also serves as a Trustee of Berea College and as President of the Board of Trustees of the Cleveland Museum of Art.

Albert C. Bersticker has been Non-Executive Chairman of the Oglebay Board of Directors since May 1, 2003. Previously, Mr. Bersticker was Chairman of the Board of Directors from January 1999 to May 1999, Chairman and Chief Executive Officer from January 1996 to December 1998 and President and Chief Executive Officer from May 1991 to December 1995, of Ferro Corporation, a producer of specialty coatings, plastics, electronic materials, chemicals and ceramics. He retired from Ferro Corporation in May 1999. Mr. Bersticker also serves as a director of Brush Engineered Materials Inc. In

addition, Mr. Bersticker is on the Board of Trustees and is Treasurer of St. John's Medical Center in Jackson, Wyoming.

Madeleine W. Ludlow has served on the Board of Directors of Oglebay since 1999. Ms. Ludlow was President and Chief Executive Officer from April 2001 to January 2004, President from January 2001 to April 2001 and Senior Vice President and Chief Financial Officer from July 2000 to January 2001, of Cadence Network, Inc., a privately held cost management company. Prior to joining Cadence Network, Inc., Ms. Ludlow served as Vice President and Chief Financial Officer of Cinergy Corporation from February 1999 to July 2000, where she also served as President of the Energy Commodities Business Unit of Cinergy Corporation from April 1998 to February 1999 and as Vice President and Chief Financial Officer from April 1997 to April 1998. Ms. Ludlow has also held various other senior executive level positions including Vice President of Public Service Enterprise Group, a public utility company located in Newark, New Jersey, from 1992 to 1997. Ms. Ludlow also serves on the Boards of Directors of ANP Funding I, LLC and Hennegan Company and is a trustee of Cincinnati Country Day School and Darden Foundation.

Michael D. Lundin was elected President and Chief Executive Officer of Oglebay in December 2002, and has served as a Director since December 12, 2001. Additionally, Mr. Lundin has served on the Board of Directors of the United Shipping Alliance since 2002. Prior to serving as a Director of Oglebay, Mr. Lundin served as President and Chief Operating Officer, Oglebay Norton Company, from November 1, 2001; as Vice President, Michigan Operations and President, Michigan Limestone Operations, Inc. ("Michigan Limestone Operations"), a limestone quarry operation, from April 2000; and was President and one of the owners of Michigan Limestone Operations Limited Partnership for more than five years and up until the partnership was acquired by Oglebay in 2000.

John P. O'Brien became a member of the Board of Directors of Oglebay in 2003. Mr. O'Brien currently serves as a Managing Director of Inglewood Associates, Inc., a private investment and consulting firm specializing in turnarounds of financially underperforming companies, litigation support and valuation services. Previously, Mr. O'Brien served as Chairman of the Board and Chief Executive Officer of Jeffrey Mining Products, L.P., a manufacturer and distributor of underground mining products, from October 1995 until June 1999. He has also served as the Chairman of the Board of Allied Construction Products, LLC, a manufacturer and distributor of hydraulic and pneumatic demolition, compaction, and horizontal boring tools and trench shoring devices, since 1993, and is on the Boards of Directors of Century Aluminum Company and Preformed Line Products.

William G. (Jerry) Pryor has served on the Board of Oglebay since 1997. Mr. Pryor retired as President of Van Dorn Demag Corporation, a leading U.S. manufacturer of plastic injection molding machines. Previously, he was President and Chief Executive Officer of the Van Dorn Corporation (predecessor to Van Dorn Demag Corporation) from January 1992 to April 1993. Mr. Pryor also serves on the Board of Directors of Brush Engineered Materials, Inc.

Julie A. Boland has served as Vice President, Chief Financial Officer and Treasurer since January 1, 2002. From 1999 until 2001, Ms. Boland was Vice President, Credit Risk Management & Advisory Group for Goldman Sachs International, a global investment banking, securities and investment management firm; was Vice President, Fixed Income, Loan Capital Markets and served in other roles for J.P. Morgan & Co., an investment banking firm, from 1993 to 1999; and was employed as a Certified Public Accountant for PriceWaterhouse, a public accounting firm, from 1988 to 1991.

Sylvie A. Bon has served as Vice President, Administration and Chief Information Officer since May 2003. Prior to that time Ms. Bon served as Vice President, Chief Information Officer, Oglebay Norton Company, from May 1, 2002. Prior to joining Oglebay, Ms. Bon was employed by Avery Dennison, a global producer of office supply and self-adhesive products, where she served as Director, Information Systems, Fasson Roll Worldwide. Prior to that Ms. Bon served as Director Information

Systems, Fasson Roll North America; Manager, Information Systems Avery Dennison Europe, Fasson Roll Division; and Manager Distribution and Logistics. Ms. Bon was employed by Avery Dennison for more than five years.

Michael J. Minkel was appointed Vice President, Marketing & Business Development in July 2003. Prior to that, Mr. Minkel served as Vice President of Sales & Marketing, Oglebay Norton Company, from November 2002; and served Oglebay Norton Specialty Minerals, Inc. as Vice President of Sales & Marketing from 2000 until 2001; and as General Manager — Kings Mountain Operations from 2001 until 2002. Prior to joining Oglebay, Mr. Minkel served as President of Exploration Computer Services, an Australian software & mining-consulting firm, and held various positions in the natural resource industry since 1974, including positions in coal exploration geology and mine planning, oil & gas software sales & consulting, and energy industry-related strategic information sales & consulting.

Rochelle F. Walk was elected Vice President of Oglebay in August 1999 and serves as General Counsel and Secretary of Oglebay, positions she has held since June 1998. Prior to joining Oglebay, she was Corporate Counsel, a Business Unit Director and Marketing Director of the Sherwin Williams Company, a global producer of paints and coatings, from 1990 to 1998, and was an attorney with the law firm of Ulmer & Berne from 1986 to 1990.

Oglebay's Board of Directors has determined that Directors James T. Bartlett, Madeleine W. Ludlow, John P. O'Brien and William G. Pryor qualify as Oglebay's "audit committee financial experts," within the meaning of applicable Securities and Exchange Commission regulations. They serve on Oglebay's audit committee due to their experience and professional education, including their business experience described above. All members of Oglebay's audit committee are independent under Nasdaq independence standards and Rule 10A-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

All executive officers serve at the pleasure of Oglebay's Board of Directors, with no fixed term of office.

Oglebay maintains an Ethical & Legal Code of Conduct that covers all employees, including Oglebay's principal executive officer, principal financial officer and principal accounting officer, or persons performing similar functions.

### *Executive Compensation*

### Summary Compensation Table

The following table sets forth information with respect to benefits made available, and compensation paid or accrued, by Oglebay during the years ended December 31, 2003, December 31, 2002 and December 31, 2001 for services by the individuals who served as Oglebay's Chief Executive Officer and Oglebay's four most highly compensated executive officers other than the Chief Executive Officer:

| | | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| Name and Principal Position(1) | Year | Salary ($) (2) | Bonus ($) (2)(3) | Other Annual Compensation ($) (4) | Restricted Stock Awards ($) | Securities Underlying Options/SARS (#) | LTIP Payouts ($)(5) | All Other Compensation ($) (6) (7) |
|---|---|---|---|---|---|---|---|---|
| Michael D. Lundin President and Chief Executive Officer | 2003 | 425,000 | 21,250 | — | — | 32,000 | — | 14,300 |
| | 2002 | 310,577 | — | — | — | 30,000 | 167,633 | 10,027 |
| | 2001 | 195,070 | — | 31,155 | — | 8,000 | — | 10,027 |
| Julie A. Boland Vice President, Chief Financial Officer and Treasurer | 2003 | 225,000 | 11,250 | — | — | 16,000 | — | 3,505 |
| | 2002 | 225,000 | 70,000 | — | — | 22,000 | — | 2,865 |
| | 2001 | — | — | — | — | — | — | — |

| Name and Principal Position(1) | Year | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| | | Salary ($) (2) | Bonus ($) (2)(3) | Other Annual Compensation ($) (4) | Restricted Stock Awards ($) | Securities Underlying Options SARS (#) | LTIP Payouts ($)(5) | All Other Compensation ($) (6) (7) |
|---|---|---|---|---|---|---|---|---|
| Sylvie A. Bon Vice President- Administration and Chief Information Officer | 2003 2002 2001 | 165,000 106,615 --- | 8,250 24,651 --- | --- - --- | --- --- --- | 5,000 10,500 --- | --- --- --- | 3,178 2,665 --- |
| Michael J. Minkel Vice President Marketing and Business Development | 2003 2002 2001 | 165,616 139,654 120,700 | 8,000 --- 7,388 | --- --- --- | --- --- --- | 5,000 5,000 1,500 | --- --- --- | 2,473 5,981 4,667 |
| Rochelle F. Walk Vice President General Counsel and Secretary | 2003 2002 2001 | 175,000 175,000 156,960 | 8,750 --- --- | --- --- --- | --- --- --- | 7,000 5,000 3,750 | --- --- --- | 2,221 8,809 9,589 |

(1)    Mr. Lundin was appointed President and Chief Executive Officer on December 4, 2002. Ms. Boland joined Oglebay Norton in January 2002. Ms. Bon joined Oglebay Norton in May 2002.

(2)    Includes amounts deferred in 2003 by the named executives under the Oglebay Norton Capital Accumulation Plan for salary earned in 2003 or bonus earned in 2002: Bon—$11,807; and Minkel—$6,715. Includes amounts deferred in 2002 by the named executives under the Oglebay Norton Capital Accumulation Plan for salary earned in 2002 or bonus earned in 2001: Bon—$3,808; and Minkel—$20,320. Includes amounts deferred in 2001 by the named executives under the Oglebay Norton Capital Accumulation Plan for salary earned in 2001 or bonus earned in 2000: Walk— $42,724. The Oglebay Norton Capital Accumulation Plan was terminated, effective June 1, 2003. Includes amounts deferred in 2003, 2002 and 2001, respectively, by the named executives under the Oglebay Norton Incentive Savings and Stock Ownership Plan: Lundin—$12,000, $10,500 and $10,500; Boland—$10,750, $5,731 and $0; Bon—$12,000, $5,064 and $0; Minkel—$12,000, $11,000 and $10,500; and Walk—$11,821, $10,582 and $10,500.

(3)    Includes special bonuses approved by the Organization and Compensation Committee of the Board of Directors and awarded in 2003 to Mr. Lundin, Ms. Boland, Ms. Walk, Mr. Minkel and Ms. Bon for their contributions to Oglebay's ongoing financial and operating restructuring, as well as amounts paid to Ms. Bon and Ms. Boland as guaranteed bonuses at the time of hire in 2002.

(4)    For 2001, includes personal benefits exceeding 25% of the total personal benefits for Mr. Lundin of $28,147 for relocation.

(5)    The amount was paid in cash in 2003 for the payout earned for the period from 1999 to 2002 under the Oglebay Norton Company 1999 Long-Term Incentive Plan.

(6)    Includes contributions by Oglebay Norton during 2003, 2002 and 2001, respectively, for the named executives under Oglebay Norton's Incentive Savings and Stock Ownership Plan: Lundin—$6,000, $5,250 and $5,250; Boland—$3,505, $2,865 and $0; Bon—$2,649, $2,532 and $0; Minkel—$2,418, $4,889 and $4,667; and Walk—$2,221, $5,366 and $4,200. Includes contributions by Oglebay Norton during 2003, 2002 and 2001, respectively, for the named executives under the Oglebay Norton Capital Accumulation Plan: Bon—$529, $133 and $0; Minkel—$55, $1,092 and $0; and Walk—$0, $0 and $1,946. Also, includes payments by Oglebay Norton for life insurance premiums for 2003, 2002 and 2001, respectively: Lundin—$8,300, $4,777 and $4,777; and Walk—$0, $3,443 and $3,443.

(7)    On February 10, 2004, the Board of Directors of Oglebay approved cash bonuses for each of the following executive officers for their efforts in implementing the restructuring: Lundin–$34,000; Boland–$18,000; Bon–$13,200; Minkel– $12,800; and Walk–$14,000. As of May 7, 2004, the following executive officer base salary increases were approved by the Organization and Compensation Committee of the Board of Directors: Lundin–$75,000; Boland–$22,500; Bon– $10,000; Minkel–$8,000; and Walk–$8,000.

### Reorganized Oglebay Board of Directors

Under the Ohio General Corporation Law ("OGCL"), the business and affairs of Reorganized Oglebay will be managed under the direction of the Board of directors of Reorganized Oglebay. The identity of the initial directors will be disclosed in a Filing with the Bankruptcy Court as soon as the information is available, but in any event no later than ten days prior to the deadline to object to Confirmation of the Plan. Out of the initial seven directors to be identified on, or designated pursuant to the procedures specified on, Exhibit IV.C.2 of the Plan, the New Preferred Stock will designate four

directors, management of Oglebay will designate two directors and the New Common Stock will designate one director. Upon appointment of the members of the Board of Directors of Reorganized Oglebay, the then-existing Board of Directors of Oglebay will resign.

Following the issuance of the New Preferred Stock, the Board of Directors of Reorganized Oglebay will consist of seven members, elected as follows:

- the holders of the New Preferred Stock will be entitled, voting as a separate class, to elect the "New Preferred Stock Director Number" at each annual election of the directors, which will be a maximum of four. In case of any removal either with or without cause, of a director elected by the holders of the New Preferred Stock, the holders of the New Preferred Stock will be entitled, voting as a separate class either by written consent or at a special meeting, to elect a successor to hold office for the unexpired term of the director who has been removed. In case of any vacancy (other than removal) in the office of a director elected by the holders of the New Preferred Stock, the vacancy will be filled by the remaining directors elected to the Board of Directors by the holders of the New Preferred Stock; and

- the remaining directors will be elected by holders of New Common Stock voting separately as a single class. In case of any removal, either with or without cause, of a director elected by the holders of the New Common Stock, the holders of the New Common Stock will be entitled, voting as a separate class either by written consent or at a special meeting, to elect a successor to hold office for the unexpired term of the director who has been removed. In case of any vacancy (other than removal) in the office of a director elected by the holders of the New Common Stock, the vacancy will be filled by the remaining directors elected to the Board of Directors by the holders of the New Common Stock.

For purposes of this description, the "New Preferred Stock Director Number" means, at any given time, for so long as (a) at least 75% of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of four directors, (b) less than 75%, but more than 50%, of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of three directors, (c) the percentage of the shares of New Preferred Stock outstanding as of the Effective Date which remain outstanding is between 25% and 50%, a maximum of two directors, and (d) less than 25% of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of one director.

### Director Compensation

During 2003, none of Oglebay's executive officers or directors was a member of the board of directors or compensation committee of any other company where the relationship would be construed to constitute a committee interlock within the meaning of the rules of the SEC.

Commencing on the Effective Date, each non-employee director of Reorganized Oglebay will be paid such compensation as is determined by the Debtors, which compensation is anticipated to be disclosed in a Filing with the Bankruptcy Court prior to the Confirmation Hearing. Such directors also may participate in the Management Stock Plan. See "— Employee Benefit Matters — New Benefit Programs."

Except for the Chairman of the Board, directors who are not Oglebay's employees historically received a fee of $12,000 per year and $900 for each board and committee meeting attended, including meetings of non-standing subcommittees. Committee chairs received $1,200 for each committee meeting they chaired. The Chairman of the Board received annual compensation of $100,000. Except for the Chairman of the Board, directors who were not Oglebay's employees also received an annual award of

800 shares of Old Common Stock of Oglebay under the Oglebay Norton Company Director Stock Plan Directors were reimbursed for expenses they incurred in attending board and committee meetings

In 1998, the shareholders of Oglebay approved the Oglebay Norton Company Director Fee Deferral Plan. The Director Fee Deferral Plan, which was amended and restated effective January 1, 2002, permitted non-employee directors to defer all or part of the cash portion of their compensation into:

- share units based upon the market price of Old Common Stock of Oglebay at the date on which the cash computation otherwise would have been paid; or

- an account as deferred cash which is credited with a market rate of interest

In addition, amounts deferred into share units received a 25% matching credit by Oglebay, including a 25% matching credit for deferred dividend equivalents. Since 2002, directors also have been also able to defer part or all of their annual award of common stock under the Director Stock Plan on the same terms as provided in the Director Fee Deferral Plan. The Director Fee Deferral Plan was terminated effective as of May 1, 2004. Upon termination, in accordance with the terms of the Director Fee Deferral Plan, deferred cash will be distributed to participants in cash plus interest and share units were converted into shares of Old Common Stock of Oglebay and distributed to participants. Participants who received shares of Old Common Stock of Oglebay will receive New Warrants on the Effective Date, exercisable for 30 days after the Effective Date, to purchase shares of New Common Stock

## Amended and Restated Articles and Amended and Restated Code of Regulations of Reorganized Oglebay

*Ohio Control Share Statute.* Section 1701.831 of the Ohio Revised Code requires the prior authorization of the shareholders of certain corporations in order for any person to acquire, either directly or indirectly, shares of that corporation that would entitle the acquiring person to exercise or direct the exercise of 20% or more of the voting power of that corporation in the election of directors or to exceed specified other percentages of voting power. In the event an acquiring person proposes to make such an acquisition, the person is required to deliver to the corporation a statement disclosing, among other things, the number of shares owned, directly or indirectly, by the person, the range of voting power that may result from the proposed acquisition and the identity of the acquiring person. Within ten days after receipt of this statement, the corporation must call a special meeting of shareholders to vote on the proposed acquisition. The acquiring person may complete the proposed acquisition only if the acquisition is approved by the affirmative vote of a majority of the voting power of the corporation in the election of directors represented at the meeting and a majority of the portion of the voting power of all shares entitle to vote in the election of directors represented at the meeting excluding the voting power of all "interested shares" represented at the meeting Interested shares include any shares held by the acquiring person and those held by officers and directors of the corporation as well as by certain others, including many holders commonly characterized as arbitrageurs. Section 1701 831 does not apply to a corporation if its articles of incorporation or code of regulations state that the statute does not apply to that corporation. Reorganized Oglebay's Amended and Restated Articles will contain a provision opting out of this statute.

*Ohio Interested Shareholder Statute* Chapter 1704 of the Ohio Revised Code prohibits certain corporations from engaging in a "chapter 1704 transaction" with an "interested shareholder" for a period of three years after the date of the transaction in which the person became an interested shareholder, unless, among other things: (a) the articles of incorporation expressly provide that the corporation is not subject to the statute (Reorganized Oglebay will make this election); or (b) the board of directors of the corporation approves the chapter 1704 transaction or the acquisition of the shares before the date the shares were acquired.

After the three-year moratorium period, the corporation may not consummate a chapter 1704 transaction unless, among other things, it is approved by the affirmative vote of the holders of at least two-thirds of the voting power in the election of directors and the holders of a majority of the voting shares, excluding all shares beneficially owned by an interested shareholder or an affiliate or associate of an interested shareholder, or the shareholders receive certain minimum consideration for their shares. A "chapter 1704 transaction" includes certain mergers, sales of assets, consolidations, combinations and majority share acquisitions involving an interested shareholder. An "interested shareholder" is defined to include, with limited exceptions, any person who, together with affiliates and associates, is the beneficial owner of a sufficient number of shares of the corporation to entitle the person, directly or indirectly, alone or with others, to exercise or direct the exercise of 10% or more of the voting power in the election of directors after taking into account all of the person's beneficially owned shares that are not then outstanding. Reorganized Oglebay's Amended and Restated Articles will contain a provision opting out of this statute.

*Anti-Takeover Provisions Contained in the Amended and Restated Articles and Amended and Restated Code of Regulations.* The Amended and Restated Articles and Amended and Restated Code of Regulations will contain provisions that could have the effect of delaying or making less likely to occur a change in control of Reorganized Oglebay:

*Special Meeting of Shareholders.* The Amended and Restated Code of Regulations of Reorganized Oglebay will provide that special meetings of shareholders may only be called by its president or chairman of the board, by the entire board of directors at a meeting, or by a majority of the entire Board of Directors pursuant to a formal resolution, or upon the written request of a shareholder holding at least 30% of all votes entitled to be cast on the matter to be considered at the special meeting.

*Shareholder Advance Notice Procedure.* The Amended and Restated Code of Regulations of Reorganized Oglebay will establish advance notice procedures for shareholders to submit nominations of candidates for election as directors or to present any other business for consideration at any of its annual or special shareholder meetings. With certain exceptions, these procedures will require shareholders to submit in writing any proposal for consideration at the meeting to the corporate secretary of Reorganized Oglebay not less than 60 nor more than 90 days before the date of the meeting. The notice must include the following information: (a) the name and address of the shareholder; (b) a representation that the shareholder is a holder of stock entitled to vote at the meeting and that the shareholder intends to appear in person or by proxy at the meeting to make the proposal or nomination; (c) if applicable, a description of all arrangements or understandings between the shareholder and any other person(s) (naming the person(s)) pursuant to which the proposal is to be made by the shareholder; and (d) the number and class of all stock beneficiary owned by the shareholder and any material interest of the shareholder in the proposal (other than any interest solely as a shareholder).

*Amendment of Regulations.* The Amended and Restated Code of Regulations of Reorganized Oglebay may be adopted, amended or repealed at any meeting if the shareholders by the affirmative vote of a majority of the voting power of Reorganized Oglebay.

*Prohibition Against Issuance of Non-Voting Capital Stock.* In accordance with Section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Articles will prohibit the issuance of any shares of non-voting equity securities.

*Limitation of Liability.* The Amended and Restated Articles will provide that Reorganized Oglebay will indemnify, to the full extent then permitted by law, any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he or she is or was a director or officer of Reorganized Oglebay. Reorganized Oglebay will pay, to the full extent then required by law, expenses, including attorney's fees, judgments, fines and amounts paid in settlement

incurred by a director in defending any such action, suit, or proceeding as they are incurred, in advance of the disposition thereof, upon receipt of any undertaking then required by law. Reorganized Oglebay may, in its discretion, indemnify any other person, or advance expenses to any other person, in the same manner and to the full extent then permitted by law

*Share Purchase Rights Agreement.* The Debtors and the Creditors' Committee are currently negotiating the terms of the Share Purchase Rights Agreement. Reorganized Oglebay anticipates that, if adopted, the Share Purchase Rights Agreement, under certain circumstances, could significantly impair the ability of third parties to acquire control of Reorganized Oglebay without prior approval of its Board of Directors. If the Share Purchase Rights Agreement is adopted, the Debtors will File a form of the agreement with the Bankruptcy Court as Exhibit I.A 105 of the Plan prior to the Confirmation Hearing.

**Employee Benefit Matters**

The description of the Debtors' benefit plans and agreements set forth below is provided for informational purposes only and is qualified in all respects by the actual terms of such arrangements. Nothing contained herein shall have the effect of modifying the term of any of the benefit plans and agreements discussed below or altering any party's rights or obligations thereunder.

On the Petition Date, Oglebay's employees and certain former employees participated in various retirement, incentive and welfare plans, which were sponsored by the Debtors. The following discussion summarizes the principal terms of the Debtors' employee benefit plans as in effect on the Petition Date. Except for the severance and termination agreements for currently retired or terminated employees, the 1996 Executive Life Plan and the Director Fee Deferral Plan, the Debtors are providing and intend to continue to provide (or continue as modified or replaced) after the Effective Date benefit plans substantially similar to those provided prior to the Effective Date.

*Self-Insured, Insured and Noninsured Plans and Programs*

*Self-Insured Plans.* The Debtors maintain self-insured plans that provided general health (including retiree medical), dental, prescription drug, vision and short-term disability insurance (collectively, the "Self-Insured Plans"). Under the Self-Insured Plans, the Debtors assume liability for and initially pay certain benefits, rather than paying premiums for independent insurance coverage. Various third parties serve as claims agents for, and process and pay, the medical, dental and short-term disability claims presented by covered employees. Under the Plan, the Self-Insured Plans will be reinstated in full as of the Effective Date.

*Insured Plans.* The Debtors also maintain certain insured benefit plans under which the Debtors, the employees or both contribute to the payment of premiums for insurance or other coverage provided by third parties (collectively, the "Insured Plans"). The Insured Plans include: (a) comprehensive health care plans (which include health, dental, prescription drug and vision insurance); (b) business travel accident insurance; (c) group life and accidental death and dismemberment insurance; (d) long-term disability insurance; (e) voluntary dependent life insurance; and (f) voluntary supplemental life and accidental death and dismemberment insurance. Under the Plan, the Insured Plans will be reinstated in full as of the Effective Date.

*Noninsured Plans and Programs.* The Debtors also maintain certain other benefit programs and plans under which the Debtors, the employees or both contribute to the benefit provided to the employees (collectively, the "Noninsured Programs"). The Noninsured Programs include, among others: (a) a cost of living adjustment program; (b) flexible spending accounts, which permit the payment of health care costs and dependent care costs on a pre-tax basis; (c) a leased vehicle program; (d) the ordinary course severance programs; (e) parking/transportation reimbursement program; (f) a relocation program;

(g) service award programs; (h) a tuition reimbursement program; and (i) a supplemental unemployment benefit plan  Under the Plan, the Noninsured Programs will be reinstated in full as of the Effective Date

The ordinary course severance programs and termination agreements for currently retired employees or former employees terminated prior to the Petition Date will not be reinstated  Unpaid severance owed to former employees terminated prior to the Petition Date will give rise to General Unsecured Claims against the Debtors that will be treated as Class 5 Claims (General Unsecured Claims) under the Plan, subject to the provisions of section 502 of the Bankruptcy Code  Any severance owed to former employees terminated after the Petition Date will be paid to qualifying employees in the ordinary course of business pursuant to a Bankruptcy Court order entered on April 28, 2004

### Retirement Plans

*Qualified Pension Plans.* Oglebay sponsors the Oglebay Norton Company Pension Plan (the ''Oglebay Pension Plan''), which is a defined benefit pension plan that covers substantially all of Oglebay's full-time salaried and some hourly employees at certain locations  Under the Oglebay Pension Plan, eligible employees, other than Coal and Non-Ferrous (as defined in the Oglebay Pension Plan) participants and Michigan Limestone Operations participants, receive an annual benefit that is calculated by multiplying the participant's average compensation by a factor of 1 5% and the participant's years of covered service (but not below a minimum benefit unrelated to compensation).  Eligible employees who are Coal and Non-Ferrous participants receive a monthly benefit equal to 1% of the participant's average monthly earnings multiplied by the participant's years of service, up to 30 years, (but not below a minimum benefit unrelated to compensation).  Eligible employees who are Michigan Limestone Operations participants and have more than 30 years of service receive a monthly benefit equal to 105% of the following: 33% of the participant's average monthly earnings plus 1 2% of the participants average monthly earnings multiplied by each year of service in excess of 30 years.  Eligible employees who are Michigan Limestone Operations participants and have less than 30 years of service receive a monthly benefit equal to 105% of the following: 1 1% of the participants average monthly earnings multiplied by each year of service  Michigan Limestone Operations participants are entitled to a minimum benefit unrelated to compensation.  Benefits are paid in a straight life annuity form to unmarried participants and in the form of 50% joint and survivor annuity to married participants and are not subject to reduction for Social Security or other offset  Other forms of payment and surviving spouse benefits are also available under the plans, as well as early retirement and facility shutdown benefits.

Oglebay Norton Marine Services Company, LLC sponsors the Hourly Pension Plan of Oglebay Norton Marine Services Company, LLC, which is a defined benefit plan for hourly associates covered by the collective bargaining agreement between the company and the United Steelworkers of America (Unlicensed Seamen).  The amount of benefit under this pension plan is specified in the governing collective bargaining agreement

Oglebay Norton Industrial Sands, Inc  sponsors two defined benefit pension plans: (1) the Retirement Plan for the Glass Rock Plant and the Millwood Plant of Oglebay Norton Industrial Sands, Inc  and (2) the Retirement Plan for Hourly Employees of Oglebay Norton Industrial Sands, Inc  - Orange County Plant  Both of these defined benefit pension plans covers collectively bargained hourly employees.  The benefit under both plans is based on a negotiated dollar amount multiplied by the employee's years of service.

Michigan Limestone Operations sponsors the Michigan Limestone Operations, Inc  Pension Plan for Union Employees, which is a defined benefit pension plan covering collectively bargained employees  Under this plan, covered employees are entitled to a benefit based on their years of service and their average monthly earnings for the highest consecutive sixty calendar months during the last 120 calendar months of employment prior to retirement  An employee with thirty or more years of service receives a monthly benefit of 33% of average monthly earnings plus an additional 1 2% of average monthly earnings

for each year of service in excess of thirty. An employee with less than thirty years of service receives a monthly benefit of 1.1% of average monthly earnings for each year of service. The total amount under the percentage formula is increased by 5% (but not below a minimum benefit unrelated to earnings). Benefits for calcite plant workers were frozen as of September 30, 1993, but service for eligibility continues to accrue.

Global Stone Tenn Luttrell Company sponsors the Global Stone Tenn Luttrell Company Employees' Retirement Plan, which is a defined benefit pension plan that covers collectively bargained hourly employees. Under this plan, eligible employees receive a benefit based on their compensation during each year of employment. For years after December 31, 1988, eligible employees are accruing a benefit equal to 1.3% of annual compensation for each year of employment.

Erie Navigation Company, Inc. sponsors the Erie Navigation Company Defined Benefit Floor Plan, which is a defined benefit pension plan covering certain non-collectively bargained employees. Under this plan, eligible employees receive a benefit based on average annual compensation and years of service. As of February 1, 2004, plan participation was closed, and service and compensation for plan purposes were frozen.

Under the Plan, the qualified defined benefit pension plans will be reinstated in full as of the Effective Date.

*Qualified 401(k) Plans.* Oglebay also sponsors the Oglebay Norton Incentive Savings and Stock Ownership Plan, which is a defined contribution 401(k) plan. This plan covers full-time salaried, hourly and certain collectively bargained employees. The plan provides for company contributions and permits eligible employees to defer compensation.

Oglebay Norton Marine Services Company, LLC sponsors the Columbia Unlicensed Savings Plan. Oglebay Norton Terminals, Inc. sponsors the Cleveland Bulk Terminal Plan and Trust. Global Stone Management Company sponsors the Global Stone Tenn Luttrell Company 401(k) Plan. Michigan Limestone Operations sponsors the Michigan Limestone Operations, Inc. Calcite Bargaining Unit 401(k) Plan and the Michigan Limestone Operations, Inc. Cedarville Bargaining Unit 401(k) Plan. All of the foregoing plans listed in this paragraph are defined contribution 401(k) plans that cover collectively bargained employees.

Erie Navigation Company, Inc. sponsors the Erie Navigation Company Profit Sharing 401(k) Plan, which is a defined contribution 401(k) plan. This plan covers certain non-collectively bargained employees. Deferrals to this plan were suspended effective April 1, 2003 when employees became eligible to participate in the Oglebay Norton Incentive Savings and Stock Ownership Plan. The plan continues to hold plan assets.

Under the Plan, the qualified defined contribution 401(k) plans will be reinstated in full as of the Effective Date.

*TRA Supplemental Benefit Retirement Plan and Oglebay Norton Company Supplemental Savings and Stock Ownership Plan.* The TRA Supplemental Benefit Retirement Plan (the "Excess Benefit Retirement Plan") and the Oglebay Norton Company Supplemental Savings and Stock Ownership Plan (the "Supplemental Plan") are non-qualified retirement plans that provide benefits to highly compensated salaried employees. The Internal Revenue Code limits the benefits provided under qualified pension plans and qualified 401(k) plans. The Excess Benefit Retirement Plan provides for the payment, out of Oglebay's general funds, of the amount that an eligible participant would have received under the Oglebay Pension Plan but for the Internal Revenue Code limits. The Supplemental Plan provides for the payment, out of Oglebay's general funds, of the amount that an eligible participant would have received under the Oglebay Norton Company Incentive Savings and Stock Ownership Plan but for the Internal

Revenue Code limits. The Excess Benefit Retirement Plan and the Supplemental Plan will be reinstated in full under the Plan.

### Capital Accumulation Plan

Effective January 1, 2000, Oglebay adopted its Capital Accumulation Plan. The Capital Accumulation Plan was terminated on June 1, 2003, and all amounts due to the participants of the plan were paid out. Prior to its termination, under the Capital Accumulation Plan, certain management and highly compensated employees, who were limited in the amounts of salary and bonus they could defer pursuant to plans qualified pursuant to ERISA, could elect to defer receipt of salary, bonus and/or long term incentive compensation. Participants were permitted to defer up to 50% of their salary, up to 100% of their bonus and up to 100% of their long term incentive compensation, each in 10% increments, payable during the year.

The Capital Accumulation Plan, which was not a qualified plan, provided for the payment, out of Oglebay's general funds, of the amount deferred, together with an amount of investment earnings, gains and/or losses, and expenses determined with reference to the performance of certain "deemed" investment options, as directed by the participant. The Capital Accumulation Plan also provided an amount equivalent to any benefit not provided to the participant under the Incentive Savings and Stock Ownership Plan by reason of the deferral of compensation under the Capital Accumulation Plan, although no duplication of benefits provided under any other of Oglebay's arrangements was permitted. Deferred salary and bonus, and the investment gain or loss on the deferred salary and bonus, under the Capital Accumulation Plan, were fully vested. In 2003, Oglebay contributed the following amounts for the named executives: Ms. Bon—$529; and Mr. Minkel—$604. Benefits were distributed in cash following retirement, death, other termination of service, or termination of the plan. Interim distributions prior to termination of service or termination of the plan were also permitted, based on participant elections made sufficiently in advance and in the case of certain hardship situations.

### 2002 Stock Option Plan

The predecessor to the Organization and Compensation Committee approved the 2002 Stock Option Plan to enable Oglebay to attract and retain key members of management, provide incentives and reward performance and ensure that the interests of key members of management are aligned with the shareholders' interests. The 2002 Stock Option Plan was approved by the shareholders of Oglebay at the 2002 Annual Meeting. The maximum number of shares of Old Common Stock of Oglebay subject to awards granted under the 2002 Stock Option Plan was 500,000, with no more than 125,000 shares to be awarded in any single year. Stock option awards could be incentive stock options, which are stock options that meet the requirements for qualification under Section 422 of the Internal Revenue Code of 1986, or non-qualified stock options, which are stock options that do not qualify as incentive stock options. The exercise price of a stock option was to be at or above the closing price of the shares of Old Common Stock of Oglebay on the date of grant. Stock options were exercisable for a period not to exceed ten years from the date of grant. The Organization and Compensation Committee determined when the right to exercise stock options vests for each participant granted an award. The options had no value unless Oglebay's stock price appreciated and the recipient satisfied the applicable vesting requirements. In the event of a "change in control," unless otherwise determined by the Organization and Compensation Committee, all stock options then outstanding would become fully exercisable as of the date of the change in control. All other terms, conditions and restrictions with respect to each award were determined by the Organization and Compensation Committee. Under the Plan, the 2002 Stock Option Plan will be terminated, all outstanding stock options issued under the 2002 Stock Option Plan will be cancelled and the holders of such options will no longer be able to exercise such options after such time.

### Long-Term Incentive Plans

**2002 Long-Term Incentive Plan.** Under Oglebay's 2002 Long-Term Incentive Plan, participants are eligible for awards paid in cash for performance against targets which are based on Oglebay's performance over multiple-year periods. Oglebay's Board of Directors sets the performance measures at the beginning of each year during the performance period and assigns a weighting to each measure. Performance measures and target awards were set for 2002 and 2003 under this Plan. The 2002 Long-Term Incentive Plan and all outstanding awards owed thereunder will be rejected pursuant to the Plan.

**1999 LTIP.** Oglebay established the Oglebay Norton Company 1999 Long-Term Incentive Plan (the "1999 LTIP") on October 3, 1998, which was approved by the shareholders of Oglebay at the 2000 Annual Meeting. The predecessor to the Organization and Compensation Committee administered the 1999 LTIP and selected officers and other key employees to participate in the plan. Under the 1999 LTIP, participants were eligible to be granted stock options and cash incentive payment awards. Under outstanding stock option awards, a participant has a right to purchase a specified number of shares, during a specified period, and at a specified exercise price, all as determined by the predecessor to the Organization and Compensation Committee. No further stock option awards may be made under the 1999 LTIP. Cash incentive payment awards were made for 2002. No further cash awards can be earned or paid. The 1999 LTIP will be terminated and all outstanding stock options issued under the 1999 LTIP will be cancelled pursuant to the Plan.

**Former LTIP.** Oglebay established a long-term incentive plan on December 13, 1995 (the "former LTIP"), which was approved by the shareholders of Oglebay at the 1996 Annual Meeting. The predecessor to the Organization and Compensation Committee administered the former LTIP and selected officers and other key employees to participate in the plan. Under the former LTIP, participants were eligible to be granted awards, as determined by the predecessor to the Organization and Compensation Committee and, up to 1998, were eligible to defer a portion of their annual incentive awards. Rochelle F. Walk holds options granted under the former LTIP. No further awards may be made under the former LTIP. The former LTIP will be terminated and all outstanding stock options issued under the former LTIP will be cancelled pursuant to the Plan.

### Officer Agreements

Oglebay has entered into separate agreements (collectively, the "Officer Agreements") with certain executive officers. The Officer Agreements are designed to retain these individuals and provide for continuity of management in the event of any actual or threatened change in control (as defined in the Officer Agreements) of Oglebay. None of the Officer Agreements will become operative unless Oglebay's experiences a change in control. Consummation of the Plan is not intended to and shall not constitute a change in ownership or change of control under the Officer Agreements, and the Debtors anticipate that each executive officer will waive any such change in ownership or change in control provision.

There are two triggers that apply to the Officer Agreements. The first trigger requires that a change in control occurs. After a change in control, the officer is entitled to continued employment for a 30-month contract term at a compensation rate equal to the greatest of that in effect immediately before the change in control, in effect two years before the change in control, or such greater rate determined by Oglebay, and certain bonuses, plus certain additional benefits and continued participation in specified benefit plans as an executive officer. The second trigger is tripped if, after a change in control, the officer is terminated without "cause" or the officer terminates his or her employment for "good reason." If the second trigger occurs, then, subject to certain exceptions, the officer is entitled to receive compensation at the highest monthly rate payable to the officer during the 30-month contract term plus certain bonus awards instead of employment, but only for the longer of the time remaining in the original 30-month

contract term (after the change in control) or six months. The officer is also entitled to receive certain additional benefits in certain circumstances for one year following the 30-month contract term.

After employment termination, the officer must attempt to mitigate damages by seeking comparable employment elsewhere. If the officer is successful, compensation is reduced, dollar-for-dollar, for compensation and benefits received from the subsequent employer. In addition, the officer agrees not to disclose any of Oglebay's trade secrets. If and to the extent payments made to the officer on account of a change in control are treated as excess parachute payments under the Internal Revenue Code, the Officer Agreement provides for an additional payment to make the officer whole with respect to additional excise tax payments.

On the Effective Date, Reorganized Oglebay will enter into new change in control agreements with Michael D. Lundin, Julie A. Boland, Sylvie A. Bon, Michael J. Minkel and Rochelle F. Walk, on the terms set forth in Exhibit IV C 3 a of the Plan (which will include, among other things, the termination of any existing Officer Agreements with these individuals). The terms of the change in control agreements were negotiated with the Creditors' Committee. Each change in control agreement will be consistent with the current agreements, but subject to the following changes. The new agreements will provide that upon a "change of control" (as defined in the change in control agreement), the term of the employment shall be for a period of one year. During such term, the executive officer will be entitled to receive compensation in an amount equal to the greater of (a) the executive officer's base salary in effect immediately prior to the "change of control" or (b) the executive officer's base salary in effect at any time during the two years preceding the "change of control" (excluding any mandatory bonus). In addition, if the executive officer is terminated following the "change of control," the executive officer will be entitled to receive severance benefits until the later of (a) six months following termination or (b) the number of months remaining in the 12 month period following the "change of control" and such severance shall be paid, at the highest monthly rate calculated based on the amounts payable to the executive officer in the preceding sentence.

Global Stone Corporation entered into employment agreements with five of its employees. These employment agreements generally provided that the employees would receive a severance benefit upon a termination of employment without cause. The severance benefit would continue their monthly salary for a six-month period and would provide them with coverage under the company's employee benefit plans for that six-month period. The Debtors currently intend to reject these employment agreements under the Plan.

*Severance Agreements*

In 1999, Oglebay entered into a separation agreement and release with Mr. R. Thomas Green, Jr., which provided for Oglebay to pay Mr. Green monthly installments of about $11,631 beginning September 1, 1999 until his death, at which time such payment will be reduced by 50% until the death of his spouse. The Debtors currently intend to reject Mr. Green's agreement under the Plan.

In 2001, Oglebay entered into separate separation agreements and releases with Mr. Danny R. Shepherd, Mr. Stuart H. Theis and Mr. Jeffrey S. Gray. Mr. Shepherd's separation agreement and release provided for Oglebay to pay Mr. Shepherd about $482,377 in 50 biweekly installments. Mr. Theis' separation and retirement agreement and release provided for Oglebay to pay Mr. Theis about $274,038 in 38 biweekly installments beginning January 4, 2002 and ending June 6, 2003. Mr. Gray's separation agreement and release provided for Oglebay to pay Mr. Gray about $304,151 in 46 biweekly installments and a one-time lump sum payment of $30,000. The Debtors currently intend to reject Mr. Shepherd's, Mr. Theis' and Mr. Gray's separation agreement under the Plan.

In 2002, Oglebay entered into a separation agreement and release with Mr. Kenneth P. Pavlich, its Vice President of Operations and Business Development, which provided for Oglebay to pay Mr.

Pavlich $302,294 in biweekly payments beginning January 3, 2003 and ending December 31, 2004. The Debtors currently intend to reject Mr. Pavlich's separation agreement under the Plan.

Any other separation or termination agreement that Oglebay entered into with a former employee whose employment terminated prior to the Petition Date and that the Debtors currently intend to reject will be filed in a designation or Exhibit V.D to the Plan prior to the Confirmation Hearing.

### *"Pour-Over" and Irrevocable Trusts*

Oglebay has made commitments under various plans and agreements for supplemental pension benefits, deferred and executive compensation arrangements, and obligations arising in the event of a change in control, which it has not been required to fund on a current basis. In order to provide assurances that those commitments will be honored, Oglebay established three trusts with an independent trustee to provide additional security for these commitments in the event of a "change in control." During 2002, Oglebay terminated one of the trusts and currently has two trusts remaining.

Irrevocable Trust Agreement II provides additional assurances for benefits and payments due under the Excess Benefit Retirement Plan, the Officer Agreements, certain deferred compensation agreements and the Supplemental Plan. The Supplemental Plan provides for cash payment of the amount by which certain participants' benefits under Oglebay's Incentive Savings and Stock Ownership Plan would exceed the Internal Revenue Code limitations applicable to that plan.

The Oglebay Norton Company Assurance Trust provides additional assurances for benefits and payments for executives serving Oglebay after 2002 due under the Excess Benefit Retirement Plan, the Officer Agreements, certain deferred compensation agreements, and the Supplemental Plan. It also provides that, in the event of a threatened "change in control," Oglebay will deposit in a pour-over trust, on an irrevocable basis, 125% of the aggregate unfunded obligations of the commitments. The trust becomes revocable if, after the threat, no "change in control" occur. If a "change in control" does occur, the trust remains irrevocable.

Oglebay has not contributed any significant assets to the two trusts. However, Oglebay retains the right to make discretionary contributions into the trusts at any time. Assets held in the trusts are subject at all times to the claims of Oglebay's general creditors. If funds in the trusts are insufficient to pay amounts due under a plan or agreement, Oglebay remains obligated to pay those amounts. No employee has any right to assets in the trusts until, and to the extent, benefits are paid from the trusts. Oglebay intends to reinstate and continue these trusts after the Effective Date.

### *New Benefit Programs*

The Debtors intend to implement the following new benefit plans on or after the Effective Date:

**Management Stock Plan.** As of the Effective Date, Reorganized Oglebay will implement the Management Stock Plan, in the form attached as Exhibit I.A.52 to the Plan, to attract, retain and motivate key employees following the Effective Date. The terms of the Management Stock Plan were negotiated with the Creditors' Committee. The Management Stock Plan in many respects will replace certain elements of the 2002 Stock Option Plan. A total of approximately 1,325,397 shares of New Common Stock will be available for issuance pursuant to restricted stock and/or stock options granted under the Management Stock Plan. The Management Stock Plan requires that 50% of these shares be issued shortly following the Effective Date, with approximately 265,079 shares being issued in the form of restricted stock and 397,619 shares being reserved for the issuance of stock options, with a strike price of $12.63 per share. The remaining shares will be available for future grants. Under the Management Stock Plan, the restricted stock will vest at the rate of 25% per year over a 4-year period commencing on July 1, 2005 and the stock options will vest at the rate of 33-1/3% per year over a 3-year period commencing on January 1, 2005. Accelerated vesting will apply in certain circumstances specified in the plan document,

including a change in control or a termination without cause. Reorganized Oglebay's Board of Directors (or a committee thereof) will determine the awards of restricted stocks and options to be granted under the Management Stock Plan as of and following the Effective Date. The Debtors believe that the size and terms of the Management Stock Plan are appropriate, within market terms and necessary to achieve the goals of attracting, retaining and motivating key employees.

*Management Incentive Plan.* On the Effective Date, the Debtors will implement the Management Incentive Plan, in the form attached as Exhibit I A 51 to the Plan, to provide certain key employees with incentive to remain in the Debtors' employ following the Effective Date. The terms of the Management Incentive Plan were negotiated with the Committee. The Management Incentive Plan will consist of a retention bonus plan and a supplemental severance plan. Under the retention bonus portion of the plan, a total of 45 key employees will receive a retention bonus equal to a percentage of their annual base salary, payable 50% upon continued employment as of the Effective Date and 50% 90 days after the Effective Date. The percentage of salary used to calculate the retention bonus for five members of the Debtors' senior management team will be reduced at the monthly rate of 5% beginning on November 15, 2004. The aggregate amount of retention bonuses for the 45 key employees is approximately $2,274,539. A discretionary pool of $250,000 (subject to a cap of $10,000 for any one employee) also will be available to the Debtors for employees not otherwise participating in the retention bonus plan. Under the supplemental severance portion of the plan, a total of 45 key employees will be eligible for a supplemental severance payment equal to either 100% or 50% of their annual base salary, payable upon termination without cause within 12 months of the Effective Date. The supplemental severance payment will be reduced by one month for each month subsequent to the Effective Date, to a minimum of six months. The total cost of the supplemental severance plan is approximately $4,381,280.

An employee's participation in the Management Incentive Plan will be in addition to, as applicable, the Management Stock Plan, any management employment agreements effective on or after the Effective Date, the Debtors' annual incentive plan and any other plans or benefits that the Debtors may provide to their employees in the ordinary course of business.

*Other Benefits Plans.* The Reorganized Debtors may develop and implement other appropriate benefit plans from time to time after the Effective Date.

**Related Party Transactions**

*The following is a summary of other transactions since January 1, 2001 to which Oglebay was a party, in which any of Oglebay's directors, executive officers, beneficial owners of more than 5% of any class of Oglebay's voting securities, and certain family members of such persons have had an interest and in which the amount involved exceeded $60,000.*

### *Chartered Aircraft*

The Debtors periodically need to charter a small aircraft for the purposes of traveling to and from their remote locations. Mr. Lundin, president and chief executive officer, and his wife are the shareholders of a company known as L L Aviation, LLC, which owns such an aircraft. The Debtors chartered the aircraft owned by L L Aviation, LLC during calendar years 2001, 2002 and 2003. The Debtors paid a total of $104,266 in 2001, $122,494 in 2002 and $91,000 in 2003 for such charters.

### *Michigan Limestone Operation*

In the second quarter of 2000, the Debtors acquired all of the partnership interests in Michigan Limestone Operations Limited Partnership from its prior owners for $53 million in cash at closing, and the assumption of approximately $8 million in debt, plus additional contingent payments subject to the achievement of performance parameters over several subsequent years. The purchase price for Michigan

Limestone Operations Limited Partnership was arrived at through arms-length negotiations between the parties. On April 26, 2000, Mr. Lundin, one of the former owners of Michigan Limestone Operations Limited Partnership, became one of Oglebay's executive officers. Mr. Lundin's share of the Michigan Limestone Operations Limited Partnership purchase price paid at closing was approximately $9.8 million, of which he received approximately $4.9 million after paying loans and expenses related to the transaction. Additionally, as part of the transaction, Mr. Lundin is scheduled to receive a share of contingent payments to the extent earned through 2011. Under the terms of the MLO Contract, upon a change in control, including bankruptcy, the former owners of Michigan Limestone Operations Limited Partnership may have the right to accelerate the remaining payments. The Plan currently provides that the MLO Contract will be amended as set forth on Exhibit III.C.2. to the Plan and, as of the Effective Date, will be assumed (as amended) by Reorganized Oglebay. The MLO Claims will be accorded the treatment set forth in the Plan. See "Treatment of Certain Claims Under the Plan—Treatment of MLO Claims." Mr. Lundin has abstained from the negotiations dealing with the treatment of the MLO Claims under the Plan.

Mr. Lundin received payments totaling $568,000 in 2001, $571,000 in 2002 and $391,000 in 2003 as his 18.6% share of the contingent payments. On November 1, 2001, Mr. Lundin was promoted to the position of Oglebay's president and chief operating officer, and on December 12, 2001, Mr. Lundin was elected to its board of directors. On December 4, 2002, Mr. Lundin was appointed as Oglebay's chief executive officer.

### Supplemental Retirement Benefit Plan of Mr. John N. Lauer

Oglebay agreed to provide its former chairman of the board, Mr. John N. Lauer, a supplemental retirement benefit plan providing him retirement benefits that, when added to any benefits payable to him under the Pension Plan, will equal the benefits he would have been entitled to under the Pension Plan if:

- his covered compensation throughout the period of his employment had included salary at the rate of $500,000 per year and an annual bonus equal to the higher of his actual bonus for the applicable year and $250,000;

- he had been credited with ten years of service under the Pension Plan; and

- there were no limits on the amount of covered compensation that could be taken into account in determining the benefit payable to him under the Pension Plan.

If Mr. Lauer remained employed by Oglebay through January 1, 2004 and received maximum annual bonuses (i.e., $250,000), the aggregate retirement benefit payable to him under the Pension Plan and his supplemental plan will be the equivalent of an annual lifetime benefit of $112,500 per year. The Debtors currently intend to reject Mr. Lauer's supplemental retirement benefit plan under the Plan. Mr. Lauer will remain entitled to the same benefits other highly compensated employees are entitled to under the TRA Supplemental Benefit Retirement Plan and the Oglebay Norton Company Supplemental Savings and Stock Ownership Plan.

### Employment Agreement with Mr. John N. Lauer

Mr. Lauer served as Oglebay's chief executive officer until December 4, 2002 and as Oglebay's chairman of the board of directors until April 30, 2003. Mr. Lauer's compensation arrangements during the tenure of his employment as one of Oglebay's executive officers were governed by the employment agreement described below. In connection with Mr. Lauer's resignation as chief executive officer in December 2002, Mr. Lauer and Oglebay executed an amendment to the employment agreement providing for a continued term of employment for Mr. Lauer with Oglebay until January 4, 2004 and as further described below.

On December 17, 1997, Oglebay entered into an employment agreement with Mr. Lauer pursuant to which Mr. Lauer became its president, chief executive officer and a director effective January 1, 1998. The predecessor to the Organization and Compensation Committee, the Compensation, Organization and Governance Committee, negotiated the terms of the agreement on Oglebay's behalf. The compensation arrangements in the employment agreement tied Mr. Lauer's compensation directly to the Debtors' performance over the term of Mr. Lauer's employment. In particular, his compensation was tied to the price of Old Common Stock of Oglebay. Oglebay did not pay Mr. Lauer a salary during his tenure as chief executive officer with Oglebay. Instead, the primary elements of his compensation under the employment agreement were:

- a grant of 25,744 shares of restricted Old Common Stock of Oglebay;

- a grant of a "performance option" to purchase an additional 380,174 shares of Old Common Stock of Oglebay; and

- an annual bonus of up to $200,000 per year based upon the Debtors' performance during the year. For the calendar year 1999, the board of directors determined to increase the annual bonus cap to $250,000.

On June 30, 2000, the employment agreement was amended to provide for excise tax benefits. In 2002, the employment agreement was amended again pursuant to which Mr. Lauer agreed to continue as chairman until December 31, 2003, at which time he was to retire from the board. The amendment provided Mr. Lauer with a one-time grant of 25,000 shares of Oglebay's Common Stock. These shares were fully vested, but Mr. Lauer was restricted from selling them until his employment with Oglebay terminated. The amendment also provided that, for 2003, Mr. Lauer's annual bonus was not to be subject to any special cap and was to be calculated as if Mr. Lauer had an annual base salary of $500,000. The amendment also modified the terms of Mr. Lauer's supplemental retirement benefit plan as discussed above under "—Supplemental Retirement Benefit Plan of Mr. John N. Lauer." Lastly, the amendment provided that Mr. Lauer will receive medical benefits under the medical plan maintained by Oglebay for retirees following his retirement.

The Debtors currently intend to reject Mr. Lauer's employment agreement under the Plan, and any shares of restricted Old Common Stock of Oglebay and any performance or similar options to purchase shares of Old Common Stock of Oglebay provided under Mr. Lauer's employment agreement will be cancelled on the Effective Date under the Plan.

**Indemnity Arrangements**

### *Indemnification Obligations*

The OGCL permits a corporation to indemnify current and former directors, officers, employees and agents of the corporation and other persons serving at the request of the corporation against expenses, judgments, fines and amounts paid in settlement in connection with an action, suit or proceeding by reason of such person's service to the corporation. In order to be indemnified, the person must have acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interest of the corporation. With respect to any criminal action or proceeding, the person must have no reasonable cause to believe that his or her conduct was unlawful. In any particular instance, upon determination that the applicable standard of conduct has been met, indemnification may be made by a corporation. Such determination must be made by a court, by a majority of disinterested directors, by independent counsel (in certain limited cases) or by the shareholders of the corporation.

The OGCL requires that a corporation indemnify a present or former director or officer of a corporation against certain expenses if the person has been successful, on the merits or otherwise, in

defense of any action, suit or proceeding or in defense of any issue therein. In addition, the OGCL permits the advancement of expenses relating to the defense of any proceeding to directors, officers, other employees and agents, if the person agrees to reasonably cooperate with the corporation concerning such proceeding and commits to repay the corporation for the advances made for such expenses in the event that such person is ultimately determined not to be entitled to indemnification therefor.

The OGCL provides that the indemnification provisions contained in the OGCL are not exclusive of any other right that a person seeking indemnification may have or later acquire under any provision of the corporation's articles or regulations, under any other agreement, by any vote of shareholders or disinterested directors or otherwise. In addition, the OGCL provides that a corporation may maintain insurance or similar protection, at its expense, to protect itself and any director, officer, employee or agent of the corporation against any expense, liability or loss arising in connection with their service to the corporation. This insurance may provide benefits regardless of whether the corporation has the power to indemnify a particular person under the OGCL.

Oglebay's existing amended and restated articles of incorporation provide for indemnification of its officers, directors, employees and agents to the fullest extent permitted by the OGCL.

### *Treatment of Indemnification Obligations Under the Plan*

Prior to the Effective Date, Oglebay shall make arrangements to continue directors and officers liability and fiduciary (including ERISA) insurance, or purchase a tail policy or policies, for the benefit of its directors, officers and employees for the period from and after the Effective Date, and, prior to the Effective Date, shall fully pay the annual premium for such insurance. Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and Section V.A of the Plan. Each insurance carrier under such policies shall continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

Under the Plan, the obligations of each Debtor or Reorganized Debtor to indemnify any person who is serving or has served as one of its directors, officers or employees by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## RIGHTS OFFERING

### Terms of the Rights Offering

It will be a condition of the Effective Date that new financing be raised. To meet this condition, Oglebay intends to issue the New Preferred Stock, with terms substantially as described below under "Securities to be Issued on the Effective Date and Other Post-Reorganization Indebtedness—New Preferred Stock." Oglebay presently intends that the shares of New Preferred Stock will be offered and sold pursuant to (a) the Rights Offering, (b) standby commitments made by certain of the holders of Old Senior Subordinated Notes and third party accredited investors who have agreed to purchase shares not

subscribed for in the Rights Offering, and (c) commitments made by certain of these same holders and third party accredited investors to purchase in the aggregate 500,000 additional shares of New Preferred Stock. Pursuant to the Rights Offering, it is anticipated that non-certificated subscription rights will be issued to holders of Old Senior Subordinated Note Claims identified as Allowed Old Senior Subordinated Note Claims under the Plan ("Eligible Participants") through the Rights Offering beginning as of the subscription commencement date. The subscription rights will allow a holder to subscribe for and purchase its ratable share (based upon the ratio of the aggregate principal amount of such Eligible Participant's Allowed Old Senior Subordinated Noted Claims to the aggregate principal amount of all such Allowed Claims) of the New Preferred Stock, calculated as follows: for each $1,000 in principal amount of Allowed Old Senior Subordinated Note Claims held by an Eligible Participant, the Eligible Participant will have the right to subscribe for and purchase 80 shares of New Preferred Stock at a total purchase price of $800 (a price of $10 per share). The aggregate number of shares of New Preferred Stock, which may be subscribed for and purchased pursuant to the subscription rights, will be 8,000,000 shares of New Preferred Stock. In addition, certain holders of the Old Senior Subordinated Notes and certain third party accredited investors have agreed to purchase an aggregate of 500,000 additional shares of New Preferred Stock pursuant to the Commitment Agreement.

A registration statement covering the Rights Offering and the 500,000 additional shares of New Preferred Stock was filed with the SEC on May 14, 2004. If the Rights Offering cannot be consummated in the form and manner currently contemplated, Oglebay intends to raise new financing pursuant to an alternative financing structure also involving the issuance of the shares of New Preferred Stock. **THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OF THE NEW PREFERRED STOCK.**

**The Commitment Agreement**

Pursuant to the Commitment Agreement, each of the holders of the Old Senior Subordinated Notes party thereto (who hold an aggregate of $40,316,000 principal amount of such notes) agreed severally to subscribe for and purchase that number of shares of New Preferred Stock having an aggregate purchase price equal to such holder's pro rata share of the total number of shares of New Preferred Stock issuable pursuant to the Rights Offering based on such holder's respective beneficial ownership of the total amount of outstanding Old Senior Subordinated Notes (the "Basic Commitment Amount"). In addition, certain of such holders of Old Senior Subordinated Notes and certain third party accredited investors severally agreed to purchase specified amounts of shares of New Preferred Stock that are not subscribed for in the Rights Offering (the "Unsubscribed New Preferred Stock") plus the 500,000 additional shares having an aggregate purchase price determined as follows: (a) in the case of each such holder of Old Senior Subordinated Notes, the difference between such holder's commitment amount as set forth in the Commitment Agreement (the "Commitment Amount") and such holder's Basic Commitment Amount, and (b) in the case of such third party accredited investor, the investor's commitment amount set forth in the Commitment Agreement (in each case, the "Standby Commitment Amount"). If the aggregate purchase price of the Unsubscribed New Preferred Stock is less than the Standby Commitment Amounts, the Unsubscribed New Preferred Stock will be allocated to such holders of Old Senior Subordinated Notes and such third party accredited investors pro rata based on the amounts of their respective Standby Commitment Amounts.

In consideration for the commitments, each Subscriber that is (a) a holder of the Old Senior Subordinated Notes will be entitled to receive a fee, payable in cash on the Effective Date, equal to: 2% of its Basic Commitment Amount and 5% of its Standby Commitment Amount, or (b) a third party accredited investor will be entitled to receive a fee, payable in cash on the Effective Date, equal to 5% of its Standby Commitment Amount.

Without the prior written consent of the Subscribers representing two-thirds of the amount of the aggregate commitments under the Commitment Agreement (the "Requisite Subscribers"), Oglebay

cannot solicit or initiate any inquiries or proposals regarding, or participate in discussions concerning, any plan, proposal, or offer of reorganization, restructuring or alternative financing (an "Alternative Proposal") other than the Plan or the restructuring terms contemplated in the Commitment Agreement. Failure to comply with this non-solicitation provision will not be a breach under the Commitment Agreement if the fiduciary duties of its officers and directors require Oglebay to take any action in connection with an Alternative Proposal

Upon receipt of any Alternative Proposal, Oglebay is required to notify the Subscribers of (a) the identity of the person making or intending to make the Alternative Proposal, (b) the terms of the Alternative Proposal or the modification or amendment of such Alternative Proposal, (c) whether Oglebay is providing or intends to provide access to any non-public information, and (d) whether Oglebay has entered in negotiations concerning the Alternative Proposal

Unless required by court order, Oglebay will not enter into a definitive agreement with respect to an Alternative Proposal without the prior written consent of the Requisite Subscribers or unless the agreement has been terminated.

The obligation of each Subscriber to perform its obligations under the Commitment Agreement is subject to certain conditions These conditions can be waived only by the Requisite Subscribers and include, among other things:

(a)     the Plan, containing terms and conditions consistent in all material respects with the restructuring terms contemplated in the Commitment Agreement and otherwise containing terms and conditions reasonably satisfactory to the Subscribers, will have been confirmed by the Bankruptcy Court;

(b)     the Confirmation Order will be reasonably acceptable to the Subscribers, will have been entered by the Bankruptcy Court, and will be a Final Order;

(c)     the Plan will be consummated on terms consistent in all material respects with the restructuring terms contemplated by the Commitment Agreement, the Disclosure Statement, Plan supplement documents, and the definitive documents implementing, achieving and relating to the restructuring terms will be reasonably satisfactory to the Subscribers, and any modifications to the Plan or the restructuring terms contemplated by the Commitment Agreement on or after the date of the Commitment Agreement will be reasonably acceptable to the Subscribers;

(d)     100% of the New Preferred Stock is issued and sold pursuant to the Rights Offering and the Commitment Agreement;

(e)     the Registration Statement will have become effective and the issuance of the New Preferred Stock issuable pursuant to the Rights Offering and the Commitment Agreement and the shares of New Common Stock issuable upon conversion will have been registered under the Securities Act; and

(f)     the issuance of shares of New Common Stock to the holders of Allowed Senior Subordinated Note Claims in respect of the cancellation thereof in accordance with the Plan will be exempt from the registration requirements of the Securities Act, by virtue of Section 1145 of the Bankruptcy Code.

The obligation of Oglebay to perform its obligations under the Commitment Agreement is subject to certain conditions including, among other things:

(a)     the Plan, in a form consistent in all material respects with the restructuring terms contemplated by the Commitment Agreement, will have been confirmed by the Bankruptcy Court and

(b)     the Confirmation Order will have been entered by the Bankruptcy Court and will be a Final Order

The Commitment Agreement can be terminated by the Requisite Subscribers and Oglebay under certain circumstances. The termination events that are currently in effect for such Subscribers are (a) Oglebay materially breaches the Commitment Agreement; (b) satisfaction of the conditions precedent to be complied with by Oglebay under the Commitment Agreement does not occur; (c) a default or an event of default occurs under the definitive documents to implement the restructuring terms contemplated by the commitment letter with Silver Point, the Second DIP Facility, the Confirmation Facility or the commitment letter with Silver Point, or the Second DIP Facility is otherwise terminated; (d) Oglebay or its affiliates or their respective officers, directors, employees, representatives or agents seek, solicit, encourage or initiate (including, except under limited circumstances, by way of furnishing information) any inquiries or proposals regarding, or participate in negotiations or discussions concerning, any Alternative Proposal; (e) Oglebay enters into a definitive agreement with respect to any Alternative Proposal without the prior written consent, in their sole discretion, of the Requisite Subscribers; (f) Oglebay seeks the assumption of the MLO Contract either through the Plan or by assumption motion without the prior written consent of the Requisite Subscribers; and (g) the restructuring transactions necessary or appropriate to restructure Oglebay's businesses or simplify Oglebay's corporate structure are not completed by October 15, 2004.

If one of the termination events described above is not cured or waived by written agreement of the Requisite Subscribers and written notice of termination is provided, the Commitment Agreement will terminate and except for limited rights set forth in the Commitment Agreement, no party to the Commitment Agreement will have any continuing liability or obligation to any other party under the Commitment Agreement. However, Oglebay and the Subscribers will have the rights and remedies available under applicable law and the termination of the Commitment Agreement as described above will not relieve the Subscribers or Oglebay from liability for breach or non-performance of the Subscribers' or Oglebay's obligations under the Commitment Agreement prior to the date of termination. If (a) the Subscribers terminate the Commitment Agreement because Oglebay has entered into an Alternative Proposal without the required written consent of the Subscribers or (b) Oglebay terminates the Commitment Agreement for any reason other than a material breach by the Subscribers and prior to termination an Alternative Proposal has been pending or made which proposal is entered into or consummated prior to the Effective Date, then the Subscribers will be entitled to receive the commitment fees discussed above on the effectiveness of any plan or reorganization.

Oglebay can terminate the Commitment Agreement: (a) if the Subscribers materially breach the Commitment Agreement or (b) prior to entering into an agreement regarding any Alternative Proposal, provided that (i) the Board of Directors of Oglebay has determined in good faith (based on advice of its financial advisor or counsel) that the failure to take such action would be inconsistent with its fiduciary obligations set forth in the Commitment Agreement or under the Bankruptcy Code, (ii) Oglebay has given the Subscribers two business days' advance oral and written notice of its intention to enter into such an agreement, and (iii) the Subscribers will be entitled to receive the fees set forth in the Commitment Agreement described above.

Oglebay and the Subscribers anticipate that they will enter into a further amendment to the Commitment Agreement (a) to amend the terms of the treatment or possible treatment of the MLO Claims, the Senior Secured Note Claims and the Senior Subordinated Note Claims contained in the Commitment Agreement to accurately reflect the treatment of such classes under the Plan, (b) to change the date on which the non-completion of the restructuring transactions contemplated in the Commitment

Agreement will became a termination event from October 15, 2004 to November 15, 2004, and (c) to change the date prior to which the Registration Statement will be declared effective from September 23, 2004 to October 15, 2004, among other things.

## SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE AND OTHER POST-REORGANIZATION INDEBTEDNESS

### Valuation

#### *Overview*

The Debtors have been advised by Lazard, its financial advisor, with respect to the consolidated Enterprise Value of the Reorganized Debtors on a going-concern basis. Lazard has undertaken this valuation analysis for the purpose of determining value available for distribution to holders of Allowed Claims and Allowed Interests pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution (the "Distributable Value") to holders of Allowed Claims and Allowed Interests is comprised of two primary components (a) an estimated value of the reorganized Debtors' operations on a going concern basis (the "Enterprise Value"), and (b) the value of certain expected net operating loss carry forwards ("NOLs").

Based in part on information provided by the Debtors, Lazard has concluded solely for purposes of the Plan that the Distributable Value of the Reorganized Debtors ranges from $370 and $410 million, with a midpoint of $385 million as of an assumed Effective Date of October 31, 2004. Based on an average debt balance of approximately $275 million, Lazard's mid-point estimated Enterprise Value implies a value for the New Common Stock of $25 million. Assuming approximately 2.9 million shares of New Common Stock are distributed pursuant to the Plan, common equity value is equal to $8.54 per share. These values do not give effect to the potentially dilutive impact of any shares issued (a) upon exercise of the New Warrants, (b) upon conversion of the New Preferred Stock and (c) under the Management Stock Plan. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF OCTOBER 31, 2004, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD IN EARLY JULY 2004. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

With respect to the Projections prepared by the management of the Debtors and included in this Disclosure Statement, Lazard assumed that such Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including gross profit growth and improvements in operating margins, earnings and cash flow. The Reorganized Debtors' projected financial performance is better than the recent financial performance of the Debtors. As a result, if the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value and equity value of the Reorganized Debtors, Lazard (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections as described in this Disclosure Statement, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects;

(c) met with certain members of senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market value of public companies that Lazard deemed generally comparable to the operating business of the Debtors; (e) considered precedent transactions in the Aggregate, Concrete & Cement and Industrial Metals & Minerals industries; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analysis, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Lazard did not independently verify management's Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims and Allowed Interests thereunder.

Lazard's analysis addresses the estimated going concern Enterprise Value of the Debtors and the value of certain expected NOLs. It does not address other aspects of the proposed reorganization, the Plan or any other transactions and does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Lazard's estimated Enterprise Value of the Debtors does not constitute a recommendation to any holder of Allowed Claims or Allowed Interests as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to, nor did Lazard, express any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Such estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of securities.

*Valuation Methodology.* The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtors on which such analyses were based. Lazard's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value.

Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values assuming the Reorganized Debtors are a full taxpayer. Lazard separately valued the Debtors' NOLs as of the assumed Effective Date and added this value to the Enterprise Value range to arrive at a

Distributable Value range. While the Debtors are currently marketing the Mica Business, this analysis incorporates projected financial results for this Business for purposes of calculating Enterprise Value given the current status of the sale process.

*Comparable Company Analysis.* Comparable Company analysis estimates the value of a company based on the implied valuations of other similar companies that are publicly traded. Under this methodology, the Enterprise Values for selected public companies are typically expressed as multiples of various income statement items. The primary valuation metric applied in this analysis includes Enterprise Value to earnings before interest, taxes, depreciation and amortization ("EBITDA"). The analysis also includes a multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, operating margins, leverage and business trends are examined. Based on these analyses, financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects. maturity of businesses, location, market presence and size and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Debtors by way of one or more of the factors described above: Eagle Materials, Florida Rock Industries, Lafarge, Martin Marietta Materials, Texas Industries, U.S. Concrete and Vulcan Materials.

Lazard calculated Enterprise Value to EBITDA multiples by dividing the Enterprise Value of each comparable company by its last twelve months ended ("LTM") March 2004 and estimated 2004 EBITDA as provided in current market research. Lazard concluded that it was appropriate to apply a discount to the various Peer Group valuation multiples when valuing the Reorganized Debtors to reflect (a) the Debtors' smaller comparative size, (b) sensitivity to revenue variances, (c) the capital intensive nature of this business (resulting in a disadvantageous impact on valuation), and (d) sensitivity to the macro-economic business cycle. Lazard selected Enterprise Value to LTM March 2004 EBITDA multiples ranging from 7.5x to 8.1x with a mid-point of 7.8x and estimated 2004 EBITDA multiples ranging from 6.2x to 6.9x with a mid-point of 6.5x.

These multiples were then applied to the Debtors' normalized LTM March 2004 and estimated 2004 EBITDA to determine a range of Enterprise Values. To calculate normalized EBITDA, Lazard adjusted the Debtors' LTM March 2004 and forecasted 2004 results to exclude nonrecurring restructuring fees, miscellaneous income and expense, the contribution of the Lawn & Garden Business Unit which was sold in October of 2003 and to incorporate the proposed accounting treatment for stripping costs which is expected to be implemented post-bankruptcy.

*Precedent Transactions Analysis.* Precedent Transactions analysis estimates the Enterprise Value of a company based on the implied valuations of merger and acquisition ("M&A") transactions in the target company's industry. Valuation multiples for these transactions are calculated based on the purchase price (including any debt assumed where appropriate) paid for the acquired company as a multiple of EBITDA.

Lazard reviewed selected historical and recently completed or announced transactions between 1998 and 2004 that involved companies in lines of business Lazard believed to be comparable in certain

respects to the Debtors' line of business. Lazard sampled 33 separate transactions from a pool of 131 publicly announced M&A transactions within the Aggregate Concrete & Cement and Industrial Metals and Minerals industries. Acquisitions relating to subsidiaries, acquisitions of private companies and acquisitions of foreign companies were included, although acquisitions less than $50 million in value were excluded. Similar to the approach taken in the Comparable Company analysis, Lazard applied a discount to the observed precedent transaction valuation multiples in consideration of (a) the Debtors' smaller comparative size, (b) sensitivity to revenue variances, (c) the capital intensive nature of this business and (d) sensitivity to the macro-economic business cycle.

Based on this approach, Lazard derived an Enterprise Value to LTM March 2004 EBITDA multiple range of 7.1x to 7.8x, with a mid-point of 7.4x. These multiples were then applied to the Debtors' normalized LTM March 2004 EBITDA to determine a range of Enterprise Values. Similar to the Comparable Company approach, Lazard calculated normalized EBITDA by adjusting the Debtors' financial results to exclude nonrecurring restructuring fees, miscellaneous income and expense, the contribution of the Lawn & Garden Business Unit and to incorporate the proposed accounting treatment for stripping costs which is expected to be implemented post-bankruptcy.

*Discounted Cash Flow Analysis.* The Discounted Cash Flow ("DCF") analysis values a business by determining the current value of estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm is determined by calculating the present value of the Reorganized Debtors' un-levered after-tax free cash flows provided in its business plan (the Projections) plus a proxy for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term capital structure of approximately 20% debt and 80% equity, consistent with the average capital allocation observed among the Peer Group. The cost of equity was estimated based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard considered the debt financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. With respect to the Reorganized Debtors, Lazard considered (a) the Debtors' smaller comparative size, (b) sensitivity to revenue variances, (c) the capital intensive nature of this business (resulting in a disadvantageous impact on valuation), and (d) sensitivity to the macro-economic business cycle. Based on these considerations, Lazard's DCF valuation was based upon a range of Discount Rates between 12.5% and 14.5%, with a mid-point of 13.5% and an EBITDA multiple range used to derive a terminal value of 6.5x to 7.0x, with a mid-point of 6.75x.

In applying the above methodology, Lazard utilized management's detailed financial Projections for the three months ended December 31, 2004 through December 31, 2008 to derive un-levered after-tax cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers and the value of their NOLs is calculated separately. These cash flows, along with the terminal value, are discounted back to September 30, 2004 using the range of Discount Rates described above to arrive at a range of Enterprise Values.

*Net Operating Losses.* The Reorganized Debtors are expected to have substantial NOLs after they emerge from bankruptcy. Lazard valued the NOLs by calculating the present value of the tax savings provided relative to the taxes the Reorganized Debtors would otherwise pay absent application of such NOLs This analysis assumed that the limitation on such NOL utilization would be approximately $6 million annually and the cash flows from this benefit should be discounted at the Debtors' cost of equity Based on this approach, Lazard arrived at a valuation of the Reorganized Debtors' NOLs of approximately $6 million.

The summary set forth above does not purport to be a complete description of the analyses performed by Lazard The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description. In performing these analyses, Lazard and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions and other matters The analyses performed by Lazard are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses

## New Common Stock

*General.* As of the Effective Date, Reorganized Oglebay will be authorized to issue the New Common Stock, of which: (a) approximately 2,928,571 shares will be distributed to holders of Allowed Claims in Class 7 (see "Overview of the Plan—Summary of Classes and Treatment of Claims and Interests" and "Treatment of Certain Claims Under the Plan—Treatment of Old Senior Secured Note Claims" for a discussion of the possible alternative treatment of Class 7 under the Plan); (b) 17,233,091 shares will be initially reserved for issuance upon conversion of the New Preferred Stock (which number consists of (i) 8,500,000 shares initially reserved for issuance upon conversion of the 8,500,000 shares of New Preferred Stock to be issued on the Effective Date plus (ii) additional shares reserved for issuance as a result of the accretion of dividends thereon through the fifth anniversary of the Effective Date); (c) a number of shares of New Common Stock equal to one-tenth (1/10th) of the number of shares of Old Common Stock held by holders of Allowed Interests in Class 10 on the Distribution Record Date (which number is currently expected to be an aggregate of approximately 523,869 shares of New Common Stock) will be reserved for issuance upon the exercise of New Warrants; and (d) approximately 1,325,397 shares will be reserved for issuance under the Management Stock Plan.

The approximately 2,928,571 shares of New Common Stock and the 8,500,000 shares of New Preferred Stock to be issued and outstanding on the Effective Date will represent approximately 25.6% and 74.4%, respectively, of the total voting power and equity interests in Reorganized Oglebay (before giving effect to the issuance of the shares of New Common Stock reserved for issuance as described above).

In addition to the New Common Stock to be issued pursuant to the Plan, Reorganized Oglebay also will be authorized to issue additional shares of New Common Stock from time to time following the Effective Date under the provisions of the Amended and Restated Articles, the Amended and Restated Code of Regulations and applicable law. The holders of New Common Stock will be entitled to one vote per each share held of record on all matters submitted to a vote of shareholders, except for the election of directors or as otherwise limited by the terms of the New Preferred Stock or any preferred stock issued after the Effective Date

Subject to the terms of the New Preferred Stock or any preferred stock issued after the Effective Date, holders of the New Common Stock will be entitled to receive ratably such dividends as may be declared by Reorganized Oglebay's Board of Directors out of funds legally available for payment of dividends. Reorganized Oglebay will be required, subject to restrictions described herein, to pay dividends on the New Preferred Stock, but does not anticipate paying dividends on the New Common

Stock. See "Risk Factors–Risks Related to the Securities–Dividend Policies; Restrictions on Payment of Dividends and Other Payments." In the event of a liquidation, dissolution or winding up of Reorganized Oglebay, holders of the New Common Stock will be entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preference of any additional issuances of preferred stock, including the New Preferred Stock. All of the outstanding shares of the New Common Stock to be issued pursuant to the Plan, upon such issuance, will be validly issued, fully paid and nonassessable. Holders of the New Common Stock will have no preemptive, subscription, redemption or conversions rights. Subject to the terms and conditions set forth in the Share Purchase Rights Agreement, if adopted, each share of New Common Stock issued pursuant to the Plan will be accompanied by a Share Purchase Right.

*Transfer Agent.* The transfer agent for the New Common Stock will be National City Bank.

*Listing.* Reorganized Oglebay intends to apply to list the New Common Stock on The Nasdaq National Market as soon as practicable after the Effective Date when Reorganized Oglebay meets the listing requirements. It is unlikely, however, that the New Common Stock will qualify for listing at the time it is issued, and there can be no assurance that the New Common Stock will ever be listed on the NASDAQ National Market. If Reorganized Oglebay is not able to list such securities on the Nasdaq National Market, it intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Common Stock on the OTC Bulletin Board. Again, however, no assurance can be made that such securities will be quoted on the OTC Bulletin Board or that an active trading market will exist.

## New Warrants

Set forth below is a brief summary of the material provisions relating to the New Warrants. This summary is not intended to be complete and is qualified in its entirety by the provisions of the New Warrant Agreement and the New Warrant Certificate setting forth the terms and conditions of the New Warrants.

*General.* Under the absolute priority rule of the Bankruptcy Code, holders of Allowed Interests in Class 10 are not entitled to any distributions on account of such Interests. Nevertheless, as a result of the negotiations relating to the Commitment Agreement and the Plan, holders of Claims in Class 7, as a Class, have agreed to the treatment proposed by the Debtors for Class 10 under the Plan. Accordingly, on the Effective Date, holders of Allowed Interests in Class 10 will receive the New Warrants on account of such Allowed Interests. Each New Warrant will represent the right to purchase one-tenth ($1/10^{th}$) of a share of New Common Stock for every share of Old Common Stock of Oglebay held by holders of Allowed Interests in Class 10 on the Distribution Record Date, at an exercise price of $10 per share. Based on the number of shares of Old Common Stock currently outstanding, the Debtors anticipate that the New Warrants will be exercisable for an aggregate of approximately 523,869 shares of New Common Stock. If the Share Purchase Rights Agreement is adopted, shares of New Common Stock issued upon exercise of the New Warrants will also be accompanied by Share Purchase Rights. Oglebay will enter into the New Warrant Agreement with the New Warrant Agent. The New Warrant Agreement will govern the terms relating to the issuance, form, registration, exercise, transfer and exchange of the New Warrants, as well as adjustment provisions, if any. The New Warrants may only be exercised by their holders, in whole or in part, at any time and from time to time prior to 5:00 p.m., Eastern time, on the date that is 30 days after the Effective Date. Each New Warrant that is not exercised before such time will become void, and all rights of the holder in respect of such New Warrant will cease as of such date.

The New Warrants will be issued in either global form or in definitive, certificated form representing individual warrants. The global warrant will represent such number of the outstanding New Warrants as specified in the global warrant and will provide that it will represent the aggregate amount of outstanding New Warrants from time to time endorsed on the global warrant and that the aggregate amount of outstanding New Warrants may from time to time be reduced or increased, as appropriate.

Any such endorsement will be made by the New Warrant Agent and DTC which will be acting as the depositary. Upon request, a holder of New Warrants may receive from the depositary and the New Warrant Agent separate definitive warrants.

*Delivery.* On the Effective Date, Reorganized Oglebay will deliver, by first class mail, to the holders of the New Warrants either a certificate representing the New Warrants, or notice of such holder's position in a global New Warrant representing the New Warrants in the case where such holders' Old Common Stock is held in the name of a broker, bank, depositary or other nominee, which notice will indicate the material terms and conditions and exercise instructions of the New Warrant and a form of election to purchase.

*Undeliverable New Warrants.* If any distribution of a certificate representing the New Warrants or notice of New Warrants is returned to the New Warrant Agent as undeliverable, no further distributions will be made to the holder unless and until the New Warrant Agent and Reorganized Oglebay are notified in writing of such holder's then-current address. Generally, such undeliverable distributions will remain in the New Warrant Agent's possession until they become deliverable. The right to exercise any New Warrant will terminate at 5:00 p.m., Eastern time, on the date that is 30 days after the Effective Date, regardless of whether the certificate representing, or notice of, the New Warrant has been delivered.

*Exercise.* The New Warrants will be exercisable by surrendering the following to the New Warrant Agent: (a) the New Warrant certificate, if any; (b) the form of election to purchase, properly completed and signed, which signature must be guaranteed by an Eligible Guarantor Institution pursuant to SEC rule 17Ad-15; and (c) payment to the New Warrant Agent, by certified check, official bank check or wire transfer, for Reorganized Oglebay's account, of the aggregate New Warrant exercise price for the number of shares of New Common Stock in respect of which such New Warrants are then exercised.

Upon exercise of any New Warrants in accordance with the New Warrant Agreement, the New Warrant Agent will deliver or cause to be delivered, in such name as the holder of such New Warrants may designate in writing, a certificate or certificates for the number of whole shares of New Common Stock issuable upon exercise of the New Warrants delivered by such holder for exercise.

If a holder has a New Warrant certificate and it exercises fewer than all of its New Warrants evidenced by such New Warrant certificate, a New Warrant certificate will be issued for the remaining number of New Warrants.

*Transfer or Exchange of New Warrants.* When definitive, certificated New Warrants are presented to the Warrant Agent with a request to register the transfer of the definitive New Warrant or to exchange such definitive New Warrant for an equal number of definitive New Warrants of other authorized denominations, the New Warrant Agent will register the transfer or make the exchange as requested if its requirements for such transactions are met; *provided, however,* the definitive New Warrants presented or surrendered for registration of transfer or exchange (a) are duly endorsed or accompanied by a written instruction of transfer form satisfactory to the New Warrant Agent, duly executed by the holder and (b) in the case of any New Warrant held by an affiliate of Reorganized Oglebay, such request shall be accompanied by evidence, including an opinion of counsel if requested, reasonably satisfactory to Reorganized Oglebay that either: (i) the New Warrant is being delivered to the Warrant Agent by a holder for registration in the name of such holder, without transfer; or (ii) the New Warrant is being transferred in reliance on an exemption from the registration requirements of the Securities Act.

**Exchange of a Beneficial Interest in a Global New Warrant for a Definitive New Warrant.** The transfer and exchange of global New Warrants or beneficial positions in such warrants will be effected in accordance with the New Warrant Agreement and the procedures of DTC, as follows:

- Any person having a beneficial position in a global New Warrant may, upon written request to the New Warrant Agent, exchange such beneficial position for a definitive, certificated New Warrant. Upon receipt by the New Warrant Agent of written instructions or such other form of customary instructions from DTC or its nominee on behalf of any person having a beneficial position in a global New Warrant, the New Warrant Agent will cause the number of New Warrants represented by the global New Warrant to be reduced and, following such reduction, Reorganized Oglebay will execute, and the New Warrant Agent will countersign, a definitive New Warrant.

- Definitive New Warrants issued in exchange for a beneficial position in a global New Warrant will be registered in such names as DTC will instruct the New Warrant Agent.

**Exchange of a Definitive New Warrant for a Beneficial Interest in a Global New Warrant.** Upon receipt by the New Warrant Agent of a definitive New Warrant that is not a restricted New Warrant duly endorsed or accompanied by appropriate instruments of transfer, in form satisfactory to the New Warrant Agent, together with written instructions directing the New Warrant Agent to make or to direct DTC to make an endorsement on the global New Warrant to reflect an increase in the number of New Warrants represented by the global New Warrant, the New Warrant Agent will cancel such definitive New Warrant and cause or direct DTC to cause in accordance with the standing instructions and procedures existing between DTC and the New Warrant Agent, the number of New Warrants represented by the global New Warrant to be increased accordingly. If no global New Warrants are then outstanding, Reorganized Oglebay will issue, and the New Warrant Agent will countersign, a new global New Warrant representing the appropriate number of New Warrants represented by the global New Warrant.

All requests for transfer and exchange of definitive or global New Warrants or the surrender and payment upon exercise of definitive warrants or global warrants, as the case may be, may be made as follows:

> National City Bank
> Corporate Trust Operations
> Department 5352
> P.O. Box 92301
> Cleveland, Ohio 44193-0900
> Telephone: (800) 622-6757
> Facsimile: (216) 257-8508

*Fractional Shares.* Reorganized Oglebay will not issue any fractional shares of New Common Stock upon the exercise of the New Warrants. If more than one New Warrant is presented for exercise at the same time by the same holder, the number of full shares of New Common Stock issuable upon the exercise of such New Warrants will be computed on the basis of the aggregate number of shares purchasable upon exercise of such New Warrants. If any fraction of a share of New Common Stock would otherwise be issuable upon the exercise of any New Warrants, Reorganized Oglebay will round to the nearest whole number of shares of New Common Stock to be issued (up or down), with half shares being rounded up.

*Taxes.* Reorganized Oglebay will not be required to pay any taxes that may be payable upon the issuance of new certificates evidencing the New Warrants or shares of New Common Stock in a name other than that of the registered holder. Reorganized Oglebay will not issue or deliver such New Warrant certificates evidencing the New Warrants or shares of New Common Stock unless and until the person requesting the issuance shall have paid Reorganized Oglebay such tax or established that such tax has been paid.

*Listing.* The New Warrants will not be listed on any securities exchange. However, Reorganized Oglebay intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Warrants on the OTC Bulletin Board. The ability to publicly trade the New Warrants on the OTC Bulletin Board is entirely dependent upon registered broker-dealers applying to the OTC Bulletin Board to initiate quotation of such securities. Reorganized Oglebay intends to notify market makers to request them to apply to the OTC Bulletin Board to initiate quotations in the New Warrants. Other than furnishing to registered broker-dealers copies of this Disclosure Statement, Reorganized Oglebay will have no control over the process of quotation initiation on the OTC Bulletin Board.

This summary of the New Warrants is qualified by reference to the terms set forth on Exhibit I.A.60 of the Plan.

**New Preferred Stock**

The Amended and Restated Articles will provide that, as of the Effective Date, Reorganized Oglebay will be authorized to issue 30,000,000 shares of preferred stock, of which 8,500,000 shares are designated as the New Preferred Stock.

Set forth below is a brief summary of the material provisions relating to the New Preferred Stock. This summary is not intended to be complete and is qualified in its entirety by the provisions of the Amended and Restated Articles setting forth the rights, preferences, privileges and restrictions of the New Preferred Stock, a copy of the form of which will be filed as an Exhibit to the Plan. See "Reorganized Oglebay—Amended and Restated Articles and Restated Code of Regulations of Reorganized Oglebay."

*Ranking.* The New Preferred Stock will, with respect to dividend rights and rights upon Reorganized Oglebay's liquidation, winding-up or dissolution, rank senior to the New Common Stock and, except as otherwise approved by the holders of a majority of the outstanding shares of New Preferred Stock or contemplated by the terms of the New Preferred Stock, the Junior Stock. The rights of the holders of New Preferred Stock, however, will be subordinate to the rights of the lenders under the Confirmation Facility, other holders of Reorganized Oglebay's indebtedness and other general creditors.

*Dividend Rights.* Holders of the New Preferred Stock will be entitled to receive, out of Reorganized Oglebay's assets legally available for payment, dividends on the then effective Liquidation Preference, payable quarterly, at an annual rate Oglebay anticipates to be equal to 14.25%, which is 200 basis points over the anticipated highest applicable interest rate, payable under the Confirmation Facility as of the Effective Date. Until the third anniversary of the Effective Date, dividends will be deemed paid by accreting and adding the amount of the per share dividend to the then effective Liquidation Preference of each share of New Preferred Stock. After that date, dividends will be payable in cash, unless Reorganized Oglebay is prohibited under statutory law, or by the terms of the Confirmation Facility, or any facility or security refinancing the Confirmation Facility, from paying cash dividends, in which case, the dividends will be deemed paid by accreting and adding the amount of the per share dividend to the then effective Liquidation Preference. Dividends on the New Preferred Stock will be cumulative.

In addition to the dividends provided above, holders of the New Preferred Stock will be entitled to receive an additional dividend in an amount equal to the amount by which (a) the aggregate amount of dividends that would have been received by holders of the New Preferred Stock in any dividend period if the holders' New Preferred Stock had been converted at the beginning of such dividend period into shares of New Common Stock at the Conversion Price exceeds (b) the aggregate New Preferred Stock dividend amount accrued or received in such dividend period described in the paragraph above. However, any dividend for which an adjustment in the Conversion Price of the New Preferred Stock is made pursuant to the applicable anti-dilution provisions will not be deemed a dividend or otherwise give rise to any rights under this paragraph. Any such additional dividend will be payable to the holders of New Preferred Stock in the form of cash.

Dividends on the applicable Liquidation Preference of a share of the New Preferred Stock will be payable quarterly, in arrears, on the last day of March, June, September and December of each year, starting December 31, 2004 (assuming an Effective Date of October 31, 2004). Dividends will be payable from the most recent dividend payment date or, in the case of the dividend payable on December 31, 2004 (assuming an Effective Date of October 31, 2004), from the New Preferred Stock issue date. Dividends payable on the New Preferred Stock for any period less than a full quarterly dividend period will be computed on the basis of a 360-day year consisting of twelve 30-day months. Dividends payable on the New Preferred Stock for each full dividend period will be computed by dividing the annual dividend rate by four.

Each declared dividend will be payable to holders of record as they appear on Reorganized Oglebay's stock records at the close of business on the 15th day prior to the relevant dividend payment date. Regular quarterly dividend periods will start on and include the last day of March, June, September and December, of each year and will end on and include the date before the next dividend payment date.

Reorganized Debtors' ability to pay cash dividends will be constrained by contractual limitations and may be constrained by statutory limitations in the future. See "Risk Factors–Risks Related to the Securities–Dividend Policies; Restrictions on Payment of Dividends and Other Payments."

*Conversion Rights.* A holder of the New Preferred Stock will have the right, at his or her option, to convert any or all of his or her shares of New Preferred Stock into the number of shares of New Common Stock obtained by dividing the aggregate then effective Liquidation Preference of the shares of New Preferred Stock being converted by the Conversion Price. The initial Conversion Price equals $10 and is subject to adjustment upon the occurrence of the events described below.

If a holder of shares of New Preferred Stock exercises conversion rights, those shares will cease to accumulate dividends as of the end of the day immediately preceding the date of conversion. Holders of shares of New Preferred Stock who convert their shares into the New Common Stock will not be entitled to, nor will the Conversion Rate be adjusted for, any accrued and unpaid dividends. Instead, accrued dividends, if any, will be cancelled. Accordingly, shares of New Preferred Stock converted after the close of business on any record date for the payment of dividends declared and before the opening of business on the dividend payment date relating to that record date must be accompanied by a payment in cash of an amount equal to the dividend payable in respect of those shares for the dividend period in which the shares are converted, whether paid in cash or by accretion of the Liquidation Preference. A holder of shares of New Preferred Stock on a dividend payment record date who converts such shares into the New Common Stock on the corresponding dividend payment date will be entitled to receive the dividend payable on such shares of New Preferred Stock on such dividend payment date, and the converting holder need not include payment of the amount of such dividend upon such conversion.

Notwithstanding the foregoing, if shares of New Preferred Stock are converted during the period between the close of business on any dividend payment record date and the opening of business on the corresponding dividend payment date, and Reorganized Oglebay has called such shares of New Preferred Stock for redemption during the period between the close of business on any dividend payment record date and the close of business on the corresponding dividend payment date, the holder who converts such shares will receive the dividend payable on such dividend payment date and need not include payment of the amount of such dividend upon such conversion.

The Conversion Price will be subject to adjustment if, after the New Preferred Stock issue date, any of the following events occur:

- the issuance of any capital stock as a dividend or distribution on the New Common Stock or any other Junior Stock;

- the combination, subdivision or reclassification or capital reorganization of the New Common Stock;

- the issuance to all holders of the New Common Stock of rights. options or warrants entitling them to subscribe for or purchase the New Common Stock or securities convertible into or exchangeable or exercisable for the New Common Stock at less than the then current Conversion Price or market price for the New Common Stock, subject to certain exceptions;

- the distribution to all holders of the New Common Stock of evidence of Reorganized Oglebay's indebtedness or other assets, including securities, but excluding the dividends, distributions, rights and warrants referred to above and any cash dividend or distribution on which holders of New Preferred Stock participate; or

- the issuance, sale or exchange of shares of New Common Stock, other than pursuant to any right or warrant to purchase the New Common Stock referred to above and other than pursuant to any dividend reinvestment plan or employee or director incentive or benefit plan or arrangement, including any employment, severance or consulting agreement, for consideration having a fair market value that is less than the current Conversion Price or market price for the New Common Stock

No adjustment of less than 1% of the Conversion Price will be required  Any adjustment not made due to this limitation must be carried forward, however, and taken into account in any subsequent adjustment determination. Except as stated above, the New Preferred Stock does not have rights protecting its holders against dilution resulting from the sale of additional shares of, the New Common Stock by Reorganized Oglebay.

In the event of a consolidation or merger or similar transaction in which the outstanding shares of New Common Stock are by operation of law exchanged for, or changed, reclassified or converted into, other stock or securities, or cash or other property, or any combination of stock, cash or property, the outstanding shares of New Preferred Stock will, after the transaction, be convertible on the same terms and conditions into the consideration receivable by a holder of the number of shares of New Common Stock into which shares of New Preferred Stock could have been converted immediately prior to the transaction.

If the New Preferred Stock is called for redemption, the conversion right will terminate at the close of business on the fifth business day prior to the date fixed for redemption, unless Reorganized Oglebay defaults in the payment of the redemption price.

Fractional shares of New Common Stock will not be issued upon conversion, but a cash adjustment will be paid in respect of the fractional interests. Reorganized Oglebay will at all times reserve a sufficient number of shares of New Common Stock to effect the conversion of all shares of New Preferred Stock then outstanding.

*Redemption*  Shares of New Preferred Stock will not be subject to redemption prior to the first anniversary of the Effective Date. On or after the first anniversary of the Effective Date, the shares of New Preferred Stock will be redeemable at Reorganized Oglebay's option, in whole or in part, at any time or from time to time, out of funds legally available for payment, at the following redemption prices (expressed as a percentage of the then effective Liquidation Preference per share), plus, without duplication, accrued and unpaid dividends, if any, up to, but excluding, the date fixed for redemption:

| Year | Redemption Prices (expressed as a percentage of the then effective Liquidation Preference) |
| --- | --- |
| On or after the first anniversary of the Effective Date until, but excluding, the second anniversary of the Effective Date | 110% |
| On or after the second anniversary of the Effective Date until, but excluding, the third anniversary of the Effective Date | 108% |
| On or after the third anniversary of the Effective Date until, but excluding, the fourth anniversary of the Effective Date | 106% |
| On or after the fourth anniversary of the Effective Date | 104% |

In each case, however, the New Common Stock must be trading at or above an average of 130% of the Conversion Price for 30 consecutive trading days at any time prior to the date that Reorganized Oglebay provides the redemption notice.

If fewer than all of the outstanding shares of New Preferred Stock are to be redeemed, Reorganized Oglebay will select those to be redeemed pro rata, or by lot, or in any other manner as Reorganized Oglebay's Board of Directors may determine.

On or after the date fixed for redemption, provided that the redemption price has been paid or provided for, dividends will no longer be declared on the New Preferred Stock called for redemption. The shares will no longer be deemed to be outstanding, and the holders of these shares will have no rights as shareholders, except the right to receive the amount payable on redemption, without interest.

If Reorganized Oglebay redeems any shares of New Preferred Stock, notice of redemption will be given by first-class mail, postage prepaid, mailed not less than 30 days nor more than 60 days before the redemption date, to the holders of record of the shares of New Preferred Stock to be redeemed as their addresses appear on Reorganized Oglebay's stock register.

*Change of Control Repurchase*. The Debtors are currently negotiating with the Creditors' Committee the possible adoption of a change of control repurchase provision that would provide each holder of New Preferred Stock the right, upon the occurrence of a "change of control" (to be defined) and subject to certain conditions and limitations, to require Reorganized Oglebay to repurchase any or all of such holder's shares of the New Preferred Stock. The terms of any change of control repurchase provision will be disclosed in Exhibit IV.C.1.a of the Plan.

*Voting Rights.* Each holder of the New Preferred Stock will be entitled to the number of votes equal to the number of shares of New Common Stock into which shares of New Preferred Stock so held could be converted at the record date for determination of the shareholders entitled to vote, or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited. Except as required by law or as otherwise set forth below, all shares of New Preferred Stock and all shares of New Common Stock will vote together as a single class on all matters to come before the shareholders of Reorganized Oglebay. Fractional votes by the holders of New Preferred Stock will not be permitted, and any fractional voting rights (after aggregating all shares into which shares of New Preferred Stock held by each holder could be converted) will be disregarded.

For as long as shares of New Preferred Stock are outstanding, the affirmative vote of the holders of a majority of the outstanding shares of the New Preferred Stock shall be necessary for Reorganized Oglebay to:

- authorize or adopt an amendment to, or repeal any provision of, Reorganized Oglebay's Amended and Restated Articles (including by way of merger, consolidation or otherwise); provided that no modification or amendment may, without the consent of each holder of New Preferred Stock affected by this modification or amendment, decrease the Liquidation Preference or dividend rate of the New Preferred Stock;

- authorize, create, amend or issue, or increase the authorized amount of, Parity Stock or Senior Stock, or authorize or issue any derivative securities evidencing the right to acquire these shares of Senior Stock or Parity Stock; *provided, however*, that the affirmative vote of the holders of a majority of the outstanding shares of the New Preferred Stock will not be necessary for Reorganized Oglebay to authorize, create, amend or issue, or increase the authorized amount of, Parity Stock or Senior Stock if either (a) all of the proceeds of such issuance will be used to redeem the New Preferred Stock, in whole or in part, or (b) a portion of the proceeds will be used to redeem all of the New Preferred Stock;

- increase the authorized amount of, or issue any additional shares of, New Preferred Stock;

- directly or indirectly recapitalize or reclassify any shares of Reorganized Oglebay capital stock into New Preferred Stock, Senior Stock or Parity Stock;

- pay or declare any dividend on any shares of Junior Stock (other than a dividend payable solely in shares of Junior Stock paid to holders of Junior Stock);

- take any action that results in the purchase or redemption by Reorganized Oglebay of any Parity Stock or Junior Stock;

- create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to any indebtedness other than (a) the maximum borrowing capacity provided for under the Confirmation Facility or Refinancing Indebtedness, (b) any "permitted indebtedness," as such term is defined under the Confirmation Facility or any Refinancing Indebtedness and (c) any other indebtedness in an aggregate principal amount outstanding at any time not exceeding $30 million, provided, that the amount referred to in clause (c) will be increased to the extent that the borrowing capacity under the Confirmation Facility is permanently reduced; provided however, that this entire provision will cease to be effective as of the third anniversary of the Effective Date; and

- effect a liquidation or other winding-up of Reorganized Oglebay.

Each holder of New Preferred Stock will be deemed to have voted or, in the case where the affirmative vote of the holders of New Preferred Stock is required by any law, statute or regulation applicable to Reorganized Oglebay, will vote all of the shares of New Preferred Stock held by such holder to approve:

- any authorization, creation, amendment or issuance of Parity Stock or Senior Stock requiring the approval of the holders of shares of New Preferred Stock if either (a) all of the proceeds of such issuance will be used to redeem the New Preferred Stock, in whole or in part, or (b) the proceeds will be used to redeem all of the New Preferred Stock; and

- any authorization, creation, amendment or issuance of Junior Stock requiring the approval of holders of shares of New Preferred Stock

Following the issuance of the New Preferred Stock, the Board of Directors of Reorganized Oglebay will consist of seven members, elected as follows:

- the holders of the New Preferred Stock will be entitled, voting as a separate class, to elect the "New Preferred Stock director number" at each annual election of the directors, which will be a maximum of four. In case of any removal, either with or without cause, of a director elected by the holders of the New Preferred Stock, the holders of the New Preferred Stock will be entitled, voting as a separate class either by written consent or at a special meeting, to elect a successor to hold office for the unexpired term of the director who has been removed. In case of any vacancy (other than removal) in the office of a director elected by the holders of the New Preferred Stock, the vacancy will be filled by the remaining directors elected to the board of directors by the holders of the New Preferred Stock; and

- the remaining directors will be elected by holders of New Common Stock voting separately as a single class. In case of any removal, either with or without cause, of a director elected by the holders of the New Common Stock, the holders of the New Common Stock will be entitled, voting as a separate class either by written consent or at a special meeting, to elect a successor to hold office for the unexpired term of the director who has been removed. In case of any vacancy (other than removal) in the office of a director elected by the holders of the New Common Stock, the vacancy will be filled by the remaining directors elected to the board of directors by the holders of the New Common Stock.

For purposes of this description, the "New Preferred Stock director number" means, at any given time, for so long as (a) at least 75% of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of four directors, (b) less than 75%, but more than 50%, of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of three directors, (c) the percentage of the shares of New Preferred Stock outstanding as of the Effective Date that remain outstanding is equal to or between 25% and 50%, a maximum of two directors, and (d) less than 25% of the shares of New Preferred Stock outstanding as of the Effective Date remain outstanding, a maximum of one director.

*Liquidation Preference.* In the event of Reorganized Oglebay's liquidation, dissolution or winding up after payment or provision for payment of Reorganized Oglebay's debts and other liabilities, holders of outstanding shares of New Preferred Stock will be entitled to receive out of Reorganized Oglebay's assets available for distribution to shareholders (and before any distribution of assets is made to the holders of the New Common Stock or any Junior Stock as to distributions) the Liquidation Preference, plus the amount of any accrued and unpaid dividends, to the date fixed for liquidation, dissolution or winding up.

Upon any liquidation, dissolution or winding up of Reorganized Oglebay, the holders of shares of New Preferred Stock will be entitled to receive the greater of (a) the Liquidation Preference, plus the amount of any accrued and unpaid dividends, to the date fixed for liquidation, dissolution or winding up and (b) the amounts that such holders would have received if all of the then outstanding shares of New Preferred Stock had been converted into New Common Stock immediately prior to such liquidation, dissolution or winding up.

All distributions made with respect to the New Preferred Stock in connection with any liquidation, dissolution or winding up will be made *pro rata* to the holders of the New Preferred Stock.

A consolidation, merger, sale or transfer (for cash, shares of stock, other securities or other consideration) of all or substantially all of Reorganized Oglebay's assets will not be considered a liquidation, dissolution or winding up for this purpose. If, however, the aggregate amount of cash receivable in exchange for or upon conversion of the New Preferred Stock in connection with a cash merger or other cash transaction would be less than the liquidation value of the New Preferred Stock, then the cash merger or transaction will be considered a liquidation, dissolution or winding up and will be subject to the rights described above.

*Preemptive Rights.* No holder of any shares of New Preferred Stock will have any preemptive right to subscribe for stock, obligations, warrants or other securities of any class, whether now or authorized in the future.

*No Other Rights.* Shares of New Preferred Stock do not have any preferences, voting powers or relative, participating, option or other special rights, except as set forth in the Amended and Restated Articles (some of which are described above) or as otherwise required by law.

*Book-Entry, Delivery and Form.* DTC will act as securities depositary for the New Preferred Stock. Initially, the New Preferred Stock will be represented only by one or more fully registered global security certificates registered in the name of Cede & Co., the nominee of DTC, and deposited with DTC.

*Transfer Agent.* The transfer agent for the New Preferred Stock will be National City Bank, N.A.

*Listing.* Reorganized Oglebay intends to apply to list the New Preferred Stock on The Nasdaq National Market as soon as practicable after the Effective Date when Reorganized Oglebay meets the listing requirements. It is unlikely, however, that such securities will qualify for listing at the time they are issued, and there can be no assurance that the New Preferred Stock will ever be listed on The Nasdaq National Market. If Reorganized Oglebay is not able to list such securities on The Nasdaq National Market, it intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Preferred Stock on the OTC Bulletin Board. Again, however, no assurance can be made that such securities will be quoted on the OTC Bulletin Board or that an active trading market will exist.

**Future Issuances of Stock**

In addition to the New Common Stock and the New Preferred Stock to be issued on the Effective Date and the New Common Stock to be issued (a) upon exercise of the New Warrants, (b) upon conversion of the New Preferred Stock and (c) pursuant to the Management Stock Plan, Reorganized Oglebay will be authorized to issue additional shares of capital stock from time to time following the Effective Date to the extent permitted under the Amended and Restated Articles, the Amended and Restated Code of Regulations and applicable law.

**New Term Loan**

On the Effective Date, the Debtors may enter into the New Term Loan. The New Term Loan would be for an aggregate original principal amount not to exceed $5 million. Based upon current projections, the Debtors do not believe that the New Term Loan is necessary to implement the Plan. The Debtors, however, are currently reviewing the necessity, if any, for such a loan to maintain liquidity through peak borrowing seasons in their operations. See "Treatment of Certain Claims Under the Plan— Treatment of Old Senior Secured Notes."

**Confirmation Facility**

As of the Effective Date, the Debtors, the Confirmation Facility Agent and certain lenders will enter into the Confirmation Facility. The Debtors anticipate that the Confirmation Facility will consist of

the New Revolver, the New Term Loan A and the New Term Loan B. The New Revolver will be in an aggregate principal amount at any one time outstanding not to exceed $55 million (provided that from March 1, 2005 through September 30, 2005 the amount available for borrowings under the New Revolver will increase to $65 million), with a $20 million sublimit for letter of credit accommodations. Availability under the New Revolver will be subject to a borrowing base. The New Term Loan A will be in an outstanding principal amount of up to $105 million. The New Term Loan B will be in an outstanding principal amount of up to $150 million, and will include amounts currently outstanding under the term loan A-1 of the Second DIP Facility and amounts currently outstanding under the term loan B of the Second DIP Facility.

The pricing of the loans under the New Revolver and the New Term Loan A is to be on the same terms as those of the Second DIP Facility, as described herein under "Operations During the Chapter 11 Cases - Postpetition Operations and Liquidity - Second DIP Facility." Amounts outstanding under the New Term Loan B will bear interest at either (a) the greater of 14.25% and the prime rate plus 9.75% for prime rate loans or (b) the greater of 12.25% and LIBOR plus 10.25% for LIBOR rate loans.

The Confirmation Facility will mature five years after the Effective Date and will include restrictive covenants, including requirements of minimum EBITDA, a limitation on capital expenditures and restrictions on the payment of dividends by the Reorganized Debtors, as well as other restrictions customary in facilities of this nature.

This summary of the Confirmation Facility is qualified by reference to the terms set forth on Exhibit I.A.19 to the Plan.

## RISK FACTORS

The implementation of the Plan and the New Warrants, the New Common Stock and the New Preferred Stock to be issued on the Effective Date are subject to a number of material risks, including those enumerated below. Prior to voting on the Plan, each party entitled to vote should carefully consider the risk factors enumerated or referred to below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. If any of the following risks actually occurs, the Debtors and the Reorganized Debtors may not be able to conduct their business as currently planned, and the Debtors' and the Reorganized Debtors' financial condition and operating results could be seriously harmed. In addition to the risks set forth below, risks and uncertainties not presently known to the Debtors and the Reorganized Debtors, or risks that the Debtors currently consider immaterial, may also impair the Debtors' or the Reorganized Debtors' operations or results. For purposes of this section of the Disclosure Statement only, the term "Oglebay Companies" will be used to refer to the Debtors and the Reorganized Debtors.

### Risks Related to the Debtors' Reorganization

#### *Potential Disruption of Operations*

The commencement and pendency of the Chapter 11 Cases could adversely affect the Debtors' relationships with customers and suppliers, as well as the Debtors' ability to retain or attract high quality employees. In such event, weakened operating results may occur that could give rise to variances from the Projections contained in this Disclosure Statement.

#### *Financial Condition of the Debtors; Substantial Leverage*

The Second DIP Facility, which the Debtors consummated on July 15, 2004, allows them to refinance substantial amounts of secured prepetition debt, which will streamline the process of confirming the Plan. However, due to this refinancing, the Debtors currently have significant indebtedness under the Second DIP Facility that is substantial in relation to their current estimates of shareholders' equity. In